# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PEDRO LOZANO, ET AL.              :      CIVIL ACTION
                                  :
              Plaintiffs,         :      NO. 6-cv-56-JMM
                                  :
      v.                          :      (Hon. James M. Munley)
                                  :
CITY OF HAZLETON,                 :
                                  :
              Defendant.          :


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND PROCEDURAL HISTORY ................................... 1

II.  BACKGROUND ........................................................................ 4

A.  Registration Ordinance 2006-13 ................................................. 7

B.  Immigration Ordinance 2006-18 ................................................. 7

C.  Ordinances' Impact To Date ....................................................... 9

III.  ARGUMENT ........................................................................... 11

A.  Standard For Injunctive Relief ................................................... 11

B.  Plaintiffs Are Likely To Succeed On The Merits ....................... 12

1.  The Immigration And Registration Ordinances Violate The Supremacy Clause ................................................................................... 13

2.  The Immigration And Registration Ordinances Violate Due Process By Depriving Plaintiffs Of Fundamental Liberty And Property Interests Without Meaningful Notice Or Opportunity To Challenge Adverse Determination ........................................................................... 26

3.  The Immigration Ordinance Contravenes The Equal Protection Clause And The Fair Housing Act ...................................................... 38

4.  The Registration Ordinance Violates Federal Guarantees Of Privacy .... 46

5.  Hazleton Lacks The Municipal Power To Regulate Employment And Landlord Tenant Issues ........................................................... 50

C.  Plaintiffs Will Suffer Irreparable Harm by the Enforcement of the Immigration and Registration Ordinances ................................. 58

i

D.    The Harm to Plaintiffs Greatly Outweighs Any Alleged Harm to Hazleton ................................................................................... 60

E.    Granting the Preliminary Injunction is In the Public Interest .................... 62

IV.   CONCLUSION ............................................................................. 62

# TABLE OF AUTHORITIES

## CASES

*A. A. v. New Jersey*,
   341 F.3d 206 (3d Cir. 2003)...........................................................................48

*Adarand Constructors, Inc. v. Pea*,
   515 U.S. 200, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)............................40

*Allegheny Energy, Inc. v. D.Q.E., Inc.*,
   171 F.3d 153 (3d. Cir. 1999)..........................................................................12

*Alvin v. Suzuki*,
   227 F.3d 107 (3d Cir. 2000)............................................................................27

*American Insurance Associate v. Garamendi*,
   539 U.S. 396 (2003) ...............................................................................14, 26

*Bartnicki v. Vopper*,
   200 F.3d 109 (3d Cir. 1999) aff'd 532 U.S. 514 (2001)...............................49

*Board of Regents v. Roth*,
   408 U.S. 564 (1972) ......................................................................27, 28, 30

*Bloomsburg Landlords, Associates, Inc. v. Town Of Bloomsburg*,
   912 F. Supp. 790 (E.D. Pa 1995) ..................................................................55

*Bradley v. United States*,
   299 F.3d 197 (3d Cir.2002).............................................................................42

*Brown v. Board of Education*,
   347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954).......................................42

*Brown v. Texas*,
   443 U.S. 47 ( 1979) ........................................................................................47

*Carey v. Piphus*,
   435 U.S. 247 (1978) .......................................................................................27

*Castro-O'Ryan v. INS*,
    847 F.2d 1307 (9th Cir. 1988)........................................................ 17

*Chicago v. Morales*,
    527 U.S. 41 (1999) ...................................................................... 47

*Christopher v. Nestlerode*,
    373 F. Supp. 2d 503 (M.D.Pa.,2005) ....................................... 42, 44

*Chy Lung v. Freeman*,
    92 U.S. 275 (1876) ........................................................... 13, 15, 16

*City of Cleburne v. Cleburne Living Center*, 473, U.S. 432, 440 (1985) ......... 38, 41

*Clark v. Martinez*,
    543 U.S. 371 (2005) .................................................................... 21

*Cleveland Board of Education v. Loudermill*,
    470 U.S. 532 (1985) ............................................................... 27, 29

*College Savings Bank v. Florida Prepaid Postsecondary Education Exp.*
    *Board*, 131 F.3d 353 (3d Cir. 1997),
    *aff'd*, 527 U.S. 666, 675 (1999)................................................... 30

*Community Services, Inc. v. Wind Gap Municipal Authority*,
    421 F.3d 170 (3d Cir. 2005)........................................................ 46

*Conn v. Gabbert*,
    526 U.S. 286 (1999) .................................................................... 29

*Connecticut v. Doehr*,
    501 U.S. 1 (1991) ....................................................................... 33

*Council of Alternative Political Parties v. Hooks*,
    121 F.3d 867 (3rd. Cir. 1997) ..................................................... 62

*Council of Middletown Township v. Benham*,
    523 A.2d 311 (Pa. 1986) ............................................................. 55

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000) ..................................................................... 26

*De Canas v. Bica*,
424 U.S. 351 (1976) ....................................................... 13, 15, 18

*Drax v. Reno*,
338 F.3d 98 (2d Cir. 2003) ........................................................ 17

*E.B. v. Verniero*,
119 F.3d 1077 (3d Cir. 1997),
*cert. denied*, 522 U.S. 1109 (1998), ..................................... 28, 29

*Eastampton Center, L.L.C. v. Township of Eastampton*,
155 F. Supp. 2d 102 (D.N.J. 2001) ........................................ 45

*Farm and Labor Organizing Committee v. Ohio State Patrol*,
308 F.3d 523 (6th Cir 2002) ..................................................... 43

*Fitzgerald v. Mountain Laurel Racing, Inc.*,
607 F.2d 589 (3rd Cir. 1979) .................................................. 59

*Fraternal Order of Police v. City of Philadelphia*,
812 F.2d 105 (3d Cir. 1987) ............................................... 48, 49

*Fuentes v. Shevin*,
407 U.S. 67 (1972) .................................................................... 36

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000) ................................................................. 19

*Genkinger v. City of New Castle*,
84 A.2d 303 (Pa. 1951) ............................................................ 52

*Gomez v. Turner*,
217 U.S. App. D.C. 281, 672 F.2d 134 (D.C. Cir. 1982) ........... 47

*Graham v. Richardson*,
403 U.S. 365 (1971) ........................................................... 13, 14

*Greene v. Lindsey*,
    456 U.S. 444 (1982) .................................................................. 33

*Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.*,
    845 F. Supp. 295 (E.D. Pa. 1994) ............................................. 58

*Grutter v. Bollinger*,
    539 U.S. 306, 123 S. Ct. 2325 (2005) ........................................ 43

*Hartman v. City of Allentown*,
    880 A.2d 737 (Pa. Commw. Ct. 2005) ....................................... 55

*Hartman v. City of Allentown*,
    No. 2003-C-1846 (Lehigh County, June 14, 2004) ..................... 54

*Henderson v. Mayor of the City of New York*,
    92 U.S. 259 (1876) .................................................................... 13

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................ 13, 14, 24, 62

*Huntington Branch, NAACP v. Town of Huntington*,
    844 F.2d 926 (2d Cir. 1988), *aff'd*, 488 U.S. 15 (1988) .............. 45

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989) ...................................................... 12

*Jago v. Van Curen*,
    454 U.S. 14 ............................................................................... 30

*James Daniel Good Real Property*,
    510 U.S. 43 (1993) ............................................................. 35, 37

*Johnson v. California*,
    543 U.S. 499 (2005) .......................................................... 40, 41

*Kentucky Department of Corrections v. Thompson*,
    490 U.S. 454 (1989) .................................................................. 27

*Kline v. City of Harrisburg*,
  68 A.2d 182 (Pa. 1949) ................................................................. 52

*League of United Latin American Citizens v. Wilson*,
  908 F. Supp. 755 (C.D. Cal. 1995) ......................................... 16, 23

*Lenair v. Campbell*,
  31 Pa. D. & C. 3d 237 (Phila. County 1984) .............................. 54

*Lomack v. City of Newark*,
  463 F.3d 303 (3d Cir. 2006) ......................................................... 40

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................ 28, 29, 35, 37

*Mayers v. Ridley*,
  465 F.2d 630 (D.C. Cir. 1972) ..................................................... 45

*McCartney v. Meadow View Manor, Inc.*,
  508 A.2d 1254 (Pa. Super. 1986) ................................................. 53

*Montero-Camargo*,
  208 F.3d 1122 (9th Cir. 2000) ..................................................... 43

*Morales v. TWA*,
  504 U.S. 374 (1992) ........................................................ 58, 59, 60

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) .............................................................. 35, 37

*Nixon v. Commonwealth*,
  839 A.2d 277 (Pa. 2003) .............................................................. 29

*Northeastern Florida Chapter of the Associated General Contractors of
  America v. City of Jacksonville, Florida*,
  508 U.S. 656 (1993) ..................................................................... 42

*Opticians Association of America v. Independent Opticians of America*,
  920 F.2d 187 (3d. Cir. 1990) ....................................................... 12

*PG Publishing Co. v. County of Washington*,
162 Pa. Commw. 196 (Pa. Commw. Ct. 1994) ........................................... 50

*Parker v. Hough*,
215 A.2d 667 (Pa. 1966) ............................................................................. 33

*Paul P. by Laura L. v. Verniero*,
170 F.3d 396 (3d Cir. 1999) ........................................................................ 48

*Paul P. v. Farmer*,
227 F.3d 98 (3d Cir. 2000) .......................................................................... 48

*Piecknick v. Commonwealth of Pennsylvania*,
36 F.3d 1250 (3d Cir. 1994) ................................................................. 27, 29

*Plyler v. Doe,*
457 U.S. 202 (1982) .............................................................................. 16, 23

*Regents of University of Michigan v. Ewing*,
474 U.S. 214 (1985) .................................................................................... 32

*Resident Advisory Board v. Rizzo*,
564 F.2d 126 (3d Cir. 1977) ........................................................................ 44

*Rogers v. Larson*,
563 F.2d 617 (3d Cir. 1977) ........................................................................ 24

*SK&F Co. v. Premo Pharmaceutical Laboratories, Inc.*,
625 F.2d 1055 (3d Cir. 1980) ...................................................................... 12

*Shaw v. Hunt*,
517 U.S. 899, 116 S. Ct. 1894 (1996) ......................................................... 43

*Small v. United States*,
333 F.2d 702 (3d Cir. 1964) ................................................................... 30, 31

*Smaller Manufacturers Council v. Council of City of Pittsburgh*,
485 A.2d 73 (Pa. Commw. Ct. 1984) ........................................................... 52

*Sniadach v. Family Finance Corp. of Bay View*,
    395 U.S. 337 (1969) ..................................................................... 36

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002) ...................................................................... 19

*Sterling v. Borough of Minersville*,
    232 F.3d 190 (3d Cir. 2000) .................................................. 48, 49

*Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*,
    619 F.2d 231 (3d Cir.1980), *cert. denied*, 449 U.S. 1096 (1981) ................. 60

*Takahashi v. Fish & Game Commission*,
    334 U.S. 410 (1948) ..................................................................... 13

*Toll v. Moreno*,
    458 U.S. 1 (1982) ............................................................. 13, 14, 18

*Trafficante v. Metropolitan Life Insurance Co.*,
    409 U.S. 205 (1972) ..................................................................... 45

*Tribune-Review Publ. Co. v. Allegheny County Housing Authority*,
    662 A.2d 677 (Pa. Commw. Ct. 1995) ......................................... 50

*Tribune-Review Publ. Co. v. Bodack*,
    875 A.2d 402 (Pa. Commw. Ct. 2005) ......................................... 50

*Truax v. Raich*,
    239 U.S. 33 (1915) ............................................................. 13, 29

*United States v. Cannistraro*,
    800 F. Supp. 30 (N.J.1992) .................................................. 38, 43

*United States Department of Defense v. Federal Labor Relations Authority*,
    510 U.S. 487 (1994) ..................................................................... 48

*United States v. Commonwealth of Pennsylvania*,
    533 F.2d 107 (3d. Cir. 1976) ....................................................... 12

*United States v. Gilbert*,
   813 F.2d 1523 (9th Cir. 1987)........................................................................ 45

*United States v. Hunter*,
   459 F.2d 205 (4th Cir. 1972)......................................................................... 45

*United States v. Kim*,
   193 F.3d 567 (2d Cir. 1999)................................................................... 19, 25

*United States v. Locke*,
   529 U.S. 89 (2000) ....................................................................................... 26

*United States v. Lopez*,
   521 F.2d 437 (2d Cir. 1975)......................................................................... 19

*United States v. Maali*,
   No. 6:02-CR-171ORL28KRS,
   2005 WL. 2204982 (M.D. Fla. Sept. 8, 2005)............................................. 25

*United States v. Williams*,
   124 F.3d 411 (3d Cir. 1997)......................................................................... 38

*United Tavern Owners of Philadelphia v. Philadelphia Sch. District*,
   272 A.2d 868 (Pa. Commw. Ct. 1971) ........................................................ 55

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) ..................................................................................... 43

*Waters v. Barry*,
   711 F. Supp. 1125 (D.D.C. 1989) ................................................................ 47

*Western Pennsylvania Restaurant Association v. Pittsburgh*,
   77 A.2d 616 (Pa. 1951) ................................................................................ 55

*Williams v. Guzzardi*,
   875 F.2d 46 (3rd Cir. 1989) ......................................................................... 55

*Wisconsin Department of Industrial v. Gould*,
   475 U.S. 282 (1986) ..................................................................................... 26

*Yeager v. Hackensack Water Co.*,
    615 F. Supp. 1087 (D.N.J. 1985) ................................................................ 49

*Zadvydas v. Davis*,
    533 U.S. 678 (U.S. 2001)...................................................................... 14, 21

*Zinermon v. Burch*,
    494 U.S. 113 (1990) ................................................................................ 27

