**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PEDRO LOZANO, ET AL. | : | CIVIL ACTION NO. 3:06-cv-01586-JMM |
| | : | |
| Plaintiffs, | : | (Hon. James M. Munley) |
| | : | |
| v. | : | |
| | : | |
| CITY OF HAZLETON | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFFS' POST-TRIAL
PROPOSED FINDNGS OF FACT AND BRIEF**

# Table of Contents

**Page**

I.  Proposed Findings of Fact .................................................................. 1

A.  The Plaintiffs ....................................................................... 1

B.  The Plaintiffs Have Standing To Challenge The Ordinances .................... 4

C.  Hazleton's History And Recent Population Growth ............................... 8

D.  Hazleton's Financial Picture ..................................................... 10

E.  Hazleton's Decision To Adopt The Immigration Ordinances ................. 12

F.  The Ordinances' Findings Are Not Supported By The Evidence .......... 17

   (1)  Hazleton's Per Capita Crime Rate Has Decreased Since 2001 ......... 18

   (2)  There Is No Credible Evidence Of Illegal Immigrants Being Involved In Pervasive Gang Activity In Hazleton ............................................ 24

   (3)  Barletta's Claim That One Third of Drug Arrests in Hazleton Involve Illegal Immigrants Is Not Supportable ............................................. 25

   (4)  The City's Budget And Financial Statements Do Not Reflect Expenses Or Concerns About Expenses Related to Undocumented Immigrants .................................................................................. 26

   (5)  The City's Police Overtime Expenses Do Not Reflect Substantial Cost Related To Illegal Immigration ......................................................... 27

   (6)  Hazleton Does Not Provide Any Funding To The School District .... 28

   (7)  Hazleton Does Not Provide Any Funding For Healthcare ................. 30

   (8)  The Testimony Of Hazleton's Expert George Borjas Is Neither Relevant Nor Credible ...................................................................... 35

   (9)  The Testimony Of Hazleton's Expert John Martin Is Neither Credible Nor Relevant ...................................................................... 37

G.  Hazleton's Ordinances Violate The Constitution And Federal Law ....... 39

   (1)  Hazleton's Ordinances Are Preempted ............................................. 39

      (a)  Immigration Law Implicates National Policy Issues, None Of Which Hazleton Considered Or Was Competent to Consider ...... 39

      (b)  The Determination Of Immigration Status Requires Complex Analysis Under Federal Law ....................................................... 40

(c)    Unlike Federal Law, Hazleton's Ordinances Require Employers To Check The Immigration Status Of Independent Contractors ........ 45

(d)    Hazleton's Immigration Ordinances Provide Shorter Response Times To Verify Immigration Status And Harsher Penalties ....... 46

(e)    Hazleton's Immigration Ordinance Require Use Of Basic Pilot, But Federal Law Does Not ............................................................ 47

(f)    Unlike Federal Law, Hazleton's Revised Immigration Ordinance Creates A Private Right of Action .................................................. 48

(g)    The Federal Government Has Adopted Programs To Aid Municipalities With Crimes Involving Illegal Immigrants .......... 49

(2)    Hazleton's Ordinances Do Not Comply With Fourteenth Amendment Procedural Due Process Requirements ................................................ 50

(a)    The Revised Immigration Ordinance Does Not Provide Adequate Notice Or Opportunity To Be Heard .............................................. 51

(b)    The Tenant Registration Ordinance Does Not Provide Notice Of The New Registration Obligation To Non-English Speaking Residents ....................................................................................... 53

(c)    The Complaint and Verification Process Contemplated By The Ordinances Is Rife With Errors ...................................................... 55

(3)    Hazleton's Ordinances Promote Discrimination ................................ 64

(a)    The Revised Immigration Ordinance's Complaint-Based Enforcement System Promotes Discrimination ............................ 64

(b)    Hazleton's Immigration Ordinances Have Generated Anti-Immigrant Hostility That Did Not Previously Exist .................... 66

II.    Plaintiffs' Post-Trial Brief ........................................................................ 69

    A.    All of Plaintiffs' Claims Are Valid Against the Ordinances As Amended ........................................................................................................... 69

        (1)    Even As Amended, the Ordinances Impose a Strict Liability Standard On Employers That Conflicts With Federal Law ................................ 70

        (2)    Even As Amended, the Ordinances Are Invalid Under the Equal Protection Clause and Anti-Discrimination Laws .............................. 73

    B.    The Court Should Issue an Additional Declaration That the Immigration Ordinance Violates Federal Law When Considered Without The Latest Amendments ........................................................................................... 76

C.    The New Authority Cited By Defense Counsel Actually Strengthens
      Plaintiffs' Legal Claims ............................................................................ 79

D.    Conclusion ................................................................................................. 87

# Table of Authorities

**Cases:**

*City of Mesquite v. Aladdin's Castle, Inc.*
  455 U.S. 283 (1982) ..................................................................... 78

*County of Los Angeles v. Davis,*
  440 U.S. 625 (1979) ..................................................................... 78

*Doe v. Butler,*
  892 F.2d 315 (3d Cir. 1989) ........................................................ 76

*Friends of the Earth, Inc. v. Laidlaw Env. Svcs.,*
  528 U.S. 167 (2000) ..................................................................... 78

*Hines v. Davidowitz,*
  312 U.S. 52 (1952) .................................................................. 72, 81

*Huntington Branch NAACP v. Town of Huntington*,
  844 F.2d 926 (2d Cir.), *aff'd*, 488 U.S. 15 (1988) .......................... 76

*Incalza v. Fendi North America, Inc.,*
  479 F.3d 1005 (9th Cir. 2007)................................................... 80, 81

*Khodara Envtl., Inc. v. Beckman*,
  237 F.3d 186 (3d Cir. 2001).....................................................78-79

*Penny Saver Pubs., Inc. v. Village of Hazel Crest*,
  905 F.2d 150 (7th Cir. 1990)........................................................ 79

*Pryor v. National Collegiate Athletic Ass'n.,*
  288 F.3d 548 (3rd Cir. 2002) ....................................................... 75

*Reno v. Bossier Parish School Bd.*,
  520 U.S. 471 (1997) ..................................................................... 75

*Resident Advisory Bd. v. Rizzo,*
  564 F.2d 126 (3d Cir. 1977).......................................................... 76

*Reynolds v. City of Valley Park*,
  No. 06-CC-3802, at 5 (St. Louis Cty. Circuit Ct., Mar. 12, 2007) .................... 79

*Rogers v. Nelson*,
    563 F.2d 617 (3d Cir. 1977) ............................................................................ 72

*United States v. Atandi*,
    376 F.3d 1186 (10th Cir. 2004) ................................................................. 84-87

*United States v. Bazargan*,
    992 F.2d 844 (8th Cir. 1993) ................................................................... 85, 86

*United States v. Gov't of the Virgin Islands*,
    363 F.3d 276 (3d Cir. 2004) ............................................................................ 78

*United States v. Igbatayo*,
    764 F.2d 1039 (5th Cir. 1985) ........................................................................ 84

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953) ........................................................................................ 78

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ........................................................................................ 75

*Williams v. Mohawk*,
    411 F.3d 1252 (11th Cir. 2005), *vacated*, 126 S. Ct. 2016 (2006) .................. 84

**Statutes:**

27 C.F.R. § 478.11 .............................................................................................. 86

53 P.S. § 36011 .................................................................................................. 77

8 U.S.C. § 1324(a)(3)(A) .................................................................................... 84

8 U.S.C. § 1324a(a)(1)(A), (b)(1)(A)(ii) .............................................................. 72

8 U.S.C. § 1324a(a)(3) ........................................................................................ 72

18 U.S.C. § 922(g) ......................................................................................... 85-86

18 U.S.C. § 922(g)(5) .......................................................................................... 86

18 U.S.C. § 1961 *et seq.* ...................................................................................... 80

18 U.S.C. § 1964 .................................................................................................. 83

42 U.S.C. § 3604 *et seq.* ........................................................................... 76

## I.    Proposed Findings of Fact[1]

Plaintiffs request this Court to make the following findings of fact based on the evidence presented at trial:

### A.    The Plaintiffs

1.    Plaintiffs commenced this action to challenge as unconstitutional recent ordinances enacted by the City of Hazleton concerning undocumented immigrants.  (See Second Amended Complaint, Docket No. 82).

2.    Plaintiff Pedro Lozano came to the United States from Colombia in 2002 in search of a better life.  (Vol. 1/161:13-20).  He is a lawful resident of the United States.  (Vol. 1/161:21-24).  After living in New York, he moved to Hazleton in search of affordable housing and better employment.  (Vol. 1/164:12-23).  Lozano is currently seeking work in the Hazleton area.  (Vol. 1/162:18-163:18).  In Colombia, Lozano was an official of the National Police Force for 35 years.  (Vol. 1/162:10-17).

3.    Plaintiffs Jose Luis Lechuga, and his wife, Rosa Lechuga (Vol. 2/118:10-15, 153:2-5), were born in Mexico and moved to the United States in 1982 without the federal government's permission.  (Vol. 2/118:20-119:5).  They received amnesty in the late 1980s and became lawful permanent residents. (Vol. 2/119:6-120:7).  The Lechugas came to the United States to make a life for themselves and their children.  (Vol. 2/118:24-25).  They moved to Hazleton in 1991 because of employment opportunities in the city.  (Vol. 2/122:9-123:3, 153:6-10).  The Lechugas have four children: one is a lawful permanent resident and three are United States citizens.  (Vol. 2/120:9-11, 156:5-14).

---

[1]    Plaintiffs incorporate herein by reference their previously filed conclusions of law filed on March 2, 2007.  (Docket No. 144).

4.      Plaintiff John Doe 1 moved to Hazleton in 2001.  (P-200, John Doe 1 Dep. Tr. at 12:11-12).   He was born in Mexico.  (P-200, John Doe 1 Dep. Tr. at 14:24-25).  He is neither a U.S. citizen nor lawful permanent resident.  (P-200, John Doe 1 Dep. Tr. at 26:4-14).  Although John Doe 1 is not yet a lawful permanent resident, his father filed a petition on his behalf for an immigrant relative visa, which has been approved.   (P-200, John Doe 1 Dep. Tr. at 74:1-3).  John Doe 1 is awaiting an appointment with the United States Citizenship and Immigration Service ("CIS"), after which he will become a lawful permanent resident.  (P-200, John Doe 1 Dep. Tr. at 74:7-8).

5.      Plaintiff John Doe 3 moved to Hazleton in 2003.  (P-202, John Doe 3 Dep. Tr. at 9:18-22).   He was born in Mexico.  (P-202, John Doe 3 Dep. Tr. at 20:24-25).  He is neither a U.S. citizen nor lawful permanent resident.  (P-202, John Doe 3 Dep. Tr. at 11:8-10).

6.      Plaintiffs Jane Doe 5 and John Doe 7 moved to Hazleton in 2001.  (P-203, Jane Doe 5 Dep. Tr. at 13:11-17; P-204, John Doe 7 Dep. Tr. at 10:4-8).  Both were born in Colombia.  (P-203, Jane Doe Dep. Tr. at 14:13-15; 16:16-17; P-204, John Doe 7 Dep. Tr. at 9:16-17).  John Doe 7 worked as an architect in Colombia and has been married to Jane Doe 5 for over 28 years.  (P-204, John Doe 7 Dep. Tr. at 10:1-3; P-203, Jane Doe 5 Dep. Tr. at 14:15-17).  Neither is a U.S. citizen or lawful permanent resident.  (P-203, Jane Doe 5 Dep. Tr. at 15:18-16:10; P-204, John Doe 7 Dep. Tr. at 10:16-24).

7.      All of the John an Jane Doe plaintiffs work and pay taxes. (P-200, John Doe 1 Dep. Tr. at 30:21-24; 33:10-15; P-202, John Doe 3 Dep. Tr. at 21:12-15; 33:1-21; 34:5-9); P-203, Jane Doe 5 Dep. Tr. at 35:15-17; 68: 19-69:19; P-204,

John Doe 7 Dep. Tr. at 12:7-20).

8.    Plaintiff Hazleton Hispanic Business Association ("HHBA"), is a not-for-profit organization whose membership is comprised of approximately twenty-seven Latino business and property owners from the Hazleton area.  (Vol. 2/77:15-21; 78:13-20; 80:22-24; 98:15-19).  HHBA promotes the interests of its business members, projects an image of the Hispanic business community in Hazleton, and assists the community.  (Vol. 2/77:27-78:3; 78:6-12).

9.    Rodolfo Espinal, president of HHBA, came to the United States on vacation from the Dominican Republic in 1988, (Vol. 2/77:15-78:22; 68:10-17), overstayed his visa and became an undocumented immigrant.  (Vol. 2/69:18-24).  In 1992, Espinal obtained lawful permanent residency, (Vol. 2/71:13-72:4), and in 2006 became a U.S. citizen.  (Vol. 2/68:12-15).  He moved from New York to Hazleton with his family in December 2001.  (Vol. 2/68:5-7; 73:18-22).

10.    Plaintiff Pennsylvania Statewide Latino Coalition ("PSLC"), a not-for-profit organization established in 1994, (Vol. 2/52:16-18) has a mission to promote the social, political, economic and cultural development of Pennsylvania Latinos; develop leadership; and create networks among Latino leaders and communities.  (Vol. 2/20:21-21:15; 22:14-20).  PSLC's organizational activities include an annual conference, youth development, and other advocacy activities.  (Vol. 2/23:21-24:14).  PSLC has approximately six thousand members and relies almost exclusively on the contributions of its members.  (Vol. 2/22:12-13; 45:6-46:16).  Approximately 20 of PSLC's members reside in Hazleton (Vol. 2/52:19-23), including Dr. Agapito Lopez, Anna Arias, Jose Luis Lechuga and Rosa Lechuga.  (Vol. 1/64:5-14); (Vol. 2/56:7-57:15; 59:9-14; 120:15-21).

11.    Plaintiff Casa Dominicana de Hazleton, Inc. ("Casa"), a not-for-profit organization, was incorporated in August 2005.  (Vol. 3/10:8-9).  Casa provides assistance, orientation and education to the Latino community in Hazleton, and works to unify the ties between the Latino and non-Latino communities.  (Vol. 3/7:22-25).  Casa provides its members with information, legal referrals, and assistance with economic difficulties.  (Vol. 3/8:1-9:3).  Casa is committed to preventing youths from joining gangs.  (Vol. 3/27:19-28:10).

**B.    The Plaintiffs Have Standing To Challenge The Ordinances**

12.    In order for the Court to rule on the legal claims raised against the ordinances, Plaintiffs need to identify only one individual or organization with standing.  Many Plaintiffs satisfy the three-part test for standing.

13.    Plaintiff Lozano owns two rental units in Hazleton that he has been unable to rent continuously since the enactment of the ordinances.  (Vol. 1/163:21-22; 165:2-21; 168:6-11; 175:12-24; 177:1-6).  Both of his tenants moved after learning about the tenant registration requirements.  (Vol. 1/167:17-168:5; 187:13-15; 190:13-25).

14.    While attempting to rent the units, Lozano informed prospective tenants of the City's new requirement to register at City Hall prior to renting an apartment.  (Vol. 1/168:12-18; 169:5-21).  Those prospective tenants never returned to rent an apartment.  (Vol. 1/168:12-15; 170:10-14).  Lozano eventually rented one apartment to his daughter for a few months but did not charge her for utilities as he did to other tenants.  Her tenancy ended in January 2007, and the apartment is now vacant. (Vol. 1/177:14-178:11; 180:17-25).

15.    HHBA's president, Espinal, owns a real estate agency (Vol. 2/75:2-13), and several rental units in Hazleton (Vol. 2/89:22-90:21; Vol. 2/91:20-92:3).

He has had difficulty renting them since the enactment of the ordinances. Espinal received several inquiries regarding the apartment, including two Mexican families who expressed strong interest. But they did not return after Espinal informed them about the tenant-occupancy-permit requirement. (Vol. 2/92:22-95:19).

16.     Under the immigration ordinances, Lozano and Espinal are obligated to ascertain the immigration status of all prospective tenants (P-2, § 5), and to rent to only those who produce a registration form required by Ordinance 2006-13. (P-1). But for the ordinances they would not be obligated to perform either task.

17.     Landlords are also considered to be a "business entity" under the Revised Immigration Ordinance, 2006-18. (Vol. 3/153:20-154:7). Lozano and Espinal both anticipate hiring independent contractors to do repairs to their housing units. (Vol. 1/174:23-175:7; Vol. 2/102:4-7). Accordingly, both must submit an affidavit to the City attesting that they do not hire illegal aliens. (P-2, § 4). They also must investigate the immigration status of everyone they hire. Again, but for the Ordinances, Lozano and Espinal would not be required to do so. These are discrete, particularized and certain injuries that will be caused by the ordinances and can be redressed by a decision from this Court. Consequently, Lozano and Espinal have met their burden to show that they are injured by the employment and harboring provisions of the Revised Immigration Ordinance and the Tenant Registration Ordinance.

18.     All Doe plaintiffs are tenants, and as such are required to register under the Tenant Registration Ordinance. As undocumented immigrants, they will be unable to rent an apartment in Hazleton if the ordinances go into effect because they will be unable to obtain a tenant-registration permit and landlords who fear

sanctions will not lease to them.  These injuries are definite, will be caused by the Ordinances, and can be redressed by a decision from this Court.

19.     Even though this Court has enjoined enforcement of the ordinances, they have injured some plaintiffs.  After the Tenant Registration Ordinance was passed but before the Court's injunction, Hazleton placed a notice in the local newspaper advising of the obligation of tenants to register their immigration status and of landlords not to rent to unregistered tenants.  (P-13).  John Doe 1's landlord told him he would have to move.  John Doe 1 informed his landlord that because of his uncertain immigration status, he might be able to get an occupancy permit, and his landlord informed him that he "didn't want any problems" and "didn't want to take the risk."  (P-200, John Doe 1 Dep. Tr. at 52:11-17).  Instead, his landlord insisted that John Doe 1 abandon the apartment, which he did at the end of October 2006.  (P-200, John Doe 1 Dep. Tr. at 52:8-9).  John Doe 1's landlord did not want him to leave because he was "a good tenant" (P-200, John Doe 1 Dep. Tr. at 63:8), but felt compelled to comply with the ordinances.  If the ordinances go into effect, John Doe 1 will be forced to leave Hazleton and be separated from his extended family.  (P-202, John Doe 3 Dep. Tr. at 47:21-48:11).

20.     John Doe 3 and his family have been tenants in Hazleton for four years.  (P-202, John Doe 3 Dep. Tr. at 9:19-22).  If the ordinances are enforced, John Doe 3's landlord will be required to evict him, and Doe 3 will not be legally able to rent another apartment in Hazleton.  He will thus be forced to leave Hazleton, his daughter will have to attend another school and will lose her friends.  (P-202, John Doe 3 Dep. Tr. at 37:2-8, 33:10).