## STATUTES

8 C.F.R. § 212.5(f)............................................................................................ 22

8 C.F.R. § 274a.12(a)(11-13), ........................................................................ 21

8 C.F.R. § 274a.1(c)-(f) ................................................................................... 21

8 C.F.R. 274a9(b) ............................................................................................ 44

8 U.S.C. § 1101(a)(20) ..................................................................................... 23

8 U.S.C. § 1154 ................................................................................................ 17

8 U.S.C. § 1229a .............................................................................................. 18

8 U.S.C. § 1242a .............................................................................................. 21

8 U.S.C. § 1254a .............................................................................................. 22

8 U.S.C. § 1255(i).............................................................................................. 21

8 U.S.C. § 1324a ........................................................................................ 20, 25

8 U.S.C. §§ 1324a-1324b ................................................................................ 18

8 U.S.C. §§ 1324a-b ........................................................................................ 18

8 U.S.C. § 1324a(h)(2) .................................................................................... 19

8 U.S.C. § 1324a note...................................................................................... 20

71 Fed. Reg. 16, 333 (Mar. 31, 2006) ................................................................ 17

42 U.S.C. § 3601, *et seq* .................................................................................... 44

42 U.S.C. § 3604 ................................................................................................ 44

42 U.S.C. § 3604(a) ................................................................................ 44, 45, 46

42 U.S.C. § 3604(c) .................................................................................... 44, 45

42 U.S.C.A. § 3604 ............................................................................................ 45

53 Pa. C.S.A. § 2961 ................................................................................ 51, 52, 54

68 P.S. §§ 250.101, *et seq* ..................................................................... 54, 55, 56, 57

H. R. 4437, 109th Cong. (2005) ........................................................... 5, 6, 7, 8, 9,
                                                     25

H.R. Rep. 99-682(I), at 53-56 ............................................................. 18, 19, 21, 24

Illegal Immigrant Reform and Immigrant Responsibility Act §§ 401, 402(a),
    Pub. L. No. 104-28 ........................................................................................ 20

Pa. Const. art. 9, § 2 .......................................................................................... 51

S. 1033, 109th Cong., § 402 ................................................................................ 21

S. 1438, 109th Cong., § 321 ................................................................................ 21

S. 2611, 109th Cong. § 403 (2006) ........................................................................ 4

8 U.S.C. 1101 et seq .......................................................................................... 17

U. S. Const. Amend. XIV .................................................................................... 27

## MISCELLANEOUS

Erwin Chemerinsky, *Constitutional Law: Principles
    and Policies*, 536 (2002) .............................................................................. 27

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PEDRO LOZANO, ET AL. | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | NO. 6-cv-56-JMM |
| | : | |
| v. | : | (Hon. James M. Munley) |
| | : | |
| CITY OF HAZLETON, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY RELIEF**

**I.      INTRODUCTION AND PROCEDURAL HISTORY**

Plaintiffs move this Court pursuant to Rule 65(a) and (b) for a temporary restraining order and for a preliminary injunction to prohibit defendant City of Hazleton ("Hazleton" or "City") from enforcing the Illegal Immigration Relief Act Ordinance 2006-18 ("the Immigration Ordinance") and Ordinance 2006-13 (the "Registration Ordinance"), until their lawfulness is finally decided by the Court.

This past summer, Hazleton unveiled a municipal ordinance designed to expel all so-called "illegal aliens" from the City by preventing them from working, living or obtaining goods and services.  Hazleton's Mayor, Lou Barletta, described his motives for proposing the Ordinance as follows:  "Illegal immigrants are destroying the city.  I don't want them here, period."  Robert Tanner, Illegal Immigration Now a Local Issue, TULSA WORLD, July 20, 2006, at A12.  Thus, on July 13, 2006, the City of Hazleton ("Hazleton") passed the "Illegal Immigration Relief Act Ordinance" ("Prior Ordinance") proposed by Mayor Lou Barletta and announced that such Ordinance would take effect in sixty days.  The Prior Ordinance would have punished those who rent, employ or conduct any

1

business transactions with "illegal aliens," and made English the city's official language.

As a result, immigrant families—primarily Latino—began leaving the city.[1] Latino-owned restaurants and shops lost business and many had to close down. Anti-immigration and anti-Latino sentiment seethed in Hazleton.  Because the Prior Ordinance violated the Constitutional and civil rights of all foreign-looking and sounding citizens of Hazleton - irrespective of their immigration status - Plaintiffs filed a Complaint with this Court on August 15, 2006 ("Original Complaint").  The Original Complaint challenged the Prior Ordinance on several constitutional, civil rights and other grounds.  Subsequently, on September 2, 2006, this Court approved a Stipulation whereby Hazleton agreed not to enforce the Prior Ordinance and Plaintiffs agreed not to seek an injunction against that Ordinance.

In its continued quest to drive "illegal aliens" from the city, Hazleton began anew to draft and ultimately enacted ordinances to accomplish this purpose.  On August 15, 2006, Hazleton enacted Ordinance 2006-13, captioned in part "Establishing a Registration Program for Residential Rental Properties" ("Registration Ordinance").  On September 21, 2006, Hazleton enacted Ordinance 2006-18, also entitled the "Illegal Immigration Relief Act Ordinance," ("Immigration Ordinance") and Ordinance 2006-19, entitled "Official English Ordinance" ("English Only Ordinance").  The Registration Ordinance takes effect November 1, 2006, and Hazleton has announced plans to begin implementation

---

[1]     Indeed, several of the plaintiffs named in the original complaint have left Hazleton and have accordingly chosen to withdraw from this action.

and enforcement of the Immigration and English Only Ordinances on or about that same date.

The Immigration and Registration Ordinances remain unconstitutional and violate other federal and Pennsylvania laws.  Among the many legal deficiencies of both Ordinances are violations of 1) the Supremacy Clause, because the Ordinances unlawfully infringe on the federal government's authority over immigration and are inconsistent and in conflict with federal immigration law; 2) the Fourteenth Amendment Due Process Clause, by failing to afford any notice or opportunity to contest a determination that a person is an "illegal alien" or "unauthorized worker" prior to the time the person is forced from their job or home; 3) the Fourteenth Amendment Equal Protection Clause and the Fair Housing Act, by discriminating invidiously based on race, ethnicity, and national origin; 4) U.S. and Pennsylvania constitutional privacy protections, by demanding personal and confidential information about tenants renting space in the City; and 5) Pennsylvania law restricting the powers permitted to home rule municipalities, by legislating in conflict with state-wide laws governing employment and the landlord/tenant relationship.

Plaintiffs have already been harmed by the Prior Ordinance and the enactment of the Immigration and Registration Ordinances.  They will suffer additional harm if the City is allowed to enforce the Ordinances.  Hazleton has already driven out foreign-looking or -sounding individuals, who fear being targeted as an "illegal alien" or "unauthorized worker."  Others who remain already have experienced a sense of wariness, if not outright suspicion and hostility, in Hazleton.  If the Ordinances are enforced, Plaintiffs will be subjected

to novel obligations in violation of federal and state law; eviction and termination of employment without due process, invidious discrimination, and violation of their constitutionally-protected privacy rights.   In view of the irreparable harm they have suffered and will continue to suffer as a result of these violations, Plaintiffs now move for a temporary restraining order and preliminary injunction to prevent the enforcement of the Immigration and Registration Ordinances.

## II.   **BACKGROUND**

On July 13, 2006, Hazleton passed the Prior Ordinance and the Registration Ordinance[2] had its first reading before Hazleton City Council.  On August 15, 2006, the Registration Ordinance was enacted by Hazleton.  A copy of the Registration Ordinance is attached as Exhibit "A."  After three readings, on September 21, 2006, the Immigration Ordinance was enacted by Hazleton.  A copy of the Immigration Ordinance is attached as Exhibit "B."  On the same day, Ordinance 2006-19, entitled the "Official English Ordinance" ("English Only Ordinance") was enacted by Hazleton.

The new Ordinances were enacted amid a passionate national debate over federal immigration policy at the very time that the United States Congress was considering competing bills to amend federal immigration law.  On May 25, 2006, the U.S. Senate voted in favor of a bill that would include a path to legalization for millions of undocumented aliens.  See S. 2611, 109th Cong. § 403 (2006).  The House and Senate each approved respective bills that would increase border and

---

[2]      The full name of the Registration Ordinance is "Establishing a Registration Program for Residential Rental Properties; Requiring All Owners of Residential Rental Properties to Designate an Agent for Service of Process; and Prescribing Duties of Owners, Agents and Occupants; Directing the Designation of Agent; Establishing Fees for the Costs Associated with the Registration of Rental Property; and Prescribing Penalties for Violation."

interior enforcement of immigration laws.  See generally H. R. 4437, 109th Cong. (2005); S. 2611, 109th Cong. (2006).

Hazleton's Mayor described his motives for proposing the Prior Ordinance as follows:  "[I]llegal immigrants are destroying the city. I don't want them here, period."  Robert Tanner, Illegal Immigration Now a Local Issue, TULSA WORLD, July 20, 2006, at A12.  The Mayor has also stated that his "small-town budget is buckling under the strain of illegal immigrants"; and "some people come to this country and refuse to learn English, creating a language barrier for city employees."  Id.  These sentiments are also captured in the new Immigration Ordinance, which alleges:

> That unlawful employment, the harboring of illegal
> aliens in dwelling units in the City of Hazleton, and
> crime committed by illegal aliens harm the health, safety
> and welfare of authorized US workers and legal residents
> in the City of Hazleton.  Illegal immigration leads to
> higher crime rates, subjects our hospitals to fiscal
> hardship and legal residents to substandard quality of
> care, contributes to other burdens on public services,
> increasing their cost and diminishing their availability to
> legal residents, and diminishes our overall quality of life.

See The Immigration Ordinance, §2.C.  However, the Mayor has admitted publicly on several occasions that the City does not have any statistics or other evidence to support his claim that "illegal aliens" have contributed significantly to an increase in the crime rate or other problems in Hazleton, nor does he know if any or how many undocumented individuals live or work in Hazleton.  Dan Geringer, Bloomberg:  U.S. Can't Stem Immigration Tide, PHILADELPHIA DAILY NEWS, July 6, 2006.

In fact, statistics compiled by the Pennsylvania State Police Uniform Crime Reporting System show a **reduction** in the number of total arrests in Hazleton over the last five years – from 1,458 in 2000 to 1,263 in 2005. *Ellen Barry, City Vents Anger at Illegal Immigrants*, L.A. TIMES, July 14, 2006, at 1. That decline is due in large part to a reduction in the number of more serious crimes – rapes, robberies, homicides and assaults – since 2000. *Id*. Hazleton's own website proudly has boasted that recent immigration from Mexico, the Dominican Republic, and other nations in Central and South America to Hazleton has invigorated the local economy. *See* Kent Jackson, *City Turns 150 This Week*, STANDARD-SPEAKER, April 16, 2006 in www.hazletoncity.org. A recent study confirmed how Latino immigrants had revitalized the city. *See* Joint Center for Ethnic Studies, *"Ethnic Changes in Northeastern Pennsylvania—With Special Emphasis on Recent History within the City of Hazleton,"* dated July 2006. Over the past decade, Latinos— U.S. citizens as well as immigrants—began moving to Hazleton in substantial numbers and now constitute approximately 30% of the city's residents. Mocarsky, Steve, *Hazleton's Illegal-Immigration Law a Trendsetter*, in TIMES LEADER, July 31, 2006. Latino business owners and Latino customer-based enterprises filled the once abandoned main street with new businesses and restaurants and local real estate values tripled. Vitez, Michael, *Small Town, Big Conflict*, in THE PHILADELPHIA INQUIRER, June 23, 2006. As a result of the campaign to support the passage of the Prior and New Ordinances, however, Hazleton, once known for its tranquil nature, has become highly polarized along racial and ethnic lines.

### A.   Registration Ordinance 2006-13

The Registration Ordinance requires "occupants" of any "premises" to register their personal information, including "proof of legal citizenship and/or residency" with Hazleton.  In addition, "occupants" are required to pay an "occupancy permit fee" of $10.00 for each occupant.  Thereafter, all "person[s] age 18 or older who resides at a "premises" must obtain an occupancy permit prior to occupying such premises.  *See* Registration Ordinance, §7.  Senior citizens, while exempt from the fee, must also register their personal data with Hazleton prior to "occupying" any premises.  The City published a Notice to the "Residents of the City of Hazleton" regarding the requirement of every landlord and tenant to obtain a permit.  A copy of the Notice is attached Exhibit "C."  Registration Forms were also issued by the City for purposes of registering all "occupants" and landlords.  A copy of the Registration Form is attached as Exhibit "D."

### B.   Immigration Ordinance 2006-18

Under the Immigration Ordinance, Hazleton officials are directed to investigate allegations of harboring "illegal aliens" or employing "unauthorized workers" reported by "any City official, business entity, or City resident."  *See* Immigration Ordinance, §§ 4.B and 5.B.  Property owners or homeowners who provide, or continue to provide, shelter to "illegal aliens" are deemed to be "harboring illegal aliens" and are subjected to penalties including revocations of rental licenses, prohibitions against collecting rent from any tenant, and - for subsequent violations - monetary fines.  *Id* at § 5.  According to the definitions, an "illegal alien" is an "alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq."  *Id* at §3.  The Immigration Ordinance goes on to state that "[t]he City shall not conclude

that a person is an illegal alien unless and until an authorized representative of the City has verified with the federal government, pursuant to United States Code Title 8, subsection 1373(c), that the person is an alien who is not lawfully present in the United States." *Id.*

Employers, whether individual or corporate, for-profit or not for profit, are also subject to penalties for hiring or continuing to employ "unauthorized workers" – business licenses can be suspended and business operations can be disrupted. *Id* at §4.B. "Unlawful worker" is defined as "a person who does not have the legal right or authorization to work due to an impediment in any provision of federal, state or local law, including but not limited to a minor disqualified by nonage, or an unauthorized alien as defined by United States Code Title 8, subsection 1324a(h)(3)." *Id* at §3. The Ordinance prohibits recruiting, hiring, employing, and "permit[ting], dispatch[ing], or instruct[ing] any person who is an unlawful worker to perform work in whole or in part within the City." "Work," in turn, is defined as "any job, task, employment, labor, personal services, or other activity for which compensation is provided." *Id*. at § 4A, 3F.

Violations of the Ordinance's employment provision will be punished by suspension of business permits. § 4B(4), (7). Certain violators will also be required to participate in the Basic Pilot Program, a voluntary federal employment-verification scheme. § 4B(6)(b). (Conversely, employers may avoid some penalties if they participate in the Basic Pilot Program. §4B(5).) The Immigration Ordinance also provides that employers who discharge any lawful employee is liable for triple damages and attorneys fees, regardless of whether the termination was for cause, "if, on the date of the discharge, the business entity was not

participating in the Basic Pilot Program and was employing an unlawful worker."
Id at § 4E.  The Immigration Ordinance also provides that employers who
wrongfully discharge a lawful employee can face triple damages.  *Id* at §4E(2).