21.     PSLC organized a community meeting on July 30, 2006 ,in the

basement of St. Gabriel's Church.  (Vol. 1/72:21-73:4); (Vol. 2/26:1-24).  During that meeting, Latino residents and business owners complained about inadequate trash pick up from Latino homes, a brick being thrown at the window of a Mexican restaurant, Hazleton police officers stopping Latinos to request identification, and businesses losing customers due to the fear that the ordinances had created in the community.  Latino residents also expressed concern about how their children would be treated in school and fears about attending bilingual services at church.  (Vol. 2/27:7-28:24).

22.     PSLC incurred out-of-pocket costs and expenses and devoted unusual amounts of human resources in excess of its budget for the Northeast Region to respond to the concerns of Hazleton residents.  (Vol. 2/38:19-40:14; 45:23:-50:11).

23.     HHBA President Espinal's injuries as an employer and landlord, discussed above, suffice to give HHBA standing.  Additionally, HHBA-membership-owned businesses have suffered significant monetary losses because of the ordinances.  (Vol. 2/82:12-24).  Some members were forced to close their business, others have lost significant clientele, and still others are no longer expanding their business as they had once planned.  (Vol. 2/81:12-82:4).  For example, Isabella Rubio's Gift Shop and Santo Domingo Repair Shop lost numerous customers and significant income.  Other businesses such as Royal Prestige were forced to close.  (Vol. 2/82:5-83:12; 120:5-17).

24.     Furthermore, the ordinances have caused HHBA's membership to decline.  Certain Latino-owned businesses, such as El Mariachi Restaurant, lost their Latino clientele but survived by replacing their customer base with non-Latino clientele.  These businesses withdrew their membership from HHBA to

avoid alienating new clients by participating in this litigation.  (Vol. 2/84:11-86:4; 111:21-112:6; 120:18-121:10).

25.    Casa has 80 members who volunteer their time, approximately 55 of whom reside in Hazleton.  (Vol. 3/12:21-23; 12:9-11; 18:24-19:3).  They include tenants, landlords, and business owners, all of whom are directly impacted by the Ordinances.  (Vol. 3/9:22-10:6).

26.    Mr. Saldana estimates that between 20-23 of Casa's members could be undocumented, i.e., have expired immigration status, have lost documents to show their immigration status, or are in the process of obtaining immigration documents.  (Vol. 3/21:13-15; 29:9-30:1; 20:7-13).

27.    Prior to the enactment of the ordinances, Casa's membership grew steadily.  Between December 2005 and June of 2006, its membership grew from 80 to 140.  (Vol. 3/16:17:12).  However, after the ordinances were proposed, Casa lost approximately ten members by July 2006 and another 35 by August 2006. (Vol. 3/17:13-21).  One member informed Saldana that he had left town and terminated his membership because of the ordinances.  (Vol. 3/17:22-18:18).

28.    The loss of membership caused by the ordinances has prevented Casa from being able to provide many services.  Because Casa's services are now limited, it cannot justify charging a monthly membership fee.  Once Casa's membership becomes large enough to justify a fee, it will provide additional services.  (Vol. 3/19:4-14).

**C.    Hazleton's History And Recent Population Growth**

29.    The City of Hazleton is a City of the Third Class under Pennsylvania law.  The City operates under an Optional Plan B form of government, in which the City is governed by a mayor as executive and five city council members, who

form the City's legislature.  (Vol. 4/204:6-205:10).  Hazleton does not have a home rule charter.

30.    Since 2000, Hazleton's population has noticeably increased. According to the 2000 census, 23,000 people resided in Hazleton.  (Vol. 5/145:24-146:4).  Currently, the City's population is estimated at 30,000 to 33,000.  (P-148 at p.1-2; Vol. 6/163:24-164:8;. Vol. 3/39:21-40:8; 4:208:22-209:3).  Some estimates place the City's population as high as 40,000.  (Vol. 6/164:9-17).

31.    The significant increase in the City's population is due largely to minorities moving into the community.  (P-148), (Vol. 5/146:9-11).  Most of the new minority residents are Hispanic.  (Vol. 5/146:12-14).

32.    After the September 11, 2001, attacks, numerous Latino families moved from New York and New Jersey to Hazleton in search of a better life, new employment and affordable housing.  (Vol. 1/66:22-67:12; Vol. 3/29:22-30:1). The Latinos were lawful permanent residents, U.S. citizens, and undocumented immigrants.  (Vol. 2/161:21-24; 2/175:25-176:3).

33.    No one knows the percentage of Hispanics currently residing in Hazleton. (Vol. 5/146:15-20).  In addition, no one knows the number of undocumented immigrants in Hazleton.  (Vol. 5/146:21-25).

34.    Immigrants and their family members, including those here illegally, engage in consumer spending, pay rent, pay sales taxes and otherwise generate economic activity that supports the local economy.  (Vol. 3/67:21-70:21).

35.    Prior to the ordinances, Latino residents maintained a cordial and cooperative relationship with their non-Latino neighbors.  (Vol. 1/68:14-69:6). Even though Latinos may have different customs and speak a different language,

until recently they lived harmoniously with their native-born neighbors.  (Vol. 1/68:14-69:6; Vol. 2/123:4-124:1; 153:13-154:3).

 **D. Hazleton's Financial Picture**

36. During Hazleton's significant population increase, Louis Barletta has served as mayor of Hazleton.  Barletta was elected to office in 2000.

37. According to his 2006 biography, Barletta has led the City "through one of the most impressive economic revitalizations in regional history."  (Vol. 5/154:12-19).  Barletta assumed a "monumental" $1.2 million budget deficit on a $6 million municipal budget.  (Vol. 3/40:16-41:15).  By 2004, the City had a surplus of $212,065. (P-148 at pg. 2, Vol. 5/154:23-24).  In 2005, the City had a surplus of $33,000.  (P-148 at pg. 2;Vol. 5/154:25-155:1).  The City currently has a "triple A" bond rating (Vol. 5/155:16-19), and has not cut services to its residents. (Vol. 6/211:13-20).

38. For the first time in the past ten years, Hazleton has seen tax assessments increase for three consecutive years.  (P-148 at pg. 4; Vol. 3/45:12-46:2).  Tax assessments increase when residents and businesses renovate their properties.  Increased tax assessments lead to increased tax revenue for the City. 2006 marked the largest annual-property-value increase in Hazleton's history. (Vol. 3/46:4-46:15).

39. The City's 2005 audited financial statements (P-154) (the most recent information available at trial) show the City's net assets related to business type activities increased by $58,953 in 2005. (Vol. 6/173:17-21).  They show an increase in 2005 of $1,193,778 (or 18%) in net assets for governmental activities. (Vol. 6/173:22-174:2), (P-154).  The City's expenses were $193,778 less than its revenues.  (P-154).  The City's combined net assets — one measure of fiscal

health — increased to $12.9 million from $11.7 million the year before.  (Vol. 6/174:10-16).  In 2005, the City collected $599,014 more in earned income tax than originally anticipated.  (Vol. 6/210:8-18), (P-154).

40.    For 2007, Hazleton proposed and adopted a budget with no increase in taxes or service fees.  (P-148 at 8; Vol. 3/50:14-50:20).

41.    Even though Hazleton's real estate tax assessments have increased, it has seen little increase in tax revenue because the Luzerne County Board of Assessment liberally grants taxpayer appeals and reduces property assessments. (Vol. 3/48:8-49:23; Vol. 5/154:2-4; P-148 at pg. 3).

42.    The City's real estate tax revenues have also plateaued because of a lack of developable land within the City limits.  (Vol. 3/46:24-48:7; Vol. 5/153:14-18; P-148 at pgs. 2-3).  Hazleton's lack of developable land has resulted in large, tax-rich industrial parks opening outside of Hazleton's borders.  (Vol. 3/75:6-78:4; Vol. 5/155:20-156:10).  The City does not realize the real estate tax revenue from developments located outside of the City.  (Vol. 5/156:23-157:2).

43.    Notwithstanding Hazleton's increase in population, the City has not seen an increase in its earned income tax ("EIT") revenues.  (Vol. 5/158:8-20). There are many possible explanations for the EIT remaining relatively flat in the face of a growing population. (Vol. 5/158:21-159:23).  The City's Director of Administration, Sam Monticello, insinuates without support that the flat EIT is caused by undocumented immigrants, who are working in Hazleton but not paying taxes.  (Vol. 6/191:11-192:8).  However, Monticello conceded on cross-examination that the flat EIT revenue could be attributable to many factors, including: unemployed residents residing in Hazleton; low wage jobs; the failure of

citizens, lawful permanent residents and undocumented aliens to pay their taxes; and children residing in the community. (Vol. 5/159:2-23). The EIT is Hazleton's largest source of revenue, yet the City has never studied why it has not increased with the population. (Vol. 5/160:5-14).

44.    Because Hazleton's revenues have not kept pace with its population growth, the City has balanced its budget by cutting expenses. The largest single expense in the City's budget is the salaries and benefits for active City employees. (Vol. 5/160:15-19). 70.2% or $5,589,618 of the City's expenses come from the salaries and benefits of the City's active employees. (Vol. 5/160:20-161:2; P-148 at p. 10). The police department's budget of $1,497,035 is the highest of any department in Hazleton. (Vol. 5/161:3-9; P-148 at pg. 9).

45.    Mayor Barletta cut expenses by reducing the number of police officers from forty-two to twenty-three. (Vol. 3/41:16-42:25) (Vol. 5/170:18-171:1). As recently as 2006, Hazleton employed only between twenty seven to thirty officers. (Vol. 3/43:1-43:14). Currently, the City has 30 police officers, seven of whom are on extended sick leave. (Vol. 8/36:1-13).

### E.    Hazleton's Decision To Adopt The Immigration Ordinances

46.    On May 10, 2006, Derek Kichline was murdered in Hazleton. (P-81; Vol. 6/244:14-17). Four undocumented immigrants were arrested for the murder. (Vol. 6/245:6-8). Two of the four assailants lived in nearby Freeland, not Hazleton. (Vol. 3/80:20-81:9). None of those arrested have been tried or convicted. (Vol. 3/79:21-23). Since 2001, seven homicides have been committed in Hazleton. (P-195A, at pg. 2). The Kichline murder is the only one in which undocumented immigrants have been charged.

47.    After the Kichline murder, Barletta concluded that Hazleton had a

problem with undocumented immigrants and decided to do something about the perceived problem. (Vol. 3/78:21-79:23; 81:10-81:13). Barletta asked an internet-savvy friend to find municipal ordinances, anywhere in the country, designed to address undocumented immigration. (Vol. 3/81:14-82:13). He only found an ordinance from San Bernardino, California, which was introduced but never adopted. (Vol. 3/82:12-83:6). Barletta and City Solicitor Chris Slusser, who has no immigration or civil-rights-law experience, made minor changes to the San Bernardino law to remove references to day laborers, and introduced it as Ordinance 2006-10. (Vol. 3/83:7-84:11).

48.     Barletta did not discuss the proposed illegal immigration ordinance with Hazleton's Director of Planning and Public Works, Robert Dougherty, or any of the other department head. (Vol. 5/45:14-46:6). Dougherty oversees and has ultimate responsibility for Code Enforcement and Tenant Registration, the offices charged with the enforcement of the immigration ordinances. (Vol. 5/39:24-40:14). Dougherty has a Bachelors of Science degree in Engineering, a Masters of Science degree in Engineering and a Masters of Science degree in Urban Planning and Development. (Vol. 5/46:15-23).

49.     In the past, Dougherty has been asked to give his input into new ordinances, which pertain to the offices that he oversees, before the ordinances are enacted. (Vol. 5/46:11-14). For example, Dougherty's advice was sought for prior versions of the landlord registration ordinance. (Vol. 5/77:22-24).

50.     Dougherty first learned that the City was contemplating an immigration ordinance when he read about it on the agenda for the June 2006 City Council meeting at which the original Immigration Ordinance was read for the first

time.  (Vol. 5/44:23-45:8).

51.     City Council President Joseph Yannuzzi admitted that City Council had the authority to independently research, conduct or commission studies, or retain consultants or experts to make recommendations concerning the potential impacts of any of the challenged ordinances, but City Council failed to do so. (Vol. 2/144, 185, 203).

52.     Prior to passage of the immigration, City Council did not review any written studies or data analyzing the effect of undocumented aliens on crime, the economy, healthcare, or education.  City Council also did not commission or review any study on the expected impact or effectiveness of the ordinances.  (Vol. 3/140:16-141:6).

53.     On June 15, 2006, City Council had its first public reading of Ordinance 2006-10, i.e., the Original Immigration Ordinance.  (P-10).  Barletta stated at that meeting that the ordinance "is intended to deter and punish illegal immigrants. . ."  (D-91 at pg.4; Vol. 4/254:22-255:21).  Yannuzzi publicly stated that all illegal aliens, including those who overstay their visas, are "criminals," and similar to people who break and enter into someone's home.  (Vol. 2/130; 161).

54.     After the contemporaneous second and third readings on July 13, 2006, City Council adopted the Original Immigration Ordinance.  (P-10).

55.     Shortly after he introduced the Original Immigration Ordinance, Barletta testified before the U.S. Senate about the need for municipal laws such as Hazleton's.  (Vol. 3/197:2-198:2).  Barletta testified that if the federal government had done its job Derek Kichline might still be alive today.  (Vol. 3/197:19-198:2).  Yannuzzi also expressed the view that the federal government had the power to

address immigration problems but was "not doing its job."  (Vol. 2/180-81, 196).

56.    Barletta has repeatedly stated publicly that illegal immigrants have "destroyed" Hazleton's quality of life; drained municipal resources, making it hard to continue providing public services; sent the City "spiraling into debt;" led to increased crime; doubled violent crime; and led to the overcrowding of local hospitals and schools.  (Vol. 3/91:9-93:22).

57.    Prior to the adoption of the Original Immigration Ordinance, City Council never declared illegal immigration a public "nuisance" or made any of the findings in Ordinances 2006-10 or 2006-18.  (Vol. 2/155:19-156:5).

58.    On July 13, 2006, the City had its first public reading of (1) Ordinance 2006-13, i.e., Tenant Registration Ordinance (P-1).  City Council enacted the Tenant Registration Ordinance into law on August 15, 2006, after the contemporaneous second and third readings.  (P-1).

59.    On August 15, 2006, this action was commenced.  (Docket No. 1). Plaintiffs notified the City they intended to seek to enjoin the enforcement of the Original Immigration Ordinance.  The City informed plaintiffs it intended to adopt a new ordinance to supplant the Original Immigration Ordinance.  (See Stipulation and Order, dated September 1, 2006).  The City agreed not to enforce the Original Immigration Ordinance until a new ordinance was enacted or it notified plaintiffs' counsel in writing of its intent to enforce the original Ordinance.  (Id.).

60.    The Revised Immigration Ordinance, Ordinance 2006-18, (P-2), was drafted by the Federation for American Immigration Reform ("FAIR") and the Mountain States Legal Defense Fund, both organizations that advocate for more restrictive immigration laws, tightened border security and a moratorium on

15

immigration from Mexico. (Vol. 2/147:9-18). Attorneys from both groups have entered their appearances in this case on behalf of Hazleton.

61. The Revised Immigration Ordinance was substantially different from the original. Indeed, the only definition carried over from the prior version was the definition of the "City of Hazleton." (Vol. 2/149:7-23).

62. Notwithstanding the importance of the Revised Immigration Ordinance and its relation to the Original Immigration Ordinance, which had been stayed to resolved Plaintiffs' impending preliminary injunction motion, Ordinance 2006-18 had its first reading at a special meeting on September 8, 2006, and was adopted after its second and third readings on September 12, 2006. (Vol. 2/147:9-149:6). The Original Immigration Ordinance was repealed by Ordinance 2006-21. (P-68; Vol. 2/140:4-18).

63. Yannuzzi could not explain City Council's rush to adopt the Revised Immigration Ordinance, especially when he asserted that the City did not intend to enforce it until after its employees were trained how to implement and enforce it. Barletta could not identify another Hazleton ordinance adopted within the short span of five days. (Vol.3/86:17-87:10).

64. On October 30, 2006, plaintiffs filed their First Amended Complaint. (Docket No. 29). Plaintiffs also filed a Motion for Preliminary Injunction and Temporary Restraining Order that same day. (Docket Nos. 30, 32).

65. On October 31, 2006, this Court entered a temporary restraining order, enjoining the enforcement of the Revised Immigration Ordinance, the Tenant Registration Ordinance and the Official English Ordinance. (Docket No. 35). By Stipulation and Order filed November 3, 2006, the parties agreed to

extend the temporary restraining order until a consolidated preliminary injunction hearing and trial on the merits to occur no later than January 31, 2007.  (Docket No. 39).

66.     On December 28, 2006, Hazleton adopted Ordinance 2006-40, entitled "Illegal Immigration Relief Act Implementation Amendment" (the "Implementation Amendment").  (P-5).  Ordinance 2006-40 amended Ordinance 2006-18 by adding §7, entitled "Implementation and Process."  (P-5).

67.     On January 12, 2007, plaintiffs filed their Second Amended Complaint.  (Docket No. 82).

68.     Hazleton also intends to enforce the Revised Immigration Ordinance, as modified by Implementation Amendment and the Tenant Registration Ordinance if the court lifts the injunction.  (Vol. 3/85:4-85:22).

69.      During trial, Hazleton made yet more amendments to the Revised Immigration Ordinance.  On the first day of trial, defense counsel advised that Hazleton would further amend the Revised Immigration Ordinance to remove the words "solely or primarily" from §§4.B.(2) and 5.B.(2).  (Vol. 1/52:11-12).  On the last day of trial, defense counsel informed the Court and Plaintiffs that the proposed amendment was adopted, and in addition the City added the word "knowingly" to the first part of §4.A.  (Vol. 9/3:24-4:22).

**F.     The Ordinances' Findings Are Not Supported By The Evidence**

70.     According to Section 2 of the Revised Immigration Ordinance, "illegal immigration leads to higher crime rates, subjects our hospitals to fiscal hardship and legal residents to substandard quality of care, contributes to other burdens on public services, increasing their cost and diminishing their availability to legal residents, and diminishes our overall quality of life."  (P-2 at §2.C.).

71.    At no time prior to the adoption of the ordinances did Hazleton compile, review, study, or analyze any information or statistics concerning the effect of undocumented immigration on crimes, healthcare, or public services. None of the "evidence" that the City now relies upon in support of the findings in its ordinances was considered, reviewed, or in many instances obtained until after the commencement of this lawsuit-.

### (1)    Hazleton's Per Capita Crime Rate Has Decreased Since 2001

72.    According to City Council President Yannuzzi, the primary basis for adoption of the ordinances was the perception that crime was being committed in inordinate percentages or amounts in Hazleton by illegal aliens.  (Vol. 2/131). Yannuzzi viewed the Original Immigration Ordinance as "just an ordinary ordinance to control crime."  (Vol. 2/132:21-25).