### C. <u>Ordinances' Impact To Date</u>

Although Hazleton has indicated that it does not intend to enforce the New
Ordinances until November 1, 2006, their impact  - economically, emotionally and
socially - on Plaintiffs and the community at large has already been tremendous.
"Illegal aliens" have been caricatured as murderers and criminals, waiting to prey
on Hazleton residents.  Mocarsky, Steve, *Citizen reaction to suit as varied as
population*, in TIMES LEADER, August 16, 2006.  Latinos - no matter their
immigration status - are experiencing hostility and suspicion from other, primarily
white, residents who suspect them to be "illegal aliens."  In essence, Hazleton has
concocted Ordinances that authorize the city of Hazleton and its residents to
conduct witch hunts—anyone who looks or sounds "foreign" or associated with a
"foreign" name, heritage or person must be questioned, people who are foreigners
cannot be trusted and all "illegal aliens" are criminals.  A recent quote by a local
resident sums up the climate of fear and racism in Hazleton:

> Waiting downtown for a bus, Lena Zizzo, of McAdoo,
> said she supports the ordinance because illegal
> immigrants should "stay where they belong."
> "Why should they come and take everything away? You
> don't see me going to Puerto Rico or Guam. Deport the
> whole lot of them.  Chances are, they're no good," Zizzo
> said.

Steve Mocarsky, *Public Reaction To Suit As Varied As City's Population*, TIMES
LEADER, August 20, 2006.  The article correctly pointed out that individuals from
Puerto Rico and Guam, which are both U.S. territories, are in fact U.S. citizens.

Many Latinos and "legal" immigrants have left the area fearing that they will be branded by the Ordinances' discriminatory impact, as well as their harsh and drastic sanctions.  Plaintiffs, including Jane Doe 1, who is a victim of domestic violence, John Does 1-4, and Jane Doe 2  will be forced to leave Hazleton with their families if the Ordinance is not enjoined.  In the Plaintiffs' households, moreover, there is at least one family member who **is** a U.S. Citizen.

With the exodus of Latino families from Hazleton, Hispanic businesses are losing clientele or are closing down.  *See* Declarations of Humberto Hernandez and HHBA.  Plaintiff employers and landlords are also fearful of the burdens put on them by the Immigration and Registration Ordinance.  These Ordinances require that landlords such as Plaintiffs Lozano and Hernandez and business owners such as Plaintiffs Lechuga, and members of HHBA, determine the immigration status of the individuals with whom they interact.  To avoid suspicion, the risk of complaints and threat of penalties under the Ordinances, employers and property owners will simply avoid renting to or hiring foreign-looking or sounding individuals.

Hazleton is fully aware that its enactment of immigration-related ordinance has detrimentally impacted the Latino population in the city.  *See* St. Louis Post-Dispatch, dated 8/19/06 (City Council President Yanuzzi stating that "[e]very illegal is going to have to suffer" and noting that "Hispanic store owners are saying their business has dropped…A great portion of them (illegal immigrants) are out of here").

## III.   ARGUMENT

Plaintiffs are entitled to a temporary restraining order and preliminary injunction against the enforcement of the Immigration and Registration Ordinances.  Plaintiffs are likely to prevail on their claims that these Ordinances violate the Supremacy Clause, Due Process Clause, Equal Protection Clause, the Fair Housing Act, the Right to Privacy, and Pennsylvania-law restrictions on municipal power, as well as landlord/tenant laws.  *See infra* Part B.  Employers, including Plaintiff Hernandez and members of Plaintiff organization HHBA, will be subjected to obligations not found under federal law; individuals, including Plaintiff John Doe 1, face eviction and termination of employment without due process, invidious discrimination, and being forced to provide confidential information to the City of Hazleton in violation of their constitutionally-protected privacy rights.  Landlords and employers, including Plaintiff Hernandez and HHBA members, will be subjected to a regulatory scheme that violates and conflicts with state law.  See infra Part C.  The harm to Plaintiffs greatly outweighs any alleged harm to Hazleton, especially since Hazleton has no empirical evidence to show that the Immigration and Registration Ordinances will improve the quality of life in Hazleton or remedy the ills identified as the basis for the Ordinances' adoption.  *See infra* Part D.  Finally, the public interest is in favor of granting the injunction where people are fleeing Hazleton and ethnic minorities — mainly Latinos — are living in justifiable fear of unlawful discrimination, hostility and rejection from mainstream society.  *See infra* Part E.

### A.   Standard For Injunctive Relief

Four factors govern the Court's decision whether to issue a preliminary injunction:  1) whether the movant has shown a reasonable probability of success

on the merits; 2) whether the movant will be irreparably injured by the denial of the relief; 3) whether granting the preliminary relief will result in greater harm to the non-moving party (i.e., a balancing of the hardships); and 4) whether granting the preliminary relief will be in the public interest. *Allegheny Energy, Inc. v. D.Q.E., Inc.,* 171 F.3d 153 158 (3d. Cir. 1999) (*citations omitted*). *See also United States v. Commonwealth of Pennsylvania*, 533 F.2d 107, 110 (3d. Cir. 1976). A district court must consider all four of the elements. *Opticians Association of America v. Independent Opticians of America*, 920 F.2d 187, 191-192 (3d. Cir. 1990). In this case, an analysis of these factors demonstrates Plaintiffs' compelling right to relief.

### B.   Plaintiffs Are Likely To Succeed On The Merits

Before an injunction will issue, the movant must demonstrate a reasonable probability of eventual success in the litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989). To demonstrate a reasonable likelihood of prevailing, a movant need not establish an absolute certainty of success, only a reasonable probability. *SK&F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1066-67 (3d Cir. 1980). Here, it is highly likely that the Immigration and Registration Ordinances will be deemed unlawful by the Court in their entirety as violations of the U.S. Constitution and state landlord/tenant laws.[3]

---

[3]     Plaintiff are likely to prevail against Hazleton on each of the counts in the Complaint. However, for the sake of judicial economy, only the Ordinances' violations of the supremacy Clause, Due Process, Equal Protection, Fair Housing, Privacy, as well as violations of Pennsylvania's municipal power and landlord/tenant laws are discussed in the motion and this memorandum of law.

### 1.    The Immigration And Registration Ordinances Violate The Supremacy Clause

The Immigration and Registration Ordinances are local laws concerning immigration and foreign nationals.  Such local laws are invalid under the Supremacy Clause of the United States Constitution if they are (1) *constitutionally* preempted because they are an attempt to regulate immigration, which is "unquestionably exclusively a federal power;" (2) *field* preempted because they are an attempt to legislate in a field occupied by the federal government or (3) *conflict* preempted because they "burden[] or conflict[] in any manner with any federal laws or treaties," or "[stand] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *De Canas v. Bica*, 424 U.S. 351, 354, 362, 363 (1976).

The Supreme Court has struck down numerous state statutes relating to non-citizens on one or more of these Supremacy Clause grounds.  *See, e.g., Toll v. Moreno*, 458 U.S. 1, 10 (1982) (invalidating state denial of student financial aid to certain visa holders); *Graham v. Richardson*, 403 U.S. 365, 377-80 (1971) (invalidating state welfare restriction); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 418-20 (1948) (invalidating state denial of commercial fishing licenses); *Hines v. Davidowitz*, 312 U.S. 52, 62-68 (1941) (invalidating state alien registration scheme); *Truax v. Raich*, 239 U.S. 33, 42 (1915) (invalidating state employer sanctions scheme under Fourteenth Amendment and suggesting Supremacy Clause violation); *Chy Lung v. Freeman*, 92 U.S. 275 (1876) (invalidating state statute that authorized state official to classify certain arriving immigrants as undesirable and indirectly bar their entry); *Henderson v. Mayor of*

13

*the City of New York*, 92 U.S. 259 (1876) (invalidating state bond requirement for arriving immigrants).

Courts are especially sensitive to Supremacy Clause concerns in the immigration area for several reasons. The "preeminent role of the federal Government with respect to the regulation of aliens within our borders," *Toll*, 458 U.S. at 10, is established in the Constitution itself. In addition, laws relating to foreign nationals are inextricably intertwined with international relations and are therefore a particular concern of the federal government. *Hines*, 312 U.S. at 66-67; *see also American Ins. Assoc. v. Garamendi*, 539 U.S. 396, 420 & n.11 (2003) (discussing preemption concerns in foreign relations context); *accord Mexico President Urges U.S. to Act Soon on Migrants*, NEW YORK TIMES, Sept. 6, 2001 (noting that Mexican President pressed issue of treatment of undocumented workers in bilateral meetings with President Bush). There is a special need for nationwide consistency in matters affecting foreign nationals, given the "explicit constitutional requirement of uniformity," *Graham*, 403 U.S. at 382, in immigration matters and the myriad problems that would result for citizens and non-citizens alike if each of the 50 states – or, as in this case, each of the thousands of localities like Hazleton across the 50 states – adopted its own rules for the treatment of aliens. *See Graham*, 403 U.S. at 382; *see also Zadvydas v. Davis*, 533 U.S. 678, 700 (U.S. 2001) (recognizing "the Nation's need 'to speak with one voice' in immigration matters").

The Immigration and Registration Ordinances plainly violate the Supremacy Clause under all three preemption theories – any one of which would be sufficient to invalidate the Ordinances.

### a.    Constitutional Preemption

The Immigration and Registration Ordinances are invalid because they are impermissible attempts to regulate immigration.  The regulation of immigration is constitutionally reserved to the federal government, such that even if Congress had not legislated on the same subject matter the Ordinances would be invalid.

The Ordinances constitute a broad and integrated scheme that combines multiple provisions addressing different discrete areas – tenant registration, harboring, and employment – to identify non-citizens living or working in Hazleton, assess their immigration status in a process so deficient in fairness that it does not even provide the immigrants any notice or opportunity to be heard, and expel those who do not "pass" from the city by making it impossible for them to live or work in Hazleton.  Deciding who may stay and who must depart, and expelling the latter, is the very core of immigration regulation.  *See De Canas*, 424 U.S. at 355 ("determination of who should or should not be admitted to the country" included in regulation of immigration); *Chy Lung*, 92 U.S. at 280 ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States.")  Hazleton cannot arrogate this authority to itself.

In an attempt to disguise its encroachment on federal authority, Hazleton has set forth a procedure in the Immigration Ordinance that makes penalties under that Ordinance contingent on federal verification of an individual's status.  It remains unclear, at best,  how or whether such verification could in fact be provided by the federal government.  *See Escondido rental ban violators may be difficult to document*, NORTH COUNTY TIMES, Oct. 6, 2006, available at http://nctimes.com/articles/2006/10/07/news/inland/ 22_18_5310_6_06.txt (DHS

officials stating that no federal system exists to verify rental eligibility).  In any event, the presence or absence of federal verification does not alter the fact that Hazleton has, independently of the federal government, designed its own system of laws and enforcement that seek to regulate the presence of foreign nationals within the City's borders.  This it cannot do.

Moreover, Hazleton has not included any verification procedure in the Registration Ordinance, which requires City officials to determine whether each tenant in Hazleton has presented "proof of legal citizenship and/or residency." Because "legal … residency" is not defined in any relevant manner in the federal immigration law, this Ordinance requires Hazleton to create its own definition of "legal … residency" and empowers its officials to make the City's own determinations of who is or is not a legal resident for the purposes of 2006-13. These actions encroach on the federal immigration regulation power.  *Plyler*, 457 U.S. at 225 ("The States enjoy no power with respect to the classification of aliens."); *id*. at 236 (Marshall, J., concurring) (any attempt to "determine which aliens are entitled to residence … would involve the State in the administration of the immigration laws"); *League of United Latin American Citizens v. Wilson*, 908 F. Supp. 755, 769-771 (C.D. Cal. 1995) ("LULAC") (invalidating state law provisions classifying aliens as unconstitutional regulation of immigration); *accord Chy Lung*, 92 U.S. at 279-81 (rejecting state statute that allowed state commissioner to classify arriving immigrants).  In addition, city officials lack expertise in complicated immigration matters, will be unable to identify or understand the many varieties of immigration documentation, and will

undoubtedly make mistakes in attempting to enforce the Tenant Registration Ordinance.[4]

### b.    Field preemption

The Ordinances are invalid for the additional reason that the federal government has comprehensively legislated both in the field of immigration and specifically with respect to employer sanctions and harboring of undocumented aliens.  It has left no room for local municipalities like Hazleton to pass its own versions of such laws.

There can be no doubt that the federal immigration law is a comprehensive, and complex, regulatory scheme.   Today's Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and its associated regulations in Title 8 of the Code of Federal Regulations contain a myriad of interrelated provisions establishing, among other things, numerous immigration categories; civil and criminal sanctions for various violations; and extensive procedures for determining status and removability.  *See, e.g.*, 8 U.S.C. § 1154 (procedure for granting immigrant status);

---

[4]      Federal immigration law is infamously complex.  *See Drax v. Reno*, 338 F.3d 98, 99 (2d Cir. 2003) (describing "the labyrinthine character of modern immigration law" as "a maza of hyper- technical statutes and regulations"); *see also, e.g., Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1988).  Adding to the difficulty of determining status is the fact that many types of documents, such as court decisions, letters from federal immigration agencies, and passport inserts, may constitute valid proof of immigration status but may not be so regarded by untrained persons.  And, to make matters still more complex, it cannot be assumed tht  aperson who does not hve identification documents clearly describing her immigration status in the United Sttes in violation of federal law.  For example, many nationals of Honduras who have been granted Temporary Protection Status ("TPS") have been issued Employment Authorization Documents ("EADs") with an expiration date of July 5, 2006.  The federal government has since extended the designation of Honduras for TPS by another year and has published a Federal Register notice indicating that these EADs are to be considered valid through January 5, 2007.  71 Fed. Reg. 16, 333 (Mar. 31, 2006).  Yet a person untrained in immigration law is likely to believe that an apparently expired EAD is an indication of "illegal alien" status.

§§ 1228-1252 (relating to removal proceedings and judicial review of removal decisions); §§ 1255-1259 (relating to adjustment of status); 8 U.S.C. § 1229a (removal proceedings).  Thousands of federal officials in numerous federal agencies enforce the statutes and regulations, confer benefits, make discretionary determinations, undertake adjudication, and otherwise administer the immigration laws.  Since the Registration Ordinance creates independent immigration statuses and an independent system for determining status within that system, as noted in section 1 supra, it is field preempted by the INA's comprehensive alien classification scheme.