73.    Yannuzzi admitted that City Council did not receive or review any police reports, shift incident reports, crime data or statistics showing the numbers of crimes claimed to have been committed by illegal aliens.  (Vol. 2/133:3-134:2). Yannuzzi admitted he was unaware of the criminal conviction of any illegal alien in Hazleton.  (Vol. 2/203:4-9).  Yannuzzi did not know Hazleton's population or the number of undocumented aliens in Hazleton.  (Vol. 2/134:3-8; 146:11-16).

74.    City Council did not receive any evidence, data, statistics or crime rate information from the Police Department before adopting the Revised Immigration Ordinance.  (Vol. 2/133:3-134:2).  .  Yannuzzi admitted City Council only heard from Barletta, who asserted that illegal immigration increased crime. The only crime mentioned to Council was the Kichline homicide.  (Vol. 2/150:24-151:20).

18

75.     Prior to the passage of the Immigration Ordinance, Police Chief Ferdinand did not provide Barletta with any statistics on crimes committed by undocumented immigrants.  (Vol. 3/121:2-10).  Ferdinand also did not provide Barletta with statistics on crimes committed by undocumented immigrants prior to the passage of the revised immigration ordinance.  (Vol. 6/221:16-21).  In fact, Ferdinand only sought to gather documents on crimes allegedly committed by undocumented immigrants in late January or early February of 2007, four to six weeks before the commencement of trial.  (Vol. 6/222:3-23).

76.     In discovery, Plaintiffs requested Hazleton to produce all pertinent crime statistics.  The crime statistics produced by Hazleton do not support the conclusion in Section 2.

77.     The Police Department does not keep information on the immigration status of those arrested and does not keep copies of the federal detainers, which evidence an undocumented alien being transferred to federal custody.  (Vol. 6/225:25-226:21).

78.     In response to Plaintiffs' discovery requests, Police Chief Robert Ferdinand searched for police records for crimes involving undocumented persons for a period spanning from 2001 to 2006.  (P-80; P-113; Vol. 6/243:11-244:13). The Hazleton Police Department keeps its police reports on the "Alert" computer system.  (Vol. 6/223:21-224:5).  The Alert System has several informational fields, but there is no field for immigration status. (Vol. 6/224:6-225:2).

79.     To obtain information on crimes allegedly committed by illegal aliens, Chief Ferdinand (1) conducted a computer search of terms such as "illegal alien," "illegal immigrant," "ICE" and (2) instructed his narcotics detectives to identify

those individuals they believed to be illegal aliens.  (Vol. 6/226:22-229:7).

80.    Chief Ferdinand's initial document search returned twenty-one incident investigation reports.  (P-80).  Five of those reports did not reflect crimes allegedly committed by undocumented aliens.  (Vol. 6/229:24-238:2).

81.    After an additional search, Chief Ferdinand produced nine Daily Information Sheets and one additional Incident Investigation Report.  (P-113).  Of those ten additional documents, four were duplicates of incidents reflected in other reports.  (Vol. 6/239:10-241:10; Vol. 6/242:8-13).  One of the additional ten did not evidence a crime by an undocumented person.  (Vol. 6/241:11-242:7).

82.    In total, the City was able to produce only 21 documents, which it believes reflect crimes committed by undocumented persons.  (Vol. 6/ 230:11-243:16).  The City does not know whether any of the 21 crimes resulted in a conviction of an illegal immigrant from 2001 to 2006.   (Vol. 6/247:15-248:16).

83.    From 2001 to 2006, there were 4,288 Part I (more serious offenses) in Hazleton (Vol. 6/257:13-258:11), and  4,283 Part II (less serious offenses) (Vol. 6/257:13-258:11).  In total, 8,571 total crimes were committed in Hazleton during that time period.  (P-195A; Vol. 8/10:12-12:20).

84.    In 2001 Hazleton experienced 1,358 total crimes.  In 2006 it had 1397 total crimes.  The population was approximately 10,000 more in 2006 than it was in 2001.  Thus, from 2001 to 2006, the per capita crime rate actually decreased in Hazleton.  (P-195A; Vol. 8/12:21-13:23).

85.    When Barletta and Hazleton use the term "crime rate," they refer to total crimes without reference to the size of the population.  The FBI and other law enforcement agencies typically define crime rates as crimes per capita.  (Vol.

3/117:11-118:13).

86.    From 2001 to 2006, there were 428 violent crimes (defined by the Uniform Crime Reports to be murders, rape, robberies and aggravated assaults) committed in the City of Hazleton.  (D-247; Vol. 8/13:24-15:22).  The City produced evidence that three of the 428 violent crimes were allegedly committed by undocumented aliens.  (Vol. 8/16:9-23:12).

87.    Violent crimes are on the increase nationwide: homicides are up 10.2%; robberies are up 12.2%; aggravated assaults are up 3.1%; firearms offenses are up 10 %.  (Vol. 8/25:9-26:6-8).

88.    As a general rule, a population increase leads to an increase in crime. (Vol. 8/23:19-25).   Although the population in Hazleton has increased, the number of crimes per capita have actually decreased.

89.    The decrease in per capita crimes in Hazleton at a time when the immigrant population is increasing is consistent with the testimony of Plaintiffs' expert Rueben Rumbaut, Ph.D.  Dr. Rumbaut is a Professor in the Sociology Department at the University of California at Irvine.  (P-210, Rumbaut Trial Dep., 9:1-10:1; Dep. Ex. 1).  He has been teaching about immigration since 1978.  (P-210, Rumbaut Trial Dep. 11:19-12:18; Dep. Ex. 1).  He has conducted grant-funded research work on immigrants' experience and adaptability in the United States for nearly thirty-five years.  (P-210, Rumbaut Trial Dep., 12:19-14:17; Dep. Ex. 1 at pp. 2-4).  His research includes studies of criminal behavior by immigrants.  (P-210, Rumbaut Trial Dep., 15:9-16:24).  Dr. Rumbaut has received many honors and awards, and is an elected member of the Council of the American Sociological Association and the National Academy of Sciences' Committee on

21

Population.  (P-210, Rumbaut Trial Dep. 14:18-15:8; Dep. Ex. 1 at pp. 4-5).  He

has written numerous peer-reviewed articles (P-210, Dep. Ex. 1 at pp. 6-13) and

books (id. at 5-6, 19:19-20:14), and is editor or co-editor of various immigration

textbooks and encyclopedias, (P-210, Dep. Ex. 1  at 6; Rumbaut Trial Dep., 20:15-

22:3).  Dr. Rumbaut's most recent article is entitled *The Myth of Immigrant*

*Criminality and the Paradox of Assimilation*.  Plaintiffs offered Dr. Rumbaut as an

expert in immigration and the adaptation of immigrants in this country.  (P-210,

Rumbaut Trial Dep., 29:20-24.  Defendant accepted Dr. Rumbaut's expert

qualifications.  (P-210, Rumbaut Trial Dep., 30:12-34:9).

90.     Studies show that Americans have a deeply-rooted perception that

immigrants contribute to higher crime rates.  (P-210, Rumbaut Trial Dep. 37:16-

40:6).  History is replete with examples, especially during eras of mass migration,

of nativists viewing the newcomers as threats.  For example, such nativist views

existed against the Irish, Jews, Italians, Chinese and Japanese. (P-210, Rumbaut

Trial Dep. 40:7-43:15).

91.     Immigrants do not vote and typically lack political power.

Historically they have been treated as scapegoats.  (P-210, Rumbaut Trial Dep.,

43:16-45:10).

92.     Dr. Rumbaut has assessed immigrants crime issues using federal

government reports (including FBI crime reports), victimization studies and

surveys from cities with high numbers of undocumented immigrants, like Miami,

Los Angeles and Chicago.  (P-210, Rumbaut Trial Dep. at 48:11-49:5).  Since the

federal government does not maintain statistics for crimes committed by

undocumented immigrants, Dr. Rumbaut and others use the best available data to

conduct their analysis.  (P-210, Rumbaut Trial Dep., 49:6-58:2).

93.     Dr. Rumbaut testified that those born in this country commit crimes at five times the rate of immigrants, both documented and undocumented.  (P-210, Rumbaut Trial Dep., 58:3-62:3).  Immigrants' incarceration rates are also much lower than for the native born.  (P-210, Rumbaut Trial Dep., 67:24-69:10).  Dr. Rumbaut's findings have been confirmed by his own and other researchers' longitudinal studies, which track behavior over times.  (P-210, Rumbaut Trial Dep. at 69:11-72:10).  The comparison of incarceration rates and crime rates, which plummeted between 1994 and 2005, demonstrates that the perceived immigrant criminality is in reality a myth.  Indeed, studies reveal that the more immigration to an area, the lower the crime rate.  (P-210, Rumbaut Trial Dep. 72:11-73:15).  Dr. Rumbaut's conclusions have been confirmed by other peer-reviewed studies.  (P-210, Rumbaut Trial Dep.73:17-76:25).

94.     Determining the precise percentages of crimes committed by undocumented immigrants is difficult because criminal-justice agencies do not regularly determine immigration status and do not maintain reliable statistics.  (P-210, Rumbaut Trial Dep. 77:1-78:25).  But using customized surveys and focusing on those demographic groups that comprise the largest number of undocumented immigrants, i.e., low-income, low-education Mexicans, Guatemalans and Salvadorans, Dr. Rumbaut and other researchers have concluded that undocumented immigrants commit crimes at lower rates than documented immigrants and much lower rates than native born persons.  (P-210, Rumbaut Trial Dep., 79:1-81:16).

95.     The finding in the Revised Immigration Ordinance that illegal

immigration leads to higher crime rates is simply not supported by Hazleton's experience or national trends.

### (2) There Is No Credible Evidence Of Illegal Immigrants Being Involved In Pervasive Gang Activity In Hazleton

96.     Police Chief Ferdinand claims Hazleton has experienced problems with gang activity in recent years.  (Vol. 8/26:9-16).  According to Ferdinand, the gangs operating in Hazleton include the Latin Kings, Bloods, Crips, Dominicans Don't Play (DDP), Mara Salvatrucha (MS-13), the East Side Gang, the Trinitarios, and the Soldiers.  (Vol. 8/27:11-24).  Hazleton concludes that the presence of gangs means illegal immigrants are involved with the gang activity in the City.

97.     Although Chief Ferdinand believes that some illegal immigrants are gang members, he concedes that gangs are not comprised solely of undocumented persons; some gang members are United States citizens; some gang members are lawful permanent residents; and not all undocumented persons are gang members. (Vol. 8/29:18-30:5).  Chief Ferdinand does not know what percentage of gang members are undocumented persons.  (Vol. 8/30:6-8).

98.     Detective Christopher Orozco heads the Police Department's Street Crimes Task Force.  Orozco has been on Hazleton's police force for nine years. (Vol. 8/36:7-9).  The Street Crimes Task Force was recently created to deals with all street crime issues, including gang activity.  (Vol. 8/45:11-15).

99.     During Orozco's tenure, the Police Department has only arrested five alleged gang members: one from MS-13, one from DDP, one from the Latin Kings, one from Trinitarios, and one from East Side Gang.  (Vol. 8/32:13-33:11).

100.    To attempt to bolster the testimony of Orozco and Ferdinand, Hazleton called purported gang expert Jared Lewis.  Lewis opines that gang

activity exists and is increasing in Hazleton and that local gangs are largely comprised of undocumented persons. Those opinions are not credible.

101.  Lewis does not base his opinions on facts specific to Hazleton, but rather on his study of gangs located in other parts of the country. Hazleton did not provide Lewis with any police Incident Investigation Reports, Daily Incident Reports, summary of crime statistics or any other information about crimes allegedly committed by gang members or undocumented persons prior to or subsequent to Lewis rendering his opinions. (Vol. 8/162:1-5).

102.  Prior to rendering his opinions, Lewis also did not (1) meet with Detective Orozco, Police Chief Ferdinand or any other Hazleton police officer or (2) visit Hazleton. His only trip to Hazleton, a brief one, was made the day before his trial testimony. (Vol. 8/124:14-19; 164:6-9).

103.  Lewis' opinion that 90% of gang members in Hazleton consist of undocumented persons is not credible. Lewis did not review any facts relating to alleged gang activity in Hazleton, crimes in Hazleton or the number of undocumented persons in Hazleton. Moreover, this conclusion, which was not contained in his report, was not supported by independent research shared with the Court. Instead, Lewis claims this statistic was contained in a recent FBI press release that he did not produce and about which he could not provide any specific information. (Vol. 8/168:21-169:20).

104.  There is no credible evidence of undocumented aliens being involved in pervasive gang activity in Hazleton.

### (3)    Barletta's Claim That One Third of Drug Arrests in Hazleton Involve Illegal Immigrants Is Not Supportable

105.  Barletta asserts that one-third of all recent drug arrests in the City

have involved illegal immigrants.  (Vol. 3/119:14-22).  Barletta's assertion is not supported by the record.

106.    Hazleton called Detective Jason Zola, a member of the Police Department's narcotics division to testify about drug arrests.  (Vol. 8/54:16-22). The narcotics division has four police officers.  (Vol. 8/75:9-10).  Zola testified that there were 10 drug arrests out of 30 in the City of Hazleton in 2006 involving illegal immigrants.  (Vol. 8/56:9-18).

107.    However, Zola clarified on cross-examination that the 10 drug arrests were only those made by the narcotics unit, which has four police officers.  (Vol. 8/74:12-19, 74:24-75:5).  The 26 other officers in the Hazleton Police Department make arrests for narcotics violations too.  (Vol. 8/75:6-16).  In total, there were 235 drug-related arrests in Hazleton from 2001 to 2006.  (P-75; P-76; P-188 to P-191). United States citizens, lawful residents and undocumented aliens all sell and use drugs.  (Vol. 8/75:17-19).

108.    There is no evidence to suggest that one-third of Hazleton's drug arrests were of undocumented immigrants.  To the contrary, the record reflects that only 10 out 235 drug arrests involved illegal aliens.

### (4)    The City's Budget And Financial Statements Do Not Reflect Expenses Or Concerns About Expenses Related to Undocumented Immigrants

109.    Two of most important documents concerning the City's financial condition are its annual budget and its audited financial statements.

110.    Every September, the City's Director of Administration Sam Monticello prepares the City budget for the upcoming year with the direction and input of Mayor Barletta.  (Vol. 5/148:15-149:9).

111.   The 2007 budget includes a narrative written by Monticello with Barletta's input.  (Vol. 5/150:10-19).  Monticello's goal in writing the budget narrative is to summarize where the City stands financially and to highlight the important activities in the City.  (Vol. 5/150:20-151:22).  He only includes those things that are material.  (Vol. 5/151:23-152:9).

112.   There is nothing in the 2007 Budget narrative about the alleged costs that undocumented immigrants have forced upon the City.  (Vol. 5/152:10-13; Vol. 3/50:21-51:16).

113.   In addition to the budget, Hazleton is required by law to prepare audited financial statements to reflect an accurate picture of the City's' financial condition.  (Vol. 6/166:18-24).  Barletta and Monticello provide input into and review and the completed financial statements to ensure their accuracy.  (Vol. 6/168:1-9; 168:13-16; 169:20-24).

114.   The financial statements list all material things affecting the City's financial condition.  (Vol. 6/169:25-171:3).  The City's 2005 audited financial statements are its most recent.  There is no mention of the alleged costs associated with illegal immigration in the City's 2005 audited financial statements.  (Vol. 6/ 172:1-173:16).

115.   The alleged costs of illegal immigration are not contained in either the City's budget or financial statements, which suggests that the cost of undocumented immigrants is not material to Hazleton's finances.  There is no evidence in the record showing that "illegal aliens" significantly burden the City's finances.

   **(5) The City's Police Overtime Expenses Do Not Reflect Substantial Cost Related To Illegal Immigration**

116.    Hazleton contends that it has incurred substantial police overtime expenses related to crimes allegedly committed by undocumented immigrants. The record does not support Hazleton's conclusion.

117.    Every year the City's budget includes an allocated amount for police overtime.  (Vol. 5/161:18-25).  Hazleton always exceeds the allocated amount.  For example, the City exceeded its police overtime budget by $36,903 in 2005 (P-149; Vol. 5/162:19-163:11); by $35,101 in 2004 (P-150; Vol. 5/163:12-23); and by $21,732 in 2003 (P-151; Vol. 5/163:24-164:2).

118.    In 2006, the City budgeted $30,000 for police overtime and spent $113,000.  (P-95; Vol. 5/165:4-166:8).  City Administrator  Monticello could only identify two months, May (the Kichline murder investigation) and June (the Wyoming Street raid), out of the year in which he could say for certain that police overtime expenditures related to from crimes allegedly committed by illegal aliens. The total police overtime for those two months was $17,000.  (P-94; Vol. 5/166:20-170:13).  However, the Hazleton Police Department does not keep records of what crimes result in police overtime.  (Vol. 8/138:20-23).  It is likely that the overtime for May and June of 2006 include police activity for crimes in addition those allegedly committed by illegal aliens.  (Vol. 5/171:1-13).

### (6)    Hazleton Does Not Provide Any Funding To The School District

119.    Hazleton's finding in the Revised Immigration Ordinance that Illegal Immigration significantly burdens public schools is not supported by the record.

120.    City Council did not receive any data or information from the Hazleton Area School District ("HASD") about the perceived impact of the children of undocumented persons attending schools who require English as

second language ("ESL") tutoring.  No HASD representative appeared before City Council or provided HASD's cost to City Council.  (Vol. 2/173).

121.   The HASD serves Hazleton and 13 other communities.  (Vol. 5/175:7-18).  Not all of the schools in the HASD are located in the City.  (Vol. 5/175:13-15).  Only 43.8% of HASD's students live in the City.  (Shamany Stip. at 8).

122.   The HASD is a separate legal entity from the City of Hazleton and has its own budget and taxing power.  (Vol. 5/175:19-21).

123.   Mayor Barletta is unaware of the number or percentage of undocumented immigrants students enrolled in the HASD.  (Vol. 3/103:6-104:1).

124.   Although the Original Immigration Ordinance claimed that undocumented immigrants contribute to "overcrowded classrooms," the Mayor knew only that some students were taught in trailers, and did not know how many trailers were being used or the district's average class size.  (Vol. 3/110:5-110:10).  Similarly, even though the Original Immigration Ordinance claims that schools are failing, the Mayor did not know how many schools were "failing" or whether average student test scores were trending up or down.  (Vol. 3/110:11-112:5).  Nor is there any evidence in the record to support either claim.

125.   The HASD has not taken any position with respect to the Ordinances challenged in this action.  (Shamany Stip. at 18).

126.   Enrollment counts for the HASD show that between the 2000-2001 and 2006-2007 student numbers increased steadily from 8,387 to 10,079, respectively.  (Shamany Stip. at 7).