In the INA, Congress has also specifically addressed both of the areas covered by the Immigration Ordinance: sanctions for those who employ unauthorized aliens and those who harbor immigration violators.  *See* 8 U.S.C. §§ 1324a-1324b (employer sanctions and antidiscrimination scheme), 1324 (harboring provision).

Congress added a federal employer sanctions scheme to the INA in 1986 when it passed the Immigration Reform and Control Act ("IRCA"), P.L. 99-603, after lengthy and careful consideration of various legislative options.[5]  *See* 8 U.S.C. §§ 1324a-b; H.R. Rep. 99-682(I), at 53-56 (recounting history of

---

[5]     Before 1986, there was no federal employer sanctions scheme and no general prohibition on hiring unauthorized aliens. Indeed, federal law actually invited some state regulation of the employment of aliens. *De Canas*, 424 U.S. at 361.  Therefore, in De Canas—a 1976 case—the Supreme Court permitted a California statute that prohibited the employment of non-citizens who lacked federal work authorization under narrowly defined circumstances.  424 U.S. at 352, 352 n.1, 353 n.2.  The Court subsequently emphasized that it had "rejected the pre-emption claim" in *De Canas* because "Congress *intended* that the States be allowed" to impose some regulation in this area.  458 U.S. at 13 n.18 (emphasis in original).  In doing so, it again recognized Congress's general intent to preempt all state immigration statutes.  In 1986, of course, Congress removed that permission and enacted instead an express bar on state regulation of alien employment.

legislation).  Congress has likewise carefully calibrated and modified the reach and penalties of the federal harboring statute over many years.  *See United States v. Kim*, 193 F.3d 567, 572-74 (2d Cir. 1999) (analyzing 1986 amendments to harboring statute to determine whether harboring could apply to employment); *United States v. Lopez*, 521 F.2d 437, 440-41 (2d Cir. 1975) (describing legislative history in determining reach of earlier statute).  In light of Congress' inclusion of these matters in the INA's comprehensive scheme, the Ordinances are plainly invalid.[6]

**c.**     **Conflict preemption**

Finally, the Ordinances are invalid because they conflict with multiple provisions of federal law and because they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress by

---

[6]     Defendant may claim that field preemption is inapplicable to the Immigration Ordinance's employer sanctions scheme because it penalizes businesses by denying, suspending, or revoking their licenses, and IRCA's express preemption provision states that "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens" is preempted.  8 U.S.C. § 1324a(h)(2).  But the Ordinance is not a "licensing law" within the narrow exception to § 1324a(h)(2). The statute's reference to "licensing" encompasses "lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person who has been found to have violated the sanctions provisions in this legislation" or "licensing or 'fitness to do business laws,' such as state farm labor contractor laws or forestry laws, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens."  H.R. Rep. 99-682(I), 1986 U.S.C.C.A.N. 5649, 5662 (emphasis added).  The Ordinance, of course, does not apply only to individuals who have already been found to violate IRCA's provisions.  Nor is it similar to a farm labor contractor or forestry law. In any event, even if not expressly preempted, the Ordinance is invalid because it stands as an obstacle to federal law and policy, as explained below.  *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) ("Congress' inclusion of an express pre-emption clause does not bar the ordinary working of conflict pre-emption principles" (punctuation and citation omitted)); *see also Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000) (finding conflict preemption even where state action fell outside express preemption clause).

introducing novel penalties and enforcement mechanisms not contemplated in federal law.

### i)        Conflicts with individual provisions of federal law

The Immigration Ordinance conflicts with Congress' designation of the Basic Pilot Program as a voluntary, experimental program to be implemented by the Attorney General (subsequently replaced by the Secretary of Homeland Security).[7]   *See* Illegal Immigrant Reform and Immigrant Responsibility Act §§ 401, 402(a), Pub. L. No. 104-28, Div. C (Sept. 30, 1996), *codified as amended at* 8 U.S.C. § 1324a note.  Congress set forth a limited list of employers required to participate in Basic Pilot -- or a related program -- a list completely different from Hazleton's.  *Id*. § 402(e).[8]   Congress also specifically provided that the Secretary "may not require any person or other entity to participate in a pilot program," *Id*., § 401(a); *see also id*. § 404(h) (providing that government may not "utilize any information, data base, or other records assembled under this subtitle for any other purpose other than as provided for under a pilot program).   In contrast, the Immigration Ordinance mandates that businesses enroll in the federal Basic Pilot system in certain circumstances, §§ 4.B.6.b.; 4.D, and even where it does not require such enrollment, subjects them to the risk of exorbitant penalties if they do

---

[7]     The Basic Pilot program is a recent generation of verification system designed for employers who voluntarily contract with DHS-ICE.

[8]     Section 402(e) requires certain Federal entities to participate in a pilot verification program and provides that a federal administrative law judge may require an employer to participate in a pilot program as part of a cease and desist order issued under 8 U.S.C. § 1324a.

not enroll, §§ 4.B.5; 4.E. The Immigration Ordinance's attempt to force employers to enroll in Basic Pilot is incompatible with federal law.[9]

Similarly, the Immigration Ordinance requires businesses, individuals, non-profits, and other entities to ensure that any person they "recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct … to perform work in whole or part within the City" is an authorized worker.  § 4.A.  In contrast, federal law does *not* require that employers verify the immigration status of certain categories of workers, such as independent contractors and casual domestic workers, and does not apply to entities, such as unions, that refer individuals for employment but without a fee or profit motive.  *See* 8 U.S.C. § 1242a; 8 C.F.R. § 274a.1(c)-(f); *see also* H.R. Rep. 99-682(I), at 57 (stating that "[i]t is not the intent of this Committee that sanctions would apply in the case of casual hires" and noting exception for unions and similar entities).

The "harboring" provision of the Immigration Ordinance is also directly at odds with the federal immigration system.  This provision states that it is unlawful to knowingly "let, lease, or rent a dwelling unit to" "an alien who is not lawfully present in the United States."[10]  However, numerous categories of persons who

---

[9]     Notably, one aspect of the current debate regarding immigration reform involves whether and to what extent mandatory electronic employment verification will become a feature of the federal law. *See, e.g.*, S. 1033, 109th Cong., § 402 (proposing electronic verification system); S. 1438, 109th Cong., § 321 (alternative verification proposal). Hazleton's effort to force employers to use Basic Pilot is an effort to short-circuit that national debate and impose a conclusion of the City's choosing notwithstanding the ongoing national legislative process.

[10]     *See, e.g.*, 8 C.F.R. § 274a.12(a)(11-13), (c)(8-11, 14, 18-20, 22, 24) (listing categories of persons who can receive federal permission to work, and implicitly to stay, in the United States even though they may be violating immigration laws).  For example, such persons may have pending applications to adjust to a lawful status pursuant to 8 U.S.C. § 1255(i).  Similarly, many persons released from detention pursuant to legal mandates and restrictions imposed by the

may technically be "not lawfully present in the United States" are nonetheless permitted to live and work in the United States.  In addition, persons who are applying for or have been granted "temporary protected status" are permitted to stay and work in the U.S. if they meet certain requirements, notwithstanding the fact that they are otherwise removable.  *See* 8 U.S.C. § 1254a.  Federal officials may also exercise discretion not to deport persons who are otherwise removable. *See* 8 C.F.R. § 212.5(f).  By denying abode to every individual who is "unlawfully present," the Ordinance would run roughshod over this complex system of federal classification and discretion.

For similar reasons, Registration Ordinance also conflicts with federal immigration law.  It requires each individual occupant of any rental unit to obtain an occupancy permit from Hazleton, and requires applicants for occupancy permits to provide "proof of legal citizenship and/or residency."  Statements by the Mayor and other officials indicate that the City understands this to mean "proof of legal citizenship and/or residency in the United States."  Yet, as explained above, numerous individuals who are not lawfully present in the United States are nonetheless permitted to live and work here by the federal government.  The Registration Ordinance's attempt to exclude from residing in the City of Hazleton all persons unable to tender "proof of legal citizenship and/or residency" thus squarely conflicts with the federal immigration scheme.

Moreover, the Registration Ordinance does not provide any definition of "legal … residency."  The closest approximation to such a status in the federal

---

Supreme Court, though subject to an order of removal, are permitted to stay and work in the U.S. *See Clark v. Martinez*, 543 U.S. 371 (2005); *Zadvydas v. Davis*, 533 U.S. 678 (2001).

immigration law is lawful permanent resident status.  *See* 8 U.S.C. § 1101(a)(20).

However, there are numerous "nonimmigrant" (i.e. temporary) visa holders and

others who are allowed to live in the United States under the federal immigration

system.  *See, e.g.*, 8 U.S.C. § 1101(a)(15).  Therefore, to the extent the Registration

Ordinance adopts the federal "lawful permanent resident" status to define whether

or not someone can lawfully reside in Hazleton, it does so in a manner that

conflicts with federal immigration law.   To the extent the Ordinance requires

Hazleton to create its own definition of "legal … residency" and make its own

determinations of who is or is not a legal resident for the purposes of the

Registration Ordinance, that too conflicts with the federal scheme. [11]

### ii)      Interference with the federal government's regulatory scheme

Even where the state or local law does not explicitly conflict with a specific

provision of federal law, attempts to *supplement* federal immigration law – which

the Ordinances undeniably are – nonetheless violate the Supremacy Clause.  *Hines*

*v. Davidowitz*, a case that arose in this District, illustrates this principle.

In *Hines*, the Supreme Court ruled that where the federal government had

passed an alien registration scheme, Pennsylvania could not enforce its own state

alien-registration law.  The Court explained that "where the federal government, in

---

[11]      *See Plyler*, 457 U.S. at 236 (Marshall, J., concurring) ("[T]he structure of the immigration statuses makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported"); *id.* at 241 n.6 (Powell, J., concurring) ("Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country…. Indeed, even the [federal immigration authorities] cannot predict with certainty whether any individual alien has a right to reside in the country until deportation proceedings have run their course."); *accord LULAC*, 908 F. Supp. at 770 (Congress has exclusively reserved to federal agencies the power to make independent determinations of immigration status).

the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Hines*, 312 U.S. at 66-67.  The Court further noted that the federal system attempted "to steer a middle path," creating a "single integrated and all-embracing system … in such a way as to protect the personal liberties of law-abiding aliens through one uniform national registration system, and to leave them free from the possibility of inquisitorial practices and police surveillance" while also obtaining the information sought under the statute.  *Id*. at 73-74.[12]

Similarly here, Congress has created an integrated scheme of federal regulation that includes provisions directed at both employment of unauthorized workers and harboring.  These provisions strike careful balances reflecting the national legislature's view of the national interest.  For example, with IRCA, Congress balanced the important goals of reducing employment of individuals who lack work authorization; creating a workable system for employers and employees; and avoiding harassment of or discrimination against employees.  *See* H.R. Rep. 99-682(I), at 56-62.  Thus, the statute contains safeguards such as a "safe harbor" provision for employers who are presented with facially valid documents; restrictions on reverification of employees after they are hired; extensive antidiscrimination provisions; prohibitions on employers' requesting additional

---

[12]     *Accord Rogers v. Larson*, 563 F.2d 617, 626 (3d Cir. 1977) (invalidating Virgin Islands employer sanctions scheme and stating that "[b]ecause of the different emphasis the [Virgin Islands and federal employment] schemes place on the purposes of job protection and an adequate labor force, we conclude that [the Virgin Islands statute] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the INA").

documents once an employee presents minimally adequate documentation; a ten-day cure period for good-faith violations of the document verification requirements; and a graduated series of penalties after adjudication by an administrative law judge. *See* 8 U.S.C. § 1324a.

The INA's harboring provision, too, reflects Congress' judgment on what balance should be struck regarding the statute's reach and what penalties should apply. Congress has amended the statute to alter that balance on numerous occasions. For example, in 1952 Congress amended the statute to provide that normal acts incident to employment would not be considered harboring, only to amend the statute again in 1986 to remove that proviso. *See Kim*, 193 F.3d at 574. The federal system's interpretation of the statute is not entirely settled, *see United States v. Maali*, No. 6:02-CR-171ORL28KRS, 2005 WL 2204982 (M.D. Fla. Sept. 8, 2005) (noting "uncertainty surrounding the meaning of harboring"), and recent legislative proposals would modify it yet further, see H.R. 4437, 109th Cong., § 202.

The effect of Hazleton's Ordinances is clearly to upset the balances struck by Congress in each of these areas and in immigration law generally by implementing the City's own enforcement mechanism, penalties, and interpretations in place of the federal system, and simultaneously to bypass the discretion that system places in federal officials and the procedures that it has in place for determining individuals' status and the applicability of sanctions under the INA's employment and harboring sanctions schemes. This seriously undermines the choices made by Congress in creating that system and threatens the ability of the system to work as an integrated and uniform whole – for if Hazleton

can pass its own ordinances in these areas, so can every municipality in the country, each setting forth its own mechanisms, penalties, interpretations, and procedures.  This attempt simply cannot stand.[13]

> ### 2.  The Immigration And Registration Ordinances Violate Due Process By Depriving Plaintiffs Of Fundamental Liberty And Property Interests Without Meaningful Notice Or Opportunity To Challenge Adverse Determination

The Immigration and Registration Ordinances violate the 14th Amendment Due Process provisions of the United States Constitution in that they deprive persons of property interests and do not afford meaningful notice or procedure to challenge such ordinances.  Hazleton's failure provide any procedural-due-process protections to employers and employees (section 4), or landlords and tenants (section 5), before depriving them of fundamental rights – including the right to contract, engage in a business, earn a livelihood, and continue one's residence - violates the Fourteenth Amendment's Due Process Clause.  The Fourteenth

---

[13]     *See Hines*; *see also Garamendi*, 539 U.S. at 423, 427 (California could not "employ[] 'a different, state system of economic pressure'" to address an issue touching on foreign relations, nor "use an iron fist where the [federal government] has consistently chosen kid gloves"); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000) (state statute touching on foreign relations not saved by the fact that state and federal statute "share the same goals and … some companies may comply with both sets of restrictions," because "the inconsistency of sanctions … undermines the congressional calibration of force"); *United States v. Locke*, 529 U.S. 89, 115 (2000) (fact that state requirements were similar to federal not enough to avoid preemption; "[t]he appropriate inquiry still remains whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation"); *Wisconsin Dep't of Indus. v. Gould*, 475 U.S. 282, 286, 288-89 (1986) (state statute touching on area governed by a "complex and interrelated federal scheme of law, remedy and administration" preempted because "conflict is imminent whenever two separate remedies are brought to bear on the same activity" and "[e]ach additional [state] statute incrementally diminishes the [agency's] control over enforcement of the [federal law] and thus further detracts from the integrated scheme of regulation created by Congress").