127.   The HASD is not legally permitted to ask students, their parents or legal guardians about the immigration status of any student.  Therefore, the HASD

does not have any information concerning the number of students who are undocumented immigrants or are U.S. citizens whose parents are undocumented immigrants.  (Shamany Stip. at 16-17).

128.    The HASD is also required by Pennsylvania law to provide, and provides, "English as a Second Language" ("ESL") programs for students whose dominant language is not English.  The students involved in HASD's ESL program speak a variety of languages.  (Shamany Stip at 10-11).

129.    The number of "English Language Learner" students, defined as students learning to speak English as a second language, increased from 136 during the 2000-2001 school term, to 804 during the 2006-2007 school term.  (Shamany Stip. at 9).

130.    Although the HASD did not keep budget and expenditure records for the English Language Learner program until 2002, its records reflect the actual expenditures for the program have always exceeded the budget amount.  (Shamany Stip. at 12-13).  Moreover, the HASD has applied for and received federal Title III reimbursement for ESL expenditures.  (Shamany Stip. at 14).

131.    The City does not provide any funding to the HASD.  (Vol. 5/176:17-20).  No one from the HASD, including superintendent or the school board members, have ever asked the City for any funding for English as second language courses.  (Vol. 5/179:20-177:13).

132.    The City's conclusion that illegal immigration places a strain on Hazleton's schools is not supported by the record.

### (7)    Hazleton Does Not Provide Any Funding For Healthcare

133.    The Revised Immigration Ordinance states that illegal immigration "subjects our hospitals to … substandard quality of care[.]"  However, no person

who appeared before City Council expressed that view and no document provided to City Council supported that finding.  (Vol. 2/134; P-2 at § C.2).  This finding is not supported by the record.

134.    The Greater Hazleton Healthcare Alliance ("GHHA") is the primary healthcare provider for Hazleton and the surrounding communities.  (Vol. 5/172:17-173:1).  As a regional healthcare system, GHHA serves more than just Hazleton residents.  GHHA operates the Hazleton General Hospital, which is located in Hazleton.  (Vol. 5/173:2-4).

135.    GHHA is a not-for-profit corporation, which has a charitable mission. (Vol. 5/173:5-10).  The City does not provide any financial support to GHHA. (Vol. 5/173:11-174:5; Vol. 3/112:6-113:9).  GHHA has never asked the City for funding.  (Vol. 5/174:17-23).  GHHA has not taken any position with respect to the Ordinances challenged in this action.  (Edwards Stip. at 26).

136.    GHHA did not present to City Council any GHHA costs or losses or financial statements showing the hospital's costs to provide medical services to undocumented persons, or to show that a material number of those who cannot afford or do not pay for medical care are undocumented persons.  (Vol. 2/151-53).

137.    Barletta does not know the percentage of GHHA patients from Hazleton.  (Vol. 3/115:2-115:13).  Neither Barletta nor GHHA officials know how many undocumented immigrants are treated by the hospitals.  (Vol. 3/113:10-114:16).  Despite claiming that undocumented immigrants lead to long emergency-room waits, Barletta is unaware of any study or data to support his claims.  Nor does he know whether other hospitals around the country were experiencing similar waiting periods.  (Vol. 3/115:14-118:9).

138.   GHHA has consolidated all in-patient and emergency services at Hazleton General Hospital, while all out-patient services are provided at the Hazleton-St. Joseph campus.  (Edwards Stip. at 6).  Before the consolidation of emergency room services, GHHA had seven treatment rooms and one triage room at Hazleton General Hospital.  (Edwards Stip. at 10).  Consolidation of GHHA's emergency room facilities involved a two phase program.  Phase I involved the construction of eight new treatment rooms and two new triage rooms, which opened in July of 2006.  Phase II involved the demolition of seven treatment rooms and one triage room to build ten new treatment rooms, which are now operational. GHHA's emergency unit now has eighteen treatment rooms and two triage rooms at Hazleton General Hospital.  (Edwards Stip. at 9, 11-13).

139.   The new emergency department facilities and staffing have resulted in improved patient satisfaction, and patient wait times are comparable to those of other hospitals.  (Edwards Stip. at 14-15).  Also, emergency room visits to GHHA decreased by more than 4,000 from 2005 to 2006, with the average cost per visit of $168 for 2005, and $174 for 2006.  (Edwards Stip. at 17, 19).

140.   The GHHA treats all patients who appear at the emergency department regardless of age, race, color, national origin, religious creed, financial status, handicap, sex or sexual preference, and will not deny treatment for inability to pay for services.  (Edwards Stip. at 18).  Patients who cannot pay for services are entitled to a discount or waiver of the charges.  (Edwards Stip. at 20-21).

141.   The GHHA does not ask patients about their immigration status, and does not know the number of undocumented immigrants who have visited the emergency room between 2005 and 2006.  (Edwards Stip. at 24).

142.    The GHHA had an operating profit of $1.2 million in 2005, and $4 million in 2006.  (Edwards Stip. at 23).

143.    At trial, Hazleton called purported expert Steven Camarota to testify to the "the fiscal impact of illegal aliens, the number of illegal aliens, the use of census data on calculating such numbers, and the impact of illegal aliens in hospital emergency rooms."  (Vol. 7/150:10-13).  Camarota's testimony is not credible or relevant.

144.    Camarota is the Director of Research for the Center for Immigration Studies ("CIS") (Vol. 7/150:16-18), an organization whose mission includes reducing the number of immigrants who enter the United States, both lawfully and unlawfully.  (Vol. 7/155:19-156:3; 7/157:18-22).

145.    Camarota's opinion that undocumented immigrants are a fiscal burden on hospitals in Hazleton is not credible because he does not know the number of undocumented immigrants in Hazleton who do not have health insurance or who have utilized emergency services in Hazleton.  Rather than rely on local data, he relied on national figures to estimate the number of undocumented immigrants in Hazleton who are uninsured.  (Vol. 7/192:8-15).

146.    In addition, the majority of individuals in the United States who lack health insurance are not undocumented immigrants.  Camarota conceded that, of the 46 million individuals in this country who are uninsured, only 6-7 million are undocumented immigrants.   (Vol. 7/193:12-25).  Moreover, undocumented immigrants utilize free healthcare less often than uninsured citizens.  (Vol. 7/195:1-196:4).

147.    Camarota's conclusions are also contradicted by the well reasoned

opinions of Plaintiffs' expert, Leighton Ku, Ph.D.   By agreement of the parties, the
Court admitted Dr. Ku's expert report (P-107), in lieu of live testimony to rebut the
opinions of Camarota. (Vol. 8/177:16-25).

148.    Dr. Ku is a Senior Fellow at the Center on Budget and Policy
Priorities, a non-profit policy organization in Washington, DC.  (P-107 at 1).  Dr.
Ku has a Ph.D. in Health Policy and two masters' degrees, including an M.P.H.
degree.  P-108 at 1).  He has served as a researcher at various institutions for over
twenty years.  (Id.).  He has expertise in immigrant health issues, including
insurance coverage, access to care, language barriers and medical care use and
expenditures.  (Id.).  He has written numerous papers on these topics, testified
before Congress, and been a member of expert panels on immigrant health.  (Id.).
He has conducted extensive primary and secondary research into these topics.
(Id.).  He also serves as an adjunct professor of public policy at George
Washington University.  (Id.).  The Court accepted without objection Dr. Ku as an
expert on immigrant health issues, including cost issues related thereto.  (Vol. 9/1-
23).

149.    On average, immigrants, and particularly undocumented immigrants,
have much lower medical care costs than native born citizens.  Two published
reports cited by Dr. Ku support this research and conclusions.  (P-107 at 2).

150.    Camarota stated, without citing any sources or studies, that even
though undocumented individuals use less medical care than U.S. born persons and
documented non-citizens, that fact is "trump[ed]" by the fact that they are
uninsured at higher rates.  (Vol. 7/195:25-196:4; 195:1-11).  The published figures
cited by Ku contradict that assertion.  A 2006 study published in the journal *Health*

*Affairs* found undocumented individuals, on average, had lower public, private, and out of pocket health care expenses than native-born citizens. (P-107 at 2).

151.   Camarota criticizes the *Health Affairs* report in part because it classifies "U.S.-born children of illegal aliens" as native born citizens in calculating their health care expenditures. (D-1773 at 6). Camarota's criticism is baseless because all U.S.-born children are U.S. citizens, regardless of the immigration status of their parents.

152.   Ku's report credibly concludes that 74% of those who are uninsured in the United States are native born. (P-107 at 3). This conclusion demonstrates that the lack of health insurance is not just a problem for undocumented persons.

153.   The federal government provides two sources of funding to help offset the expenses incurred by state and local health care providers, providing emergency care for undocumented immigrants. Local health care providers often fail to make full use of these funds. For example, in the first quarter of 2006, Pennsylvania hospitals claimed only $69,122 of $1.4 million available for such reimbursements in the first quarter of 2006. (P-107 at 3). There is no indication that the Hazleton Health Care Alliance or the City Council pursued any such federal funding.

### (8)    The Testimony Of Hazleton's Expert George Borjas Is Neither Relevant Nor Credible

154.   Hazleton called labor economics expert George Borjas, who opined as to the alleged adverse economic effect of undocumented persons. Borjas' testimony is irrelevant to the factual issues in dispute.

155.   Borjas' analysis is not relevant because he did not study the economies or labor markets of Hazleton, Luzerne County, Northeastern

Pennsylvania or the Commonwealth of Pennsylvania. (Vol. 6/18:3-19:19; 23:22-24:4). Borjas' broad conclusions simply extrapolate national data. (Vol. 6/66:25-68:3). Furthermore, Borjas admits that he did not distinguish between the effects of legal and illegal immigration on wages. (Vol. 6/14:11-15:15).

156. Borjas also did not review the ordinances in question. Rather, he reviewed an unidentified ordinance on the "Small Town Defenders" website. (Vol. 6/69:13-17). Based on this unidentified ordinance and his assumption that it would be perfectly enforced, Borjas opined that Hazleton would drive out all unauthorized workers and create an urgent and immediate demand for low-skilled workers and a consequential increase in wages. (Vol. 6/75:12-18; 91:1-14). Borjas did not realize that Hazleton's Implementation Amendment created a safe haven for unauthorized workers currently employed in Hazleton and acknowledged that in light of the amendment, the Revised Immigration Ordinance would have a potentially inconsequential economic effect on the City. (Vol. 6/91:1-25).

157. Because Borjas did not review any local data, he did not consider the number of low-skilled workers or businesses employing them in Hazleton. He also did not consider whether a particular need exists for low-skilled workers in Hazleton or whether businesses are able and willing to pay higher wages. (Vol. 6/42:21-43:4; 46:18-47:1; 70:10-24; 74:7-75:988:13-24).

158. Borjas conceded that his conclusions are the subject of an ongoing debate in the academic world, and other highly respected academics disagree with his opinions. (Vol. 6/55:10-57:8). One such academic is Dr. David Card, professor of Economics at the University of California, Berkeley, and a prominent expert in the field, according to Borjas. In an article entitled "*Is the New*

*Immigration Really So Bad*?," N.B.E.R. Working Papers 11547, National Bureau of Economic Research, Inc. (2005), Dr. Card concluded that the wages of low skilled workers "have remained nearly constant since 1980, despite pressures from immigrant inflows that have increased the relative supply of dropout labor and despite the rise in wage gap between other education groups in the U.S. economy." (Vol. 6/55:10-57:8).

159.   Plaintiffs' expert Marc Rosenblum, Ph.D. also disagrees with Borjas' claim that undocumented immigration drives down wages, and cited to studies by other academics disagreeing with Borjas.  (Vol. 5/150:8-151:4).

160.   Borjas background also demonstrates his bias anti-immigrant bias. His curriculum vitae identifies him as an active member of CIS, the anti-immigrant lobby that supplied another of Hazleton's experts, Camarota.  (D-170; Vol. 6/11:22-13:12).

161.   Borjas' testimony does not provide any credible support or justification for Hazleton's adoption of the ordinances.

### (9)    The Testimony Of Hazleton's Expert John Martin Is Neither Credible Nor Relevant

162.   In its case, Hazleton presented John Martin over Plaintiffs' objection to testify as to the costs of incarcerating undocumented immigrants.  Martin's testimony was not credible or relevant.

163.   Martin is not experienced in statistical or fiscal data.  He does not have a postgraduate degree in demography, economics or other related fields of study.  None of his publications has been subject to an academic peer review process. (Vol. 7/215: 21-216:6).  He does not belong to any professional or academic associations and has never before been qualified by any court as an

expert. (Vol. 7/216:9-13; 217:4-8). He has not conducted any primary research on the "fiscal impact" of immigration. (Vol. 7/225:6-16).

164. Martin is a Director at FAIR, an advocacy organization that argues for a substantial reduction in lawful and unlawful immigration. (Vol. 7/219:4-6). The "legal arm of FAIR," the Immigration Reform Law Institute ("IRLI"), supported Hazleton in this litigation and was "involved in the process of the creation of ordinance that is under discussion here." (Vol. 7/222:9-16). Trial counsel for Hazleton, Kris Kobach, has worked closely with the IRLI. (Vol. 7/224:14-17).

165. Martin's conclusions have been criticized by the Office of the Comptroller for overestimating the costs of undocumented immigrants on the State of Texas. Martin included in his estimates the costs of educating U.S. citizen children born to undocumented parents, and his estimates did not include the $500,000,000 in federal reimbursement for those very expenditures. (Vol. 7/230:13-19). Additionally, Martin failed to analyze the benefits undocumented persons provide, such as the economic products of their labor. (Vol. 7:226-13-25).

166. The Officer of the Comptroller concluded that undocumented immigrants were a net fiscal benefit to Texas, not a fiscal burden as Martin had concluded. (Vol. 7/226:5-227:2).

167. Martin conceded that his statistics for costs of incarcerating immigrants included all aliens, and he could not distinguish what costs were attributable to legal aliens and what costs were attributable to undocumented aliens. (Vol. 7/243:15-244:17). Martin did not cite specific sources for the incarceration costs of immigrants but instead referred generally to State Criminal Alien Assistance Program (or SCAAP) data. (Vol. 7/247:11:18). Martin also

conceded that his analysis of incarceration costs did not apply to Hazleton, which does not operate a prison facility that receives SCAAP funding.  (Vol. 7/247:21:24).

168.   Martin failed to research or analyze the burdens and benefits associated with undocumented aliens residing in Hazleton.  His analysis does not support Hazleton's claim that illegal immigration imposes a fiscal burden on the City.

### G.    Hazleton's Ordinances Violate The Constitution And Federal Law

#### (1)    Hazleton's Ordinances Are Preempted

##### (a)    Immigration Law Implicates National Policy Issues, None Of Which Hazleton Considered Or Was Competent to Consider

169.   Neither Barletta nor City Council considered the implications of its anti-illegal-immigration ordinances on foreign policy generally, or how it might affect relations with, for instance, Guatemala or Mexico.  (Vol. 3/88:2-89:22).  Their only concern was for Hazleton, which they were elected to serve.  (Id.).

170.   Neither Barletta nor City Council considered the possible effects of the ordinances on the nation's economy, or the economic impact of many municipalities passing similar ordinances. (Vol. 3/89:25-91:1).

171.   Immigration enforcement takes two forms: border enforcement, which involves trying to keep unauthorized persons from entering the country, and interior enforcement, which involves trying to distinguish between legal and undocumented immigrants already in this country and attempting to remove the latter.  (Vol. 4/14:3-18).

172.   For interior enforcement, it is important to strike a balance between

preventing undocumented immigration and employment without accidentally removing legal immigrants and citizens and without imposing an excessive burden on employers and workers.  (Vol. 4/14:19-15:20).

173.   Under the political system in the United States, Congress, with the help of the Executive branch, has responsibility to strike the balance on immigration enforcement.  (Vol. 4/15:21-24).  If enforcement is too lax, i.e., the filter is set too low, it will not prevent undocumented people from entering the country and being employed.  On the other hand, if the enforcement is too high i.e., the enforcement is too aggressive, it will wrongly deny employment to U.S. citizens and legal immigrants.  (Vol. 4/14:19-15:20).  How the balance is struck affects U.S. employers.  (Vol. 4/15:25-16:11; 4:18:3-19:10).

174.   Increased enforcement adds bureaucracy and slows the hiring process, making it more difficult for employers to operate.  (Id.)  How the balance is struck also affects our foreign relations, with excessive enforcement jeopardizing our alliances and cooperation with other countries, on things such as immigration enforcement, drug interdiction and terrorism investigations.  (Vol. 4/16:12-18:2).

175.   Congress understands that immigration presents a delicate balancing act but does not agree on how to strike that balance, a problem that has stalled comprehensive immigration-reform legislation.  (Vol. 4/19:11-19:23).

176.   Hazleton was not concerned with, did not consider and did not address the many national and international issues involved with immigration law and policy.

### (b)     The Determination Of Immigration Status Requires Complex Analysis Under Federal Law

177.   Mayor Barletta's mantra concerning Hazleton's efforts to curtail

illegal immigration is "illegal is illegal."  (Vol. 4/225:18-25).  Hazleton's Revised Immigration Ordinance is premised on the notion that immigration status can be quickly and accurately determined.  Barletta's mantra and Hazleton's notion misrepresent federal immigration law and policy.

178.    Under the Revised Immigration Ordinance, on receipt of a valid complaint, the Code Enforcement officer has three business days to request "identity information" on the suspected illegal alien from the business entity.  (P-2 at §4.B.3.; Vol. 3/155:9-155:14).  The ordinances do not define "identity information," but Hazleton interprets this to mean whatever the federal government would accept.  (Vol. 2/155:15-156:1).

179.    As part of their case, Plaintiffs called Professor Stephen Yale-Loehr. Professor Yale-Loehr is an experienced immigration law practitioner, an adjunct professor of law at Cornell Law School, and co-editor of the leading treatise on immigration law and procedure.  (P-205).  He has practiced immigration law continuously since 1982.  (Vol. 6/101:2-7).  He teaches immigration law and directs Cornell's political asylum clinic.  (Vol. 6/101:14-102:14).  He has taught at Cornell since 1991, and previously taught at Georgetown Law School.  (Vol. 6/102:11-13).  He has published extensively in the field of immigration law, covering a wide range of topics in articles and books.  (Vol. 6/103:7-21).  Professor Yale-Loehr is also co-editor of a twenty-volume treatise on immigration law and procedure that is updated four times a year, covers a wide variety of relevant topics, and has been frequently cited by federal courts.  (Vol. 6/103:22-106:4; 111:5-7).

180.    The Court accepted Professor Yale-Loehr as an expert on federal

immigration law, the acquisition and maintenance of immigration status, and the operation of the federal immigration system.  (Vol. 6/107:5-9; 111:1-2).