Amendment provides that "no person shall be deprived of life, liberty, or property without due process of law."  U. S. Const. Amend. XIV.

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*."  *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original; citations omitted). "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."  *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

The Supreme Court has established a two-step test for examining procedural due process claims:  the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon the deprivation were constitutionally sufficient. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted); *accord, Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

The Immigration Ordinance deprives Plaintiffs of both "property" and "liberty" interests.  Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (citations omitted).  There has been considerable debate over the past forty years surrounding the issue of what "benefits, such as jobs or payments, [should] be considered property."[14]

---

[14]     Erwin Chemerinsky, *Constitutional Law: Principles and Policies*, 536 (2002).  *See also Bd of Regents v. Roth*, 408 U.S. 564, 571-72 (1972) ("The Court has also made clear that the

The Third Circuit has emphasized that "[l]iberty interests that trigger procedural due process may be created by state law or by the federal constitution itself." *E.B. v. Verniero*, 119 F.3d 1077, 1105 (3d Cir. 1997), *cert. denied*, 522 U.S. 1109 (1998), citing *Sandin v. Connor*, 515 U.S. 472 (1995).  "Protected interests extend beyond merely freedom from bodily restraint but also [to] the *right of the individual to contract, to engage in any of the common occupations of life*, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.  In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed." *Roth*, 408 U.S. at 572 (emphasis added).

Once a protected liberty or property interest has been identified, the focus shifts to assessing the quality and timing of the process due.  The test, first enunciated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), requires this Court to balance three factors: 1) "the private interest that will be affected by the official action"; 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

---

property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money.").  "One alleging a property interest in a benefit protected by due process must go beyond showing an unsubstantiated expectation of the benefit.  To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1256 (3d Cir. 1994) (citations omitted).

procedural requirement would entail." *Id*. at 334-35; *accord E.B.*, 119 F.3d at
1106-07. We now apply the procedural-due-process analysis to the Immigration
Ordinance.

> **a.    The Immigration Ordinance Deprives Employers and
> Employees of Protected Property Interests Without Notice
> <u>or an Opportunity to Challenge</u>**

Both employers and employees have protected interests in the employment
contract.  From the employees' perspective the ability to earn a living is critical:
"[T]he significance of the private interest in retaining employment cannot be
gainsaid.   We have frequently recognized the severity of depriving a person of the
means of livelihood." *Loudermill*, 470 U.S. at 543.   As a result, courts have for
nearly a century ruled that, "The right to hold specific private employment and to
follow a chosen profession free from unreasonable governmental interference
comes within both the 'liberty' and 'property' concepts of the Fifth and Fourteenth
Amendments." *Piecknick*, 36 F.3d at 1259, *quoting, Greene v. McElroy*, 360 U.S.
474, 492 (1959).  *See also Conn v. Gabbert*, 526 U.S. 286 (1999) ("Fourteenth
Amendment's Due Process Clause includes some generalized due process right to
choose one's field of private employment…."); *Truax v. Raich*, 239 U.S. 33, 41
(1915) ("the right to work for a living in the common occupations of the
community is of the very essence of the personal freedom and opportunity that it
was the purpose of the [Fourteenth] Amendment to secure"); *Nixon v.
Commonwealth*, 839 A.2d 277, 288 (Pa. 2003).

Moreover, Article I, § 1 of the Pennsylvania Constitution provides an
independent state-law ground for this right.  *See, Nixon v. Commonwealth*, 839
A.2d 277, 288 (Pa. 2003).   From the employer's perspective, the right is viewed as

an interest in continuing the business and the right to contract with employees. *College Savings Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.*, 131 F.3d 353, 361 (3d Cir. 1997) ("Clearly, a business is an established property right entitled to protection under the Fourteenth Amendment"), *aff'd*, 527 U.S. 666, 675 (1999) ("The assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment") (parenthetical in original). *See also Roth*, 408 U.S. at 572 ("without doubt," liberty interest includes the "right of the individual to contract, to engage in any of the common occupations of life. . . ."); *Jago v. Van Curen*, 454 U.S. 14, 18 ("mutually explicit understandings," including "implied contracts," create property interest); *Small v. United States*, 333 F.2d 702, 704 (3d Cir. 1964) ("The right to pursue a lawful business or occupation is a right of property which the law protects against intentional and unjustifiable interference. A cause of action based upon such an interference is analogous to one based upon unlawful interference with existing contracts, and is governed by the same principles"). Section 4 effects deprivations of constitutionally protected liberty and property interests by giving the City the power to suspend the business permit of any entity that has been accused, wholly without proof, of employing an unlawful worker.

The Immigration Ordinance's enforcement scheme affords neither employer nor employees meaningful due process prior to ordering the employer to terminate the employee or face severe sanctions. *See* Immigration Ordinance, §4.B. Enforcement is initiated by a complaint by virtually anyone, lodged with the Hazleton Code Enforcement Officer (hereafter "Code Officer"). *Id*. at §4.B.1.

30

Within three days the Code Officer is required to "request identity information" from the business entity regarding the complained-about employees.  *Id*. at §4.B.3. The Ordinance does not define "identity information."  That not withstanding, a failure to provide "identity information" results in the suspension of the right to rent out the apartment and collect rents.   The Immigration Ordinance provides no process to appeal that denial.

If the Code Officer determines the employee is an "unlawful worker," he or she "shall suspend the business permit of any business entity which fails [sic] correct a violation of this section within three business days after notification of the violation."  *Id*. at §4.B.4.  While the Ordinance provides some means for the employer to acquire a defense to a violation, §4.B.5. (sign up for Basic Pilot Training Program), or to curtail the suspension by addressing the alleged violation, §4.B.6., it provides no opportunity for either the employer or the employee to contest the Officer's finding of a violation.  The deprivation of an employer's worker and an employee's job implicates protected property and liberty interests.[15]

The Basic Pilot program provides an employee, through the employer, a notice of negative determination and 10 days to challenge it, during which time the employee can not be penalized. Even though the Basic program provides these key due process rights, Hazleton does not provide any such notice or any opportunity to contest a negative determination.

---

[15]    Evidence of the Ordinance's blatant disregard of employer and employee rights is dramatically evidenced by the fact that the Basic Pilot program which the Ordinance relies upon provides employers and employees critical due process rights that Hazleton does *not* provide. Section 401 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104-208 (Sept. 30, 1996), established the Basic Pilot Program. The Basic Pilot Program is set to terminate on November 30, 2008.\

Depending upon what database is utilized in enforcing section 4.B.3 of the Ordinance, in what is still an undefined process, these differing enforcement schemes could lead to direct conflict in situations where an employee exercises their right to appeal a negative determination. In those instances, the Ordinance punishes an employer for not discharging that employee within three days despite the fact that federal law prohibits the employer from discharging the employee for ten days while the employee waits for a reply to his or her appeal during that 10 day appeal period.

      **b.**    **The Anti-Harboring Provision of the Immigration Ordinance Deprives Landlords and Tenants of Protected Property Interests Without Notice or an Opportunity to <u>Challenge</u>**

Both landlords and tenants have a "property interest" in their homes and apartments because real property is considered a fundamental right under the U. S. and Pennsylvania Constitutions. "There never has been doubt that the government must provide due process before it deprives a person of real or personal property. Erwin Chemerinsky, *Constitutional Law: Principles and Policies*, 536 (2002). The U. S. Supreme Court has ruled that the, "right to maintain control over [one's] home, and to be free from governmental interference, is a private interest of historic and continuing importance." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53-54 (1993). *See also Dennison v. Pennsylvania Dept. of Corrections*, 28 F.Supp.2d 387, 400 (M.D.Pa. 2003) ("Real property ownership has been historically protected by the Constitution and is considered fundamental to American society"), *quoting Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229-230 (1985) (Powell, J., concurring).

The Pennsylvania Supreme Court has held that, "An owner of property in this Commonwealth has a tremendously prized and fundamental Constitutional right to use his property as he pleases. . . ." *Parker v. Hough*, 215 A.2d 667, 669 (Pa. 1966) (citations omitted).  Moreover, the deprivation of real property need not be total or complete to trigger procedural protections.  "[E]ven . . . temporary or partial impairments to property rights . . . 'are subject to the strictures of due process.'"  *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991) (citations omitted).  The Supreme Court has held that procedural due process must attend governmental deprivations of both a landlord's rental income and a tenant's continued residence in the rental property.  *Greene v. Lindsey*, 456 U.S. 444, 450-51 (1982).

Given the above-cited authority, Section 5 clearly effects a deprivation of landlords' and tenants' protected property interests.  *See* Immigration Ordinance, §5.  The Immigration Ordinance's enforcement scheme fails to afford either landlords or tenants meaningful due process, before ordering the landlord to "correct" the alleged violation, which would require termination of the tenancy.  *Id*. at 5.B.  Like the employment scheme, enforcement of the housing provisions is initiated by a complaint, lodged with the Code Officer, by virtually anyone.  *Id*. at §5.B.1.  The Code Officer will then "verify with the federal government the immigration status" of the prospective tenants.  *See* §5.B.3.  The verification will be based upon "identity data provided by the owner."  The Ordinance is unclear about what that data consists of and how and when the owner is to transmit such data to the Code Officer.  *Id*.  The Immigration Ordinance then gives the owner "five business days following receipt of written notice from the City that a violation has occurred" to "correct a violation" or the Code Officer "shall deny or

suspend the rental license of the dwelling unit." Section 5.D.4. The Ordinance does not afford either the affected landlord or the tenant(s) an opportunity to contest the alleged violation. Accordingly, Section 5 deprives landlords of their tenants and rental income, and deprives tenants of a place to live, both of which are protected property interests.

    **c.**  **Registration Ordinance 2006-13 Deprives Plaintiff-Tenant of Protected Property Interests Without Notice or an <u>Opportunity to Challenge</u>**

   Ordinance 2006-13, the Registration Ordinance, also fails to provide due process prior to depriving tenant/renters of the right to obtain housing. As explained above, it requires each individual occupant of any rental unit to obtain an occupancy permit from Hazleton, including a requirement that applicants provide "proof of legal citizenship and/or residency", a term not defined either by the Registration Ordinance or by federal law. Once again, this Ordinance fails to provide any process to tenants denied this permit. The Registration Ordinance does not provide for written notice of the action of the reasons for it, nor does it provide any opportunity to contest a denial. Thus, plaintiff tenants could be denied the ability to lawfully rent a place to live in Hazleton without any prior notice or an opportunity to challenge the denial.

    **d.**  **The Immigration Ordinance Fails To Afford Employers, Employees, Landlords And Tenants With Even Minimal Procedural Due Process Prior To Depriving Them Of <u>Protected Liberty And Property Interests</u>**

   Having established that the Immigration Ordinance will result in depriving plaintiffs of protected interests in housing and employment, the analysis turns to what procedural protections are due. "Many controversies have raged about the

cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be *preceded* by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (emphasis added); *see also, Mathews*, 424 U.S. at 333 (The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society"). Except in "extraordinary situations," the due process must precede the deprivation. *James Daniel Good Real Property*, 510 U.S. at 53 (citations omitted).

Because the Immigration Ordinance fails to provide even the most rudimentary due process before depriving Plaintiffs of fundamental rights in housing and employment – rights essential to basic living – it is unnecessary to apply the *Mathews v. Eldridge* balancing because the Ordinance plainly fails even the most minimal standards. The Immigration Ordinance clearly violates the Due Process Clause of the Fourteenth Amendment.

          **e.**    **Individual Plaintiffs Face Extraordinarily High Risk Of Erroneous Deprivation**

The second factor the Court is to consider under the *Matthews* test is the risk of erroneous deprivation. In the instant case, the risk is extraordinarily high. As discussed above, neither the Immigration or Registration Ordinances provide a notice of the reasons for the denial of an occupancy permit, a business permit, or a permit to rent out an apartment. Nor does either Ordinance provide an opportunity for the affected employee or tenant to contest a denial of any of those permits.

This wholesale denial of any process, by itself, creates an extremely high risk of error.

That the subject matter of these permits, questions over someone documenting their immigration status, an area of law previously identified as perhaps the most complex area of law in our jurisprudence, and then holds lay business and property owners strictly liable for complying with and enforcing it, dramatically adds to the complexity and unwieldiness of this system, creating what could be called an extraordinarily high risk of error.  Lastly, the Registration Ordinance creates its own unique definition of immigration status and then bars Hazleton's residents from renting a home if they fail to satisfy it.  This entire scheme is one that is bound to create chaos and deny local residents the ability to work or have a home in the most arbitrary and capricious manner imaginable.[16]

The value of additional or substitute procedural safeguards is substantial. Providing notice and an opportunity to challenge a determination has always been recognized as a critically important procedural safeguard.   More specifically, the Supreme Court has repeatedly held that, absent "extraordinary circumstances," any deprivation of a person's occupancy rights must be preceded by notice and an opportunity to be heard.  *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972); *see also, Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 342 (1969). Providing an affected tenant or employee notice and an opportunity to challenge an

---

[16]      Tenants who choose to resist the determination of their landlord or the Town can not be forcibly evicted without the landlord obtaining a court order.  However, many tenants will choose not do so, deciding to leave rather than get involved in litigation in what may appear to be a daunting and futile court process as it is not obvious whether a court reviewing an action to evict has the authority to reverse Hazleton's determination that a tenant is an "unlawful alien". Nor will the City give tenants notice of how to seek to reverse its determination by seeking judicial relief.

adverse determination before an impartial decision maker would unquestionably increase the accuracy and reliability of the decision making process.  Those tenants and employees are the parties who have both the most at stake and the most information relevant to a determination, and thus their participation is absolutely essential for any process to be accurate and reliable. Otherwise, it would resemble, at best, a "Star Chamber" in which a person would be convicted in abstentia.

      **f.**    **The Government's Interest And The Administrative Burdens That The Additional Or Substitute Procedural <u>Requirement Would Entail Are Not Substantial</u>**

Lastly, the burden imposed on Hazleton is not so substantial as to provide a basis to deny plaintiffs their due process right to notice and an opportunity to contest a negative determination.  The burden of providing a notice to the tenant or employee, who will be denied her fundamental property interests to employment or housing, and then providing a meaningful opportunity to challenge a negative determination, is not substantial in comparison to the potential deprivation of fundamental property and liberty rights that Hazleton seeks to impose.  "[T]here can be no doubt that at a minimum [due process] require[s] that deprivation of life, liberty or property by adjudication be *preceded* by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (emphasis added); *see also Mathews*, *supra* at 333 (The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.").   Except in "extraordinary situations," due process must precede the deprivation. *James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) (citations omitted).   Since the Ordinances fail to

provide even the most rudimentary due process before depriving plaintiffs of fundamental rights in housing and employment – rights essential to basic living – whatever burden is imposed on Hazleton pales in comparison.