181.    In rebuttal, and over Plaintiffs' objection, Hazleton called and the Court accepted Michael Cutler as an expert in the field of immigration law enforcement.  Cutler lacks both the academic credentials and professional experience to opine on matters related to the substance and interpretation of immigration law.  (Vol. 8/191:4-192:18).  Therefore, his testimony regarding legal matters cannot be accorded any weight.

182.    The Revised Immigration Ordinance defines "illegal alien" as an "an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq."  (P-2 at §3.D; Vol. 3/149:19-150:18).

183.    There is no general definition of the phrase "illegal alien" in the Immigration and Nationality Act.  (Vol. 6/130:3-14).  There is also no general definition of the phrase "lawfully present" in the Immigration and Nationality Act.  (Vol. 6/130:15-131:1).

184.    There are two broad categories of lawfully admitted aliens under federal law: non-immigrants (i.e., persons in the country temporarily); and immigrants (i.e., lawful permanent residents or green card holders).  While there is no definition of the phrase "lawful resident" under federal immigration law, the closest approximation to that phrase is "lawfully admitted for permanent residence," i.e., green card holders.  (Vol. 6/131:23-132:5).  (Vol. 6/111:12-16; 112:13-113:3).  Millions of persons a year enter the United States as non-immigrants.  (Vol. 6/111:19).  Individuals can obtain immigrant (i.e., lawful

permanent resident) status in a variety of ways, including family or employment characteristics, the so-called diversity green card lottery, or relief such as asylum. (Vol. 6/112:22-113:1).

185.   There is also a third category of aliens: persons not currently in an immigrant or non-immigrant status under federal immigration law. (Vol. 6/113:4-13).  The number of people in this third category is often estimated at 12 million. (Vol. 6/113:16-17).

186.   It is inappropriate to consider all of these individuals in this third category  as "illegal."  (Vol. 6/114:8-25; 128:7-19).  The fact that a person does not currently have a lawful immigration status does not mean that the federal government wishes, or is even lawfully permitted, to remove that person from the United States.  (Vol. 6/114:14-25; 127:13-16).

187.   The federal government frequently exercises its discretion not to attempt to remove persons from the United States, even though they may lack lawful immigration status.  (Vol. 6/114:16-25; 117:3-10; 124:18-125:23).

188.   Individuals who currently lack legal status may obtain lawful status in different ways, (Vol. 6/113:21-114:7), such as adjustment of status, asylum, cancellation of removal, and cancellation under the Violence Against Women Act. (Vol. 6/115:1-13).  In some instances, individuals can affirmatively apply for regularization of status.  In other instances, regularization of status is only available after an individual has been placed in removal hearings by the federal government (even if the operative facts justifying relief predate the commencement of the removal hearing). (Vol. 6/118:22-121:8).

189.   The act of submitting an application does not change the applicant's

immigration status, even if the application is bona fide and will ultimately be approved. (Vol. 6/116:18-117:5; 118:6-17; 161:8-21). It may take months or years for an applicant to adjust status, obtain relief, or otherwise regularize status. (Vol. 6/128:20-129:19; 116:14-24; P-200, John Doe 1 Dep. Tr. 74:1-8).

190. The federal government does not know whether an out-of-status person has a valid claim to regularize status until an application is filed and a decision is rendered under the laws and procedures of the federal immigration system. (Vol. 6/117:23-118:5; 121:15-17; 128:2-6). Accordingly, no database can accurately determine whether the federal government will choose to remove a given individual from the United States.

191. A person who has a valid claim to remain in the United States but who currently lacks immigration status frequently will not have any documents to demonstrate that he has such a claim. (Vol. 6/121:9-14; 127:17-128:1).

192. The federal government does not decide whether a person should be removed from the country based on a telephone call or even on documents and information within the federal government's possession. (Vol. 6/135:13-20). Rather, the federal government only decides if a person must leave the country after holding hearings at which an Immigration Judge (an official of the Department of Justice) determines whether the DHS has proved by clear and convincing evidence that the individual is removable under applicable law. (Vol. 6/133:7-134:22). The Immigration Judge will also determine whether the individual is eligible for relief from removal. (Vol. 6/118:25-119:24).

193. The federal government has the discretion to decide whether to initiate removal proceedings against a given person. (Vol. 6/114:23-25; 124:22-125:7).

194.   Removal hearings include significant procedural safeguards, such as the right to counsel and the right for both sides to present witnesses and evidence beyond what is already in a person's administrative file.  (Vol. 6/134:8-22; 135:5-15).  The individual may seek review of the Immigration Judge's status determination within the Department of Justice and in the federal courts.  (Vol. 6/135:21-136:5).

195.   The federal government generally permits persons in removal proceedings to remain in their communities in the United States while the proceedings are pending, even though the DHS has alleged that they are removable.  (Vol. 6/136:14-21).

196.   Some persons who the Immigration Judge determines should be removed and who have not have established relief from removal are nonetheless permitted to live in the United States by the federal government, or are entitled to do so under controlling Supreme Court case law.  (Vol. 6/123:7-124:17).

197.   The federal government routinely grants work authorization to individuals who lack lawful immigration status.  (Vol. 6/124:3-13; 125:24-126:6; 127:4-6; 149:2-14).  Work authorization and immigration status are separate concepts.  A person can be work-authorized, but lack lawful immigration status, or have lawful status but lack work authorization.  (Vol. 6/126:15-127:6).

**(c)    Unlike Federal Law, Hazleton's Ordinances Require Employers To Check The Immigration Status Of Independent Contractors**

198.   The Revised Immigration Ordinance applies to all "business entit[ies]," which are defined broadly to include all persons, groups of persons and employers who hire, employ or somehow compensate a worker.  (P-2 at §3.A; Vol. 3/146:20-147:15).  Hazleton interprets business entity to include landlords.  (Vol.

3/153:20-154:7).

199.   The requirements apply to all "contractors," independent, sub and otherwise. (P-2 at §3.C; Vol. 3/147:16-148:4).  The ordinances apply to anyone engaged in "work," which is defined broadly to include, "any job, task, employment, labor, personal services, or any other activity for which compensation is provided, expected, or due, including but not limited to all activities conducted by business entities."  (P-2 at §3.F; Vol. 3/149:4-149:10).  In sum, the employment requirements apply not just to employers and contract employees, but to anyone getting work or help from anyone else.  (Vol. 3/149:11-149:18).

200.   It makes no difference under the Revised Immigration Ordinance whether the complained-about worker is an employee or an independent contractor.  (Vol. 3/156:2-156:16).

201.   Under federal law employers do not need to check identity documents of independent contractors.  (Vol. 4/57:10-58:3).

### (d)   Hazleton's Immigration Ordinances Provide Shorter Response Times To Verify Immigration Status And Harsher Penalties

202.   The amount of time provided in the Revised Immigration Ordinance for Hazleton to determine the immigration status of an employee or tenant is substantially less than the time allotted under federal law.

203.   Within three days of a request from the Code Enforcement Officer, a business must produce the identity information on the complained-about worker or the business' permit to operate in the City shall be suspended.  (P-2 at §4.B.3.).

204.   Hazleton's ordinances undermine the already-weak due process protections that exist under federal law.  For instance, under the ordinances employers must terminate a complained-about employee within three days if the

employer fails to produce identity documents or the employee is non-confirmed by the verification system. (Vol. 4/46:11-47:4).

205. By way of comparison, the federal Basic Pilot program gives workers eight days to appeal a non-confirmation. Congress is contemplating expanding that period. Even eight days is often insufficient time to track down necessary documents and evidence. (Vol. 4/145:17-147:2).

206. Another difference between federal law and Hazleton's ordinances is that under federal law failure to produce identity documents upon demand results in a small civil penalty. Under Hazleton's ordinances , it results in the loss of a business license, which effectively requires the employer to cease operations. (Vol. 4/123:19-124:10).

**(e)  Hazleton's Immigration Ordinance Require Use Of Basic Pilot, But Federal Law Does Not**

207. The Revised Immigration Ordinance makes participation in the federal government's Basic Pilot Program mandatory for business entities if (a) desiring an "award of any City contract or grant . . . for which the value of employment, labor or, personal services shall exceed $10,000…." (P-2 at §4.D.); and (b) "[w]here two or more of the unlawful workers were verified by the federal government to be unauthorized aliens…." (P-2 at §4.B.6.b.; Vol. 3/164:12-165:13).

208. Under federal law, the Basic Pilot program is voluntary. (Vol. 4/23:23-24:4; 27:25-28:8). Congress has recently considered making Basic Pilot mandatory, but has declined to do so because of concerns that the system has too many errors, leading to citizens and work-authorized legal immigrants being "non-confirmed" for employment despite their lawful status. Vol. 4/24:5-25:17).

209. Congress has not considered, much less passed or made mandatory, a

verification system involving private housing.  (Vol. 4/54:2-54:12).

       **(f)**    **Unlike Federal Law, Hazleton's Revised Immigration Ordinance Creates A Private Right of Action**

210.   The Revised Immigration Ordinance establishes an "unfair business practice claim" in favor of "unfairly discharged workers."  (P-2 at  §4.E.).  This private cause of action allows a terminated employee who is not an illegal immigrant to sue if his or her employer was not signed up for the Basic Pilot Program and has an illegal alien on its payroll.  (Id.)  The "unfairly discharged worker" can recover treble damages for up to 120 days, as well as costs and attorneys' fees.  (Id.)  Under the plain language of the ordinance, it does not matter why the employer discharged the worker, or even if it was for cause, so long as the foregoing elements of the claim are met.  (Vol. 3/172:8-175:11).

211.   City Council has never before declared or adopted an ordinance regarding "unfair business practice," as found in Ordinance 2006-18, § 4.E, nor has it adopted a new private right of action or private lawsuit ordinance.  (Vol. 2/169-170).  The unfair business practice provision was not supported by any legal opinion from the City Solicitor.  (Vol. 2/172).

212.   There is no similar provision in federal law, and Congress has not considered one.  (Vol. 4/60:13-60:23).

213.   Defense counsel's suggestion during cross examination of Plaintiffs' expert, Dr. Rosenblum, that the Hazleton's private right of action (§ 4.E.) is equivalent to federal law is misplaced.  (Vol. 4/137:1-140:21).  The provision referred to by defense counsel is the RICO statute, 18 U.S.C. § 1961, which does not recognize a federal private right of action that resembles the Revised Immigration Ordinance in any meaningful way. The elements of a civil RICO

claim include a series of predicate federal criminal offenses; a racketeering "enterprise" akin to a conspiracy, involving multiple actors; and proof that the plaintiff's damages were proximately caused by the racketeering activity. These elements are entirely absent from the Ordinance's novel treble-damages provision.

> **(g)    The Federal Government Has Adopted Programs To Aid Municipalities With Crimes Involving Illegal Immigrants**

214.    Both Mayor Barletta and City Council President Yannuzzi have expressed the view that the federal government has the power to address immigration problems but is "not doing its job."  (Vol. 3/197:19-198:2; Vol. 2/180-81, 196).  The evidence shows that the federal government has successfully cooperated with Hazleton in crimes involving illegal immigrants and has established a formal program to coordinate law enforcement efforts with municipalities, which Hazleton has not taken advantage of.

215.    The Hazleton Police Department has successfully worked with ICE and federal law enforcement officials to investigate crimes involving undocumented immigrants, including the Wyoming Street raid in which two of the five people arrested were illegal immigrants.  (Vol. 8/37:7-14; 38:2-5; 44:11-45:6).  Chief Ferdinand told ICE's Larry O'Donnell:  "It's nice to have your support when we do encounter them [i.e., illegal immigrants] (such as in the recent homicide)."  (P-83 at HAZ 00178; Vol. 8/36:6-10).

216.    As described by the federal government, the 287g program, is a law enforcement partnership between DHS, ICE, and local law enforcement agencies.  (P-83 at HAZ 00167).  It is designed to allow local police departments, like Hazleton's, to assist the federal government with processing the deportation of criminal aliens.  (P-83; Vol. 8/32:4-14).  It also allows state and local police

officers, detectives and investigators to work in conjunction with ICE officers. (P-83 at HAZ 00167).

217.   The 287g program allows local and state law enforcement officers access to (a) the necessary resources and latitude to pursue investigations relating to violent crime, gang activity, narcotics, etc., (b) increased resources and support in more geographic locations, and (c) more robust coverage throughout the United States. (P-83 at HAZ 00167). The 287g program acts as a "force multiplier," creating investigative leads, arrests and convictions of criminal aliens. (P-83 at HAZ 00167; Vol. 8/35:13-16).

218.   Chief Ferdinand did not inquire about the 287g program until August of 2006, after the initial immigration ordinances were proposed and adopted. (P-83 at HAZ 00168). Hazleton's Police Department applied to participate in the 287g program, (Vol. 8/35:17-19), but has not yet obtained 287g status because it has not completed the requirements. (Vol. 8/36:2-13).

219.   The City's law enforcement powers stop at its borders, making it impossible for the City to investigate companies outside of its borders who may be employing undocumented immigrants. (Vol. 8/38:20-40:10). Moreover, both Detective Orozco and Police Chief Ferdinand recognized that gangs are not a local concern, but rather operate nationally and internationally. (Vol. 8/28:1-5). Because the gangs claimed to be present in Hazleton are located in numerous locations, effective law enforcement requires multi-jurisdictional cooperation. (Vol. 8/43:7-44:6).

### (2)    Hazleton's Ordinances Do Not Comply With Fourteenth Amendment Procedural Due Process Requirements

**(a)    The Revised Immigration Ordinance Does Not Provide Adequate Notice Or Opportunity To Be Heard**

220.    The Revised Ordinance's employment provisions do not require Hazleton or the employer to give notice of either the complaint or the verification results to the affected worker.  (P-2 at § 4.B.3.; Vol. 3/159:23-160:13).  The harboring section of the Revised Immigration Ordinance does not require Hazleton or the landlord to give notice to the aggrieved tenant that his or her verification has been rejected.   (P-2 at §5).

221.    Once Hazleton notifies the business entity that a worker's status has not been verified, the entity has three days to "correct" the violation.  (P-2 at §4.B.3.; Vol. 3/160:14-160:23).  Because the Revised Immigration Ordinance does not specify how to "correct" a violation, Hazleton passed the Implementation Amendment (Ordinance 2006-40) to define "correction." (P-5 at §7.C.; Vol. 3/160:24-161:7).  Under the Implementation Amendment, a business entity can "correct" a violation by (1) terminating the worker or (2) asking Hazleton to request additional verification from the federal government, based on additional identity information.  (P-5 at §7.C.; Vol. 3/161:8-164:11).  Although §7.C. lists three options for "correcting" a violation, both the first and third options require the business entity to terminate the employee.

222.    The Revised Immigration Ordinance takes a strict liability approach, allowing no exceptions to the three-business-day-production requirement.  If a business fails to produce identity information within the prescribed period, regardless whether there is good cause for the failure, the City must suspend the entity's operating permit.  (Vol. 3/156:19-158:14).  For a second or subsequent violation, the Code Office is required to suspend the entity's business permit for

twenty days.  (P-2 at §4.B.7).

223.   The harboring section gives landlords found to be leasing to illegal aliens five days to "correct" the violation, slightly more time than under the employment section.  (P-2 at §5.B.4).  The Implementation Amendment (2006-40) provides three ways for a landlord to "correct" a violation.  (P-2 at §7.D.; Vol. 3/185:22-188:9).  The landlord can issue a notice to quit, seek an additional verification based on new identity information, or file a court action to recover possession of the property. (P-2 at §7.D.1-3.).  The first and third options require the landlord to take steps to evict the tenant.  (Vol. 3/186:17-187:13).

224.   If an owner fails to correct a violation, the Revised Immigration Ordinance requires Hazleton to suspend the landlord's license, without exception.  (P-2 at §5.B.4; Vol. 3/187:14-188:9).

225.   The ordinance does not afford aggrieved landlords or tenants an administrative hearing to contest the determination.  (Vol. 3/188:10-188:23).

226.    The judicial remedy afforded by the Revised Immigration Ordinance affords the same judicial remedy to aggrieved landlords and tenants as under the employment section.  Aggrieved parties can file an action with the District Magistrate, with a right of appeal to the Luzerne County Common Pleas Court.  The court is bound by a rebuttable presumption that the federal status determination is correct.  (P-2 at §5.F.; Vol. 3/189:14-190:2).

227.   The Ordinances do not provide either a pre- or post-termination administrative hearing to a business entity notified of a violation or to a worker determined to be unlawful or terminated by the employer as a result of such a finding.  Mayor Barletta was unable to identify any Hazleton administration

process to provide aggrieved workers with an opportunity to contest the termination or for business entities to contest notice to terminate the employee on penalty of losing the operating license.  (Vol. 3/166:24-168:20).

228.   The only procedure established by the Revised Immigration Ordinance for an aggrieved business entity or worker is to file an action in the "Magisterial District Court for the City of Hazleton, subject to the right of appeal to the Luzerne County Court of Common Pleas."  (P-5 at §7.F.; Vol. 3/168:22-169:10).  In any judicial challenge, the Implementation Amendment requires the reviewing court to treat the federal government's status determination as a "rebuttable presumption."  (P-5 at §7.G.).

> **(b)   The Tenant Registration Ordinance Does Not Provide Notice Of The New Registration Obligation To Non-English Speaking Residents**

229.   The Tenant Registration Ordinance, Ordinance 2006-13, amended an existing registration ordinance pertaining only to landlords.  (Vol. 3/190:6-190:16).

230.   The Tenant Registration Ordinance requires landlords to register their properties with the City and pay a $5 registration fee.  (Vol. 5/83:3-14; P-1 at §7). Landlords registering must complete a form prepared by the City.  (Vol. 5/82:11-83:17; P-12).  The ordinance applies to every living unit that a property owner allows someone else to occupy and to every occupant who is over age 18, regardless whether they have a lease.  (Vol. 3/190:17-191:11).

231.   Tenants must complete an application for an occupancy permit provided by the Code Enforcement Office and must include "[p]roper identification showing proof of legal citizenship and/or residence."  (P-1 at §7.b.1.).

232.   The Code Enforcement Office's form requires a tenant to provide his

or her name, date of birth, mailing address, proof of United States citizenship or proof of legal residency in the United States.  (P-69; Vol. 5/84:5-85:12).  Tenants must pay a $10.00 fee at the time they register.  (P-69, § 7.B.; Vol. 5/86:1-15).  If more than one tenant resides in an apartment, each tenant must pay the registration fee.  (Vol. 5/86:8-10).  If a tenant moves, he or she must re-register with the City and pay an additional $10.00.  (Vol. 5/86:11-15).

233.   A landlord is not permitted to allow a person to occupy a living unit unless the person presents a tenant permit.  (Vol. 3/192:13-192:15).