In sum, there is no question but that, when reviewed in their totality, the three *Matthews* factors argue compelling that this Ordinance stands in violation of due process due to its failure to provide timely notice and an opportunity to contest to tenants and employees.  The supreme importance of the rights at stake, the absolute arbitrariness that will otherwise pervade the process, and the lack of substantial burden to Hazleton, all weigh for the relief requested by plaintiffs.

### 3.    The Immigration Ordinance Contravenes The Equal Protection Clause And The Fair Housing Act

By expressly allowing the consideration of suspect classifications, "national origin, ethnicity and race,"[17] to determine whether someone is an "unlawful worker" or "illegal alien," the Immigration Ordinance violates the Equal Protection Clause of the Fourteenth Amendment.  The Immigration Ordinance contains two parallel, but almost identical, complaint-based enforcement schemes to identify "unlawful workers" in the business and employment context (Section 4.B.) and "illegal aliens" in the housing context (Section 5.B.). "Complaint based" enforcement systems are commonly referred to as a "passive" enforcement system, *see U.S. v. Cannistraro*, 800 F. Supp. 30, 59-60 (N.J.1992).[18]   If the complaint

---

[17]     *See City of Cleburne v. Cleburne Living Center*, 473, U.S. 432, 440 (1985); *United States v. Williams*, 124 f3d 411, 422 (3d Cir. 1997).

[18]     Both sections of the Immigration Ordinance contain the following language: An enforcement action shall be initiated by means of a written signed complaint to the Hazleton Code Enforcement Office submitted by any City official, business entity, or City resident. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.

identifies the alleged violators, the acts constituting the violation, the date and the location where the acts occurred, the Ordinance mandates a specific investigatory scheme be strictly adhered to.[19]

Within three days of receiving the signed complaint, the Code Enforcement Office must request "identity information" about the alleged unlawful workers from the cited business entity. If that business does not provide the "identity information" within three days of that request, then the City will suspend its business permit indefinitely. The indefinite suspension can occur before a finding of a violation of the Immigration Ordinance.[20] The Immigration Ordinance provides that violators are then investigated and prosecuted. Penalties are imposed, including but not limited to indefinite suspension of business and rental permits and daily fines of $250 against property owners.

The Immigration Ordinance deems invalid and unenforceable violations based *solely* or *primarily* on national origin, ethnicity or race. *See* §4.B.2. and §5B.2. But the clear, unstated negative-implication of the Immigration Ordinance is that the race, ethnicity and national origin can be considered evidence of a violation, so long as it is not the primary or sole basis for the complaint.[21] Race,

---

[19]     Though the procedures described are those dealing with allegations of business entities employing unlawful workers as set out in Section 4.B, the procedures are identical for property owners alleged to have rented to "illegal aliens" under Section 5.B unless otherwise noted.

[20]     The Code Enforcement Office does not require property owners to provide the identity information of a tenant who is allegedly an "illegal alien" because under Ordinance 2006-13, it should already exist in the City's Tenant Registry.

[21]     The City cannot argue that it will not consider race as evidence of a violation. Such a claim would be contrary to the plain meaning of the Ordinance, which allows race to be considered so long as it is not the primary or sole factor.

ethnicity and national origin are not valid predictors of someone's immigration status. By making race, ethnicity and national origin relevant considerations in enforcing the Ordinance, Hazleton "threatens to stigmatize individuals by reason of their membership in a racial [or ethnic] group and to incite racial [and ethnic] hostility . . . [and] to reinforce racial and ethnic divisions." *Johnson v. California*, 543 U.S. 507 (2005).

**a.     The Equal Protection Clause Prohibits the Use of Race as Evidence of a Violation**

In order to be valid, the Immigration Ordinance's race-based enforcement scheme must pass muster under the Equal Protection Clause of the Fourteenth Amendment. Supreme Court precedent is clear that "all racial classifications [imposed by government] . . . must be analyzed by a review court under strict scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). "Under strict scrutiny, the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citing *Andarand Constructors, supra*);[22] *see also Lomack v. City of Newark*, 463 F.3d 303, 307 (3d Cir. 2006) (city firefighters transferred pursuant to program to eliminate single-race fire companies brought claim against city, mayor, and fire department officials, alleging that racial balancing policy violated equal protection). The Immigration Ordinance's approval of national origin as a basis

---

[22]     In *Adarand Constructors*, a state prison inmate brought an equal-protection claim against corrections officials, challenging unwritten policy of placing new or transferred inmates with cellmates of same race during initial evaluation.

for a complaint that someone is an "unlawful worker" or "illegal alien" also triggers strict scrutiny. *City of Cleburne*, 473 U.S. at 400.

The *Johnson* Court explained why strict scrutiny applies to any instance where the government uses racial classifications, even for so-called benign use:

> The reasons for strict scrutiny are familiar. Racial classifications raise special fears that they are motivated by an invidious purpose. Thus, we have admonished time and again that, "[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining ••• what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. We therefore apply strict scrutiny to *all* racial classifications to " 'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool." (citations omitted).

*Johnson*, 543 U.S at 505-06.  The use of racial classification in the as in the instant case, which involves the administration of justice, is particularly troublesome.

> Race discrimination is "especially pernicious in the administration of justice." And public respect for our system of justice is undermined when the system discriminates based on race. (citations omitted)

*Id*. at 511.

The enforcement system in the Immigration Ordinance relies on an impermissible racial classification by allowing race as evidence of unlawful status under the Ordinance.  Hazleton cannot escape strict scrutiny by arguing that the Immigration Ordinance does not use of race to either benefit or burden the alleged violator or its use is neutral on its face.  The Court in *Johnson* addressed these issues when discussing the arguments presented on behalf of the California Department of Corrections (CDC):

> The CDC claims that its policy should be exempt from our categorical rule because it is "neutral"–that is, it "neither benefits nor burdens one group or individual more than any other group or individual." … The CDC's argument ignores our repeated command that "racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally." Indeed, we rejected the notion that separate can ever be equal-or "neutral"–50 years ago in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and we refuse to resurrect it today.  (citations omitted).

*Id*. at 507.

The Immigration Ordinance clearly anticipates that alleged violators, if nonwhite, will be subjected to a greater likelihood of investigation and prosecution than white violators, all other factors being equal.  By allowing selective prosecution or enforcement of laws based on the race of an individual, the Immigration Ordinance violates equal protection.  *See also Christopher v. Nestlerode*, 373 F.Supp.2d 503, 519 (M.D.Pa.,2005), (citing) *Bradley v. United States*, 299 F.3d 197, 206-07 (3d Cir.2002).[23]

The Immigration Ordinance's statements that race cannot serve as the "sole or primary" basis of the complaint does not cure the constitutional infirmity.  It is rare to see race as the only factor at play in any challenged practice.  *See, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429

---

[23]     Plaintiffs have standing to assert a facial challenge to this scheme as violative of equal protection because the "injury in fact" is the imposition of the discriminatory barrier or classification which offends the Constitution, not the impact it might ultimately have. *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656, 663-68 (1993) (association of general contractors brought action against city challenging ordinance according preferential treatment to certain minority-owned businesses in award of city contracts).  Further, plaintiffs have standing in that there are no circumstances under which the use of the challenged provision – the use of race as evidence of a violation – could lawfully be used.

U.S. 252, 268 (1977) (rarely are legislative or administrative decisions motivated by single concern).[24]

> Even in the limited circumstance when drawing racial
> distinctions is permissible to further a compelling state
> interest, government is still 'constrained in how it may
> pursue that end:  [T]he means chosen to accomplish the
> [government's] asserted purpose must be specifically and
> narrowly framed to accomplish that purpose.'"

*Grutter v. Bollinger*, 539 U.S. 306, 333, 123 S.Ct. 2325 (2005) (citing *Shaw v. Hunt*, 517 U.S. 899, 908, 116 S. Ct. 1894 (1996)).

Hazleton cannot establish a compelling governmental interest to justify its actions.  Indeed, it is difficult to imagine what governmental interest could be so *compelling* so as to justify this overtly discriminatory scheme.  Appearance based factors, such as race, do little to tell about an individual's immigration status.  *See Montero-Camargo*, 208 F.3d 1122, 1135-36 (9th Cir. 2000).  Further, this discriminatory scheme is not narrowly tailored to minimize its discriminatory effect.  For instance, the City could have (as Immigration and Customs Enforcement (ICE) does in its complaint based scheme) utilize appropriately trained personnel to evaluate the substantive merit of a complaint before it is investigated.  8 C.F.R. 274a9(b);[25]  *see also Christopher v. Nestlerode*, 373 F.Supp.2d 503, fn. 4 (M.D.Pa.,2005) (Pennsylvania law mandates that deputy

---

[24]    *See also Farm and Labor Organizing Committee v. Ohio State Patrol*, 308 F.3d 523, 538 (6th Cir 2002) ("the selective enforcement framework does not require a plaintiff to show that the defendant had no race-neutral reasons for the challenged enforcement decision"); *U.S. v. Cannistraro*, *supra* at 60 ("if a decision maker selected a particular course of action at least *in part* because of its adverse effects upon an identifiable group, equal protection is violated").

[25]    "When the Service receives a complaint from a third party, it shall investigate only those complaints that have a reasonable probability of validity."

sheriffs undergo basic training in a range of topics, including criminal procedure and cultural diversity).

Because the Ordinance cannot withstand strict scrutiny, it is unconstitutional. Accordingly, this Court should issue enjoin its enforcement.

> **b.     The Fair Housing Act Prohibits the Use of Race as Evidence of a Violation In its Anti-Harboring Provisions**

For the same reasons, the provisions of the Ordinance affecting property owners and tenants also violate the Fair Housing Act ("FHA" or "Act"). 42 U.S.C. § 3601 *et seq*. The Fair Housing Act prohibits discrimination in housing-related transactions based on, inter alia, race, color, or national origin. 42 U.S.C. § 3604. In particular, the Act makes it unlawful for any person to "make [] unavailable or deny" housing based on race, color, or national origin. 42 U.S.C. § 3604(a). Such discrimination can be established either on a theory of intentional discrimination (disparate treatment) or discriminatory effect (disparate impact). *See, e.g., Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 141-44 (3d Cir. 1977). It is also unlawful for any person "to make, print, or publish, or cause to be made, printed, or published any notice [or] statement . . . with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination" on the basis of race, color, or national origin. 42 U.S.C. § 3604(c).

The language of the Act is "broad and inclusive" and is subject to "generous construction." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972). The Act's prohibitions "appear[ ] to be as broad a prohibition as Congress could have made, and *all practices which have the effect of making dwellings unavailable on the basis of race are therefore unlawful*." *United States v. Gilbert*, 813 F.2d 1523, 1528 (9th Cir. 1987) (quoting 42 U.S.C.A. § 3604) (emphasis added). The

Act has been found to apply to municipal zoning provisions and the enforcement of such provisions.  *See, e.g., Eastampton Center, L.L.C. v. Township of Eastampton*, 155 F. Supp. 2d 102, 110-15 (D.N.J. 2001), *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988), *aff'd*, 488 U.S. 15 (1988).

There can be no question but that the Anti-Harboring enforcement scheme of the Ordinance violates the Act.  As outlined above, the Ordinance makes an express statement that race, ethnicity, and national origin may be used to identify persons not entitled to reside in Hazleton, in violation of 42 U.S.C. § 3604(c).[26]

In the same way, the Ordinance intentionally makes dwellings unavailable on the basis of race, ethnicity, and national origin, in violation of 42 U.S.C. § 3604(a).  As the Third Circuit has made clear in the Fair Housing Act context, "Where a regulation or policy facially discriminates on the basis of the protected trait [e.g., race or national origin], in certain circumstances it may constitute per se or explicit . . . discrimination because the protected trait by definition plays a role in the decision-making process."  *Community Services, Inc. v. Wind Gap Municipal Authority*, 421 F.3d 170, 177 (3d Cir. 2005) (internal punctuation omitted).

In addition, as a result of the Ordinance's sanctioning of the use of the prohibited categories of race, ethnicity, and national origin as the basis for a complaint, the Ordinance will have a disparate impact on the ability of members of

---

[26]   *See, e.g., United States v. Hunter*, 459 F.2d 205, 210 (4th Cir. 1972) (emphasizing that § 3604(c) "applies on its face to 'anyone'" making discriminatory statements); *see also Mayers v. Ridley*, 465 F.2d 630, 653 (D.C. Cir. 1972) (Wilkey, J., concurring) (describing the "discouraging psychological effect" discriminatory statements); Robert G. Schwemm, Discriminatory Housing Statements and 3604(c): a New Look at the Fair Housing Act's Most Intriguing Provision, 29 Fordham Urb. L.J. 187, 249-50 (2001) (discussing § 3604(c)'s purpose of protecting of minorities from the insult caused by statements of discrimination).

racial and national origin minorities – Latinos in particular – to obtain housing or continue to reside in Hazleton.  *See* 42 U.S.C. § 3604(a).  This impact would be on virtually 30% of Hazleton's population.  *See* Gaiutra Bahadur, "Hazleton Gets a Jolt it Didn't Want," in PHILADELPHIA INQUIRER, dated Sept. 18, 2006.

As in the Equal Protection context, the Ordinance's reliance on race, ethnicity, or national origin as just one factor, and not the "sole or primary" basis for a complaint does not lessen in any way the City's liability under the Fair Housing Act.  It is well-established that the FHA is violated as long as "some discriminatory purpose was a 'motivating factor' behind the challenged action." *Wind Gap Municipal Authority*, 421 F.3d at 177.  As the Third Circuit has emphasized, "The discriminatory purpose need not be malicious or invidious, nor need it figure in 'solely, primarily, or even predominantly' into the motivation behind the challenged action."  *Id*.

In sum, nonwhite persons, and in particular Latinos, in the City of Hazleton will immediately be subjected to unequal treatment in attaining and maintaining peaceful habitation upon the implementation of this Ordinance, in clear violation of the Fair Housing Act.  And, the Ordinance's express statement that race, ethnicity, and national origin are legitimate factors in determining who may reside in Hazleton constitutes an independent violation of the Act.  Section 5 of the Ordinance plainly contravenes the Fair Housing Act.