234.   Prior to the entry of this Court's temporary restraining order, the City notified residents of the tenant registration obligation with a newspaper advertisement.  (P-13; Vol. 3/192:13-193:9; P-66; Vol. 5/86:22-24; 87:9-12).  The notice informs residents of the obligation of every tenant to register in person at the Code Enforcement Office.  (Vol./3/193:17-193:22).  It also identifies the documents that tenants are required to present to register.  (Vol. 3/193:23-194:10).

235.   The notice advises U.S. citizens that they must bring certain documents to prove citizenship and sign a statement declaring their citizenship.  (P-13; Vol./3194:11-194:22).  Similarly, the notice describes the documents an alien must present.  (P-13; Vol. 3/194:23-195:14).

236.   The notice of the tenant registration obligation, which the City placed in the newspaper, was in English.  (P- 66; Vol. 5/87:24-25).

237.   The City is aware that some residents in Hazleton do not speak English.  (Vol. 5/89:14-21).  Spanish is the predominant language of people individuals in Hazleton who do not speak English. (Vol. 5/89:17-21).  In the past, the City has used Spanish language forms and notices in order to communicate

with those residents who do not speak English.  (P-67).  The City did not place a notice of the tenant registration obligation in Spanish or any other language because of the Official English Ordinance, 2006-19.  (Vol. 5/89:9-13).

238.    The penalty for failure to comply with the tenant-registration requirement is a fine of not less than $100 or more than $300, plus costs, or imprisonment for a term not to exceed ninety days in default of payment.  (P-1 at §10; Vol. 3/196:2-196:13).

239.    The registration of all tenants in the City is a large undertaking.  (Vol. 5/79:4-13).  To handle tenant registration, Hazleton created a new position and hired former Fire Chief, Thomas J. Powell.  (Vol. 5/79:14-80:22).  Powell has received no training on the documents that establish valid U.S. residency.  (P-84; Vol. 5/79:19-80:6).

### (c)    The Complaint and Verification Process Contemplated By The Ordinances Is Rife With Errors

240.    The Revised Immigration Ordinances makes it "unlawful for any business entity to recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City."  (P-2 at §4.A.).

241.    The Revised Immigration Ordinance also requires that "[e]very business entity that applies for a business permit to engage in any type of work in the City shall sign an affidavit, prepared by the City Solicitor, affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker."  (P-2 at §4.A.).  No business entity, including stores, businesses and landlords, can operate in Hazleton without a permit.  (Vol. 3/153:20-154:7).

242.    The Revised Immigration Ordinance establishes a complaint-initiated

enforcement system.  (P-2 at §4.B.; Vol. 3/154:8-154:22).  Anyone who lives in the City can file a complaint, including Hazleton employees.  (Vol. 3/154:15-154:24; Vol. 5/50:4-13; 61:1-10).

243.   The Revised Immigration Ordinance also makes it illegal for any person or business entity to "let, lease, or rent a dwelling unit to an illegal alien." (P-2 at §5.A.1.; Vol. 3/182:12-182:21).  Each day that a landlord harbors each illegal alien is a separate violation, e.g., three illegal aliens harbored for three days would be nine violations.  (P-2 at §5.A.2; Vol. 3/182:22-183:4).

244.   The Revised Immigration Ordinance makes it a violation for a landlord to fail to provide identity information within three business days, which is parallel to the employment provisions.  (P-2 at  §5.A.3.; Vol. 3.183:5-183:12).

245.   The harboring provisions include a complaint-initiated system that operates identically to the one described in the employment section.  (P-2 at §5.B.; Vol. 3/183:13-183:19).  As with the employment section, the verification process contemplated by §5.B.3 has not been approved and is not operational.  (Vol. 3/184:8-184:18).

246.   Code Enforcement Officers Richard Wech and Paul Kattner are the City employees who will receive complaints.  (Vol. 5/72:22-73:2).  Wech and Kattner report directly to Robert Dougherty, the Director of Hazleton's Department of Planning and Public Works.  (Vol. 5/49:3-9; 72:22-73-2).

247.   A complaint is deemed "valid" if it "include[s] an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred." (P-2 at §4.B.1.).

248.   Although the Code Enforcement Office has prepared certain forms

relative to the ordinances at issue, it has not prepared a form for a complaint under the Revised Immigration Ordinance.  (Vol. 5/50:14-51:5; 61:11-14).

249.    An invalid complaint is one that is primarily or solely based on race, ethnicity or national origin.  (P-2, § 4.B.2.; Vol. 5/62:4-18).  The Revised Immigration Ordinance, which is the subject of the Second Amended Complaint, does not deem invalid a complaint in which race, ethnicity or national original is a factor, so long as they are not the primary or sole factor in the making of the complaint.  (P-2, § 4.B.2.; Vol. 5/63:6-64:8).

250.    The City has not developed any written guidelines concerning the investigation of the immigration status of an individual or any written standards to aid Wech and Kattner in determining whether a complaint is based primarily or solely on race, ethnicity or national origin.  (Vol. 5/15:25-16:5; 21:2-5; 64:9-19).  In fact, Dougherty, has not had any conversations with Wech or Kattner about the enforcement of the immigration ordinance.  (Vol. 5/64:20-22).

251.    Dougherty agrees that it is impossible to determine a complainant's motivation in filing a complaint under Section 4 or Section 5 of the Revised Immigration Ordinance, 2006-18.  (Vol. 5/71:25-72:16).  There are, therefore, no meaningful anti-discrimination safeguards in the Revised Immigration Ordinance's enforcement provisions.

252.    City Council did not receive information from any federal agency or public comment concerning the use, operation, availability or accuracy of either the Basic Pilot Program or the SAVE program before adopting the Original Immigration Ordinance (or the Revised Immigration Ordinance).  When asked about Basic Pilot's accuracy rate,  Yannuzzi answered: "I have no idea.  Nothing

has 100 percent really." (Vol. 2/169:25-170:5).

253.    The Code Enforcement Office has never before been required to verify the citizenship or legal residency status of anyone in Hazleton. (Vol. 5/131:11-20). The Code Enforcement Officers have never actually reviewed resident alien cards, green cards or other such documentation. (Vol. 5/134:14-21). Dougherty has not received any training to determine immigration status based on the presentation of documents. (Vol. 5/54:19-22). Wech and Kattner also have not received training to determine the validity of the documents that establish lawful residency or on how to determine whether identity documents are authentic. (Vol. 5/11:19-12:4;  17:22-18:2; 54:23-55:1; 134:14-21).

254.    Wech and Kattner have never had any direct contact with the United States Department of Homeland Security, the United States Citizenship and Immigration Services ("USCIS") or any other federal agency that deals with immigration issues. (Vol. 5/135:21-25). They are unfamiliar with the Basic Pilot and SAVE programs and have never received any training on their purpose or use. (Vol. 5/16:6-14). Moreover, the computer systems in the Code Enforcement Office, which would presumably be used to access the federal databases, are outdated. (Vol. 5/17:3-7). The budget cuts for the Code Enforcement Office suggest that the computer systems will not be updated any time soon. (Vol. 5/17:8-15).

255.    Even if Wech and Kattner had the requisite experience and training, the Basic Pilot and SAVE programs have serious functional flaws that prohibit its use as contemplated by Hazleton.

256.    At trial, Plaintiffs called Marc Rosenblum, PhD. an expert about the

federal government's employment verification systems and immigration policy. Dr. Rosenblum, is an associate professor of political science at University of New Orleans. He has a Ph.D. in political science from University of California at San Diego. He has ten years of research experience, scholarship and publications in the fields of political science, foreign policy and immigration. In 2006 he spent six months as a fellow working on the United States Senate Immigration Subcommittee, which was considering changes to employment-verification laws. He has authored six to seven peer-reviewed journal articles and contributed an entry on international politics and migration to the Encyclopedia of American Immigration. (P-196; Vol. 4/4:9-13:19).

257.   The Court accepted Dr. Rosenblum as an expert in employment verification and in U.S. immigration policy making. (Vol. 4/13:20-13:25).

258.   Dr. Rosenblum testified about the federal employment verification systems. (Vol. 4/13:20-13:25). Basic Pilot is an electronic verification system, whereby an employer submits employee identity information, which is then checked against various government databases. (Vol. 4/27:3-27:24). If the system produces a match with the database, then the person is permitted to work; if not, then the employer is advised that the person is not permitted to work. (Id.)

259.   Under the Revised Illegal Immigration Ordinance, Hazleton will not make the determination whether a person is an "illegal alien." (Vol. 3/175:17-175:23). The Ordinance purports to establish a verification process whereby the federal government will make the determination. The Revised Immigration Ordinance directs the Code Office to "submit identity data required by the federal government to verify, pursuant to United States Code Title 8, section 1373, the

immigration status of such person(s)…."   (P-2 at §4.B.3).

260.   If the complaint is that the worker is an "illegal alien," the Ordinance requires Hazleton to send the identity information obtained from the employer to the federal government for verification of immigration status. (P-2 at §4.B.3; Vol. 3/158:15-158:22).

261.   If the federal government verifies the worker's status, the Ordinances require Hazleton to "provide the business entity with written confirmation of that verification."  (P-2 at §4.B.3.).

262.    Hazleton does not have a Memorandum of Understanding ("MOU") with any federal agency to conduct the verification contemplated by either the employment (§ 4.B.3.) or the housing (§  5.B.3.) provisions of the Revised Illegal Immigration Ordinances.  (Vol. 3/175:17-181:14).

263.   The City has entered into a MOU with the federal government for the Basic Pilot program for city employees.  (P-94; Vol. 5/58:23-59:12).  The Basic Pilot program is a federal computer database available to employers to verify the residency status of immigrants and is not intended to be used by local or state governments or for other purposes.  (Vol. 5/123:10-18; Vol. 3/176:20-178:1). Since the City's Basic Pilot MOU limits its use to checking the status of new City employees, it will not and cannot be the verification system contemplated by the ordinances to check on the business entities' employees or the landlord's tenants.

264.   The City has not had discussions with DHS or ICE about their willingness and capability to assist Hazleton in determining whether a person who is the subject of a complaint is lawfully present in this country.  (Vol. 5/55:2-20).

265.   While Barletta claims the federal government would rely on the

SAVE system to conduct the verifications, such an agreement requires an MOU. The DHS has not entered into any such agreement with Hazleton, and no federal official has told Hazleton that the requisite MOU is forthcoming.  (Vol. 3/181:1-181:23; 184:8-184:18).  Thus, the verification system contemplated by the Revised Immigration Ordinance is neither approved nor operational.

266.    Congress commissioned a study of Basic Pilot, known as the Temple-Westat Study, which was published in 2002.  (P-125; Vol. 4/25:18-26:15).  The study concluded that the program should not be expanded to a mandatory or large-scale program until problems in the system are fixed.  (Vol. 4/26:21-27:2).

267.    Basic Pilot produces a relatively high number of "false negatives," meaning that the system fails to confirm work-authorized persons.  These mistakes frequently occur because of data entry errors such as misspelled names and transposed numbers.  (Vol. 4/28:10-29:18).

268.    Congress has also resisted making Basic Pilot mandatory because the system does not contain adequate procedural protections to prevent false negatives. Currently, notice of non-confirmation goes only to the employer.  The Temple-Westat Study found that 73% of employers do not properly notify non-confirmed employees of the findings or of their appeal rights, and about half of employers subject such employees to "adverse employment conditions" during the appeal. (Vol. 4/30:22-32:5; 33:6-34:6).  Most citizens are confirmed right away, but about 10% of immigrants or non-citizens are initially non-confirmed.  (Vol. 4/32:6-33:5).

269.    In June 2006, Richard Stana, Director of Homeland Security and Justice at DHS, testified before the General Accounting Office ("GAO") in Congress that Basic Pilot still makes many mistakes, both failing to prevent the

hiring of illegal workers (false positives) and failing to confirm authorized workers (false negatives). (P-55; Vol. 4/35:8-38:7). The report concluded that current weaknesses in the Pilot Program "have to be fully addressed to help ensure the efficient and effective operation of an expanded or mandatory pilot system or similar automated employment verification program, and the cost of additional resources would be a consideration." (P-55 at pg. 21; Vol. 4/38:8-39:1).

270.   Currently, only 14,500 employers out of more than 6 million employers nationwide have voluntarily signed up to use Basic Pilot. (Vol. 4/34:18-35:7; 157:21-158:12; 159:1-5).

271.   Congress is concerned about Basic Pilot's deficient due process protections, especially with regard to notice to the affected worker. Under current law, the MOU outlines employers' responsibilities for using the system, including notifying workers of tentative non-confirmations, notifying workers of the appeal process and not penalizing workers during these steps. Studies show that many employers disregard these protections. (Vol. 4/49:9-50:7). Since Hazleton's ordinances shorten the time frame for employers to act and increase the penalties for retaining undocumented workers, it enhances employers' incentives to not notify workers and simply to terminate them, compounding the errors and the likely discrimination. (Vol. 4/50:8-50:19; 58:4-58:21).

272.   Even under the most restrictive (or anti-immigration) legislation proposed in Congress, including the Sensenbrenner bill from the last session, H.R. 4437 (P-16), Congress would not make Basic Pilot or any other electronic-verification system mandatory for at least six years. (Vol. 4/159:6-159:22). None of the bills include provisions, like Hazleton's, to suspend employers' operating

licenses or to create private causes of action for discharged native-born workers. (Vol. 4/62:24-64:13; 53:1-54:1). Thus far not a single government study has determined that Basic Pilot is ready for large-scale expansion or universal use. (Vol. 4/159:23-160:1; 167:6-167:18).

273.   The latest government study introduced into evidence was conducted by the Inspector General at the Social Security Administration ("SSA"), issued in December 2006. *See, Accuracy of the Social Security Administration's NUMIDENT File*, (P-197; Vol. 4/161:1-161:20). The report found that the NUMIDENT database, which is used by both Basic Pilot and SAVE, found errors in 4.1% of the records, which translates into errors in 17.8 million records. (Vol. 4/161:21-162:23). These errors could lead to incorrect responses in the form of false positives and false negatives. (Vol. 4/162:25-163:13).

274.   Congress has set a benchmark of 99% accuracy in the first verification step as a pre-requisite for making the Basic Pilot program mandatory. (Vol. 4/126:16-128:1).

275.   If Hazleton's ordinances and other similar municipal laws adopted in other communities went into effect, it would drastically increase the number of queries to federal verification systems. Both DHS and SSA have expressed concerns about being able to handle accurately a significantly larger volume of queries. (Vol. 4/163:8-164:13).

276.   Although defense counsel suggested during his questioning Dr. Rosenblum that the flaws in the Basic Pilot program have been corrected by DHS, neither defense counsel nor any witness has produced documentary or other evidence to support this claim. (Vol. 4/88:9-95:22; 135:13-136:24; 160:11-

160:25).

### (3)    Hazleton's Ordinances Promote Discrimination

#### (a)    The Revised Immigration Ordinance's Complaint-Based Enforcement System Promotes Discrimination

277.    Section 4.B.1's complaint-initiated mechanism is likely to increase discrimination and/or wrongful discharges.  The burden to prove that the worker is lawful rests with the employer.  There are no protections against people initiating complaints against business competitors.  And there are no protections built into the law to prevent retaliatory and discriminatory complaints.  (Vol. 4/50:20-52:25).

278.    Section 4.E of the Revised Immigration Ordinance, creating a private right of action in favor of "unfairly discharged employees," is also likely to exacerbate the discriminatory effects of Hazleton's law because it provides employers an additional incentive to be defensive.  (Vol. 4/59:4-60:12; 82:5-82:18).

279.    Hazleton's ordinances do not change the federal verification systems. They are based on the existing infrastructure and merely make the penalty structure harsher.  (Vol. 4/39:14-40:3; 44:8-44:21).  Hazleton's ordinances shorten compliance timelines and introduce new ways to file complaints.  (Vol. 4/40:3-40:6).

280.    Professor Rosenblum testified that the passage of the IRCA in 1986, which for the first time established an employer-sanctions-enforcement system (commonly referred to as the I-9 system), provides a historical analogue for assessing the likely effect of Hazleton's ordinances.  (Vol. 4/21:13-23:13; 40:7-40:19).  Congress "tweaked" IRCA in 1996, adding *inter alia* a new pilot program for electronic verification known as the Basic Pilot program.  (Vol. 4/23:14-22).

281.    Although Hazleton's ordinances have never taken effect because of this Court's injunction, government and private studies of IRCA's effects are pertinent in assessing the likely effects of Hazleton's ordinances.  (Vol. 4/62:8-62:23; 78:18-78:23; 112:10-112:23).  Studies about the effects of the Immigration Reform and Control Act ("IRCA") are the "best historical example" of how Hazleton's ordinances will affect employers and employees (and, given the parallel operational structures, landlords and tenants).  (Vol. 4/40:10-40:14).

282.    Government and academic studies have exhibited widespread consensus about three IRCA effects.  (Vol. 4/40:15-41:5).  First, it has failed to curtail employment of undocumented workers.  (Vol. 4/40:25-41:9).  Second, IRCA has driven down wages, not just for immigrants but for all U.S. workers.  (Vol. 4/41:10-41:13).  Third, IRCA has led to greater employment discrimination against Latinos.  (Vol. 4/41:14-41:16).

283.    Most of the evidence derives from a 1990 GAO report, *Immigration Reform, Employer Sanctions and the Question of Discrimination*.  (P-56).  The report found that 7% of employers simply stopped hiring people who looked Latino and a significant percentage of employers required more documentation from people who looked or sounded foreign than from native-born people.  (Vol. 4/41:17-43:17).

284.    Hazleton's Ordinances are likely to encourage employers to engage in "defensive hiring" and "defensive firing."  Defensive hirings and firings occur because even well-meaning employers, who want to comply with the law, have difficulty determining who is and who is not legal.  They err on the side of caution and protect themselves by not hiring, or firing, people who *might* be illegal.  Since

80% of the people in this country illegally are Hispanic, employers take an "information shortcut" and act based on the assumption that Hispanics are more likely than others groups, both native-born citizens and foreign-born from other nations, to be illegal. Hazleton's Ordinances will exacerbate problems of defensive hiring and firing by creating a greater incentive for employers to simply terminate workers to avoid being getting penalized. (Vol. 4/47:8-49:4; 54:13-56:3; 60:24-62:7; 113:2-113:24).

285.   The errors endemic in Basic Pilot also exist in SAVE since the two systems rely on the same databases. (Vol. 4/147:3-147:20). The same defensive hiring and firing practices generated by Basic Pilot would occur if Hazleton used the SAVE system. The employers and landlords who must "eyeball" the applicant and decide whether to hire or rent are likely to err on the side of caution by not hiring or renting to a person who looks as if he belong to an ethnic group more likely to include undocumented immigrants. (Vol. 4/147:21-148:19).

286.   Since the ordinances' harboring provisions operate essentially the same as the employment provisions, the incentives for landlords not to rent in the first place or to evict people who look and sound foreign, especially Hispanics, are the same. (Vol. 4/52:8-52:25).