**4.    The Registration Ordinance Violates Federal Guarantees Of Privacy**

For modern Americans who have been convicted of  no crime, the requirement that they "present their papers" to local officials  as a condition of taking up or changing residence imposed by Hazleton's "Occupancy Permit"

regime is truly an "alien" one.  As the court observed in *Waters v. Barry*, 711 F. Supp. 1125, 1134 (D.D.C. 1989), quoting *Gomez v. Turner*, 217 U.S. App. D.C. 281, 672 F.2d 134, 143-44 n. 18 (D.C. Cir. 1982): "That  citizens can walk the streets, without explanation or formal papers, is surely among the cherished liberties that distinguish this nation from so many others."  *See, e.g., Brown v. Texas*, 443 U.S. 47, 52 ( 1979) (invalidating conviction under Texas statute empowering police officers to demand "name and residence address" in the absence of reasonable suspicion).   Moreover, the right to move from one residence to another is an aspect of constitutionally protected liberty.  *See Chicago v. Morales*, 527 U.S. 41, 53 (1999) ("We have expressly identified this "right to remove from one place to another according to inclination" as "an attribute of personal liberty" protected by the Constitution."

By contrast, the newly adopted Hazleton Registration Ordinance requires that each adult who seeks to reside in Hazleton but does not own their own home apply for a an "occupancy permit," each time they take up or move residences. The applicant, according to the Registration Ordinance and its mandated forms, must apprise the City of their address and telephone number and present papers proving "legal citizenship or residency," along with a $10 fee. The City thus has erected both a mechanism for requiring residents who do not own houses to disclose their identity and address by requiring them to present their "papers" and for establishing a comprehensive dossier of their residences over time.  This mechanism runs afoul of the protections of personal privacy well recognized by precedent in this Circuit.  *See Sterling v. Borough of Minersville*, 232 F.3d 190, 193-196 (3d Cir. 2000) ("The right  not to have intimate facts concerning one's life

disclosed without one's consent" is "a venerable [right] whose constitutional significance we have recognized in the past."); *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 112 (3d Cir. 1987).

At one level, the Occupancy Permits might seem a minor imposition. Many families list their addresses for public inspection in a telephone book. But the Supreme Court has recognized "nontrivial privacy interest" in an individual's home address. *See United States Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 500-502 (1994). The Third Circuit has subjected the involuntary disclosure of residency information, to "the balancing inquiry repeatedly held appropriate in privacy cases." *E.g., Paul P. by Laura L. v. Verniero*, 170 F.3d 396 (3d Cir. 1999).[27]

Equally important, the disclosures demanded by the City display the residence of every occupant who does not own their home, revealing not only a single home address but the associations that take place in the home.[28] Unlike the telephone book, the disclosures required by the Registration Ordinance do not

---

[27] The Court continued "The compilation of home addresses in widely available telephone directories might suggest a consensus that these addresses are not considered private were it not for the fact that a significant number of persons, ranging from public officials and performers to just ordinary folk, choose to list their telephones privately, because they regard their home addresses to be private information.") id at 404. *See A. A. v. New Jersey*, 341 F.3d 206, 211 (3d Cir. 2003)(finding that privacy interest in home address is overcome by "compelling" interest in allowing parents to protect their children from possible sex predators); *Paul P. v. Farmer*, 227 F.3d 98 (3d Cir. 2000)( privacy intrusion by revelation of "area of residence" is outweighed by similar interest).

[28] *Cf. Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105, 119 (3d Cir. 1987)(recognizing privacy of association and invalidating questions about association); *Bartnicki v. Vopper*, 200 F.3d 109 (3d Cir. 1999) aff'd. 532 U.S. 514 ( 2001)(" As commonly understood, the right to privacy encompasses both the right "to be free from unreasonable intrusions upon [one's] seclusion" and the right to be free from "unreasonable publicity concerning [one's] private life." *Fultz v. Gilliam*, 942 F.2d 396, 401 (6th Cir. 1991)").

involve a single voluntary subscriber at a residence. The system put in place by the city provides for no "unlisted numbers," and is constructed to  provide a comprehensive history of every resident of a rented dwelling in the City.  If an individual decides to move in with a paramour, she must register with the city, and so too, if she decides to move out. If a married couple decide to establish separate residences, they must register with the city; if an adult child move back into his parents home, the city demands disclosure.  These are matters of personal relation which are shielded from overbearing government inquiry and disclosure by the constitutional right to privacy.[29]

Furthermore, in implementing the Registration Ordinance as an enforcement mechanism of the Immigration Ordinance, the City is requiring that applicants provide highly confidential documents such as birth certificates, alien residency cards, passports, naturalization documents and any document issued by the federal government. These documents contain information in which plaintiffs have a reasonable expectation of privacy such as date of birth, country of birth, country of origin, date of entry into the United States, etc.  This information can easily be used to usurp an individual's identity.

While Section 12 of the Registration Ordinance  announces that information collected pursuant to it will be "confidential", it establishes neither a definition of "confidentiality" nor any penalty for disclosure. Indeed it explicitly reserves the

---

[29]     *See Sterling v. Borough of Minersville*, 232 F.3d 190, 197 (3d Cir. 2000)(sexual orientation is intimate and protected against involuntary disclosure by privacy right); *Yeager v. Hackensack Water Co.*, 615 F. Supp. 1087, 1092 (D.N.J. 1985) (Water company's collection of names of members of household violates privacy rights "the right to be free from compelled disclosure of the names of household members is within the right of privacy which has been recognized by the courts").

right to release the information "to authorized individuals" "during the course of "an official City investigation."  *See Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105, 118 (3d Cir. 1987) (holding that important element of the privacy inquiry is the degree to which sensitive information is safeguarded from disclosure).  Here, given the City's broad account of its powers, this hardly provides much protection. Indeed, however one reads the "confidentiality" provided by the ordinance it may be that such records are subject to disclosure under the Pennsylvania Right to Know Act.[30]  Against these unprecedented impositions, the City provides as justification only an empirically falsifiable claim that "illegal immigrants" threaten higher crime rates and burdens of public services, and a desire to enforce its federally preempted rules against "harboring" such individuals.  In the privacy balancing mandated by Third Circuit precedent, these alleged interests simply do not weigh heavily enough to sustain the intrusion wrought by the Registration Ordinance.

### 5.    Hazleton Lacks The Municipal Power To Regulate Employment And Landlord Tenant Issues

Hazleton, a City of the Third Class, exceeded its state constitutional and statutory powers in (1) purporting to create a private cause of action in favor of

---

[30]    Compare *Tribune-Review Publ. Co. v. Allegheny County Hous. Auth.*, 662 A.2d 677 (Pa. Commw. Ct. 1995) (refusing to disclose payroll records, but noting that "careful review of both federal and state law has revealed no statute restricting the release of government employees' home addresses and home telephone numbers") and *PG Publishing Co. v. County of Washington*, 162 Pa. Commw. 196 (Pa. Commw. Ct. 1994) (authorizing release of cell phone records) with *Tribune-Review Publ. Co. v. Bodack*, 875 A.2d 402 (Pa. Commw. Ct. 2005) (redacting telephone numbers because "In this era when identify theft is a national problem, release of a person's phone number to the public at large merely because that person called a public official or was called by some public official could cause such public records to operate to the prejudice or impairment of a person's reputation or personal security").

"unfairly discharged employees" in Section 4.E. of the Immigration Ordinance; (2) requiring that landlords evict illegal alien tenants within five business days of receiving written notice from Hazleton that illegal status of the alien has been verified under Section 5.B. 3 of the Immigration Ordinance; and (3) enacting the Registration Ordinance regulating landlord/tenant relationships.

As a home-rule-charter municipality, Hazleton derives its legislative powers from the Constitution of the Commonwealth of Pennsylvania and the Home Rule Charter law. Section 2961 of the Home Rule Charter law provides:

> A municipality which has adopted a home rule charter may exercise powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter. All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality.

53 Pa. C.S.A. § 2961; *see also* Pa. Const. art. 9, § 2. However, "[t]he general powers of all municipal governments, regardless of the style and plan selected, are limited to those bestowed by the state legislature." *See, e.g., In re Nomination Petition of Joseph Digiorlamo for Mayor*, NO. 0501736-31, slip. op. at 3 (Bucks County, Apr. 6, 2005). Municipalities are not sovereigns and have no original or fundamental power of legislation. *Genkinger v. City of New Castle*, 84 A.2d 303, 304 (Pa. 1951); *see also Kline v. City of Harrisburg*, 68 A.2d 182 (Pa. 1949). Rather, they have only the powers to enact ordinances which are given to them by the General Assembly. *Genkinger*, 84 A.2d at 304.

### a.     Pennsylvania Law Prohibits Municipal Regulation Of Business And Employment Matters

The General Assembly has circumscribed the ability of a home-rule-charter municipality, such as Hazleton, to regulate business and employment.  According to the Home Rule Charter law:

> [a] municipality which adopts a home rule charter **shall not determine the duties, responsibilities or requirements placed upon businesses, occupations and employers**. . . except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities.

53 Pa.C.S.A. § 2962(f) (emphasis added).  Through the enactment of Section 4.E. of the Immigration Ordinance, Hazleton attempts to impose duties and responsibilities on employers in direct violation of the Home Rule Charter law. *See Smaller Manufacturers Council v. Council of City of Pittsburgh*, 485 A.2d 73, 77 (Pa. Commw. Ct. 1984).

To understand Section 4.E., it is necessary to understand the collateral consequences of Hazleton's efforts to eradicate illegal immigrants from its borders. The ordinance permits the Hazelton Code Enforcement Officer to suspend the business permit of any business which the officer determines recruited, hired for employment, continued to employ, dispatched or instructed an "unlawful worker" to perform work in whole or in part within the City.  *See* Immigration Ordinance, § 4.A. and § 4.B.(4).   Irrespective of the legislative wisdom of closing an entire business for hiring a single "unlawful worker," it is undeniable that such an enforcement action would cause other workers to lose pay and/or their jobs. Hazleton's solution to such collateral harm is to create a heretofore nonexistent

cause of action in favor of an "unfairly discharged employee" against the employer.

Section 4.E. deems it an "unfair business practice" for a business in the City to discharge "an employee who is not an unlawful worker," if the business was not participating in the Basic Pilot program and was employing an unlawful worker. Immigration Ordinance, § 4.E.1.  Section 4.E. empowers an "unfairly discharged employee" to sue the employer for the described "unfair business practice." Immigration Ordinance, § 4.E.2.  The statute further authorizes the "unfairly discharged employee" to recover actual damages, including three times the employee's lost wages for a 120-day period.  Immigration Ordinance, § 4.E.2.a.  It also permits the employee to recover attorneys' fees and costs.  Immigration Ordinance, § 4.E.2.b.  In sum, by creating a private cause of action in favor of "unfairly discharged employees, Section 4.E. increases the rights of employees and the responsibilities of employers in Hazleton.

Pennsylvania is an employee-at-will state.  *E.g., McCartney v. Meadow View Manor, Inc.*, 508 A.2d 1254, 1255 (Pa. Super. 1986).  Section 4.E. attempts to alter that state-wide rule with respect to businesses operating — in whole or in part — in the City of Hazelton by allowing employees of to sue for discharge on facts that are otherwise not actionable.  Similarly, Section 4.E. allows for the recovery of treble damages for a discharged employee, creating a substantive right that does not exist under Pennsylvania law.  Finally, Section 4.E. alters the American rule by allowing the discharged employee to recover attorneys' fees, regardless of whether he/she prevails on the underlying claims.

Because Section 4.E. improperly attempts to impose otherwise non-existent duties upon employers by creating a cause of action, allowing recovery of treble damages and allowing the recovery of attorneys' fees, it constitutes an ultra vires act and must be declared void.

**b.     Pennsylvania Law Prohibits Regulation of Landlord/Tenant Issues**

In addition to prohibiting municipalities from regulating the employer/ employee relationship, the Home Rule Charter law proscribes municipalities from exercising "**powers contrary to, or in limitation or enlargement of, powers granted by statutes which are applicable in every part of this Commonwealth**." 53 Pa. C.S.A. § 2962(c)(2) (emphasis added). These limitations were designed to reserve to the Commonwealth matters that are most appropriately dealt with on a state-wide level. *Hartman v. City of Allentown*, No. 2003-C-1846, slip. op. at 5 (Lehigh County, June 14, 2004).

The Commonwealth has explicitly claimed authority over landlord-tenant issues by virtue of its enactment of the Landlord and Tenant Act of 1951, 68 P.S. §§ 250.101, *et seq*. ("L/T Act"). The legislature clearly expressed its intention that the L/T Act be the **sole** source of rights, remedies and procedures governing the landlord/tenant relationship. *Lenair v. Campbell*, 31 Pa. D. & C.3d 237, 241 (Phila. County 1984). The L/T Act states:

> [A]ll other acts and parts of acts, general, local and special, inconsistent with or supplied by this act, are hereby repealed. **It is intended that this act shall furnish a complete and exclusive system in itself**.

68 P.S. § 250.602 (emphasis added).[31]   *See also, Williams v. Guzzardi*, 875 F.2d 46, 53, n.13 (3rd Cir. 1989).  More specifically, "[t]he Pennsylvania Landlord and Tenant Act of 1951, Pa. Stat. Ann., tit. 68, § §  250.101-250.602, prescribes the exclusive procedures to be followed to evict a tenant."  *Bloomsburg Landlords, Assoc., Inc. v. Town Of Bloomsburg*, 912 F. Supp. 790, 803 (E.D. Pa 1995).

State preemption applies where "there is such actual, material conflict between the state and local powers that only by striking down the local power can the power of the wider constituency be protected." *Hartman v. City of Allentown*, 880 A.2d 737, 747 (Pa. Commw. Ct. 2005)(citing *United Tavern Owners of Philadelphia v. Philadelphia Sch. Dist.*, 272 A.2d 868, 871 (Pa. Commw. Ct. 1971)).  Accordingly, municipalities such as Hazelton are prohibited from altering or supplementing that law.  *See, e.g., Council of Middletown Township v. Benham*, 523 A.2d 311 (Pa. 1986) (*citing Western Pennsylvania Restaurant Association v. Pittsburgh*,  77 A.2d 616, 620 (Pa. 1951)).