### (b)    Hazleton's Immigration Ordinances Have Generated Anti-Immigrant Hostility That Did Not Previously Exist

287.   Plaintiffs presented testimony of an atmosphere of discrimination that arose after the adoption of the ordinances, which must be considered in reviewing the ordinances' discriminatory effect. From the time the ordinances were first proposed in June 2006, the climate of cordiality in Hazleton began to change dramatically and a division grew in the community between Latino and non-Latino

residents.  (Vol. 1/79:9-18).

288.   For example, Dr. Agapito Lopez, a long time resident of Hazleton, was subjected to discriminatory and hostile treatment immediately preceding and after the enactment of the ordinances.  In particular, Lopez received three pieces of racist hate mail.

289.   The first piece of hate mail was a pamphlet slipped underneath Dr. Lopez's office door on July 12, 2006, the day before the ordinances were enacted. (Vol. 1/73:12-74:4; Vol. 2/4:13-5:4).  A handwritten note on the envelope stated, "Read This!  You Might Learn Something."  (Vol. 2/5:5-11); (P-185).  The enclosed pamphlet described the danger of allowing Latinos to gain political power in the United States.  (Vol. 2/5:19-6:6); (P-185).  It warned that "Whites will be quickly stripped of their rights with our wealth confiscated for redistribution to non-whites as is taking place in South Africa."  (Vol. 2/6:3-6); P-185).  It also warned that the United States is "under invasion by millions of unskilled Mexicans" (Vol. 2/5:16-18; P-185), stated that "the consequences which this immigration disaster holds for our children is horrendous" (Vol. 2/5:25-6:1; P-185), and queried whether the United States would become the "United States of Mexico."  (Vol. 2/6:7-9; P-185).

290.   A few days after the ordinances were enacted, Dr. Lopez received at his office a second piece of hate mail, sent from nearby Wilkes Barre.   (Vol. 1/78:1-7; Vol. 2/7:7-16; 16:20-17:3).  The handwritten letter signed "disgruntled citizens" complained about Dr. Lopez's actions in "defending" the "Latin community" and the purported harm that the "Latin community" was causing Hazleton.  (Vol. 2/7:17-24; 8:14-15; 17:4-11); (P-186).  The letter did not

distinguish between documented and undocumented immigrants (Vol. 2/7:22-24; P-186), and described the purported problems cited by the mayor and other proponents of the ordinances.  (Vol. 2/6:24-7:6; 7:21-9:11; 15:6-22); (P-186).

291.    Dr. Lopez received a third piece of hate mail at his home in October 2006.  (Vol. 1/78:10-12; Vol. 2/9:12-23); (P-187).  The envelope contained a photograph of a Latino man who appeared to be wearing a Mexican hat, containing the words, "Subhuman Spic Scum."  The caption of the photograph stated, "If it's Brown, Flush it Down."  (Vol. 2/10:4-12); (P- 187).

292.    Receiving the hate mail made Dr. Lopez aware of the hostility that now exists in his city and made him fearful for himself and his family.  (Vol. 1/78:20-79:5; Vol. 2/6:17-23; 8:16-9:11; 10:13-22).

293.    Latinos, regardless of whether they were documented or even U.S. citizens, are experiencing a rising tide of anti-Latino hostility and animosity from the city's non-Latino residents.  For example, Dr. Lopez noticed that his once "friendly" relationship with his neighbors turned "a bit cold."  (Vol. 1/83:9-20).

294.    After the enactment of the ordinances, the Lechugas, Jane Doe 5 and John Doe 1 all experienced hostility and discriminatory treatment from their Hazleton neighbors.  (Vol. 2/124:2-125:5; 152:1-7; 134:17-135:4); (P-200, John Doe 1 Dep. Tr. at 43:21-25); (P-203, Jane Doe 5 Dep. Tr. at 74:14-22).  In contrast, prior to the enactment of the ordinances, they had not experienced such treatment, and felt secure and tranquil in the community.  (Vol. 2/154:4-5; P-200, John Doe 1 Dep. Tr. at 43:21-25; P-203, Jane Doe 5 Dep. Tr. at 74:14-22).

## II.    Plaintiffs' Post-Trial Brief

Plaintiffs submit this post-trial brief to address the amendments to the Immigration Ordinance announced by Defendant on the first and last day of trial and to respond briefly to new arguments and authority raised by defense counsel during the course of trial.  As explained in Part A. below, all of Plaintiffs' causes of action remain valid against the challenged Ordinances, even as amended by Ordinance 2007-6, and this Court accordingly should issue the requested relief with respect to the Ordinances as amended.  In addition, as explained in Part B. below, the Court should issue a declaration that the Immigration Ordinance as it stood at the outset of trial – that is, without the amendments made by Ordinance 2007-6 (herein, the "existing  Ordinance") – likewise violates the Constitution and applicable laws.  Finally, as explained in Part C.  below, Defendant's new arguments and authority do not refute, and actually strengthen, Plaintiffs' claims.

### A.    All of Plaintiffs' Claims Are Valid Against the Ordinances As Amended

In the midst of his opening statement, the City's counsel informed the Court that Hazleton had decided to make a further amendment to its immigration regulation scheme, in additional to the several previous changes made since the outset of this case.  The revision announced on the first day of trial would remove the words "solely or primarily" from §§ 4(B)(2) and 5(B)(2) of the Immigration Ordinance, provisions that then stated: "a complaint which alleges a violation solely or primarily on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced."  (Vol. 1/52:11-12; Exh. P-2).  Then, on the final day of trial, defense counsel announced further amendments, informing the Court that, the night before, Hazleton had not only amended the Immigration

Ordinance to remove the words "solely or primarily" from §§ 4(B)(2) and 5(B)(2), but also had made another change. Vol. 9, Part I/3:24-4:22).  This second change added the word "knowingly" to the first section of § 4(A), the provision that made it "unlawful for any business entity to recruit, hire for employment, or continue to employee … any person who is an unlawful worker."  These latest amendments to the Immigration Ordinance are contained in Ordinance 2007-6 (Exh. D-271).

The parties agree the Court may and should decide whether Plaintiffs' claims are valid against the existing Ordinances.  Defendant has not argued – nor could it – that the latest revisions have any effect on Plaintiffs' field and constitutional preemption claims; the multiple conflicts Plaintiffs have identified between Hazleton's scheme and federal law (except as discussed in Part A.1. below); Plaintiffs' claims under the Due Process Clause; Plaintiffs' privacy claims; or Plaintiffs' state law claims.  Indeed, with respect to the latest amendments, the disagreement between the parties is narrow and confined to two discrete aspects of Plaintiffs' case: (1) Plaintiffs' assertion that the Ordinances impose a strict liability standard on employers that conflicts with federal law; and (2) Plaintiffs' assertion that the Ordinances violate federal constitutional and statutory anti-discrimination provisions.  As explained below, all of the previously identified conflicts still exist with respect to the existing Ordinance.  In addition, Plaintiffs' discrimination claims are still valid despite the revisions to the Ordinances.

> **(1)    Even As Amended, the Ordinances Impose a Strict Liability Standard On Employers That Conflicts With Federal Law**

Plaintiffs and *Amicus* U.S. Chamber of Commerce have identified a number of serious conflicts between the challenged Ordinances and federal law, including conflicts with federal classifications of non-citizens, Pl. Mem. in Support of Their

Opp. to Def's Mot. to Dismiss and Cross-Mot. for Summary Judgment ("Pl. Mem.") at 11-12, 15-16; federal policy choices regarding mixed-status families, Pl. Mem. at 12; federal law and procedure regarding the determination of immigration status, Pl. Mem. at 12-17; federal law governing the Basic Pilot Program, Pl. Mem. at 18; Brief *Amicus Curiae* of the Chamber of Commerce of the United States of America ("Chamber Br.") at 16-19; federal law exempting certain work relationships from work authorization verification, Pl. Mem. at 18-19; federal law restricting reverification of workers and use of immigration documentation, Pl. Mem. at 19; Chamber Br. at 19 n.13; and Congress' overall regulatory scheme, Pl. Mem. at 20-24.

None of the preceding conflicts is in any way resolved by the latest amendments in Ordinance 2007-6, and each continues to serve as an independent basis for sustaining Plaintiffs' Supremacy Clause cause of action (and Plaintiffs' claims that the Ordinances are field-preempted, Pl. Mem. at 26-32 and impermissibly regulate immigration, Pl. Mem. at 32-37).

In Plaintiffs' (and the Chamber of Commerce's) preemption argument, they claim the Immigration Ordinance imposes a strict liability standard on employers that directly conflicts with the comprehensive federal employer sanctions scheme established by the Immigration Reform and Control Act of 1986 ("IRCA"). *See* Pl. Mem. at 19; Chamber Br. at 13-15. Because Ordinance 2007-6 adds the word "knowingly" to § 4(A) of the Immigration Ordinance, Defendant will likely argue that it cures this conflict with federal law. However, because the Ordinance's enforcement and sanctions provisions, even after the latest amendment, operate as a strict liability scheme, a direct conflict continues to exist.

71

In IRCA Congress prohibited only the "knowing" employment of unauthorized workers and provided employers with protection from liability if the employee "provides a document or combination of documents that reasonably appears on its face to be genuine" and is listed as acceptable by the federal government. 8 U.S.C. § 1324a(a)(1)(A), (b)(1)(A)(ii); *see* 8 U.S.C. § 1324a(a)(3) (good faith compliance with documentation process is an affirmative defense to claim of IRCA violation); *see also* Chamber Br. at 12-13; *id.* at 5-7 & n.4 (explaining legislative history). Hazleton's local employer sanctions scheme, which imposes strict liability and does not take into account an employer's compliance with the documentation process, clearly conflicts with IRCA.

The Immigration Ordinance's treble-damages private right of action has no employer-knowledge element whatsoever and does not exempt from liability employers that comply with the documentation process. Immigration Ordinance § 4(E); *see* Chamber Br. at 13. Similarly, the Ordinance's complaint and sanctions procedures turn entirely on whether a worker is found to be an unlawful worker and make no provision for any inquiry regarding the employer's knowledge or compliance with IRCA's documentation process. Immigration Ordinance §§ 4(B), 7(C). These clear conflicts with federal law, and the others outlined by Plaintiffs and the Chamber of Commerce, compel the Court to invalidate the Ordinance as amended. *See, e.g., Hines v. Davidowitz,* 312 U.S. 52, 66-67 (1952) (state laws cannot "conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations"); *Rogers v. Nelson*, 563 F.2d 617, 626 (3d Cir. 1977) (invalidating Virgin Islands employer sanctions scheme as conflict preempted).

**(2)      Even As Amended, the Ordinances Are Invalid Under the Equal Protection Clause and Anti-Discrimination Laws**

Defense counsel explained Hazleton had deleted the words "solely or primarily" from §§ 4(B)(2) and 5(B)(2) of the Immigration Ordinance in order to "remove the equal protection challenge" from this case.  (Vol. 1/52:6).  Defendant has not succeeded in this effort.  Plaintiffs' equal protection claim survives because, in the circumstances presented here, Defendant's re-endorsement of the Immigration Ordinance at the end of trial requires a finding that Defendant has impermissibly engaged in racial discrimination.  In addition, and independent of Defendant's motivations in re-endorsing the Immigration Ordinance, the evidence at trial plainly established the Ordinances have a discriminatory effect that violates the Fair Housing Act.

In pre-trial briefing, Plaintiffs' equal-protection analysis focused on the most obvious evidence of the Immigration Ordinance's discriminatory nature: its provisions establishing that only "[a] complaint which alleges a violation *solely or primarily* on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced."  Ordinance 2006-18 (pre-amendment), §§ 4(B)(2), 5(B)(2) (emphasis added).  The existing Ordinance contemplated – and indeed required – that Hazleton take enforcement actions against individuals based on complaints that were motivated *in part* based on race or national origin.  Pl. Mem. at 49-53; *accord* Vol. 1/53:22-23 (defense counsel acknowledging that "solely or primarily implies that case [*sic*] [race] be used secondary in such a complaint").  Plaintiffs explained, and Defendant ultimately did not deny, such mixed-motive discrimination requires strict judicial scrutiny and would fail such analysis.  Pl. Mem. at 53-56.

At trial, Plaintiffs' expert, Professor Marc Rosenblum, Ph.D., testified that, for reasons unrelated to the "solely or primarily" language, the Ordinance is likely to increase discrimination in employment and housing, especially against people of Latino descent.  (Vol. 4/21:5-12).  Prof. Rosenblum explained the Ordinance will exacerbate the phenomenon of "defensive hiring" – that is, employers will choose not to hire (and landlords will choose not to rent to) individuals who "might be illegal."  (Vol. 4/47:17-48:20).  Similarly, the Ordinance gives landlords and employers an incentive simply to terminate their relationship with someone accused or suspected of being an "illegal alien," does not afford any notice or meaningful protections to the accused, and does not provide sufficient time to respond to complaints, all of which increase the likelihood that individuals will be terminated merely because they "might be illegal."  (Vol. 4/48:21-52:25; 54:17-56:3; 59:4-60:12; 82:5-82:18).  This especially effects people of Latino backgrounds, because employers and landlords take an "informational shortcut" and act based on the assumption that Latinos are more likely than other groups to be "illegal."  (Vol. 4/60:24-62:7).[2]  Defendant did not present any evidence casting doubt on any of Prof. Rosenblum's testimony regarding the discriminatory nature of the Ordinance.

---

[2]     Prof. Rosenblum based his conclusions on government studies and published data regarding the effects of employer verification systems generally and his analysis of the particular scheme envisioned under the Hazleton ordinance.  Prof. Rosenblum did not rest his conclusions regarding discrimination on the "solely or primarily" language in the Ordinance or the explanation of its operation offered by Plaintiffs in their briefs.  In fact, Prof. Rosenblum recognized that the Immigration Ordinance included purportedly anti-discriminatory language but explained that language would not negate its discriminatory effect.  Vol. 4/51:22-52:3.

After Prof. Rosenblum testified, explaining why the Ordinance will have discriminatory impacts and effects on the Latino community in Hazleton, the City Council met to consider passage of Ordinance 2007-6. A specific purpose of the amendment was to address equal protection issues in the Ordinance. (Vol. 1/52:6(. Yet, despite the uncontroverted evidence that the Ordinance will result in racial discrimination even with the proposed amendment, neither the Mayor nor the Council took any steps to further modify the Ordinance's language or to incorporate anti-discrimination safeguards. In fact, the Mayor indicated he would enforce the Ordinances even if they had a discriminatory effect. (Vol. 4/263:9-16).

The significance of Prof. Rosenblum's testimony for Plaintiffs' discrimination claims is twofold. First, Defendant's re-endorsement of the Immigration Ordinance's discriminatory scheme in these circumstances gives rise to an inference that Defendant has impermissibly engaged in intentional racial discrimination that violates the constitutional guarantee of equal protection. "[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 487 (1997); *see also Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977) (noting specifically "[t]he specific sequence of events leading up [to] the challenged decision also may shed some light on the decisionmaker's purposes …. Departures from the normal procedural sequence also might afford evidence that improper purposes were playing a role"); *Pryor v. National Collegiate Athletic Ass'n.,* 288 F.3d 548, 564-68 (3rd Cir. 2002) (finding plaintiffs had stated a claim for improper discrimination where they alleged that defendant specifically knew of

discriminatory results of policy and acted with purpose of causing such results).

This intentional discrimination also violates the Fair Housing Act, 42 U.S.C. §

3604 *et seq*. *See* Pl. Mem. at 57-59.

Second, and wholly apart from any question of Defendant's intent, Prof.

Rosenblum's unrebutted testimony establishes the Ordinances' housing-related

provisions will have a disparate adverse effect on Latino residents of Hazleton,

regardless of their immigration status, strong proof of Plaintiffs' Fair Housing Act

claim.  Disparate impact is a sufficient basis for a claim under the Fair Housing

Act, regardless of intent.  Pl. Mem. at 57, 59-60; s*ee, e.g., Doe v. Butler,* 892 F.2d

315, 323 (3d Cir. 1989); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 141-44 (3d

Cir. 1977); *see also Huntington Branch NAACP v. Town of Huntington*, 844 F.2d

926, 937 (2d Cir.) (discriminatory effect may be proven by showing an "adverse

impact on a particular minority group"), *aff'd*, 488 U.S. 15 (1988).

### B.     The Court Should Issue an Additional Declaration That the Immigration Ordinance Violates Federal Law When Considered Without The Latest Amendments

In addition to finding the challenged Ordinances invalid in their current

iterations and issuing the requested relief with respect to those Ordinances, the

Court should declare that the existing Immigration Ordinance – the version in

effect until the final day of trial – violates the Constitution and federal and state

law as alleged by Plaintiffs.  Defendant's words and actions convey that Defendant

has not accepted that the existing Ordinance is unlawful.  Hazleton made its latest

modifications for the express purpose of preventing this Court from ruling on

Plaintiffs' claims as pleaded in their Complaint, Amended Complaint, and Second

Amended Complaint.  In these circumstances, the interests of all of the parties and

the Court are served by a ruling that reaches both the existing Ordinances and the last amended version of the Immigration Ordinance.

Hazleton's many revisions to the challenged Ordinances, before and during trial, have come at the urging and direction of its trial counsel. (*See, e.g.,* Vol. 2/146:9-18; Vol. 3/149:1-3 (admitting that Ordinance 2006-18 was written by trial counsel)). By Defendant's own admission, the revisions were undertaken solely to enhance Defendant's litigation position. (*See, e.g.,* Vol. 1/52:6). Defendant rushed several significant amendment through the City Council in defiance of its ordinary procedures, without subjecting the changes to any genuine deliberation by the legislative body.[3] The latest amendments took place in the midst of trial and some seven months after the litigation began. Throughout, Defendant stubbornly has insisted in court that the prior versions of the Ordinances were valid and sound. (*See, e..g.,* Vol. 9/34:11 (addition of "knowingly" was "just a clarification")).

---

[3]    Ordinance 2006-18, which replaced wholesale the original Immigration Ordinance with a significantly different and more elaborate scheme, was introduced in an emergency meeting late on a Friday afternoon and was given a second and third reading the following Tuesday, shortcutting the usual deliberative process by cutting the 10-day period usually allowed for consideration and deliberation between the introduction of a new bill and its second reading to the legal minimum. Vol. 2/147:4-148:6. Similarly, Ordinance 2007-6 was introduced on March 15, 2007, which was not a scheduled meeting date for the City Council. *See* http://www.hazletoncity.org/public/council-category/council-meeting-dates-2.html. On March 21, 2007 – six days later – the City Council gave Ordinance 2007-6 a second and third reading, amended it to include the new provision relating to the word "knowingly," and enacted it.

Hazleton's hasty addition of the "knowingly" provision, a wholly new topic not encompassed in the original bill, violates not only Hazleton's own customs, but also state law governing the introduction and consideration of municipal ordinances. *See* 53 P.S. § 36011 ("[Proposed ordinances] shall not be so altered or amended on their passage through council as to change their original purpose.")