The landlord/tenant provisions of the Immigration Ordinance and Registration Ordinance directly conflict with the L/T Act.  Section 5.A. of the Immigration Ordinance makes it unlawful for any person or business entity that owns a dwelling unit ("landlord") in Hazleton to knowingly, or in reckless disregard of the fact, harbor an illegal alien.  Section 5.B.(3) requires the landlord to "correct a violation" within five business days or else have its license denied or suspended and prohibits the landlord from collecting any rent, payment, fee, or other form of compensation from, or on behalf of, any tenant in the dwelling unit

---

[31]   Section 250.103 of the L/T Act excludes existing laws under 10 specific situations from repeal or modification, and Section 250.503-A  requires tenants to comply with all obligations, including those imposed by, *inter alia*, municipal ordinances.

during the period of suspension.   Because harboring is defined to include permitting the occupancy by an illegal alien, and a separate violation is deemed to have been committed on each day that harboring occurs, the only way a landlord can "correct a violation" is to evict the tenant within 5 days of written notice from Hazleton.

Similarly, the Registration Ordinance requires landlords to take reasonable steps to remove or register unauthorized occupants that are the guests of current occupants within **ten** days of learning of their unauthorized occupancy.  The penalty for non-compliance is a one-time fine of $1,000 for each occupant without a permit, plus $100 per occupant for each day the landlord allows such an unauthorized occupant to occupy the rental unit.[32]

The eviction provisions of the Immigration Ordinance and Registration Ordinance require the landlord to violate the L/T Act.  The L/T Act safeguards tenants even when they have done something meriting eviction.  Under the L/T Act, removal is initiated by the filing of a complaint.  The tenant is not required to appear before the justice of the peace to answer the complaint at a date less than seven days from the date of the summons.  68 P.S. § 250.502.  And, even if a judgment is rendered in favor of the landlord, a writ of possession will not issue until the fifth day after the rendition of the judgment, and is not to be executed until the eleventh day following service upon the tenant, which is to occur within

---

[32]      Occupants are defined to include any person merely residing in the rental unit that is 18 years or older.  An occupant cannot obtain an occupancy permit, however, unless he/she can provide proof of legal citizenship and/or residency.   Accordingly, landlords may have current tenants that will not meet the stringent citizenship and/or legal residency requirement of the Registration Ordinance.  Landlords are, thus, faced with the Hobson's choice of evicting such tenants (and losing rental income, perhaps also subjecting themselves to liability for breaching the lease) or paying exorbitant fines for not doing so.

48 hours of issuance.  68 P.S. § 250.503.  Under the L/T Act, a tenant cannot be evicted for a minimum of 23 days.  (This does not include the provisions for notice, which can add an additional 10 days at a minimum, unless the lease provides for a lesser time, or waives notice entirely.  *See* 68 P.S. §250.501.)

The Registration Ordinance also materially conflicts with the L/T Act. Under Section 10.b. of the Registration Ordinance, occupants who allow additional occupancy in a Rental Unit without first obtaining the written permission of the landlord, and without requiring that any additional occupant obtain his or her own permit, are in violation of the Registration Ordinance and are subject to conviction and fines similar to those the landlord is subject to, i.e., $1,000 per occupant, and $100 per day per occupant for which permission and a permit were not obtained.

Under Section 250.504-A of the L/T Act, however, tenants have a right to invite social guests, family, or visitors for a reasonable period of time, as long as their obligations as a tenant under the L/T Act are observed.  Although Section 250.503-A of the L/T Act lists Tenant's duties as including complying with all obligations imposed upon tenants by applicable provisions of all municipal ordinances, the duty to obtain authorization for/and registration of guests in the Registration Ordinance is in direct conflict with a tenant's rights to have visitors for a reasonable period of time under the L/T Act.

The Registration Ordinance also requires that landlords take reasonable steps to remove or register unauthorized occupants within **ten** days of learning of their unauthorized occupancy.  As described above, this requirement conflicts with the L/T Act's notice under Section 250.501; the time limits for notice under Section

250.501; the time limits for removal under Sections 250.502 and 250.503; and tenant's rights under Section 250.503-A.

In sum, Hazleton has clearly exceeded the municipal authority granted to it by the Commonwealth of Pennsylvania in enacting Sections 4.E. and 5.B.(3) of the Immigration Ordinance, and in enacting the Registration Ordinance.

### C. Plaintiffs Will Suffer Irreparable Harm by the Enforcement of the Immigration and Registration Ordinances

The Plaintiffs will suffer irreparable harm if the requested preliminary injunction and/or temporary restraining order is not issued. "An injury is deemed irreparable if it cannot be adequately compensated by an award of damages." *Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.*, 845 F. Supp. 295, 300 (E.D. Pa. 1994). The court can enjoin the government officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution." *Morales v. TWA*, 504 US 374, 381 (1992).

The Plaintiffs will be, and already have been, adversely impacted to a great extent by the Prior Ordinance, and new Immigration and Registration Ordinances that are unconstitutional. Hazleton is now widely known as an extremely unfriendly place to foreigners, regardless of their immigration status in the United States. *See*, generally, Declarations of Plaintiffs John Doe 1 and HHBA. As such, numerous individuals and families — mostly Latino — are leaving or have already left Hazleton. Businesses that cater to the Latino population are closing down. For those that remain open, business is slow — the numbers of customers and renters have dropped considerably. *See* Declarations of Plaintiffs Hernandez and HHBA.

Once the Immigration Ordinance is in effect, it will be even harder for these Latino business owners to survive: most of their customers are Latino themselves and, given the anti-Latino hostility evidenced in Hazleton, there is no likelihood the customer base will be replenished with non-Latino customers. With the Latino population fleeing Hazleton, businesses are sure to close down. Harm to one's business which threatens one's livelihood constitutes irreparable harm. *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 601 (3rd Cir. 1979). At this juncture, the Plaintiffs who own apartments or businesses fear that their actions (or inaction) may lead to complaints or violations of the Registration and Immigration Ordinances. *See* Declaration of Plaintiff Hernandez. Moreover, as explained above, the Immigration and Registration Ordinances are preempted by federal immigration law and invalid pursuant to Pennsylvania's municipal power and landlord/tenant laws. *Id*. *See Morales*, 504 US at 381 (holding that there was no adequate remedy at law when state actors' enforcement actions of regulations preempted by federal law were imminent).

The harm caused by the Immigration and Registration Ordinances is not restricted to business owners and landlords. Plaintiffs—all Latinos--will be denied equal protection in the City's attempt to weed out "illegal aliens." Furthermore, those Plaintiffs who do not own their own home will have their right of privacy violated by Hazleton. Moreover, several of the Plaintiffs are in the process of obtaining legal status in the U.S. or are otherwise not deportable under the federal immigration law, but possess no confirmation at this time to show that they are not "illegal aliens" under the Immigration Ordinance. *See* Declaration of John Doe 1. As such, they will lose the ability to live or work in Hazleton without meaningful

due process.  *Id.*  The denial of fundamental rights to these Plaintiffs constitutes irreparable harm.  *See Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 245 (3d Cir.1980), *cert. denied*, 449 U.S. 1096 (1981) (holding that allegation of deprivation of constitutional "life and liberty" rights was sufficient allegation of irreparable harm such that plaintiffs were not required to exhaust their administrative remedies before proceeding in district court).  And, even though Hazleton will be violating Plaintiffs' fundamental right of privacy, they are not making an effort to ensure that Spanish-speaking persons receive proper notice regarding implementation of the Registration Ordinance.  See Declaration of Brenda Lee Mieles.

Finally, Hazleton's intrusion into the uniquely federal field of immigration will cause great harm to national immigration law and policy, as well as to foreign relations, especially if this Court allows the Immigration Ordinance to take effect. A consequence of this Court refusing to enjoin Hazleton's misguided regulation of immigration law will be that every municipality in the country will be free to establish piecemeal immigration standards and procedures across the country.  The Immigration Ordinance's unlawful attempt to regulate an exclusively federal matter and its many departures from federal immigration law create significant problems for immigration policy in this country.

### D.  The Harm to Plaintiffs Greatly Outweighs Any Alleged Harm to Hazleton

While the harm visited by the Registration and Immigration Ordinances upon the Plaintiffs is real and immediate, any injury claimed by Hazelton from the issuance of the requested injunctive relief is speculative and unsupported by any

empirical or statistical evidence that it is "illegal aliens" who have caused the City's many ills, as claimed by the Mayor.

Hazleton has not come forward with any evidence that would indicate that enforcement of the Immigration Ordinance would solve any of the City's problems. The Mayor of Hazleton has publicly admitted on several occasions that he does not have any statistics or real evidence to back up his claim that "illegal immigrants" have contributed significantly to an increase in the crime rate or other problems in Hazleton, instead citing a single murder allegedly committed by "illegal immigrants" to justify the Ordinance.  Neither did he know how many undocumented individuals live, work, or go to school in Hazleton.  In fact, statistics compiled by the Pennsylvania State Police Uniform Crime Reporting System show a reduction in the number of total arrests in Hazleton over the last five years – from 1,458 in 2000 to 1,263 in 2005.  Moreover, while everyone seems to agree that Hazleton's immigrant population has swelled since 2000 – mostly with Latino immigrants venturing west from New York and New Jersey – there is no evidence that the vast majority of newcomers are anything but legal.

In light of the irreparable harm that Plaintiffs will suffer if the Registration and Immigration Ordinances take effect, as described in the preceding section, the City's lack of data to back up its claims that illegal aliens are responsible for increased crime and other ills in Hazleton, and that the data actually shows that the number of arrests in Hazleton has decreased during the last five years, the harm caused to Plaintiffs far outweighs any alleged harm to the Defendant. *See* Ellen Barry, *City Vents Anger at Illegal Immigrants*, L.A. TIMES, July 14, 2006, at 1 (police statistics reveal decrease in arrests in Hazleton over last five years).

### E.    Granting the Preliminary Injunction is In the Public Interest

The Ordinance runs afoul of the U.S. Constitution, civil rights and state laws.  The public interest is greatly served by preventing the enforcement of an ordinance that directly violates constitutional provisions and does not remedy any documented problems.  *See Council of Alternative Political Parties v. Hooks*, 121 F.3d 867, 883-884 (3rd. Cir. 1997) (stating that "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights.")

Moreover, because the harm in this case involves a municipality interfering with what are clearly federal powers, the potential harm is to the entire nation.  As the Supreme Court has noted, the "[l]egal imposition of distinct, unusual and extraordinary burdens and obligations upon aliens ... bears an inseparable relationship to the welfare and tranquility of *all* the states, and not merely to the welfare and tranquility of one."  *Hines*, 312 U.S. at 66 (emphasis added).

## IV.    CONCLUSION

For the reasons set forth in the Declarations of Humberto Hernandez, Brenda Lee Mieles, HHBA, John Doe 1 and this Memorandum of Law in support of this Motion for Preliminary Injunction and Temporary Restraining Order, the Plaintiffs respectfully request this Court to enter a preliminary injunction and temporary restraining order to prohibit the enforcement of Immigration Ordinance 2006-18 and Registration Ordinance 2006-13, related to immigration status and registration

of tenants, unless such time as these Ordinances' lawfulness are determined.

Respectfully submitted,


By: /s/ Thomas G. Wilkinson, Jr.

Thomas G. Wilkinson, Jr.
Linda S. Kaiser
Doreen Yatko Trujillo
Thomas B. Fiddler
Elena Park
Ilan Rosenberg
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel. (215) 665-2000
Fax: (215) 665-2013

Lillian Llambelis, Esquire
Foster Maer, Esquire
Jackson Chin, Esquire
PUERTO RICAN LEGAL
DEFENSE FUND
99 Hudson St. 14 Floor
New York, NY 10013-2815
Tel. (212) 739-7575
Fax: (212)431-4276

George R. Barron, Esquire
88 North Franklin Street
Wilkes-Barre, Pennsylvania
18701
Tel. (570) 824-3088
Fax: (570) 825-6675

63

David Vaida, Esquire
137 North 5th Street
Allentown, PA 18102
Tel. (610) 433-1800
Fax: (610) 433-2985

Barry H. Dyller
Barry H. Dyller, Esquire
DYLLER LAW FIRM
Gettysburg House
88 North Franklin Street
Wilkes-Barre, PA 18701
Tel. (570)  829-4860
Fax: (570) 825-6675

Lee Gelernt, Esquire
Omar C. Jadwat, Esquire
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
 Immigrants' Rights Project
125 Broad St., 18th Fl.
New York, NY 10004
Tel. (212) 549-2620
Fax: (212) 549-2654

Lucas Guttentag, Esquire
Jennifer C. Chang, Esquire
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950

Witold J. Walczak, Esquire
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA  15213
Tel. (412) 681-7864
Fax: (412) 681-8707

Paula Knudsen, Esquire
AMERICAN CIVIL LIBERTIES  UNION
OF PENNSYLVANIA
105 N. Front St., Suite 225
Harrisburg, PA 17101
Tel. (717) 236-6827
Fax: (717) 236-6895

Mary Catherine Roper, Esquire
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA  19106
Tel. (215) 592-1513 ext. 116

*Counsel for Plaintiffs*

Shamaine Daniels, Esquire
Laurence E. Norton, II, Esquire
Peter Zurflieh, Esquire
COMMUNITY JUSTICE PROJECT
118 Locust Street
Harrisburg, PA 17101
Tel. (717) 236-9486
Fax: (717) 233-4088

*Counsel for Plaintiffs Rosa Lechuga, Jose Luis Lechuga, Brenda Lee Mieles John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6 and Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4 and Casa Dominicana of Hazleton, Inc.*

65

Peter D. Winebrake, Esquire
TRUJILLO RODRIGUEZ & RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
Tel. (215) 731-9004
Fax: (215) 731-9044

*Counsel for Plaintiff Pennsylvania Statewide Latino Coalition*

## CERTIFICATE OF SERVICE

I, Thomas G. Wilkinson, Jr., counsel for Plaintiffs, hereby certify that I am duly authorized to make this certification; that on the 30th day of October, 2006, I did cause a true and correct copy of Plaintiffs' Memorandum of Law in Support of Plaintiff's Motion for Preliminary Relief to be mailed by Federal Express to counsel addressed as follows:

> Harry G. Mahoney, Esq.
> Andrew B. Adair, Esq.
> Deasey, Mahoney & Bender, Ltd.
> 1800 John F. Kennedy Boulevard
> Suite 1300
> Philadelphia, PA  19103-2978

BY:  /s/ Thomas G. Wilkinson, Jr.

67