"[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc*. 455 U.S. 283, 289 (1982). The legality of a challenged practice is appropriately decided unless "there is no reasonable expectation that the wrong will be repeated…." *County of Los Angeles v. Davis*, 440 U.S. 625 (1979). To do otherwise would "leave the defendant ... free to return to [its] old ways," *United States v. W.T. Grant Co*., 345 U.S. 629, 632 (1953). The defendant faces a "'heavy,' even 'formidable' burden of persuading the court that the challenged conduct cannot reasonably be expected to resume." *United States v. Gov't of the Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004) (quoting *Friends of the Earth, Inc. v. Laidlaw Env. Svcs.*, 528 U.S. 167, 189-90 (2000)).

On multiple occasions, courts have decided the legality of a statute or ordinance that has been repealed. In *City of Mesquite*, for example, the Supreme Court considered whether a particular provision of a city ordinance was unconstitutionally vague even though the city had repealed that provision. 455 U.S. at 289. The Court explained "the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." *Id. See also*, *e.g., Penny Saver Pubs., Inc. v. Village of Hazel Crest*, 905 F.2d 150, 153-154 (7th Cir. 1990) (claim for declaratory relief in challenge to ordinance was not moot, even though ordinance was amended so as not to apply to plaintiff, because "there still remains a live controversy between the parties as to whether the ordinance was unlawful").[4] Of

---

[4]    In the course of finding a challenge to a repealed act of Congress moot, the Third Circuit has noted the Fourth Circuit's holding that "statutory changes that discontinue a challenged practice are *usually* enough to render a case

particular relevance here, a Missouri court considering a challenge to an anti-immigrant ordinance very similar to Hazleton's recently declared the ordinance void and permanently enjoined its enforcement, even though the municipality had repealed the ordinance during the course of litigation. *Reynolds v. City of Valley Park*, No. 06-CC-3802, at 5 (St. Louis Cty. Circuit Ct., Mar. 12, 2007) (appeal docketed).

In this case, Defendant's latest rushed amendment of the Immigration Ordinance, in the midst of and to enhance its position in this litigation, and without any acknowledgment of the infirmity of the existing Ordinance, simply cannot establish that "there is no reasonable expectation that the wrong will be repeated." Accordingly, in addition to issuing Plaintiffs the requested relief with respect to the Ordinances as amended by Ordinance 2007-6, the Court should declare that the existing Immigration Ordinance violates the Constitution and state and federal law for the reasons set forth in Plaintiffs' previous submissions.

### C. The New Authority Cited By Defense Counsel Actually Strengthens Plaintiffs' Legal Claims

---

moot." *Khodara Envtl., Inc. v. Beckman*, 237 F.3d 186, 194 (3d Cir. 2001) (emphasis added) (citing *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000)). However, the Circuit has also rejected a government actor's claims of mootness where the action allegedly mooting the case was taken "with litigation lurking a few days away" and where the circumstances suggested "that the impending litigation was the cause of the determination." *Virgin Islands*, 363 F.3d at 285; *cf. Penny Saver*, 905 F.2d at 153 n.1 (noting that District Judge in a related case found that defendant "acted on advice of its trial counsel" (punctuation omitted)). The *Virgin Islands* court additionally found that the government actor's "continued defense of the validity and soundness of the [challenged practice] prevents the mootness argument from carrying much weight[,]" because that "stance does not bespeak of a genuine belief that the [practice] was of a type that would not be contemplated again." *Virgin Islands*, 363 F.3d at 286.

Defendant relied on two legal arguments in the course of trial that had not been highlighted in its briefs: first, the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, negates Plaintiffs' preemption claims with respect to the Ordinances' treble damages private right of action; and second, a series of cases involving the federal firearms statutes contradicts Plaintiffs' description and analysis of federal immigration law. (*See, e.g.,* Vol. 4/137:1-140:24; Vol. 6/141:17-143:3). Additionally, on several occasions during the trial, defense counsel referred to a newly decided case from the Ninth Circuit, *Incalza v. Fendi North America, Inc.,* 479 F.3d 1005 (9th Cir. 2007) (s*ee, e.g.,* Vol. 1/45:16-46:8; Vol. 9, Part II/37:10-38:3) and has recently informed Plaintiffs that Defendant intends to reference congressional testimony delivered after the close of evidence in its post-trial submissions. None of these developments undermines Plaintiffs' claims; rather, they underscore the points Plaintiffs have made throughout.

Defense counsel cited *Incalza* as support for its position that, in order for conflict preemption to be found, "[t]here has to be inevitable conflict so the person cannot stand within the legal protection, so to speak, or be legal under both statutes." (Vol. 9, Part II/38:1-3). Yet *Incalza* did not reach that question. *Incalza* involved a suit by an Italian national who claimed his employment was wrongly terminated in violation of an implied contract and California anti-discrimination law. 479 F.3d at 1008. The employer argued in response that it was required to terminate the employee under IRCA and, to the extent California law required a different result, it was preempted. *Id.* at 1009. The Ninth Circuit determined IRCA did not require the employee's termination, so there was no conflict between

federal law and state law as alleged by the employer, and the state law's provision of a damages remedy to the employee for improper termination did not create a conflict between state law and federal law. *Id.* at 1010-19. The court specifically did not address whether the state law would be conflict-preempted where compliance with both state and federal law was technically possible but potentially at cross-purposes. *Id.* at 1010.

*Incalza* actually applied the same standard in its conflict preemption analysis advanced by Plaintiffs in their briefs. The court applied the *Hines v. Davidowitz* standard – a state law is conflict-preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1010; *cf.* Pl. Mem. at 9-10 (relying on *Hines* standard). To be sure, the *Incalza* court recognized the conflict must be a genuine one: mere "tension … is not enough" to find preemption. 479 F.3d at 1010. But Plaintiffs do not rest their conflict preemption claims on mere tension; rather, Plaintiffs (and the Chamber of Commerce) have identified specific, pervasive incompatibilities between the Ordinances and federal law. Pl. Mem. at 9-26; Chamber Br. at 12-20.

Moreover, *Incalza*'s analysis of the purposes of IRCA echoes Plaintiffs' position and strongly supports a finding of conflict between the Hazleton Ordinances and federal law here. *Incalza* finds, consistent with the testimony of Plaintiffs' witnesses in this case, that one of Congress's purposes in IRCA was "protecting the rights of lawful alien workers" and that members of Congress had "repeatedly expressed" "[c]oncern with protecting such workers from discrimination based on national origin engendered by IRCA's employer sanctions." 479 F.3d at 1011 (citing legislative history); *see id.* at 1012 n.6 (noting

anti-discrimination provisions in IRCA and creation of Office of Special Counsel
for Immigration-Related Unfair Employment Practices).  The court noted,
"[a]llowing employers to place employees on leave without pay while problems or
concerns with their immigration status are resolved protects lawful employees
from discharges by employers who, concerned with liability under IRCA, would
otherwise terminate those employees first and ask questions later."  *Id.*  The
Ordinances provide no such safety valve and will result in precisely the sort of
harm the Ninth Circuit recognized Congress was seeking to avoid.  (*See* Vol.
4/48:21-52:25; 54:17-56:3; 59:4-60:12; 82:5-82:18 (discussing "defensive firing");
Chamber Br. at 16 n.10).

    In cross-examination of Plaintiffs' expert witness, Professor Rosenblum,
defense counsel made reference to unpublished statistics that, he asserted, showed
that "93 percent of all employees run through Basic Pilot are verified electronically
in less than three seconds."  (Vol. 4/88:18-20;  Vol. 4/135:16-136:23).  Defense
counsel has now informed Plaintiffs that he intends to provide the Court with the
April 24, 2007 Congressional testimony of a Department of Homeland Security
official ["Cong. Test."] stating variously that "over 92%" or "nearly 92%" of
initial Basic Pilot queries are initially electronically verified.  (Cong. Test. 1, 3).
An error rate of 8% (or 7%) does not represent a radical departure from previous
statistics, resolve the problems that Professor Rosenblum noted with the Basic
Pilot system and Hazleton's use of it, or remove the likelihood that it will cause
discrimination.  (Vol. 4/88:17-89:12, 97:1-14).

    In fact, consistent with Professor Rosenblum's testimony, the April 24 DHS
statement explains the notice requirements under the Basic Pilot system and the

eight-day window that it provides for employees to contest tentative nonconfirmations – a period that Professor Rosenblum described as "one of the most important differences between the Hazleton system and the Basic Pilot." (Vol. 4/46:11-47:4; Cong. Test. at 3; *see also* Chamber Br. at 16-17 (describing conflict between Hazleton scheme and eight-day period)).

Moreover, the April 24 statement demonstrates clearly that Basic Pilot is neither a mandatory system nor ready to be made mandatory, even by the federal government. There are a number of significant improvements to the system still to be made, and current federal proposals "recognize the challenges of implementing a mandatory national system and seek to minimize the burdens placed on employers." Cong Test. at 5. Indeed, DHS endorses a "gradual approach" that would "phase in" electronic verification requirements. *Id.* at 6. Municipalities like Hazleton cannot overrule (and make irrelevant) Congress' decisions regarding employer verification systems by unilaterally making the voluntary Basic Pilot system a mandatory one.

The first of Defendant's new legal arguments relates to the civil RICO statute, 18 U.S.C. § 1964. Plaintiffs previously have explained the Immigration Ordinance's treble-damages private right of action, § 4(E), conflicts with both federal and state law. Pl. Mem. at 30-31, 63-65; *see also* Chamber Mem. at 10, 13. At trial, the City's counsel made the remarkable assertion that § 4(E) is actually an example of "Hazleton matching Federal law." (Vol. 9, Part II/35:5-6). The provision of Federal law that is being "match[ed]", counsel claimed, is the civil provisions of RICO. (Vol. 9, Part II/35:5-20).

83

Apart from the fact both involve treble damages, there is virtually no similarity, much less any identity, between § 4(E) and RICO's civil provisions. As the cases Defendant cited make clear, the elements of a civil RICO claim include a series of predicate federal criminal offenses;[5] a racketeering "enterprise" akin to a conspiracy, involving multiple actors; and proof that the plaintiff's damages were proximately caused by the racketeering activity. *See*, *e.g., Williams v. Mohawk*, 411 F.3d 1252 (11th Cir. 2005), *vacated*, 126 S. Ct. 2016 (2006) (RICO case cited by Defendant in which plaintiffs alleged that defendant's employees and third-party recruiters traveled to the border to recruit undocumented workers, transported them to work sites, knowingly and recklessly accepted false documents, and helped unauthorized workers evade detection; allegations amounted to "hundreds, even thousands, of violations of immigration law"). These predicate elements are entirely absent from the Ordinance's novel treble-damages provision.

The vast differences between civil RICO and § 4(E) of the Immigration Ordinance illustrate Congress' caution in creating any private remedy even for egregious violations of federal restrictions on the employment of non-citizens. These differences illustrate, yet again, that Hazleton's attempts to create its own immigration regulation scheme will wreak havoc on Congress' choices in this area.

Defendant's second new argument relates to a number of cases involving the federal firearms statutes, *United States v. Atandi*, 376 F.3d 1186 (10th Cir. 2004), *United States v. Igbatayo*, 764 F.2d 1039 (5th Cir. 1985), and *United States v.*

---

[5]    The RICO "racketeering activity" that relates directly to employment of unauthorized alien workers is 8 U.S.C. § 1324(a)(3)(A), which makes it a federal crime to "knowingly hire[] for employment at least 10 individuals with actual knowledge that the individuals are [unauthorized] aliens" during a twelve-month period."

*Bazargan*, 992 F.2d 844, 847 (8th Cir. 1993).  Defense counsel raised these cases during cross-examination of Plaintiffs' expert witness, Professor Stephen Yale-Loehr, and again during closing argument.  (Vol. 6/141:17-143:3; Vol. 9, Part II/46:20-49:11).  Defendant asserts these cases provide a definition of unlawful status that is relevant to this case; suggest that immigration status is not as indefinite or complex as Plaintiffs (and the evidence) have shown; and somehow contradict Plaintiffs' assertion that, under federal law, the only way to determine whether someone must leave the country is through the removal hearing procedure prescribed by the Immigration and Nationality Act. (Vol. 9, Part II/46:20-49:4).

To the contrary, *Atandi* and the other firearms cases simply illustrate that federal laws and regulations and federal courts have developed a specific definition of what it means to be "illegally or unlawfully in the United States" *as that phrase is used in the federal firearms statutes*.  *See* 18 U.S.C. § 922(g) ("It shall be unlawful for any person ... who, being an alien ... is illegally or unlawfully in the United States ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition…."). In *Atandi,* the Tenth Circuit held:

> an alien who is only permitted to remain in the United States for the duration of his or her status (as a student, for example) becomes "illegally or unlawfully in the United States" *for purposes of § 922(g)(5)(A)* upon commission of a status violation. We look to the date of the status violation to determine when the alien's presence became unauthorized, not to when that violation is recognized by official decree.

376 F.3d 1186, 1188 (emphasis added);[6] *accord Bazargan*, 764 F.3d at 848 (determining whether defendant was "a legal alien *for the purposes of 18 U.S.C. § 922(g)(5)* during the period of time that he possessed the firearms" (emphasis added)). The *Atandi* court relied in part on a federal regulation, 27 C.F.R. § 478.11, which defines certain terms used in the firearms statutes for the purpose of administering those statutes, stating in particular that an alien "illegally or unlawfully in the United States" for the purpose of this statute is an alien "not in valid immigrant, nonimmigrant or parole status." Defendant now claims that § 478.11 provides a definition relevant to this case. (Vol. 9, Part II/48:25-49:3).

Hazleton is plainly incorrect in claiming interpretations of one immigration-related term in the federal firearms laws by the federal courts and the federal government somehow apply to Hazleton's use of different terms for a very different purpose. Eligibility under federal law to purchase firearms and ability to reside in the United States under federal immigration law and policy are totally distinct inquiries.[7] Indeed, these cases prove the

---

[6]     Counsel repeatedly omitted the key term "for purposes of § 922(g)(5)(A)" when purporting to quote this passage verbatim to Plaintiffs' expert witness and to the Court. Vol. 6/142:10-14; Vol. 9, Part II/46:20-47:5.

[7]     *Bazargan* illustrates this point perfectly. The defendant in that case was admitted as a student, violated the terms of his admission by transferring between schools without notifying the government, and later applied for asylum. 992 F.2d at 845. At the time of the firearms purchase in April 1991, Bazargan had submitted an asylum application, which was pending, but was not in a lawful status because he had violated his terms of admission. *Id.* at 845-46. Still, he had federal work authorization as a result of his asylum application. *Id.* at 845. When he was put in removal proceedings, he was granted asylum by the immigration judge and so was not removed from the country. *Id.* at 846.

point that there is no single definition of "legal" immigration status in federal law for all purposes and the complexity of federal immigration law makes it particularly difficult to interpret terms that are not precisely defined in the Immigration and Nationality Act.[8]  As Plaintiffs' evidence and citations show, the federal government decides whether someone should depart from the United States only through removal proceedings, and Hazleton's Ordinances run roughshod over that process and the complex system of classification the federal government employs. Pl. Mem. at 12-13.

### D.    Conclusion

For the reasons set forth above, Plaintiffs respectfully request that the Court adopt Plaintiffs' previously-submitted Proposed Conclusions of Law, make such further Conclusions of Law as are suggested by Part A. above, grant Plaintiffs' requested relief with respect to the Ordinances as amended, and declare that the existing Immigration Ordinance violates the Constitution and federal and state law.

---

Under Hazleton's theory, it would have been proper for any municipality in the United States to deny Barzagan abode in April 1991, notwithstanding that he was known to the federal government and authorized to work in the United States and notwithstanding that the federal government ultimately decided that he should not removed from the United States because he had a well-founded fear of persecution in his country of origin.

[8] For example, the Tenth Circuit concluded the district court in *Atandi* erred by assuming the term "unlawful presence," which has special meaning in the immigration code, was the same as being "illegally or unlawfully in the United States."  *United States v. Atandi*, 228 F. Supp. 2d 1285, 1288 (D. Utah 2002), *rev'd*, 376 F.3d 1186 (10th Cir. 2004).

Dated: May 14, 2007

Respectfully submitted,

By:   /s/ Thomas B. Fiddler
     Thomas G. Wilkinson, Jr., Esquire
     Linda S. Kaiser, Esquire
     Doreen Yatko Trujillo, Esquire
     Thomas B. Fiddler, Esquire
     Elena Park, Esquire
     Ilan Rosenberg, Esquire
     COZEN O'CONNOR
     1900 Market Street
     Philadelphia, PA  19103
     Tel. (215) 665-2000
     Fax: (215) 665-2013

     Foster Maer, Esquire
     Jackson Chin, Esquire
     Denise Alvarez, Esquire
     PUERTO RICAN LEGAL
     DEFENSE AND EDUCATION FUND
     99 Hudson St. 14 Floor
     New York, NY  10013-2815
     Tel. (212) 739-7575
     Fax: (212)431-4276

     George R. Barron, Esquire
     88 North Franklin Street
     Wilkes-Barre, PA  18701
     Tel. (570) 824-3088
     Fax: (570) 825-6675

     David Vaida, Esquire
     137 North 5th Street
     Allentown, PA  18102
     Tel. (610) 433-1800
     Fax: (610) 433-2985

Lee Gelernt, Esquire
Omar C. Jadwat, Esquire
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
125 Broad St., 18th Fl.
New York, NY  10004
Tel. (212) 549-2620
Fax: (212) 549-2654

Lucas Guttentag, Esquire
Jennifer C. Chang, Esquire
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA  94111
Tel: (415) 343-0770
Fax: (415) 395-0950

Witold J. Walczak, Esquire
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA  15213
Tel. (412) 681-7864
Fax: (412) 681-8707

Mary Catherine Roper, Esq.
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA  19106
Tel. (215) 592-1513 ext. 116

*Counsel for Plaintiffs*

Shamaine Daniels, Esq.
Laurence E. Norton, II, Esq.
Peter Zurflieh, Esq.
COMMUNITY JUSTICE PROJECT
118 Locust Street
Harrisburg, PA  17101
Tel. (717) 236-9486
Fax: (717) 233-4088

*Counsel for Plaintiffs Rosa Lechuga, Jose
Luis Lechuga, John Doe 3, John Doe 7,
Jane Doe 5 and Casa Dominicana of
Hazleton, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas B. Fiddler, counsel for Plaintiffs, hereby certify that I did cause a true and correct copy of Plaintiffs' Post-Trial Proposed Findings of Fact to be served electronically by ECF to all counsel for Defendant City of Hazleton.


Dated:  May 14, 2007                    By:  <u>/s/ Thomas B. Fiddler</u>

ATTORNEY WORK PRODUCT                DRAFT
PRIVILEGED AND CONFIDENTIAL