# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

| | | |
|---|---|---|
| **PEDRO LOZANO,** | : | **No. 3:06cv1586** |
| **HUMBERTO HERNANDEZ,** | : | |
| **ROSA LECHUGA,** | : | **(Judge Munley)** |
| **JOSE LUIS LECHUGA,** | : | |
| **JOHN DOE 1,** | : | |
| **JOHN DOE 3,** | : | |
| **JOHN DOE 7,** | : | |
| **JANE DOE 5,** | : | |
| **CASA DOMINICA OF HAZLETON, INC.,** | : | |
| **HAZLETON HISPANIC BUSINESS ASSOCIATION, and** | : | |
| **PENNSYLVANIA STATEWIDE LATINO COALITION,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF HAZLETON,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

# TABLE OF CONTENTS

## I. Preliminary Issues

**A. Standing**...........................................................**13**

**1. Constitutional standing**....................................**14**

**a. Individual named plaintiffs**..............................**16**
**b. Organizations**....................................................**24**
**c. Tenant plaintiffs**...............................................**37**

**2. Prudential standing**..........................................**45**

**B. Anonymous Does**.............................................**57**

**1.  Factors favoring anonymity** ...........................**64**
**2.  Factors favoring disclosure**............................**80**

**C. Amendments to the ordinances**......................**85**

## II.  Federal Constitutional Issues

**A.  Federal pre-emption**........................................**91**

**1.  Employment provisions**...................................**93**

**a. Express pre-emption**........................................**93**

**b. Implied pre-emption**........................................**100**

**i. Field** ...............................................................**100**
**ii. Conflict**   ........................................................**111**

**2.  Tenancy provisions**.........................................**122**

**a. Housing illegal aliens**............................................**122**

**b. Tenant registration ordinance**............................**123**

**B. Procedural due process**......................................**131**

**1.  Employment provisions**......................................**132**

**2.  Landlord/tenant**....................................................**141**

**C. Equal Protection**....................................................**146**

**D. Privacy rights** ........................................................**156**

### III. Federal Statutory Causes of Action

**A. Fair Housing Act**....................................................**163**

**B. Section 1981**..........................................................**166**

### IV.  State Law Causes of Action

**A. Pennsylvania municipality law**............................**170**

**B. Landlord/Tenant Law**............................................**181**

**C. Police powers** ........................................................**184**

**Conclusion**..................................................................**186**

**Verdict**........................................................................**190**

**Appendix**....................................................................**193**

## DECISION

_____This case addresses Defendant City of Hazleton's authority to enact ordinances that regulate the presence and employment of illegal aliens.[1] Before the court for disposition is plaintiffs' complaint challenging the validity of those ordinances. Trial has been held on this matter, and the parties have filed briefs setting forth their respective positions.  The matter is thus ripe for disposition.

**Background including findings of fact**

Defendant City of Hazleton is located in Luzerne County in northeastern Pennsylvania.  The city's executive is a mayor and the city's legislature is a city council.  Under Pennsylvania law, Hazleton is a City of the Third Class and operates under an Optional Plan B form of government.   (Notes of trial testimony (hereinafter "N.T") 3/15/07 at  204-05).

At the time of the 2000 census, Hazleton's population was 23,000. (N.T.  3/16/07 at 145-46).  Since 2000, Hazleton's population has increased sharply, and now has an estimated 30,000 to 33,000 residents.

---

[1]The parties vary in their use of the terms "illegal alien," "unauthorized alien," "illegal immigrant" and "undocumented alien."   We will use the terms interchangeably.

4

(P-148, 2007 Budget Proposal, at 1-2; N.T. 3/19/07 at 163-64).

The increase in Hazleton's population can be explained largely by a recent influx of immigrants, most of whom are Latino.  (N.T. 3/16/07 at 146).  After the September 11, 2001 terrorist attacks, many Latino families moved from New York and New Jersey to Hazleton seeking a better life, employment and affordable housing.  (N.T. 3/12/07 at 66-67; N.T. 3/14/07 at 29-30).  Those moving to Hazleton included United States citizens, lawful permanent residents and undocumented immigrants.  (N.T. 3/13/07 at 161; N.T. 3/14/07 at  29-30).

The number of undocumented immigrants in Hazleton is unknown. (N.T. 3/16/07 at 146).  Immigrants, both legal and undocumented, support the local economy through consumer spending, paying rent and paying sales taxes. (N.T. 3/14/07 at  67-70).

Beginning on July 13, 2006, the City of Hazleton enacted numerous ordinances aimed at combating what the city viewed as the problems created by the presence of "illegal aliens."  On July 13, 2006, Ordinance 2006-10, the city's first version of its "Illegal Immigration Relief Act Ordinance" was passed.  This ordinance prohibits the employment and harboring of undocumented aliens in the City of Hazleton.  On August 15,

2006, the city passed the "Tenant Registration Ordinance," Ordinance 2006-13 ("RO").  This ordinance requires apartment dwellers to obtain an occupancy permit.  To receive such a permit, they must prove they are citizens or lawful residents.

On September 21, 2006, Hazleton enacted Ordinance 2006-18, entitled the "Illegal Immigration Relief Act Ordinance" ("IIRA") and Ordinance 2006-19, the "Official English Ordinance."   These two ordinances replaced the original Illegal Immigration Relief Act.  On December 28, 2006, Hazleton enacted Ordinance 2006-40, which amended IIRA by adding an "implementation and process" section.  During the trial of the above matter, the city enacted the final ordinance at issue in this case, Ordinance 2007-6, which made minor, but important, changes to the language of portions of IIRA.[2]

At issue in the instant case are IIRA[3] and RO. [4]   IIRA defines "illegal

---

[2]Ordinance 2007-6 eliminated the phrase "solely and primarily" from sections 4.B.2 and 5.B.2 of IIRA and inserted the word "knowingly" to section 4.A of Ordinance 2006-18.

[3]For the remainder of the opinion we will refer to Ordinance 2006-18, as amended by Ordinance 2006-40 and Ordinance 2007-6 collectively as "IIRA" or "Ordinance."

[4]The details of these ordinances are discussed more fully below where appropriate.

alien" as an "alien who is not lawfully present in the United States,

according to the terms of United States Code Title 8, section 1101 et seq."

(IIRA  § 3.D.).  Title 8, section 1101, *et seq.* is commonly referred to as the

Immigration and Nationality Act or "INA".  The INA provides no definition for

the term "illegal alien" or the term "lawfully present."   (N.T. 3/19/07 at 130).

Generally, under federal law, aliens can be present in the country as:

1) lawfully admitted non-immigrants, i.e., visitors, those in the country

temporarily; and 2) lawful immigrants, lawful permanent residents, referred

to sometimes as "green card holders."  (N.T. 3/19/07 at 112-13).   Lawfully

admitted for permanent residence status can be attained in various ways,

including family or employment characteristics, the "green card lottery" or

relief such as asylum.  (Id.  at 112-13).

A third category of aliens present in the country are "undocumented

aliens" who lack lawful immigration status.  These aliens may have

overstayed their time in the United States or entered the country illegally.

(Id. at 113).  The number of these individuals is approximately twelve

million.   (Id.).  Hazleton's use of the term "illegal alien" evidently is aimed

at these individuals.

On August 15, 2006, plaintiffs filed the instant action to challenge the

validity of the Hazleton ordinances.   On October 30, 2006, an amended complaint was filed along with a motion for a preliminary injunction and temporary restraining order seeking to enjoin the defendant from enforcing the ordinances.

On October 31, 2006, the court granted the plaintiffs' request for a Temporary Restraining Order.  (Doc. 35).  The court ordered that the Temporary Restraining Order remain in effect until November 14, 2006 and scheduled a hearing on the preliminary injunction motion for November 13, 2006.  (Doc. 36).  In order to conduct discovery and fully brief the issues raised in the amended complaint, the parties entered into a stipulation to extend the Temporary Restraining Order for 120 days or until trial and resolution of the matter.  (Doc. 39).

On January 12, 2007, plaintiffs filed a second amended complaint. (Doc. 82).  The second amended complaint seeks a declaratory judgment that IIRA and RO violate the Supremacy Clause, the Due Process Clause and the Equal Protection Clause of the Constitution of the United States. Plaintiffs also claim that the ordinances violate 42 U.S.C.  § 1981; the Fair Housing Act, 42 U.S.C.  §§ 3601 *et seq.*; plaintiffs' privacy rights; Pennsylvania's Home Rule Charter Law, 53 PA. CONS. STAT.  §§ 2961; *et*

*seq.*, the Landlord and Tenant Act 68 PENN. STAT. §§ 250.101 *et seq.*; and its police powers.

The following plaintiffs filed the second amended complaint:

- Pedro Lozano, a lawful permanent resident of the United States, who immigrated from Colombia in January 2002 in search of a better life. (N.T. 3/12/07 at 161).   He served as an official in the National Police force for thirty-five years in Colombia.  (N.T. 3/12/07 at 162).  He moved to Hazleton from New York City to find affordable housing and better employment.  (N.T. 3/12/07 at 164).

- Jose Luis Lechuga and his wife, Rosa Lechuga, who immigrated illegally to the United States from Mexico in 1982 to forge a better life for themselves and their children.  (N.T. 3/12/07 at 118-119).   In the late 1980s, they received amnesty and became lawful permanent residents. (N.T. 3/12/07 at 119-120).  In 1991, the Lechugas moved to Hazleton for its employment opportunities.  (N.T. 3/12/2007 at 122-123).

- Humberto Hernandez is listed in the complaint as a plaintiff.  (Doc. 81, ¶¶ 3-4).  Plaintiffs presented no testimony at trial regarding Hernandez; therefore, he will be dismissed.

- John Doe 1 has lived in Hazleton for six years, but was born in

9

Mexico.  (<u>See</u> Doc. 189, Dep. John Doe 1 at 12).   John Doe 1 is not a

United States citizen or legal permanent resident, though his father filed a

document with the federal government seeking to change his immigration

status.  (<u>Id.</u> at 16, 19).  John Doe 1 is unsure of his immigration status,

though he thought that the federal government could order him removed

from the country.  (<u>Id.</u> at 22).  John Doe 1 is also unsure of whether he has

legal authorization to work.  (<u>Id.</u>).

- John Doe 3 moved to Hazleton four years ago.  (Doc. 190, Dep.

John Doe 3 at 8).  He is not a U.S. citizen or a lawful permanent resident.

(<u>Id.</u> at 11).

- Jane Doe 5 and John Doe 7 moved to Hazleton more than five

years ago.  (Doc. 191, Dep. Jane Doe 5 at 13).   Neither is a U.S. citizen

nor a lawful permanent resident.  (Doc. 191, Dep. Jane Doe 5 at 15, Doc.

192, Dep. John Doe 7 at 10-11).   They were both born in Colombia, where

John Doe 7 worked as an architect, and have been married for over

twenty-eight years.  (Doc. 191, Dep. Jane Doe 5 at 16, Doc. 192, Dep.

John Doe 7 at 9-11).

- Hazleton Hispanic Business Association is an organization

comprised of approximately twenty-seven Hispanic business and property

owners from the Hazleton area.  (N.T.  3/12/07 at 77, 78, 80, 98).

Members include landlords in the city of Hazleton.  (Id. at 98).

- Pennsylvania Statewide Latino Coalition is a not-for-profit

organization with a mission to promote the social, political, economic and

cultural development of Pennsylvania Latinos and to develop leadership

and create networks among Latino leaders and communities.  (N.T.

3/12/07 at  20-22).

- Casa Dominicana de Hazleton, Inc. is an organization that provides

assistance, orientation and education to the Latino community in Hazleton

and attempts to unify ties between the Latino and non-Latino communities.

(N.T. 3/14/07 at 7-9).  It provides members with information, legal referrals

and assistance with economic difficulties.  (Id. at  8-9).  It also works to

keep youth from joining gangs.  (Vol. 3, 27-28).[5]

Plaintiffs seek an injunction pursuant to Rule 65 of the Federal Rules

of Civil Procedure enjoining Hazleton from implementing or enforcing the

ordinances.  Additionally, plaintiffs seek the costs incurred in this litigation

including attorneys' fees pursuant to 42 U.S.C. § 1988.

---

[5]Further factual findings are made below where appropriate.
However, as most of the issues we face are purely legal, we need not
make extensive factual findings.

11

On January 23, 2007, defendant filed a motion to dismiss the second amended complaint.  (Doc. 84).   Plaintiffs filed a brief in opposition to the motion to dismiss and a motion for summary judgment on February 12, 2007.  (Doc. 106).   On February 22, 2007, we held a pretrial conference where we indicated that we would consolidate the motion to dismiss and the motion for summary judgment into the trial. Defendant filed a memorandum in opposition to the summary judgment motion on March 2, 2007.  (Doc. 150).

The court held a hearing on the preliminary injunction motion from March 12, 2007 through March 22, 2007.  We notified the parties that this hearing would be the final trial on the injunctive matter.   See FED. R. CIV. PRO.  65(a)(2)("Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.").   After the completion of the trial transcript on April 20, 2007, the parties submitted their post-trial briefs on May 14, 2007.   (Doc. 218, 219).  The matter is thus ripe for disposition.

**Jurisdiction**

As this case is brought pursuant to federal statues and the federal

constitution, we  have jurisdiction pursuant to 28 U.S.C. § 1331 ("The

district courts shall have original jurisdiction of all civil actions arising under

the Constitution, laws, or treaties of the United States.").  We have

authority to issue a declaratory judgment under 28 U.S.C. § 2201

(explaining that "any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of

any interested party seeking such declaration[.]").  We  have supplemental

jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. §

1367.

**Discussion**

Before we address the merits of plaintiffs' complaint we must address

several preliminary matters.  These matters include standing, the propriety

of several plaintiffs proceeding anonymously and which version of the

ordinances should be addressed.

## I.  Preliminary issues

**A.  Standing**

Defendant argues that all plaintiffs lack standing to bring this lawsuit.

Courts have identified two types of standing, constitutional and prudential,

and defendant contends that plaintiffs fail to meet the requirements of

either type.  We will address each in turn.

### 1. Constitutional Standing

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  <u>Simon v. Eastern Kentucky Welfare Rights Org.</u>, 426 U.S. 26, 37 (1976).  Standing provides "justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."  <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).  The Supreme Court has held that "the standing question in its Art. III aspect  is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" <u>Simon</u>, 426 U.S. at 38 (quoting <u>Warth</u>, 422 U.S. at 498-99).  The Court has described three elements that comprise the "irreducable constitutional minimum of standing."  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  A plaintiff must first "have suffered an 'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized [citations omitted] and (b) 'actual or imminent, not 'conjectural or hypothetical.'" <u>Id.</u> (quoting <u>Los Angeles v. Lyons</u>, 461

14

U.S. 95, 102 (1983)).  The injury suffered by the plaintiff must also be causally connected to the conduct of which the plaintiff complains:  "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'"  Id. (quoting Simon, 426 U.S. at 41-42.  Finally, "it must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. (quoting id. at 38, 43).

"The party invoking federal jurisdiction bears the burden" of proof to demonstrate standing.  Lujan, 504 U.S. at 561.  The level of proof required of a party conforms to "the manner and degree of evidence required at the successive stages of the litigation."  Id.  In the initial stage of the litigation, when the plaintiff need only meet the pleading standards, "general factual allegations of injury resulting from the defendant's conduct may suffice."  Id.  When the issue in question is summary judgment, though, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true."  Id. (quoting FED. R. CIV. P. 56(e)).  At trial, "those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'"  Id. (quoting Gladstone,

Realtors v. Village of Bellwood, 441 U.S. 91, 115 n.31 (1979)).

### a. Named Plaintiffs

### i. Landlord Plaintiffs

Defendant argues that the landlord plaintiffs lack standing to bring this suit.[6]  Those plaintiffs, defendant claims, did not suffer an injury caused by the ordinances which this court could redress.  Plaintiff Pedro Lozano, a native of Columbia who is a legal resident of the United States, lives in Hazleton.  (N. T. 3/12/07 at 161, 163).  Lozano and his wife purchased a two-family home in Hazleton in April 2005.  (Id. at 164).  They planned to rent half of the house to "have assistance with the mortgage." (Id. at 164).  This rental property, Lozano insists, forms the basis for his standing in this case.  The defendant disputes this assertion.

We reject the defendant's position and find that Lozano has standing to sue regarding both the tenant registration and the employer portions of Hazleton's ordinances.  First, Lozano has suffered an injury that is both concrete and particular and actual or imminent. Lozano rented the property

---

[6]At the time the plaintiff filed the lawsuit, the defendant challenged the standing of the two named landlord plaintiffs.  One of those plaintiffs has been dropped from the suit, but the defendant's arguments nevertheless apply to the remaining landlord plaintiff.

16

immediately after signing the mortgage, and continued to do so until the City passed the ordinances.[7]  (Id. at 165).  Once the ordinances passed, Lozano had more difficulty renting the property, "and the tenants that were there ran away."  (Id.).  His tenants left after he informed them that they may have to obtain a permit from the City to rent the apartment.  (Id. at 167).   After the ordinances passed, Lozano "sporadically" rented the property, but the house was not occupied "continuously."  (Id. at 168).  He showed the apartment to at least five or six people, who seemed interested in the property but failed to complete the transaction.  (Id.).  Lozano's difficulties in renting the apartment constitute an injury.

Lozano also had hired others to do more complicated repairs on his property, such as roofing.  (Id. at 175).  He anticipated hiring a contractor to repair his roof sometime in the future.  (Id.).   He would thus be forced, as an employer of labor, to comply with the employer requirements of the

---

[7]Cross-examination revealed that Lozano had not made a profit on his rental of the property in 2005, and that the apartment may not have been occupied continually during that period.  (See N. T. 3/15/07 at 177-181).  We note, however, that Lozano testified that at least part of his purpose for renting the apartment was to assist with his mortgage payments.  In that sense, the purpose of the investment appears to extend beyond simply making money, and we should not evaluate standing based solely on previous profitability.  Defendant has demonstrated, however, that renting the apartment may not have been as easy as Lozano claimed.

IIRA, adding a burden of time and expense to his operations.  Therefore, he has suffered an actual or imminent injury sufficient to meet the constitutional standing requirements.  See Pennell v. City of San Jose, 485 U.S. 1, 8 (1988) (finding that landlords who challenged zoning requirements related to hardship tenants had standing because "[t]he likelihood of enforcement, with the concomitant probability that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the ordinances, is a sufficient threat of actual injury to satisfy Art. III's requirement that 'a plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'") (quoting Babbitt v. Farm Workers, 422 U.S. 289, 298 (1979)).[8]

We disagree with the defendant that these injuries cannot be recognized by the law because they constitute a complaint about an inability to rent to illegal immigrants.  The plaintiffs testified that they were unaware of the immigration status of their renters.  No evidence, therefore, indicates that the renters they lost were illegal immigrants.  Such tenants may have been legal residents who did not desire to live in a town that

---

[8]We note that our database incorrectly cited Babbitt v. Farm Workers as 422 U.S. 289.  The correct citation for that case is 442 U.S. 289 (1979).

appeared (to them) to seek to exclude Spanish-speaking residents.  Such

tenants may also have concluded that they did not want to register with the

town and provide private information to the City as a condition of residing

there.  Perhaps they found the fees required for a permit onerous.  In any

case, we will not assume that the renters plaintiff lost were necessarily

illegal immigrants.

Further, Lozano's injuries are caused by the defendant's ordinances.

Potential renters' concerns with the registration requirements of the

ordinances and the attitude towards immigrants their passage conveyed

undermined Lozano's ability to secure tenants.  Lozano had informed the

prospective tenants that the ordinance's registration requirements

mandated that they bring immigration documents to the City, and those

prospective renters never returned.  (N. T. 3/12/07 at 168).   In addition,

complying with the ordinances requires action that will cause him time and

expense and expose Lozano to potential adverse enforcement actions.  If

the ordinances did not exist, the landlord plaintiffs would not be required to

follow these procedures.  The injury Lozano claims is therefore caused by

the defendant's actions.  See Lujan, 504 U.S. at 561-62 (holding that

"[w]hen the suit is one challenging the legality of government action or

inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will address it.").

Redressabiltiy is also apparent: if this court declares the ordinances unconstitutional and enjoins their enforcement, Lozano and the other landlord plaintiffs will not be forced to comply with them.  As a result, those plaintiffs will not be required to examine and ensure the immigration status of their tenants, facing the possibility of fines and other penalties from the City for failing to do so.  The burdens they face from such compliance will not exist, and their injury will be eliminated.

### ii. Rosa and Luis Lechuga

Defendant also challenges the standing of the plaintiffs Rosa and Luis Lechuga, who when they filed suit were business owners in the City. Plaintiff Jose Lechuga, a resident of Hazleton, had lived in the City of Hazleton with his wife Rosa and their five children for sixteen years.  (N. T. 3/12/07 at 118).  When he came originally to the United States from

Mexico in 1982, he did not have legal authorization to do so, but he is now a legal permanent resident of the country. (Id. at 118-19). He and his wife used a 1980s federal amnesty program to adjust their immigration status. (Id. at 120).

Lechuga opened a store, Lechuga's Mexican Products, in 2000. (Id. at 128). The store sold "[t]ortillas, cheese, chorizo, canned chiles, different canned products, [and] also sodas from Mexico." (Id.). His family worked in the store with him, including his wife and children. (Id. at 129). The business was not always profitable; in 2005 the Lechugas "didn't have much of a profit, but . . . [were] still in business." (Id. at 130). Business improved in 2006, but began decreasing after the City passed the ordinances. (Id. at 131). By early 2007, business had become "terrible," and in February 2007, Lechuga closed the store. (Id.).

Lechuga opened another business, a restaurant called Langria Lechuga, in February 2006. (Id. at 132). Lechuga's wife Rosa operated that business, doing the cooking. (Id.). When he found the time, Lechuga helped by serving, taking orders, washing dishes and cleaning. (Id.). This business was no more successful than the Lechugas' store. (Id. at 133).

Lechuga blamed his lack of business on the City's activities.[9]  (Id.).  A

police car was often parked across the street from the restaurant, and after

a police officer paid a visit, "people began to comment that the police

[were] there to take the clients away when they came to eat."  (Id. at 133).

This made potential customers feel "intimidated, and that is the reason why

we lost our business."[10]  (Id.).  In neither of these businesses did Lechuga

employ anyone; he testified that he had never had any plans to employ

anyone at either store.  (Id. at 150-51).

Plaintiffs have suffered an injury here in the loss of business they

experienced after the ordinances passed.  To experience an injury

sufficient to create standing, a plaintiff need not allege a large quantum of

harm.  The Third Circuit Court of Appeals, in Belitskus v. Pizzingrilli, 343

F.3d 632 (3d Cir. 2003), found that a plaintiff who complained that he could

not afford a $100 filing fee to campaign for public office had stated an

injury sufficient to confer standing.  Id. at 640. Plaintiff had only $50 in

_____

[9]Rosa Lechuga testified that the restaurant opened in February 2006,
and had been profitable in its first week: "Things were going very well, and
then when the ordinances were enacted, my business began to suffer."
(N. T. 3/12/07 at 154-55).

[10]On cross examination, Lechuga attributed his loss of business to
the ordinances."  (N. T. 3/12/07 at 138).

campaign funds and "paying the required fee would have completely depleted his campaign funds and required him to delve into his limited personal assets." Id. (holding: "'All that the Article III's injury-in-fact element requires is 'an identifiable trifle' of harm'") (quoting Joint Stock Soc'y v. UDV N. Am., Inc., 266 F.3d 164, 177 (3d Cir. 2001) (citation omitted)).  The injury of which plaintiffs complain, like the potential injury in Belitskus, is one that pushed their financial condition from bad to worse, contributing ultimately to disaster.  Such an injury surely constitutes an "identifiable trifle."

The Lechuga's injury was caused at least in part by the defendant's ordinances.  While other factors apparently contributed to the decline of the Lechuga's businesses, we find that they have presented evidence that Hazleton's approval of the ordinances contributed at least in part to the decline of customers for Lechuga's store and restaraunt, and therefore, the injury they suffered is at least fairly traceable to the defendant.

Our decision on the constitutionality of the ordinances would not, however, allow the Lechugas redress from their injuries.  Their businesses, unfortunately, have now closed.  They did not testify that they planned to reopen their businesses pending resolution of this lawsuit, and the plaintiffs

23

do not seek monetary damages from the defendant.[11]   Accordingly, no action by this court would provide relief to the Lechugas, and they lack standing to sue.  The Lechuga's lack of standing, however, does not mean that other business-owner plaintiffs, who will be forced to comply with the terms of the ordinances in order to operate their business in Hazleton, lack standing to sue, as we explain below.

### b.  Organizational Plaintiffs

Defendant argues that the organizational plaintiffs–Casa Dominicana of Hazleton, Inc., the Hazleton Hispanic Business Association and the Pennsylvania Statewide Latino Coalition–all lack standing.  Defendant argues that none of the individual members of these associations have standing, and that the organizations cannot claim representational standing.  Defendant also contends that none of the organizational plaintiffs can allege a concrete injury to their own interests, because any membership loss experienced by the organizations since the passage of the ordinances is connected by only a speculative thread to the ordinances

---

[11]Indeed, the Lechugas testified that they had decided to move out of state.  See (N. T. 3/12/07 at 136-37).

themselves.[12]  Any claim of public hostility to the organizations generated by the ordinances is too generalized, defendant claims, to constitute an injury in fact.  Defendant also contends that plaintiffs have not proved any causal connection between the ordinances and the injuries suffered by the plaintiff organizations.  Finally, defendant insists that an injunction against the ordinances would not be likely to redress the injuries plaintiffs claim.

An organization seeking to participate in a lawsuit must demonstrate that it has standing to sue.  While an organization can have standing in its own right, "an association may have standing solely as the representative of its members."  Warden, 422 U.S. at 511. Still, such standing "does not eliminate or attenuate the constitutional requirement of a case or

---

[12]Defendant claims that "[t]he loss of membership is not an injury to a legally cognizable interest, where maintaining desired levels of membership requires continuing membership of aliens unlawfully present in the United States." (Memorandum of Law in Support of Defendant's Motion to Dismiss (Doc. 87) at 22).  Plaintiffs' claim is not that the ordinances, by attempting to exclude illegal aliens from Hazleton, have harmed the organizations' ability to recruit undocumented people to their ranks.  We will not assume, as defendant appears to do, that membership in such organizations is populated in large numbers by people without legal authorization to remain in the United States.  Indeed, the problem highlighted by these organizations–that the ordinances have created a climate of fear which causes people to avoid association with groups that express interest in the rights of immigrants and Latinos–is partly reflected in defendant's claims here, which seem to associate Latino political activity with illegality.

25

controversy." <u>Id.</u>  Courts have found that an organization can have

"representational standing" when "'1) the organization's members would

have standing to sue on their own, 2) the interests the organization seeks

to protect are germane to its purpose, and 3) neither the claim asserted nor

the relief requested requires individual participation by its members.'"

<u>Public Interest Research Group of New Jersey v. Powell Duffryn Terminals,</u>

<u>Inc.</u>, 913 F.2d 64, 70 (3d Cir. 1990) (quoting <u>Hunt v. Washington Apple</u>

<u>Advertising Comm'n</u>, 432 U.S. 333 (1977)).

Defendant challenges the standing of the Hazleton Hispanic

Business Association ("HHBA").  Rudolfo Espinal, the president of the

HHBA, testified at trial as a representative of that organization.  (N. T.

3/13/07 at 77).  Espinal testified that the HHBA, formed in August 2006, is

"a group of Hispanic businessowners that got together in the City of

Hazleton to work towards common goals," especially to "promote the

interest of our business members and to project the image of the Hispanic

business community and to also help the community any way that we can."

(<u>Id.</u> at 77-78).  Most of the businesses in the association are located in

Hazleton, though some operate in the neighboring town of West Hazleton.

(<u>Id.</u> at 78).  The association promoted access to health insurance and

accounting services, but also aimed to protest the anti-illegal immigration ordinances that the City had proposed. (Id. at 79). Twenty-seven members joined the organization. (Id. at 80). The passage of the ordinances harmed organization members; some lost their businesses or a significant portion of their patrons, and many members abandoned plans to expand their businesses.[13] (Id. at 81). The organization also lost members, as "some of [them] didn't want to be part of the organization anymore." (Id. at 83). The HHBA lost resources, as members were required to pay $75 in dues and fewer dues-paying members remained. (Id. at 84).

Espinal himself lost business as a result of the ordinances. Espinal owned three rental properties in the City of Hazleton. (Id. at 90). At the time of trial, two of those units were undergoing repairs, and one was occupied. (Id.) That building consisted of four apartment units. (Id.). Espinal lived in one of those units and rented out two others. (Id.). The fourth sat vacant. (Id.). Espinal testified that after the City passed its

---

[13]Espinal testified that "Royal Prestige had to close and move out of the City. Isabella's Gift Shop had complained about losing revenue, and basically I would say all of my members have complained. People are talking about that they have lost sales maybe between 15 or 50 percent of what they used to have before." (N.T. 3/13/07 at 82).

27

ordinances "it is harder to rent apartments now, and besides that, I think that I lost tenants, potential tenants because of the ordinance." (Id. at 92-93).  After showing the apartment to prospective tenants and discussing rental prices, those tenants had indicated a desire to rent the unit.  (Id. at 93).  Following a discussion with these prospective tenants of the registration requirements under the ordinances, however, Espinal "didn't hear from them." (Id.).  A similar process repeated itself with several other prospective renters.  (Id. at 95).   Espinal planned to offer his other properties for rent, but needed to perform repairs such as painting, carpeting and electrical work before doing so.  (Id. at 96).  Espinal intended to perform some of that work himself, but would also hire workers to perform "whatever area I don't feel comfortable with." (Id. at 96).  As president of the HHBA, Espinal knew of other organization members who were landlords in Hazleton.  (Id. at 98).  These members had the same concerns for the effect of the ordinances on leasing their apartments.  (Id.). Espinal also testified that he understood the ordinances to require that he obtain information on immigration status from tenants that he normally would not seek.[14]  He had no "training in evaluating a person's immigration

---

[14]Espinal testified that "when you rent an apartment, you ask people about their ability to pay the rent, if they are working or not, that kind of

28

status or their documents." (Id. at 102).

The HHBA has representational standing in this case.  Individual

business owners who are members of the HHBA have standing to sue.

Espinal, like Lozano, would have standing to sue as a landlord and as an

employer.  Espinal also testified that members of the HHBA would be

required to comply with the procedures required for employers under the

IIRA.  They would then face onerous paperwork requirements created by

the ordinances for maintaining their licenses. These injuries would be

caused by the ordinances and could be redressed by enjoining their

enforcement.  Since the HHBA is designed to protect the interests of

Hispanic business owners in the city and the lawsuit attacks city-created

regulations of business, the organization is seeking to protect interests

germane to its purpose.  Finally, the claim asserted here by the

organization attacks the ordinances on their face; such an attack does not

require the factual specificity or individual experience required of a lawsuit

over a specific event.  Accordingly, the participation of individual members

is not required for the court to address adequately the issues raised by the

---

stuff.  I don't think you should ask about their family composition or their
religion or anything like that or their immigration status."  (N.T. 3/13/07 at
99).

lawsuit.

Defendant argues that the business-owner plaintiffs do not face an "actual or imminent risk" that the city will enforce the IIRA ordinance against them because these plaintiffs do not know if they have any illegal alien employees and cannot say they definitely will hire such employees in the future.  In any case, defendant insists, plaintiffs have no legal right to employ illegal aliens and cannot have an injury from an ordinance that prevents such action.  Because the law operates only prospectively, plaintiffs can suffer an injury from the ordinance only if they hire an unauthorized worker according to the defendant.  Since no plaintiff has declared an intention to hire an undocumented alien, defendant contends, the plaintiffs have no injury.  Plaintiffs who claim to have suffered a loss of business commerce as a result of the ordinances also cannot demonstrate an injury, defendant insists, since "[n]o-one has a legally cognizable interest in profiting from the continuing sales of products to aliens unlawfully present in the United States."  (Memorandum of law in Support of Defendant's Motion to Dismiss (Doc. 87) at 18).  Defendant further contends that the plaintiffs cannot prove that the alleged injuries to their businesses were caused by the ordinances and cannot meet the causation

requirement for standing.

We reject this argument.  The business-owner plaintiffs do not complain that the ordinances limit their ability to sell products to and hire illegal aliens.  They complain that the City's ordinances damage them by hindering the operation of their businesses and by requiring them to seek immigration information from employees in a way that violates federal law.  Their injury comes in the operation and requirements of the ordinances, not in their inability to sell, hire or rent to undocumented persons.

Defendant also challenges the standing to sue of Casa Dominicana de Hazleton ("Casa").  At trial Manuel Saldana, President of the organization, testified as a representative of the organization.  (See N.T. 3/14/07 at 7).  Casa is a not-for-profit corporation founded in August 2005.  (Id.).  The organization's offices are located in Hazleton.  (Id. at 10).  Around fifty Casa members live in Hazleton.  (Id. at 12).  Twenty to twenty-three members may lack legal authorization to reside in the United States.[15]  (Id. at 21).  Casa's purpose is "[t]o offer assistance, orientation,

---

[15]Saldana clarified this figure on re-direct: "I say 23 members, approximately . . . I would have to go over each individual's case to see what their actual [immigration] status is, because many individuals have expired or lost documents or are in the process of obtaining documents.  Those are the individuals that I refer to as illegals."  (N.T. at 3/14/07 at 29).

education, keep the unity within the community and unify the ties between the Hazleton community and the Latin community." (Id. at 7). Members of the organization included "[i]ndividuals, people renting, employees, different businesses, owners of businesses, drivers, chauffeurs," "a cross-section of the Hazleton community[.]" (Id. at 9-10). To its members, the organization provides services to help with orientation and education. (Id. at 8). Casa also sponsors concerts and raises money to assist members through periods of financial difficulty. (Id.). The organization also assists members with problems in their immigration status by directing them to attorneys and providing assistance through "orientation." (Id. at 8-9).

Casa members petitioned the organization to participate in the instant lawsuit. (Id. at 11). They feared the impact of the ordinances. (Id. at 14). Members, both legal and illegal residents, expressed "fear of not being able to obtain housing at a moment when it was needed" as well as concerns about having to produce identification at work and the effect of the ordinances on their children at school.[16] (Id.). The organization lost

---

[16]Saldana testified that "[t]he concern was not only from the illegal residents, but also from the legal residents. An individual that has a document or visa that is expired, according to law, it is no longer valid. However, the individual is legally registered within the country, and the problem of receiving a valid document once again takes at least a month's time, the same way as if you lose a document, and that is the case with

thirty-five members in August 2006, after the City passed its ordinances. (Id. at 17). One member who left the organization decided to leave Hazleton because "he found that the measures that were about to be approved were hateful and uncomfortable for him." (Id. at 18). This loss of membership, Saldana testified, harmed the organization because it diminished the number of volunteers available to carry out the group's activities and limited the number of services Casa could offer members. (Id. at 18-19).

Casa has representational standing. Members of the organization are both tenants and employees in Hazleton, and would be required to comply with the terms of the ordinances. They would have to participate in the rental registration program or lose their housing in the city. They would have to supply their employers with immigration information or face losing their jobs. Those injuries for individual members would be fairly traceable to the ordinances, which institute the registration and employment regulations. If we were to enjoin enforcement of the ordinances as the plaintiffs here seek, we could redress the Casa's injuries in this case.

---

some individuals who enter the country legally, and they are going through the process of legalizing themselves. They have a work permit, however, they don't have residency." (N.T. 3/14/07 at 15).

Casa's purpose, to promote the interests of Dominicans in their relationships in the Hazleton community, would be served by this litigation. Finally, since this case consists of a facial challenge to the City's ordinances, the interests of the litigation can be advanced without requiring the participation of individual plaintiffs.  Casa has representational standing for its members.

The defendant likewise challenges the standing to sue of plaintiff Pennsylvania Statewide Latino Coalition ("PSLC").  Jose Molina testified as representative of the PSLC during the trial in this case.  PSLC "is a nonprofit organization that promotes social, financial, political and cultural development of the Latino community in the State of Pennsylvania."  (N.T. 3/13/07 at 20).  The organization's goal "is to have a network of Latinos" addressing the interests of Latino communities statewide.  (Id. at 21).  The organization was founded by volunteers from across the state.  (Id.).  Of the 6,000 statewide PSLC members approximately twenty reside in Hazleton.  (Id. at 52).  Among the activities the PSLC has engaged in are lawsuits protesting discriminatory hiring practices for police officers and teachers, the promotion of professional certification for nurses and teachers from Puerto Rico, and promotion of voter registration and voters'

rights.  (Id. at 23).  The organization also promotes education for Latinos in the state.  (Id. at 24).  Before engaging in activities like litigation, PSLC representatives "sit down with residents and people that are affected." (Id.).  Such conversations are often initiated by these people, who reach out to the PSLC for help.  (Id.).

The PSLC became involved in the Hazleton litigation partly as a result of requests from Hazleton community activists.  (Id. at 25).  On July 30, 2006, the PSLC organized a meeting in Hazleton to discuss the ordinances.  (Id. at 26).  Between fifty and sixty people, including "homeowners . . . business owners . . . [and] landlords," attended this meeting.  (Id. at 27).   The fears that attendees at this meeting expressed to Molina convinced him that the issues raised by the ordinances would affect people far beyond Hazleton's borders.[17]  (Id. at 28-29).  Members of the organization who expressed these concerns included several who lived

---

[17]Molina described the feelings of residents: "They had people that were in fear because the police were stopping them on the sidewalks or stopping them on the driveway and asking for documentation just because of their looks.  We have businessowners saying, we have bricks through our [windows], and we can't identify who [threw the brick], but obviously it was because of the environment where we are living, where people think that it is okay to show that Latinos are not welcome here.  There was all kind of fear, and what is going to happen with our sons.  Should we still send them to school?  What is going to happen to our church?  Should we still go to our church?"  (N.T. 3/13/07 at 28).

in Hazleton and who "decided to join and become members right away in the thinking that this is something that may help us, because we want to stay in this community." (Id. at 30).[18]   Among these members were Anna Arias, who rented out half of her home and "the Rubio family," who owned a gift shop.  (Id. at 65-66).  Another member owned a barber shop, and Molina pointed to "a few more" members who were business owners.  (Id. at 66).

The PSLC has representational standing.  Members of the organization include residents of Hazleton who face actual or imminent injury from the ordinances because they are landlords or business owners who will be required to comply with the ordinances' terms.  They will have to register if they intend to rent apartments, providing personal and potentially confidential information to the City.  If they are employees, they will also have to provide information about their immigration status. Similarly, members who are employers will be burdened with IIRA's requirements and face liability if challenged on their employment practices. Accordingly, these plaintiffs have or will suffer an imminent injury from the ordinances.  These injuries, since they are or would be caused by the

---

[18]Jose Lechuga is a member of the PSLC.  (N. T. 3/12/07 at 120-21).

operation of the ordinances, are fairly traceable to the defendant's actions.

Finally, an injunction would prevent the plaintiffs from being required to comply with the terms of the ordinances, and would thus provide redress.  Participation in the litigation would serve the purposes of the PSLC, since the social and financial interests of Latinos in Hazleton are threatened by the terms of the ordinances and the PSLC's involvement in the litigation seeks to protect those interests.  In addition, since this is a challenge to ordinances that involves constitutional concerns rather than litigation about a particular event or interest, the individual participation of the represented members is not required to insure that their interests are protected.

### c. Tenant Plaintiffs

Defendant argues that the plaintiffs who are tenants in Hazleton, all of whom attempt to proceed anonymously, lack standing to sue.  These plaintiffs, defendant contends, ground their claim in a belief that they may not obtain occupancy permits from the City and will, therefore, be required to leave Hazleton.  Defendant insists that this injury is not one which the court can address.  Those plaintiffs who are not lawfully present in the United States do not have a legal interest in residing in Hazleton or

37

anywhere in the United States and cannot claim an injury from ordinances that seek to prevent their residence in the City.  Defendant also argues that those tenant plaintiffs who are lawfully present in the United States cannot show that they will likely suffer any injury-in-fact.  IIRA, after all, will not cause them to be removed from the City or be denied an occupancy permit.  If a tenant can show proof of legal residency or citizenship, that tenant must receive a rental permit and will suffer no injury from the ordinance.  Even if a resident filed a complaint against a legal resident, such a plaintiff would not be injured: "an alien lawfully present in the United States can have no reasonable expectation that the federal government would regard him as unlawfully present."  (Memorandum of Law in Support of Defendant's Motion to Dismiss (Doc. 87) at 20).

Plaintiff John Doe 1 testified by deposition on December 8, 2006. (See Doc. 189, Dep. John Doe 1).  He has lived in Hazleton for six years, but was born in Mexico.  (Id. at 12).   John Doe 1 is not a United States citizen or legal permanent resident, though his father filed a document with the federal government seeking to change his immigration status.  (Id. at 16, 19).  He testified that he was unsure of his immigration status, though he thought that the federal government could order him removed from the

38

country.  (Id. at 22).  John Doe 1 was also unsure whether he had legal authorization to work.  (Id.).  When he began working for his present employer, John Doe 1 presented identification that included an international driver's license and a Social Security card.  (Id. at 27).  John Doe 1 was forced to vacate one apartment after a landlord told him he would "have to move" after passage of the Hazleton ordinances.  (Id. at 43).  Though John Doe 1 thought he may be able to get a residency permit, his landlord told him "maybe, but he didn't want to take the risk" of having to pay a fine.  (Id. at 44).  John Doe 1 felt that his landlord wished he could stay in the apartment "because I'm a good tenant and we're family, but when he saw the ordinance, he was afraid."  (Id. at 53).

John Doe 3 likewise testified by deposition on December 8, 2006. (See Doc. 190, Dep. John Doe 3).  He was born in Mexico and is a citizen of that country.  (Id. at 17).  He is a tenant in Hazleton, where he lives with his wife and two daughters.  (Id. at 12-13).  Joe Doe 3 is not a lawful permanent resident of the United States.  (Id. at 24).  He understands his immigration status to be "illegal."  (Id. at 26).  If this court were to allow the Hazleton ordinances to go into effect, John Doe 3 fears that he will be evicted from his residence.  (Id. at 31).

Jane Doe 5 testified by deposition on January 26, 2007. (See Doc. 191, Dep. Jane Doe 5). Jane Doe 5 rented an apartment in Hazleton, the city where she had lived for the past five years. (Id. at 12-13). She was born in Columbia, and is not a United States citizen or lawful permanent resident. (Id. at 14-15, 56). She fears apprehension and removal by United States authorities if the City enforces its ordinances. (Id. at 56). Jane Doe 5 does not want to lose her residence, and for that reason hopes the ordinance will not be enforced. (Id. at 61-62). She did not want to speak to her landlord about the registration ordinance because she feared that the landlord would feel he had to ask her family to vacate their home. (Id. at 74). If the ordinances were enforced, Jane Doe 5 fears that she would have trouble finding a place to live in the City. (Id. at 81).

John Doe 7 testified by deposition on January 26, 2007. (See Doc. 192, Dep. John Doe 7). Like his wife, Jane Doe 5, John Doe 7 was born in Columbia. (Id. at 9). He is not a United States citizen or lawful permanent resident. (Id. at 10). Trained as an architect, Doe 7 came to the United States in 2001. (Id.). For the previous seven or eight months, Doe had worked as a gardener. (Id. at 12). He and his wife lived in a rented home in Hazleton. (Id. at 14-15). John Doe 7 testified that he had not spoken

frequently with his landlord out of fear that "because of the ordinances, he's going to ask them to leave the house, evict them from the house." (Id. at 58). That would require him "to find another house and it's going to be so difficult" to do so. (Id.). He fears he would be forced to leave Hazleton. (Id.).

These plaintiffs claim that the rental registration requirements and harboring provisions of IIRA violate their rights under federal law and the United States Constitution, including their right to privacy. We find that the anonymous plaintiffs have standing to challenge Hazleton's ordinances. They have suffered concrete and particularized injuries which are actual or imminent. These plaintiffs have either been forced from the property which they had rented or had been told by their landlords that they would have to be evicted due to the ordinances. The loss (or imminent loss) of one's apartment and the inability to rent a new one is certainly an actual and concrete injury. See Babbitt v. United Farm Workers, 442 U.S. 289, 298 (1979) (holding that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement [citation omitted] [b]ut [one] does not have to await the consummation of threatened injury to obtain preventive

41

relief.  If the injury is certainly impending that is enough.").  Similarly, plaintiffs would suffer an injury to their privacy rights if forced to turn over private information in order to gain a rental permit.  Such an injury is imminent, as plaintiffs intend to remain in Hazleton and would be required to obey the ordinance if it is enforced.

_____The tenant plaintiffs also meet the causation requirements of constitutional standing.  But for IIRA's requirements that plaintiffs obtain a rental permit by presenting documentation that proves their legal immigration status, plaintiffs would not face the loss of their apartments or the exposure of potentially private information.  Plaintiffs face eviction by their landlords only because of IIRA's harboring provisions.

Plaintiffs' injuries would also be redressed by a favorable decision in this case.  If plaintiffs prevail here, this court will issue a permanent injunction against the enforcement of the ordinances that has caused their injuries.  The tenant plaintiffs thus have constitutional standing to proceed in this case.

We reject defendant's argument that these plaintiffs lack standing because they do not have authorization to reside in the United States and have not suffered an injury for which they could gain relief.   First, the

defendant appears to argue that because plaintiffs would be denied

residency permits under the Hazleton ordinance they lack authorization to

reside anywhere in the United States.  No court has made such a

determination for any of these plaintiffs.  No evidence has been presented

that removal orders exist for any of the anonymous tenant plaintiffs.  None

has ever been arrested, and none testified they were being sought by

immigration authorities.  In other words, as of the time of their depositions,

none of these plaintiffs would have been forced by any determination of the

federal government to leave the City.  To find otherwise at this point would

be to ignore every principle of due process.  The tautology of this argument

is likewise apparent: defendant contends that plaintiff would not be able to

obtain a residency permit in the city and therefore cannot complain about

being required to do so.

 This argument appears to be a species of argument often heard in

recent discussions of the national immigration issue:  because illegal aliens

broke the law to enter this country, they should not have any legal recourse

when rights due them under the federal constitution or federal law are

violated.  We cannot say clearly enough that persons who enter this

country without legal authorization are not stripped immediately of all their

rights because of this single illegal act.[19]  The Fourteenth Amendment to

the United States Constitution provides that no State may "deprive any

*person* of life, liberty or property, without due process of law; nor deny any

*person* within its jurisdiction the equal protection of the laws."  U.S. CONST.

amend. XIV § 1. (emphasis added).  The United States Supreme Court has

---

[19]Fundamental to the American legal tradition is the notion that those accused of and convicted of crimes possess fundamental rights which are not abrogated simply because of such person's alleged behavior.  A person accused of a crime is entitled, among other rights, to be free of unreasonable search and seizure; to the presumption of innocence; to the proof of her guilt beyond a reasonable doubt; to minimally competent legal representation; to access to any potentially exculpatory evidence; to be free of cruel and unusual punishment; and to seek a writ of habeas corpus. See, e.g., U.S. CONST. amends. IV, V, VIII; Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). Strickland v. Washington, 466 U.S. 668, 685 (1984) (holding that "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.").  We note, however, that an alien subjected to a deportation hearing "whether for crime or for other reasons, [is] protected only by the procedural requirements of the Due Process Clause."  DANIEL KANSTROOM, *United States Immigration Policy at the Millenium: Deportation, Social Control, and Punishment: Some Thoughts About Why Hard Laws Make Bad Cases*, 113 HARV. L. REV. 1889, 1896 (2000).  The contemporary concern with and opprobrium towards undocumented aliens does not lead us to the conclusion that those who violate the laws to enter the United States can be subject without protest to any procedure or legislation, no matter how violative of the rights to which those persons would normally be entitled as persons in the United States. Our legal system is designed to provide rights and exact justice simultaneously.

consistently interpreted this provision to apply to all people present in the United States, whether they were born here, immigrated here through legal means, or violated federal law to enter the country.  See Plyler, 457 U.S. at 210 (holding that "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.  Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").  The anonymous plaintiffs are persons, and they seek to vindicate rights guaranteed them under the federal constitution.  They have standing to sue in this court.

## 2.  Prudential Standing

Having found that all plaintiffs possess constitutional standing, we now address defendant's argument that plaintiffs lack prudential standing.

Even if a court finds that plaintiffs meet the "threshold" requirements of constitutional standing, that court may nevertheless "impose" "a variety of prudential limits" on standing.  Wright, Miller and Cooper, FEDERAL PRACTICE AND PROCEDURE at § 3531.  Courts have concluded that "the aim of this form of judicial self-governance is to determine whether the plaintiff is 'a proper party to invoke judicial resolution of the dispute and the

exercise of the court's remedial powers.'" <u>Mariana v. Fisher</u>, 338 F.3d 189, 204 (3d Cir. 2003) (quoting <u>Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery County</u>, 271 F.3d 140, 145 (3d Cir. 2001)).  Courts invoking prudential standing analysis seek "'to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim.'" <u>Davis v. Philadelphia Housing Auth.</u>, 121 F.3d 92, 96 (3d Cir. 1997) (quoting <u>Wheeler v. Travelers Ins. Co.</u>, 22 F.3d 534, 538 (3d Cir. 1994)).  The Third Circuit Court of Appeals has articulated a three-part test for prudential standing: 1) "a litigant [must] assert his or her own legal interests rather than those of a third party"; 2) "courts [should] refrain from adjudicating abstract questions of wide public significance amounting to generalized grievances"; and 3) "a plaintiff must demonstrate that his or her interests are arguably within the 'zone of interests' that are intended to be protected by the statute, rule, or constitutional provision on which the claim is based." <u>Mariana</u>, 338 F.3d at 205; <u>see also</u> <u>Elk Grove United Sch. Dist. v. Newdow</u>, 542 U.S. 1, 12 (2004) (holding that "we have explained that prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication

of generalized grievances more appropriately addressed in the

representative branches, and the requirement that a plaintiff's complaint

fall within the zone of interests protected by the law invoked.'") (quoting

Allen v. Wright, 468 U.S. 737, 751 (1984)).

Defendant argues that none of the plaintiffs meet the requirements of

prudential standing because they do not fall within the "zone of interests" of

the Immigration and Nationality Act.[20]  We note, first, that defendant faces

a difficult burden to establish that these plaintiffs lack prudential standing,

as they do not seek to assert the rights of others or to challenge the way

that an agency has applied a particular law, but instead seek to challenge

ordinances which they claim would violate their rights under federal and

state law.[21]  The United States Supreme Court has declared that "[w]here a

---

[20]We note that the defendant does not address the two other elements required for prudential standing:  1) "a litigant [must] assert his or her own legal interests rather than those of a third party"; 2) "courts [should] refrain from adjudicating abstract questions of wide public significance amounting to generalized grievances."  Mariana, 338 F.3d at 205.  We would in any case find that plaintiffs meet these requirements, since they assert their own interests or the interests of the members of their organizations and because the grievances are specific to the ordinances and their intended application in Hazleton.

[21]The requirements of prudential standing and the zone of interests test in the Third Circuit also mean that plaintiffs' task here is not particularly onerous.  Courts use prudential standing "to ensure that only those parties who can best pursue a particular claim will gain access to the courts."

47

party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met." Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 80-81 (1978).[22]

Defendant insists that plaintiffs fall outside of the zone of interests protected by the statutes and constitutional provisions invoked in this lawsuit because the Immigration and Nationality Act ("INA") was not

_____

Oxford Associates v. Waste Sys. Auth. Of E. Montgomery County, 271 F.3d 140, 145 (3d. Cir. 2001). In terms of the "zone of interests" test, the Third Circuit Court of Appeals has concluded that the test was "'not meant to be especially demanding.'" Id. at 146 (quoting Davis v. Philadelphia Housing Authority, 121 F.3d , 101 (3d Cir. 1997)).

[22]A recent Supreme Court case that determined a plaintiff lacked prudential standing, Elk Grove United Sch. Dist. v. Newdow, 542 U.S. 1 (2004), turned on the fact that the respondent, who sued the school district and argued that a requirement that students use the phrase "under God" when reciting the Pledge of Allegiance violated the establishment clause of the First Amendment, had brought the case on behalf of a daughter who did not necessarily feel injured by the language to which her father objected. In addition, the girl's mother–the ex-wife of the respondent–objected to the claim. Id. at 17 (holding that "it is improper for the federal courts to entertain a claim by a plaintiff whose standing to sue is founded on family law rights that are in dispute when prosecution of the lawsuit may have an adverse effect on the person who is the source of the plaintiff's claimed standing.").

designed to protect "employers who unlawfully employee [sic] illegal aliens and landlords who harbor illegal aliens." (Memorandum of Law in Support of Defendant's Motion to Dismiss (Doc. 87) at 9). Accordingly, "those who break federal immigration law by employing or harboring illegal aliens have no standing to raise a challenge that is based on federal immigration law." (Id.). Similarly, illegal aliens, the defendant contends, do not fall within the zone of interests of the INA and lack standing to raise a preemption claim under that statute; an illegal alien, defendant insists, "does not have standing to invoke the protection of the INA in attempting to displace a state or local ordinance."[23]  (Id. at 9).

_____

[23]Implied in this argument is again the claim that people who break the laws to enter, work or reside in this country should not have access to the courts because they are "criminals" undeserving of the rights those courts seek to protect. "Illegal means illegal," after all. Such argument, however, flies in the face of long-established principles of constitutional law, not to mention the concept of justice. All persons in the United States have rights under the Fourteenth Amendment to the United States Constitution, whether they are citizens or not. See Plyler, 457 U.S. at 210 (holding that "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886) (holding that "[t]he Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial

The prudential standing doctrine indeed requires that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." <u>Bennett v. Spear</u>, 520 U.S. 154, 163 (1997); <u>see also</u> <u>Storino v. Borough of Point Pleasant Beach</u>, 322 F.3d 293, 300 (3d Cir. 2003).  In this suit, plaintiffs invoke several different statutory and constitutional provisions in their numerous claims seeking to prevent enforcement of Hazleton's ordinances.  Plaintiffs, for instance, charge that the ordinances violate their constitutional privacy rights and the equal protection and due process guaranteed them under the Fourteenth Amendment.  They also allege that the ordinances violate rights granted them by federal Fair Housing Act, 42 U.S. § 1981, and Pennsylvania statutory and common law. Finally, plaintiffs claim that the regulatory scheme set out under federal immigration law pre-empts Hazleton's efforts to control the presence of illegal immigrants in the City and the ordinances violate the Supremacy Clause of the United States Constitution.

Our question, therefore, is whether these grievances fall within the

---

jurisdiction, without regard to any differences of race, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.").

zone of interests protected by the various constitutional and statutory provisions invoked by the plaintiffs in raising them.  This case is different from most of the federal cases that invoke the zone of interests test, since the plaintiffs do not seek to challenge any application of a particular federal law.[24]  See, e.g., National Credit Union Administration v. First National Bank & Trust Co., 522 U.S. 479 (1998) (finding that private banks and the American Bankers Association were within the zone of interests of the Federal Credit Union Act and had standing to challenge a federal agency's interpretation of that act's membership restrictions); Assoc. of Data Processing Service Orgs. v. Camp, 397 U.S. 150 (1970) (finding that data processing companies were within the zone of interests of federal banking law and had standing to challenge the Comptroller of the Currency's ruling that national banks could make data processing services available to other banks and bank customers); Arnold Tours, Inc. v. Camp, 400 U.S. 45 (1970) (finding that travel agents had standing to challenge Comptroller of

---

[24]Indeed, it appears that the "zone of interests" test should not be an issue in this case at all, since the plaintiffs here do not challenge the application of a particular provision of federal or state law, but are instead seeking to vindicate their rights against enactment of ordinances to which they are clearly subject.  Litigating the "zone of interests" test in a case where the plaintiffs bring suit against ordinances aimed at them and their interests appears exceedingly pointless.

the Currency's ruling that banks could offer travel services).   While the courts have not foreclosed application of the zone of interests test to cases that do not involve a federal agency action, such cases nevertheless involve some sort of agency action against which the plaintiffs protest.  See 2 Am Jur 2d Administrative Law § 430 (arguing that "[t]he zone-of-interests test is relevant only where the action under attack is that of a government agency.").

Here, the action against which the plaintiffs protest is a local legislative enactment which they contend violates rights guaranteed them in a variety of ways under state and federal law.  Plaintiffs do not claim that the application or interpretation of a law by some state or local agency to which they have no connection is inappropriate but instead claim that their legal rights are violated by a legislative enactment aimed directly at the operation of their businesses or their ability to work or rent property in the City of Hazleton.[25]   Accordingly, plaintiffs arguably fall within the zone of

---

[25]In any case, federal courts have found that a challenge to a state law that argues for pre-emption based on a contrary provision of federal law does not implicate the "zone of interests" test because the lawsuit does not seek to vindicate rights secured under a particular statute, but implicates the principles protected by the Supremacy Clause of the Constitution.  See Pharma. Research & Manufs. of America v. Walsh, 249 F.3d 66 (1st Cir. 2001) (holding that "[plaintiff] has not asserted an action to enforce rights under the Medicaid statute, however, but rather a

interests of the statutes at the center of this lawsuit, and they have

prudential standing to sue.

Defendant's use of <u>INS v. Legalization Assistance Project of the L.A.</u>

<u>County Fed'n of Labor</u>, 510 U.S. 1301 (1993), to argue that plaintiffs do not

fall within the zone of interests here is misplaced.  In that case, Justice

Sandra Day O'Connor, sitting as a Circuit Justice,[26] considered the then-

_____

preemption-based challenge under the Supremacy Clause.  In this type of
action, it is the interests protected by the Supremacy Clause, not by the
preempting statute, that are at issue."); <u>St. Thomas-St. John Hotel &
Tourism Ass'n v. Virgin Islands</u>, 218 F.3d 232, 241 (3d Cir. 2000) (holding
that "[w]e know of no governing authority to the effect that the federal
statutory provision which allegedly preempts enforcement of local
legislation by conflict must confer a right on the party that argues in favor of
preemption.  On the contrary, a state or territorial law can be
unenforceable as preempted by federal law even when the federal law
secures no individual substantive rights for the party arguing preemption.");
<u>Burgio and Compofelice, Inc. v. NYS Dep't of Labor</u>, 107 F.3d 1000, 1006
(2d Cir. 1997) (holding that "'the Supremacy Clause creates an implied
right of action for injunctive relief against state officers who are threatening
to violate the federal Constitution or laws.'") (quoting C. Wright, A. Miller &
E. Cooper, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d § 3566
(1984)).  These cases indicate that plaintiffs' supremacy clause challenge
to local law solves any problem the plaintiffs may have with the zone of
interests for their supremacy claim.

[26]Justice O'Connor described her role in that setting:  "As a Circuit
Justice dealing with an application like this, I must try to predict whether
four [Supreme Court] Justices would vote to grant certiorari should the
Court of Appeals affirm the District Court order without modification; try to
predict whether the Court would then set the order aside; and balance the
so-called 'stay equities.' [citation omitted].  This is always a difficult and
speculative inquiry, but in this case it leads me to conclude that a stay is

Immigration and Naturalization Service's ("INS") request for a stay pending appeal of a district court's order.  Id.  At issue in the litigation were the procedures that the INS used to determine whether immigrants in the country without legal authorization were eligible for an amnesty offered in the 1986 Immigration Reform and Control Act ("IRCA").  Id.; see 8 U.S.C. § 1255a.  The respondents were "organizations that provide legal help to immigrants" who believed that the INS had interpreted IRCA too narrowly.  Id.  Justice O'Connor noted that these respondents sought court review of the actions of a federal agency, and that Congress "ha[d] explicitly limited such review to claims brought by 'person[s] suffering legal wrong[s] because of agency action' (not applicable to the respondent organizations involved here) or by persons adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Id. (citing 5 U.S.C. § 702).  Justice O'Connor found that "only in cases brought by a person whose

_____

warranted."  Legalization Assistance Project, 510 U.S. at 1301.  Because of the nature of this decision–a speculative opinion by one Supreme Court Justice sitting as a Circuit Court Justice–and the fact the decision served only to delay implementation of an order pending appeal, we do not consider that opinion as binding , but rather as persuasive authority.  We find defendant's assessment that "[t]he Supreme Court has stated [that none of the plaintiffs are within the INA's zone of interest] with respect to the landlords and employers of illegal aliens" to overstate both Justice O'Connor's findings and the role that her colleagues played in that decision.  (Doc. 87 at 8).

putative injuries are 'within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint'" did a plaintiff have standing to sue over an agency decision.  Id. (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 883 (1990)). The organizations, Justice O'Connor found, did not fall within the zone of interests protected by the statute because "IRCA was clearly meant to protect the interests of undocumented aliens, not the interest of organizations such as respondents."  Id.  Though IRCA had assigned such organizations a role in the process of determining amnesty eligibility, "there is no indication that IRCA was in any way addressed to their interests."  Id. Accordingly, Justice O'Connor found that those organizations did not fall within the zone of interests of IRCA.

Whatever precedential value we should assign to the stay of a district court order issued by a single Supreme Court Justice sitting as a Circuit Judge, we are not persuaded that this case leads to the conclusion that plaintiffs lack prudential standing under the zone of interests test.  The decision addressed the standing of advocacy groups seeking to challenge the operation of the amnesty program established under IRCA, not the standing of employers or landlords seeking to determine whether the

federal scheme of regulating immigration preempted a local ordinance.

Like most zone of interest cases, the court in this case was required to

consider whether a plaintiff had standing to challenge an interpretation of a

federal statute that did not directly regulate that group.  Defendant's

reading of the decision to state a general proposition that plaintiffs lack

standing in cases involving preemption under the INA, therefore, is far too

broad.  Indeed, Justice O'Connor concluded that illegal immigrants seeking

to adjust their status *were* within the IRCA's zone of interests.  Plaintiff

organizations in INS v. Legal Assistance Project had sued the federal

government.  Here, by contrast, plaintiffs challenge local ordinances that

would directly regulate their activities as employers, employees, landlords

and tenants.  Justice O'Connor's opinion is not applicable to the situation

here, and does not alter our determination that plaintiffs have prudential as

well as constitutional standing.

Accordingly, we find that all of the plaintiffs in this case except Jose

and Rosa Lechuga have both constitutional and prudential standing, and

we will deny defendant's motion to dismiss on that point.  The landlord

plaintiffs have standing to challenge the provisions of the ordinances

related to housing, as well as the employment restrictions.  The tenant

plaintiffs also have standing to sue over the registration provisions of the

housing ordinance, as well as for alleged violation of their privacy rights.

They also have standing to challenge the employment provisions of IIRA.

In short, plaintiffs have proved standing sufficiently for all of their claims to

proceed.

## B.  Anonymous/Doe Plaintiffs

The defendant argues that the Doe Plaintiffs may not proceed

anonymously.  Federal Rule of Civil Procedure 10(a), defendant contends,

requires that each complaint set forth the names of all the parties.

Federal Rule of Civil Procedure 17(a) mandates that every action be

prosecuted in the name of the real party in interest.  These pleading

requirements, defendant insists, are not satisfied by the "anonymous or

generic" description provided for the anonymous parties in plaintiffs'

amended complaint.  (Memorandum of Law in Opposition to Plaintiffs'

Motion for Summary Judgment (Doc. 150) at 105).  Additionally, defendant

insists that plaintiffs did not seek leave from the court to proceed

anonymously, as required by the federal rules.  Defendant also argues that

the disclosure of immigration status is not a matter so highly personal and

sensitive that anonymity is required to protect a plaintiff's interest.  Finally,

defendant insists that "a court of the United States cannot recognize and

affirm any Plaintiff's interest in evading the laws of the United States,

particularly when such laws are not challenged in the case before the

court." (Id. at 107).[27]  We find no merit to the defendant's arguments, but

---

[27]We do not find that Rule 17(a) applies to our decision of whether to
allow plaintiffs to proceed using pseudonyms.  The requirement that an
action be "prosecuted in the name of the real party in interest" relates to
attempts to ensure that those who have an interest in a legal action are
actually represented in the case.  This rule enshrines the principle that "the
action must be brought by the person who, according to the governing
substantive law, is entitled to enforce the right."  Wright and Miller,
FEDERAL PRACTICE AND PROCEDURE § 1543; see Schupack v. Coveli, 512 F.
Supp. 1310, 1313 (W.D. Pa. 1981) (finding that plaintiff was the "real party
of interest" in the case because she "possessed legal title to the stock in
question; . . . retained and paid plaintiff's counsel in this action; and . . .
plaintiff's counsel takes his instructions solely from" her).  Here, the
anonymous plaintiff's claim that they live and work in Hazleton and will be
harmed by the implementation of the ordinances in question.  There is no
doubt that they have participated in the lawsuit and that the attorneys in
their case work at least in part for them.  They claim the ordinance violates
their rights under the United States constitution and laws of the United
States and the Commonwealth of Pennsylvania.  They are certainly entitled
to seek enforcement of those rights and clearly are the real parties of
interest in the case.  The one case to which defendant cites that connects
anonymity of a plaintiff to Rule 17(a) addresses a plaintiff who used an
alias in pursuing a lawsuit against prison officials, and who did not seek to
proceed under a pseudonym because of concerns about the
consequences of using his own name but had instead used an alias at the
time of his arrest to avoid deportation for a previous criminal conviction.
See Marcano v. Lombardi, No. Civ. 02-2666, 2005 WL 3500063, *4 (D.
N.J. Dec. 20, 2005) (finding that "because Plaintiff never petitioned the
Court to proceed under an alias, his persistence in maintaining his false
identity mandates dismissal of his case).  The facts are clearly different
here.  The plaintiff in Marcano used an alias, not a pseudonym, and did so

we shall address them all.

    As set forth above, all of the John and Jane Doe plaintiffs have an uncertain immigration status.  The Federal Rules of Civil Procedure demand that litigants provide "the names of all the parties."  FED. R. CIV. P. 10(a).  The public nature of lawsuits and the public interest inherent in the rights vindicated in courtrooms makes open and transparent proceedings imperative to equitable outcomes.  See M.M. v. Zavaras, 139 F.3d 798, 803 (10th Cir. 1998) (holding that "[l]awsuits are public events.  A plaintiff should be permitted to proceed anonymously only in those exceptional cases involving matters of a highly sensitive and personal nature, real

---

only in attempt to prevent authorities from discovering his true identity and deporting him because of a prior criminal conviction.  He did not acknowledge that he was using a false name.  In addition, his case had nothing to do with immigration, but was a civil rights suit based on his treatment in jail.  Because plaintiff tried to fool the defendant about who he was, the court rightly concluded that the suit was not instituted in the name of the real party in interest.  Here, plaintiffs are not trying to mislead the court or the defendant about who they are.  They acknowledge that the pseudonyms are not their real names.  We note as well that the case that defendant cites to argue that we may raise plaintiff's failure to comply with Rule 17(a) *sue sponte*  nowhere mentions that Rule.  See Doe v. United States Dep't of Justice, 93 F.R.D. 483 (D. Colo. 1982).  Indeed, the judge in that case did not act *sua sponte*, but only after both parties filed motions, the plaintiff to proceed anonymously and the defendant for a more definite statement that included the name of the plaintiff.  Id. at 483.  Accordingly, we find that Rule 17(a) does not apply to the plaintiff's efforts to proceed anonymously.

danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity.  The risk that a plaintiff may suffer some embarrassment is not enough.") (quoting Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992)). Courts have long recognized, however, that the circumstances of a case, particularly where litigants may suffer extreme distress or danger from their participation in the lawsuit, may require that plaintiffs proceed without revealing their true names. Courts have found that plaintiffs could proceed anonymously because they feared that revealing their true identities would lead to physical violence, deportation, arrest in their home countries and retaliation against the plaintiffs' families for bringing suit.  Doe v. Advanced Textile Corp., 214 F.3d 1058, 1063 (9th Cir. 2000).  They have also allowed children who were undocumented immigrants to proceed without revealing their true names in a suit seeking to overturn a law that prevented their access to schools in Texas.  Plyler, 457 U.S.  at 202.  People seeking access to abortions at a time when they were generally illegal also received leave to proceed using pseudonyms.  See Roe v. Wade, 410 U.S. 113 (1973). Courts have allowed those suffering from mental illness to use pseudonyms.  See, e.g., Doe v. Colautti, 592 F.2d 704 (3d Cir. 1979).

Children bringing a controversial challenge to a school-sponsored religious program were also granted anonymity in the face of threatened harm for their views.  Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981).

Those federal courts which have ruled on the propriety of anonymous plaintiffs have held that "a district court must balance the need for anonymity against the general presumption that parties' identities are public information and the risk of unfairness to the opposing party." Advanced Textile, 214 F.3d at 1068. The Ninth Circuit Court of Appeals, for example, has noted that "we allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment.'" Id. at 1067-68 (quoting United States v. Doe, 655 F.2d 920, 922 n.1 (9th Cir. 1981)).  The Fourth Circuit Court of Appeals has similarly found that "[f]ederal courts traditionally have recognized that in some cases the general presumption of open trials–including identification of parties and witnesses by their real names–should yield in deference to sufficiently pressing needs for party or witness anonymity."  James v. Jacobson, 6 F.3d 233, 242 (4th Cir. 1993).

The Third Circuit Court of Appeals has not articulated a standard to

weigh litigants' efforts to proceed anonymously.  Federal district courts in

the Third Circuit, however, have held that "[i]n determining whether a party

may proceed under a pseudonym, the public's right of access should

prevail unless the party requesting pseudonymity demonstrates that her

interests in privacy or security justify pseudonymity."  Doe v. Evans, 202

F.R.D. 173, 175 (E.D. Pa. 2001). They have also articulated factors

weighing in favor and against the use of pseudonyms for plaintiffs.  Those

factors include: "(1) the extent to which the identity of the litigant has been

kept confidential; (2) the bases upon which disclosure is feared or sought

to be avoided, and the substantiality of these bases; (3) the magnitude of

the public interest in maintaining the confidentiality of the litigant's identity;

(4) whether, because of the purely legal nature of the issues presented or

otherwise, there is an atypically weak public interest in knowing the

litigant's identities; (5) the undesirability of an outcome adverse to the

pseudonymous party and attributable to his refusal to pursue the case at

the price of being publically identified; and (6) whether the party seeking to

sue pseudonymously has illegitimate ulterior motives."  Doe v. Hartford Life

and Accident Ins. Co., 237 F.R.D. 545, 549 (D. N.J. 2006) (quoting Doe v.

Provident Life & Accident Ins. Co., 176 F.R.D. 464, 467-68 (E.D. Pa.

1997)).  Factors against use of pseudonyms are: "(1)the universal level of public interest in access to the identities of the litigants; (2) whether, because of the subject matter of the litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (3) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated."  Id. at 550 (quoting Id. at 468).

We find that plaintiffs are entitled to proceed anonymously in this matter.[28]

---

[28]We agree with the defendant that plaintiffs should have sought formal leave of the court to proceed anonymously.  Such failure is not grounds to grant a procedural default to the defendant because we addressed this issue at a preliminary stage of the litigation and no prejudice has occurred to the defendant.  Early in the discovery period, plaintiffs sought a protective order from this court directing the defendant not to request information from the Doe plaintiffs that revealed their identities or immigration status.  (See Motion for Protective Order (Doc. 65)).  Defendant offered various reasons why such an order was inappropriate, including an argument that "[n]umerous federal precedents establish clearly that anonymity may not be utilized to avoid disclosure of the identity of an illegal alien."  (Brief in Opposition to Motion for a Protective Order (Doc. 67) at 1).  After considering these arguments, we granted this motion for a protective order on December 15, 2006.  That protective order reads: "The John or Jane Doe Plaintiffs in this proceeding do not have to produce, or otherwise respond to discovery requests seeking disclosure of, 'Protected Material', i.e. those documents, things, information and testimony containing information about their immigration

63

We will consider each of the factors raised by district courts in the Third Circuit in addressing such matters.

### 1.  Factors Favoring Anonymity

#### a.  Preservation of Anonymity

The first factor is the extent to which the anonymity of the plaintiffs seeking to use pseudonyms has been preserved.  In this case, plaintiffs have vigorously attempted to maintain their anonymity through the trial and deposition process, and no evidence suggests that those attempts have been unsuccessful.  These plaintiffs have not given media interviews in which they revealed their names, they have not appeared in public in forums in which they could easily be recognized, and they did not testify

_____

status, actual residence, or place of work that would allow someone to *identify them* or their immigration status." (Memorandum and Order (Doc. 72) at 7) (emphasis added).  While we recognize that our ruling on this issue did not address directly whether plaintiffs could proceed anonymously, this order did approve of the unnamed plaintiffs' unwillingness to reveal their real names.  Our order came in response to a motion from the plaintiffs for a protective order regarding discovery of their names or immigration status.  This early attention to the issue of anonymity cured any prejudice that could have resulted from the failure of plaintiffs to request leave to proceed without revealing their true names.  The parties were aware of the presence of this issue in the litigation, we ruled on an immediate and contentious issue related to anonymity, and the parties were able to prepare the litigation without the names of these plaintiffs.  Accordingly, we will consider the question of anonymous plaintiffs on the merits.

live at trial.  The record provides no indication that plaintiffs have waived

their claim on anonymity by allowing others to discover their true names.

This factor weighs in favor of plaintiffs' attempt to proceed anonymously.

### b. Bases for Request of Anonymity

Second, courts evaluate the bases for the claim that anonymity is

necessary and the legitimacy of those bases.  Here, plaintiffs seek to avoid

disclosure of their identities because they fear the consequences of such

public knowledge and are concerned that defendant may disclose their

names to federal immigration authorities.  The plaintiffs argue that they

have "stated legitimate concerns that the public identification of the Doe

Plaintiffs, amidst this highly publicized and controversial lawsuit, would

make them easy targets of intense anti-immigrant and anti-Latino

sentiment."  (Brief in Opposition to Defendant's Motion to Dismiss (Doc.

106) at 97).  Plaintiffs also contend that such disclosure may affect "their

basic rights to shelter, education, and a livelihood."  (Id. at 99).  We find

these compelling reasons for allowing plaintiffs to proceed anonymously.

In Jane Doe 1 v. Merten, the Federal District Court for the Eastern

District of Virginia refused to allow plaintiffs who sought to challenge a

Virginia law that prevented illegal immigrants from obtaining admission to

state colleges and Universities to proceed anonymously.  219 F.R.D. 387 (E.D. Va. 2004).  The students had claimed:  "[I]f they are required to reveal their identities, the federal government will seek to deport them or their families and they will thus likely decide not to proceed with this suit, effectively rendering them unable to vindicate their rights in this matter." Id. at 390.  Defendant cites to this case to support its argument that plaintiffs should be required to reveal their identities, in part because the court in that case found that the plaintiffs seeking to proceed anonymously did not have a strong interest in keeping information about their immigration status confidential.

The court in Merten concluded that "unlawful or problematic immigration status is simply not the type of 'personal information of the utmost intimacy' that warrants abandoning the presumption of openness in judicial proceedings."  Id.  We find that the facts and context of this case lead to a different assessment of the nature of information about one's immigration status.[29]  Unlike Merten, where plaintiffs were seeking

[29]The court cited no authority that supported this finding about the nature of information on immigration status (though defendant cites approvingly to the holding), but instead pointed to Southern Methodist University Association of Women Law Students v. Wynne & Jaffe, a case that refused a request by plaintiffs who were women law students to proceed anonymously in their challenge to a law firm's hiring practices.

admission to state colleges and universities, the plaintiffs in this case do

not seek to receive any goods provided by the state.  Further, their

immigration status does not determine whether they will be subject to the

terms of the ordinance.  Accordingly, the individual identities and interests

of the plaintiffs are not at issue in this case to the degree they were in

Merten and are not necessary to reach the issues of constitutionality raised

by the lawsuit.  The intense public interest in this case makes the risks

from exposing sensitive information about one's identity exponentially more

---

See Wynne & Jaffe, 599 F.2d 707, 713 (5th Cir. 1979).  We find that the situations faced by women law students during their job search are quite different from those faced by undocumented immigrants who face the possibility that their opponents in a lawsuit will reveal information that could have dire legal consequences.  The women law students did not, after all, face the possibility of deportation or exposure to an angry public convinced that their mere presence in the community was a threat to social order.  The Court in Merten nevertheless acknowledged that in Plyler, the Supreme Court permitted "illegal aliens . . . to proceed anonymously in their successful constitutional challenge to the Texas law denying free public grammar school education to illegal alien children."  Merten, 219 F.R.D. at 391.  In a footnote, the Merten court pointed out that "it should be noted that in neither *Plyler* nor *Roe* [*v. Wade*] does it appear that the issue of anonymity was contested or litigated."  Id. at 391 n.12.  We assign more importance than the Merten court did to the fact that plaintiffs in the Plyler and Roe cases proceeded anonymously.  Apparently, no federal court which examined the *Plyler* case found the use of anonymous plaintiffs troubling enough to address the issue, but instead concluded that the plaintiffs had legitimate reasons for refusing the reveal their true names in that high-profile case.  The fact that the parties did not litigate the issue is certainly not evidence that the use of pseudonyms was not vital to allowing the plaintiffs in that case (or in Roe for that matter) to vindicate their rights.

dire than in <u>Merten</u> and make more persuasive plaintiffs' reasons for seeking to proceed without revealing their true names.

The manner in which public interest has manifested itself in this case demonstrates why anonymity is necessary for plaintiffs who lack a legal immigration status.  Trial testimony indicated the intense public interest in the ordinances led at times to harassment and intimidation that created fear even among those with a more secure social and legal status than the anonymous plaintiffs.  Dr. Agapito Lopez, a Hazleton resident who became a leader in the attempt to have the ordinances overturned, testified that he organized a candlelight vigil to be held on the steps of the building where the city council met the night before the ordinances had their second reading.  (N.T. 3/12/07 at 73).   Attendees at the meeting were very afraid of the consequences of their participation, particularly of the city officials who at Lopez's request videotaped the crowd in an attempt to gather evidence in case of a potential disturbance.[30]  The fear of those in his group came "because there was another group that was intimidating us at

---

[30]The protestors' reaction to these cameras, despite the benign nature of their presence, indicates that the publicity generated by the ordinances also generated fear among immigrants and particularly Latinos in Hazleton that they would be the subject of government-sponsored harassment and intimidation.

that time by showing their presence, shouting slogans, and a lot of tension in the area." (Id. at 75).  At the ordinance's second reading the City's supporters were "very, very tense with stares at the small group of Latinos that were there." (Id.).  While the City Council was conducting its business that evening a fight had broke out in the street between opponents and supporters of the ordinances.  (Id. at 76-77).  Lopez rushed back out to the street in front of the City Council building to find "[f]ederal justice agents, department of justice agents and policemen in the street dividing two groups." (Id. 77).  The two groups, consisting of recent immigrants and another group of those supporting the ordinances had faced off, "and there was shouting from one side to the other side." (Id.).

The day before the vigil organized by opponents of the ordinances, Lopez received what he described as "hate mail" underneath the door of his office. (Id. at 73).  The letter Lopez received purported to describe the effects of illegal immigration, contending that "European Americans are being dispossessed of their own nation.  We are under invasion by millions of unskilled Mexicans who threaten to bankrupt us." (N. T. 3/13/07 at 5).  The letter further warned that "coloreds" would eventually take control of state governments, Congress and the presidency, and that "[w]hites will

quickly be stripped of their rights with our wealth confiscated for redistribution to non-whites as is taking place in South Africa."  (Id. at 6).

After the ordinances had their second reading Lopez received two other pieces of offensive mail; this mail made him feel both fearful and "offended, because it was hate mail.  It indicated hate against me as a person."  (N.T. 3/12/07 at 78-79).[31]  The first piece of mail suggested that Lopez and his "cohort, that bold, brazen Anna Arias, should spend some time on a few streets in town before defending your (Latin Community)."  (N.T. 3/13/07 at 7).  After describing what the letter-writer saw as the waste and crime caused by the immigrant residents of Hazleton, the author declared that "[w]e think you and Anna [Arias] had better think twice before

_____

[31]We note, too, that the ordinances apparently had the effect of increasing racial tension in the City.  Jose Luis Lechuga, who first arrived in the United States from Mexico in 1982, had lived in Hazleton since 1991.  (N.T. 3/12/07 at 118, 122).  When he first came to the City, he felt "like a part of the community.  People no longer looked at me like a stranger, because they knew that my wife and I were working people, and so I was accepted in the community."  (Id. at 123).  After the passage of the ordinances, however, Lechuga discovered that "apparently the racial hatred and the racism has awoken.  We notice and see that people no longer look at us–they look at us like their enemies now, not our friends."  (Id. at 124).  That Lechuga, a legal resident of the United States, felt such discomfort as a result of the controversy over the ordinances demonstrates the public controversy created by the ordinances and helps to justify the fears expressed by the anonymous plaintiffs, who do not possess the same legal status as Lechuga.

you speak."[32]  Lopez saw this letter as evidence of "the effect that the

ordinance has had on the population," which now failed to "distinguish

between undocumented immigrants and Latinos.  For them, they are all the

same."  (Id. at 9).  The final letter Lopez received[33] contained a clipping

from a newspaper describing the effects of illegal immigration as well as a

picture of a "warrior" wearing "a huge Mexican hat."  (Id. at 10).  Scrawled

near this picture were the phrases, "[s]ubhuman spic scum" and "[i]f it is

brown, flush it down."[34]  (Id.).  Lopez interpreted this mail as an attempt to

---

[32]That statement seems to be connected to a claim that activists like Lopez did nothing to address the crime present in Hazleton, but instead complained about the treatment of immigrants.  The passage from which that statement was taken reads: "We think you and Anna had better think twice before you speak.  Where were you Friday p.m. when Pine Street playground was once again a scene of trouble?  Never see you two show your faces.  Signed disgusted citizens."  (N.T. 3/13/07 at 8).

[33]The letter was postmarked Hartford, Connecticut.  (N.T. 3/13/07 at 9).  That the letter did not come from Hazleton demonstrates the wide publicity received by the case, which we find heightens the concerns of the most vulnerable plaintiffs about their participation in the case.

[34]This piece of mail listed a website, www.nsm88.com, which Hazleton's attorney discovered was attached to the "nationalist socialist movement."  (N.T. 3/13/07 at 12).  After an introductory page that highlights Nazi imagery and declares the organization to be "Fighting for Race and Nation" the website declares itself "the Official Home Page of the National Socialist Movement, an organization dedicated to the preservation of our Proud Aryan Heritage, and the creation of a National Socialist Society in America and around the world." http://www.nsm88.com/index2.html.

"silence" and "intimidate" him.  (Id. at 11).  He also "felt afraid" after receiving letters both at his office and at home; the mail let him know that "they know where I live and where I used to work and where my wife works."  (Id.).

Public expressions of support for Hazleton's ordinances have continued to lead to controversy and confrontations, as well as anger at those who challenge the City's position.  On June 3, 2007, several hundred ordinance supporters held a rally in Hazleton to express support for the city's attempts to control illegal immigration.  Nichole Dobo, *Barletta Backers Harass Writer*, SCRANTON TIMES-TRIBUNE, June 5, 2007, at A1. Amilcar Arroyo, publisher of EL MENSAJERO, a Hazleton-based Spanish-language newspaper, attempted to cover the event for his publication. Id. Arroyo, an American citizen, is not involved in the lawsuit against the City. Id.  Several members of the crowd at the rally began to shout at Arroyo after a rumor circulated that he was one of the plaintiffs in the lawsuit against the ordinances.  Id.  Confronting Arroyo, a few rally participants shouted at him to "'get out of the country'" while others chanted "'traitor.'" Id.  Police escorted Arroyo from the rally for his own protection.  Id.

We find that this record of hostility to the plaintiffs in the lawsuit and

the climate of fear and hostility surrounding the debate over the ordinances

creates a justified fear about revealing the anonymous plaintiffs' identities.

Dr. Lopez and Mr. Arroyo faced public condemnation and confrontation

based on their real or perceived participation in the lawsuit, and they are

United States citizens.  Those with a more tenuous legal status have an

exponentially greater concern over the dangers of participating in a lawsuit

that has generated such intense sentiment.

In addition, we find that the defendant does not have a strong need

to obtain the identity of the anonymous plaintiffs in order to defend against

plaintiffs' suit, thus adding to the reasonableness of plaintiffs' request to

keep their identity anonymous.  Plaintiffs seek to keep their identities

private largely because of their problematic immigration status; they fear

the consequences of a public admission of unauthorized residence and

employment in the United States.  Courts have concluded that plaintiffs

may refuse to turn over information on their immigration status when that

status is not relevant to the lawsuit.  See Topo v. Dihir, 210 F.R.D. 76, 78

(S.D. N.Y. 2002).  Here, defendant has claimed to need information on the

unnamed plaintiffs' immigration status in order to determine whether they

have standing to bring suit in the case.  Plaintiffs have admitted that they

lack legal authorization for their presence and employment in the country, and defendant therefore has all the information necessary to challenge the anonymous plaintiffs' presence in the suit.[35]  Defendant's arguments about the standing of such undocumented plaintiffs are based not on the specific facts of each undocumented plaintiff's legal status, but instead on the notion that plaintiffs who are not legally in the United States cannot be injured by the ordinances.  The information provided by the anonymous plaintiffs about their immigration status gives the defendant all the information necessary to make this standing claim.

Indeed, plaintiffs have expressed a legitimate fear that exposing their names could lead to adverse legal consequences that go beyond the public disapprobation they face.  If threats of exposure of one's legal status can intimidate plaintiffs and prevent them from participating in a lawsuit, the defendant's own statements and actions have added weight to these fears.  During discovery in this case, the parties disagreed over whether the anonymous plaintiffs should be required to turn over immigration documents to the defendant.  After a telephone conference, this court

_____

[35]We accept these plaintiffs' representations about their immigration status, since such representations are against their legal interest.  These plaintiffs admit to a problematic legal status that could lead to their deportation.

74

ordered the parties to enter into a confidentiality agreement to protect the identities of the Doe plaintiffs.  (See Order (Doc. 63)).

　　After the court issued this order, plaintiffs informed us that a local newspaper had quoted defendant's attorney, who claimed that the order violated 8 U.S.C. § 1373(c) by preventing the city from turning over to the federal government information on the plaintiff's immigration status.  See *Munley's IIRA Order Violates Federal Law, Attorney Says*, STANDARD SPEAKER, December 13, 2006 (attached to Motion for a Protective Order (Doc. 64)).  The federal law "says no government entity, federal, state or local, may in any way restrict the transfer of information concerning an alien's legal status to the federal government," Hazleton's attorney asserted.  (Id.).  The attorney expressed "surprise" at the order, which he claimed "violates federal law."  (Id.).  Plaintiffs informed us of these statements as part of their motion seeking a protective order preventing disclosure of their identities and immigration status.  Given these public statements and court filings, plaintiffs could legitimately fear that defendant was determined to expose their legal status to federal authorities.  Such fears could cause plaintiffs to abandon their attempt to secure rights guaranteed them under federal law.  We conclude, therefore, that plaintiffs

have offered good and compelling reasons for not revealing their identities.

The second factor, then, weighs heavily in favor of anonymity.

### c.  Magnitude of the Public Interest Involved in Maintaining Confidentiality

The third factor, the magnitude of the public's interest in maintaining

the confidentiality of the litigants' identities, also weighs in the anonymous

plaintiffs' favor.  Hazleton's ordinances have become the subject of wide

public debate, and has also served as a model for other communities

seeking to act against what they perceive to be the problem of illegal

immigration.  See Anabelle Garay, *Attempts to Curb Illegal Immigration*

*Prove Costly*, WASHINGTON POST, May 6, 2007, at A12 (reporting that

"[d]ozens of cities and counties have proposed or passed laws that prohibit

landlords from leasing to illegal immigrants, penalize businesses that

employ undocumented workers or train police to enforce federal

immigration laws.").  The public has an interest in determining the

constitutionality of ordinances like the one passed in Hazleton, and

particularly in determining whether such ordinances violate the

constitutional rights of immigrants who lack authorization to enter or work

in the United States.  Without the protection of anonymity, future such

plaintiffs would likely decline to participate in the lawsuit, and the public's

interest in testing the constitutionality of certain aspects of such ordinances could remain unexplored.

### d.  Legal Nature of the Issues in the Case

The fourth factor, whether the purely legal nature of the issues in the case make for an atypically weak public interest in the actual identity of the litigants, also weighs in favor of anonymity.  Because this case exists as a test of ordinances passed by Hazleton that seek to transform the role of municipalities in dealing with the presence of undocumented aliens in their jurisdictions, the issues in this case are largely related to the interaction between federal, state and local laws, the application of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the meaning of standing in federal jurisprudence and the limits of the privacy protections afforded by the Constitution.  This case does not contain the complicated factual scenarios of the typical employment discrimination or prisoner civil rights action faced daily in every federal district court.  The decision in this case does not turn on judgements about the credibility of particular witnesses, but instead on an assessment of the parties' legal arguments.  Indeed, the only reason defendant cites for needing to know the identity of the anonymous plaintiffs

is to address their standing to sue.  While standing is a clear constitutional

requirement, it is also a preliminary question and one we find we can

answer for the anonymous plaintiffs without discovery of their identities.

Defendant makes no argument that other factual or legal issues in the case

require knowing the identity of plaintiffs. Defendant, therefore, has less

interest in the identity of the particular plaintiffs than in the resolution of the

legal issues in this case.  This factor clearly weighs against disclosure of

the plaintiffs' identities.

### e.  Danger of Adverse Outcome to Unnamed Plaintiffs

We find that the fifth factor, the undesirability of an outcome adverse

to the pseudonymous parties and attributable to their refusal to pursue the

case at the price of being publically identified, has a neutral weight in our

analysis.  While an adverse outcome for the anonymous plaintiffs could

have significant consequences, limiting their ability to find housing and

secure employment, that adverse outcome would not be solely or even

primarily attributable to the anonymous plaintiffs' refusal to participate

because of the possibility of being identified publically.  This case, which

will be decided largely by answering legal questions on issues like federal

preemption, does not turn on the particular facts of the plaintiffs'

experience with the law.  Other named litigants who could press the issue

of the constitutionality of the ordinances would remain, and the outcome of

the case would not be determined by the decision of the anonymous

plaintiffs to abandon their lawsuit.  This factor, therefore, does not weigh

significantly for either side of the argument.

### f.  Whether Plaintiffs Have Ulterior Motives for Seeking Anonymity

We find that the sixth factor, whether the plaintiffs seeking to proceed

anonymously have illegitimate ulterior motives, weighs in favor of the

plaintiffs' anonymity.   The reason for the plaintiffs' desire to use

pseudonyms in this case is clear: they wish to avoid the potential harm that

will come from disclosure of their names to the defendant and to the public.

They fear that disclosing their identities could expose them to danger and

adverse legal action unrelated to the rights they seek to vindicate in this

litigation.  Defendant does not point to any improper motive of the plaintiffs

in seeking to proceed without being identified.[36]  We thus find no improper

---

[36]In an earlier response to a plaintiff's motion for a protective order
preventing disclosure of identity and information related to immigration
status, however, defendant argued that plaintiff's had engaged in a "shell
game" of substituting different anonymous plaintiffs.  We found that
problem not genuine at the time we issued the protective order; we find
that problem even less likely now, as defendant has had the opportunity to
depose the anonymous plaintiffs and has attached them to a particular set

motive behind plaintiffs' request to proceed without identifying themselves. This factor weighs in favor of anonymity.

### 2.  Factors Favoring Disclosure

#### a.  Public Interest in Plaintiffs' Identities

Of the factors in favor of disclosure of the anonymous plaintiffs' identities, we find that the first of those factors, the universal level of public interest in access to the identities of the litigants, does not support a need for disclosure.  There is widespread public interest in this case, but that interest is focused not on the identities of the plaintiffs, but on the legal issues at the heart of the case.  We find no evidence of a widespread, much less universal, public interest in the identities of the plaintiffs.  The public's interest in this case is in the right of Hazleton to press forward with its legislation, not in a dispute between the parties.  Accordingly, the public's interest in the identities of the individual plaintiffs is not so strong as to justify the danger of disclosing the identity of plaintiffs with a legitimate fear for the consequences of that disclosure.

#### b.  Subject Matter of the Litigation

The next factor in favor of disclosure asks whether, because of the

---

of identifying factors.

subject matter of the litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's normal interest.   This factor too does not weigh in favor of disclosure.  The subject matter of this litigation is primarily constitutional law, and the identities of the particular plaintiffs are not as important to the outcome of the litigation as the legal arguments they raise. In addition, the plaintiffs seeking anonymity here are not public figures, and thus there is scant public need to follow their activities in order to prevent abuse of some public trust.

### c.  Motivation for Seeking Identity

The final factor for the court to consider addresses whether the opposition to pseudonyms by counsel, the public, or the press is illegitimately motivated.  While we do not find persuasive power in defendant's argument that learning the identity of the anonymous plaintiffs is necessary to determine whether they have standing to sue, we have no evidence to indicate that defendant adopted this position for illegitimate reasons.  We note, however, that federal courts have recognized that inquiries into immigration status can have an *in terrorem*, effect, limiting the willingness of plaintiffs to pursue their rights out of fears of the

consequences of an exposure of their position.  See Topo v. Dihir, 210

F.R.D. 76, 78 (S.D.N.Y. 2002) (holding that "[c]ourts have generally

recognized the *in terrorem* effect of inquiring into a party's immigration

status when irrelevant to any material claim."); Zeng Liu v. Donna Karan

International, Inc., 207 F. Supp. 2d 191, 193 (S.D.N.Y. 2002) (finding that

disclosing immigration status when not relevant to the case presents a

"danger of intimidation [that] would inhibit plaintiffs in pursuing their

rights.").  In this case, then, we lack evidence that defendant had

illegitimate motives in challenging plaintiffs' use of anonymity, but

recognize the potential intimidation that accompanied that challenge.  We

find, therefore, that this factor weighs neither for nor against disclosure.

In sum, we find that the factors in favor of confidentiality for the

plaintiffs who seek to proceed anonymously outweigh those that

recommend disclosure.  The highly legal nature of the issues here,

combined with the intense public interest and strong level of emotion

connected with the issue mean that the undocumented immigrants who

seek to participate in this action face extraordinary circumstances that

require anonymity if they hope to proceed without facing unsupportable

burdens.  The public's interest in learning the identity of the litigants does

not outweigh the anonymous plaintiff's concerns, and defendant can

defend itself adequately without information about the anonymous plaintiffs'

identities.  Accordingly, we find that the anonymous plaintiffs may proceed

without identifying themselves.

    We note, finally, that we find misplaced defendant's concern that this

court's acknowledgment of the Doe plaintiffs' right to proceed anonymously

would "recognize" and "affirm" an "interest in evading the laws of the United

States."  (Memorandum of Law in Opposition to Plaintiffs' Cross-Motion for

Summary Judgment (Doc. 150) at 107). A venerable principle of

constitutional law holds that all persons in the United States have rights

under the Fourteenth Amendment to the United States Constitution,

whether they are citizens or not.[37] See Plyler v. Doe, 457 U.S. 202, 210

(1982) (holding that "[w]hatever his status under the immigration laws, an

alien is surely a 'person' in any ordinary sense of that term.  Aliens, even

---

[37]We note that the descendants of non-Asian immigrants who
entered this country before the immigration restrictions of the 1920s who
condemn present-day illegal immigrants by pointing out that "when my
relatives came to this country, they followed the law" ignore one very
crucial fact: virtually no law existed to prevent anyone from entering the
country prior to that period.  No federal crime for unauthorized entry
existed until 1929.  See Mae M. Ngai, Impossible Subjects: Illegal
Aliens and the Making of America, 60 (2004).  For a broader reading on
United States immigration history please see the appendix.

aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 369 (1886) (holding that "[t]he Fourteenth Amendment to the Constitution is not confined to the protection of citizens.  It says: 'Nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'  These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.").  The Doe plaintiffs' interest in this case is in vindicating rights they claim are guaranteed them under the Constitution, and those rights exist whatever their status under the nation's immigration laws.  Allowing the Doe plaintiffs to proceed anonymously in the unique conditions of this case would not reward them for evading the country's immigration laws.[38]  It would instead provide them an opportunity to secure

---

[38]Indeed, even if we were to agree with every argument made by the plaintiffs in this case and issue a permanent injunction preventing Hazleton from enforcing any of the challenged ordinances, the federal government could still independently of this action discover the identities of the anonymous plaintiffs and deport those whose presence in the United States is contrary to federal law.

84

the rights guaranteed them by the Constitution of the United States.

## C. Amendments to the Ordinance

On March 15, 2007, during this court's trial of this matter, defendant introduced Ordinance 2007-6, which has since become law in the city. See Ordinance 2007-6 (Defense Ex. 251).  This Ordinance Amended Sections 4B(2) and 5(B)(2) of IIRA.  Id.   As originally written, "a complaint which alleges a violation solely or primarily on the basis of national origin, ethnicity or race" would not be enforced. Ordinance 2006-18 at § 4B(2). The 2007 amendment removed the words "solely or primarily" from these provisions, meaning that "a complaint which alleges a violation on the basis of national origin, ethnicity or race shall be deemed invalid and shall not be enforced."  Ordinance 2007-6.  The amendment also altered Section 4.A of the Ordinance by adding the word "knowingly" to a provision prohibiting the recruitment and hiring of illegal aliens.  Id.; see Ordinance 2006-18 at § 4.A (establishing that: "It is unlawful for any business entity to knowingly recruit, hire for employment, or continue to  employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City.").  At the end of the hearing on the plaintiffs' complaint, we asked the parties for briefs on the effect of this amendment

on the instant litigation.

The parties agree that the court has jurisdiction to issue a decision on the current version of the ordinance.  Plaintiffs argue, however, that we should also rule on the version of the ordinance that existed until the March amendment.   Defendant amended the ordinance, plaintiffs argue, to avoid having this court rule on the constitutionality of the ordinance as it then existed.  That amendment did not come, plaintiffs insist, because Defendant recognized that the previous version of the ordinance violated the constitution, but simply to improve defendant's litigation position.  Accordingly, the court could reasonably conclude that defendant will not cease the illegal practice embodied in the earlier version of the ordinance.

The dispute between the parties here is over whether we should also consider the version of the ordinance that was in effect through most of the litigation in this matter.  We find that we do not have jurisdiction to rule on the constitutionality of a version of an ordinance that no longer exists, particularly when we have–as both sides admit–jurisdiction to examine the current version of that ordinance.  The cases cited by the plaintiffs to argue that we should rule on that older version of IIRA all address whether a court has jurisdiction to hear a challenge to a practice or an ordinance that

the defendant has voluntarily terminated, not whether a court has

jurisdiction to address both the old and new versions of an amended

ordinance.  See City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283,

289 (1982) (finding that voluntarily abandoning a challenged practice does

not moot answering the question raised by the lawsuit, since "the city's

repeal of the objectionable language would not preclude it from reenacting

precisely the same provision if the District Court's judgement were

vacated."); United States v. Government of the Virgin Islands, 363 F.3d

276, 286 (3d Cir. 2004) (finding that "when a party does not change its

'substantive stance' as to the validity of the contract but merely terminates

it for allegedly purely practical reasons (such as avoiding litigation), the

termination of the contract does not render the case moot" because

nothing would prevent the defendant from engaging in the same or similar

contracts); Penny Saver Pubs., Inc. v. Village of Hazel Crest, 905 F.2d 150

(7th Cir. 1990)[39]; Reynolds v. City of Valley Park, No. 06-CC-3802 (St.

---

[39]The facts of this case do not support plaintiffs' position.  Plaintiffs
argue that "the Circuit Court has also rejected the government actor's
claims of mootness where the action allegedly mooting the case was taken
'with litigation lurking a few days away' and where the circumstances
suggested that the impending litigation was the cause of the
determination."  (Doc. 218 at 79).  In that case, plaintiff, a suburban
newspaper company, sought an injunction against a village ordinance that
limited solicitation of real-estate clients.  Penny Saver, 905 F.2d at 152.

Louis County, MO Circuit Court, March 12, 2007) (available at

http://clearinghouse.wustl.edu/chDocs/public/IM-MO-0001-0017.pdf).[40]

Those courts did not address whether a court could decide on two versions

of the same ordinance, the second of which amended the first.  Instead,

they addressed whether repealing an ordinance or terminating a contract

necessarily made a plaintiffs' case against that ordinance or contract moot.

Like those courts, we conclude that the amendment of the IIRA did not

─────────────────

While the litigation was pending, the Village amended the ordinance to exempt newspapers.  Id.  Separate litigation over the amended ordinance continued.  Id. at 153.  The court found that litigation over the previous ordinance was moot "because the Ordinance, as amended, cannot be applied to Penny Saver."  Id.  The entire case was not moot, however, since the plaintiff had a "viable claim for declaratory and monetary relief" based on the village's actions in relation to the previous ordinance.  Id. The facts of this case actually do more to support our conclusion that we lack authority to rule on the constitutionality of the previous version of the ordinance.

[40]This case dealt with a similar ordinance meant to control illegal immigration.  The city of Valley Park had passed ordinances in July 2006 that penalized "'aid[ing] and abet[ting] illegal aliens or illegal immigration' and "'leasing or renting' property to illegal aliens.  Reyonlds, at ¶¶ 3-4.  The City apparently repealed those ordinances after litigation began.  Id. at ¶ 10.  The court nevertheless decided that the case was not moot, since "a defendant cannot unilaterally moot the litigation by repealing the ordinance."  Id. at Conclusions of law ¶ 2).  Here, then, the court ruled on the old ordinances because they had been repealed, but no new ordinances had been passed on which the court could rule.  That situation is different from the situation here, since we can rule on the current form of the ordinance, which raises concerns quite similar to the old one.

moot the case; our duty is to address IIRA as it now stands.

In any case, the controversy over the earlier version of IIRA is moot. That ordinance no longer exists, and plaintiffs' complaints about that former ordinance are no longer operative.  See, e.g., Nextel Partners, 286 F.3d at 693 (holding that "[I]f a claim no longer presents a live case or controversy, the claim is moot, and a federal court lacks jurisdiction to hear it.").  In addition, because we have before us a version of IIRA in which plaintiffs find constitutional infirmities similar to those in the previous IIRA, little danger exists that our decision not to rule on the previous IIRA would allow defendant to evade review and reenact that earlier ordinance.  See City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 283 n.1 (2001) (holding that "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."); City of Mesquite, 455 U.S. at 289 (determining that repeal of a statute did not moot the lawsuit because "the city's repeal of objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.").  Though courts have recognized that "a matter is not necessarily moot simply because the order attacked has expired; if the underlying dispute between the parties is one 'capable

of repetition, yet evading review, it remains a justiciable controversy within

the meaning of Article III."  New Jersey Turnpike Authority v. Jersey

Central Power and Light, 772 F.2d 25, 31 (3d Cir. 1985).  Here, the fact

that we will rule on the successor to the Ordinance that provoked the

original suit demonstrates that the issues raised by the first set of

ordinances are available for review, and we find no need to rule on the

previous versions.

Now that the preliminary matters have been disposed of, we will

address the underlying merits of the plaintiffs' case.  Plaintiffs' complaint

raises federal constitutional issues, federal statutory issues and state law

issues.   We shall address each in turn.

## II.  FEDERAL CONSTITUTIONAL ISSUES

Plaintiffs first three causes of action and the eighth cause of action

are brought pursuant to 42 U.S.C.  § 1983 (hereinafter "section 1983") for

constitutional violations.  In pertinent part, section 1983 provides as

follows:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to
> the deprivation of any rights, privileges, or immunities

> secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress[.]

42 U.S.C. § 1983.

Thus, to establish a claim under section 1983, two criteria must be met.  First, the conduct complained of must have been committed by a person acting under color of state law.  Second, the conduct must deprive the complainant of rights secured under the Constitution or federal law. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998).

In the instant case, no question exists as to whether the defendant acted under the color of state law in enacting the ordinances at issue.  The only issue with regard to section 1983, therefore, is whether the ordinances violate plaintiffs' constitutional rights.  Plaintiffs assert that the defendant violated the United States Constitution's Supremacy Clause, Due Process Clause, Equal Protection Clause and privacy guarantees.   We will address each separately.

**A. Federal Pre-emption**

Plaintiffs' Amended Complaint asserts that Hazleton's ordinances violate the Supremacy Clause of the United States Constitution, which provides that federal law is the supreme law of the land.  (Second

Amended Complaint (Doc. 82) (hereinafter "Compl.") ¶¶ 100-131).  In

particular, the Constitution provides:

> This Constitution, and the Laws of the United States
> which shall be  made in Pursuance thereof; and all
> Treaties made, or which shall be made,  under the
> Authority of the United States, shall be the supreme
> Law of the Land . . . any Thing in the Constitution or
> Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.

Accordingly, "[t]he Supremacy clause of the United States

Constitution invalidates state laws that 'interfere with or are contrary to'

federal law."  New Jersey Payphone Ass'n, Inc. v. Town of West New York,

299 F.3d 235 (3d Cir. 2002) (quoting Gibbons v. Ogden, 22 U.S. 1, 211

(1824)).  This invalidation is termed federal pre-emption.   Federal pre-

emption can be either express or implied.  Olde Discount Corp. v. Tupman,

1 F.3d 202, 216 (3d Cir. 1993).   We will discuss each in turn.   As the

ordinances at issue have two distinct provisions, one directed to

employment issues and one aimed at landlord/tenant issues, we will

discuss each topic separately with regard to pre-emption beginning with

the employment provisions.[41]

---

[41]Defendant contends that we should apply a presumption that the
Congress does not intend to supersede state law.   In support of this
proposition, defendant cites Medtronic, Inc. v. Lohr, 518 U.S. 470, 485
(1996).  Medtronic does set forth such a presumption; however, it also

## 1.  Employment provisions of IIRA

### a.  Express pre-emption

Initially, plaintiffs assert that the federal law expressly pre-empts

IIRA.   Under federal law, "Congress can define explicitly the extent to

which its enactments pre-empt state law." <u>English</u>, 496 U.S. at 78.  Pre-

emption is "express" when a statute explicitly commands that state law be

displaced.  <u>Green v. Fund Asset Management, L.P.</u>, 245 F.3d 214, 222 (3d

Cir. 2001) (citing <u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 382

(1992)).

Plaintiffs assert that the federal Immigration Reform and Control Act

of 1986 (hereinafter "IRCA"), which deals with the employment of

unauthorized aliens, contains an express pre-emption clause that pre-

states that this presumption applies "particularly . . . in a field which the States have traditionally occupied." <u>Id.</u> (quoting <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947)).   The presumption is inapplicable "when the State regulates in an area where there has been a history of significant federal presence." <u>United States v. Locke</u>, 529 U.S. 89, 108 (2000). Immigration is an area of the law where there is a history of significant federal presence and where the States have not traditionally occupied the field.  In fact, as set forth more fully below, immigration is a federal concern not a state or local matter.   Therefore, we do not apply the presumption against pre-emption.  If, however, we were to apply the presumption, our ultimate conclusion would not change as Congress has made it sufficiently clear and manifest that federal law pre-empts state law in the area covered by Hazleton's ordinances.

empts the employer portions of IIRA.  Defendant argues that IIRA does not

fall within IRCA's express pre-emption clause.  After a careful review, we

agree with the plaintiffs that IIRA's employment provisions are expressly

pre-empted.

IRCA is a "comprehensive scheme" that prohibits the employment of

unauthorized workers in the United States.  Hoffman Plastic Compounds,

Inc. v. N.L.R.B., 535 U.S. 137, 147 (2002).   "IRCA 'forcefully' made

combating the employment of illegal aliens central to '[t]he policy of

immigration law.'"  Id. (citing INS v. National Center for Immigrants' Rights,

Inc., 502 U.S. 183, 194, and n. 8 (1991)).

The law prohibits the employment of aliens who are 1) not lawfully

present in the United States; and 2) not lawfully authorized to work in the

United States.  8 U.S.C. § 1324a(h)(3).   In order to prevent the

employment of unauthorized workers, IRCA requires that employers verify

the identity and eligibility for work of all new hires. This verification is

accomplished with the employer's review of specified documents.   8

U.S.C.  § 1324(a)(b).   An employer cannot hire an alien who is unable to

present proper documentation.  8 U.S.C. § 1324(a)(1).

Under IRCA, where an employer unknowingly hires an unauthorized

alien or if an employee becomes unauthorized, the employer must discharge the employee when his status becomes known.  8 U.S.C.  § 1324a(a)(2).  Violations of IRCA by employers is punishable by civil fines and criminal prosecution.  8 U.S.C. §1342a(e)(4)(A); 1324a(f)(1). Prospective employees are subject to criminal prosecutions and fines for providing fraudulent documents.  8 U.S.C. §1324c(a).

IRCA contains an express pre-emption clause that pre-empts State or local laws dealing with the employment of unauthorized aliens.  The pre-emption clause provides: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C.  § 1324a(h)(2).

The plaintiffs assert that this section expressly pre-empts IIRA. Defendant disagrees, contending that it has followed 8 U.S.C.  § 1324a(h)(2) with "exacting precision."  (Doc. 87, Def. Brief at 37). According to Hazleton, it has "eschewed the imposition of criminal or civil penalties and has instead taken those actions expressly permitted by Congress."  (Id.).  Instead of criminal and civil sanctions, IIRA penalizes a business for employing an unauthorized alien by suspending its business

95

permit.  Such a business permit suspension amounts to "licensing and similar laws" as provided by the IRCA preemption section according to the defendant.  In other words, Hazleton interprets the statute so as to allow regulation of employers with regard to hiring unauthorized workers as long as instead of a criminal or civil sanction, the sanction that is imposed is the suspension of the employer's business permit.

We reject Hazleton's interpretation of the express pre-emption provision.   Under Hazleton's interpretation of the provision, a state or local municipality properly can impose any rule they choose on employers with regard to hiring illegal aliens as long as the sanction imposed is to force the employer out of business by suspending its business permit–what we could call the "ultimate sanction."  This interpretation is at odds with the plain language of the express pre-emption provision, which is concerned with state and local municipalities creating civil and criminal sanctions against employers.  It would not make sense for Congress in limiting the state's authority to allow states and municipalities the opportunity to provide the ultimate sanction, but no lesser penalty.  Such an interpretation renders the express preemption clause nearly meaningless.

In addition to being counterintuitive to the plain language of the

provision, Hazleton's interpretation is contrary to its legislative history.   In House Report No. 99-682(I), the United States Congress provides its interpretation of the type of "licensing" permitted under the statute.   The "licensing" that the statute discusses refers to revoking a local license for a violation of the federal IRCA sanction provisions, as opposed to revoking a business license for violation of local laws.

The Report authored by the House Committee on the Judiciary states:

> The penalties contained in this legislation are intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral of undocumented aliens.  They are not intended to preempt or prevent lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person who has been found to have violated the sanctions provisions in this legislation.  Further, the Committee does not intend to preempt licensing or "fitness to do business laws," such as state farm labor contractor laws or forestry laws, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens.

H.R. No. 99-682(I) at 5662.

Therefore, the express pre-emption clause applies generally, except for state or local laws dealing with "suspension, revocation or refusal to reissue a license" to an entity found to have violated the sanction

provisions of IRCA.

In the instant case, Hazleton suspends the business permit of those who violate its Ordinance, not those who violate IRCA.[42]  Thus, the licensing exception to State and local pre-emption is not applicable.

The other express pre-emption exception is for "fitness to do business laws" such as state farm labor contractor laws or forestry laws.  8 U.S.C. § 1324a(h)(2).  Hazleton's ordinances  are not "fitness to do business laws such as state farm labor contractor laws or forestry laws." Fitness to do business laws generally deal with a person's character as it relates to his or her ability to be engaged in a certain business activity.  An example of such a law is the California statute describing the prerequisites for issuance or renewal of a farm labor contractor license.   CAL. LABOR CODE § 1684 (West 2006). This statute requires that those seeking such a license must, *inter alia*: provide a statement that they possess the character, competency and responsibility to conduct the operations of the business; provide a bond based upon the amount of their payroll; take part in certain training; and not be found in violation of certain laws and

---

[42]As explained more fully below, the Hazleton Ordinance differs significantly from IRCA.

98

regulations.[43]  Id.  By way of comparison, IIRA is aimed at preventing employers from hiring undocumented aliens.  Thus, they are not fitness to do business laws. Therefore, this exception to pre-emption does not apply.

As the exceptions to pre-emption do not apply, IRCA expressly pre-empts the employment provisions of IIRA.

Additionally, IIRA provides more than the sanction of business permit suspension.   It creates a cause of action for discharged employees.   IIRA makes it an "unfair business practice" for an employer to discharge a worker who is not "unlawful" if, at the time, it employs an unlawful worker. (IIRA § 4.E.1).  It provides that such a discharged worker may commence a private cause of action against the business and seek treble damages, attorney's fees and costs.  (IIRA § 4.E.2(a) and (b)). Without providing any cogent analysis, defendant asserts that this sanction is similar to licensing, and therefore, is not pre-empted.  We are unconvinced.  This sanction certainly falls within the express pre-emption clause.   It does not involve licensing or anything similar to licensing.

_____

[43]A person must also be registered as a farm labor contractor pursuant to the federal Migrant and Seasonal Agricultural Worker Project Act ("MSAWPA", 29 U.S.C. 1801 *et seq.*) in order to obtain a license under the California law.  For registration under the MSAWPA, a person must not violate IRCA.  29 U.S.C.  § 1813(a)(6).

For all of the above reasons, we find that IRCA's express pre-emption provision applies to IIRA's employment provisions.   Thus, the Ordinance's employment provisions violate the Supremacy Clause of the United States Constitution.

### b.  Implied pre-emption

Although we find IIRA is expressly preempted, for purposes of completeness we will also discuss implied pre-emption.   Even if Congress places an express pre-emption clause in a statute, implied pre-emption may still be applicable.   Freightliner Corp. v. Myrick, 514 U.S. 280, 288-89 (1995).   Plaintiffs allege that IIRA unconstitutionally conflicts with federal immigration law.   Implied pre-emption can be found where the scope of the federal law at issue "indicates that Congress intended federal law to occupy the field exclusively" or where state or local laws conflict with federal laws.  Id. at 287.   Implied pre-emption thus includes two separate concepts, field preemption and conflict preemption.  We will discuss each.

### i. Field pre-emption

Field pre-emption occurs where Congress has occupied a given subject area to the preclusion of State or local laws.  Where field pre-emption is present "the subject matter of the federal and local laws is such

that the two laws or regulatory schemes must inherently either conflict or be duplicative.  That is, under this test it is impossible to have local regulation in the subject area that does not conflict with or duplicate federal regulation.   Rogers v. Larson, 563 F.2d 617, 621 (3d Cir. 1977).  Field pre-emption exists where the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230 (1947).  Field pre-emption is present where 1) "the pervasiveness of the federal regulation precludes supplementation by the States"'; 2) "the federal interest in the filed is sufficiently dominant" or 3) "the object sought to be obtained by the federal law and the character of obligations imposed by it reveal the same purpose."   Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988).

In the instant case, the first two of these situations are met, and we shall discuss them separately.

### aa.  Federal interest in the field

The first factor we will consider is the dominance of the federal interest in the field of immigration.  The history of federal regulation of immigration is one of the creation of an intricate and complex bureaucracy

that restricted who could immigrate to the United States and under what terms.  Those immigration regulations have also come to define the conditions under which aliens can find employment in the country.  The creation of this complex federal bureaucracy not only altered the role of the federal government in relation to immigration.  It also transformed the status of immigrants in American society.  A foreign-born person in the United States in 1870 had a presumptively legal statutes; no careful legal inquiry was required to determine whether that person had a right to reside in the country.  By 1990, however, determining whether a foreign-born person enjoyed a legal right to remain in the United States demanded a detailed legal examination that involved numerous federal status, several adjudicatory bodies, and a number of appeals and exceptions.  More than one hundred years of federal regulation have made the federal supremacy over immigration an intricate affair.  We provide here a general summary of nature of federal immigration regulation since the first such regulation appeared at the end of the nineteenth century.  For a more detailed examination of the history of federal immigration regulation, see the appendix to this decision.

The federal government possesses an especially strong interest in

102

immigration matters.  The United States Constitution provides that Congress shall have the power "[t]o establish an uniform Rule of Naturalization[.]"   U.S. CONST. art. I, sect. 8, cl. 4.  Thus, "[t]he power to regulate immigration-an attribute of sovereignty essential to the preservation of any nation-has been entrusted by the Constitution to the political branches of the Federal Government."  United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982).   The Valenzuela-Bernal Court states that "[o]ne cannot discount the importance of the Federal Government's role in the regulation of immigration."  Id. (citing Mathews v. Diaz, 426 U.S. 67, 81(1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); Galvan v. Press, 347 U.S. 522, 531(1954) ("that the formulation of [immigration] policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government").

Conversely, the individual states, or municipalities located in those states, do not have a strong interest in immigration.  The Supreme Court has explained that

103

> "[t]he States enjoy no power with respect to the classification of aliens. See Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). This power is "committed to the political branches of the Federal Government." Mathews[v. Diaz], 426 U.S. [67], at 81 [1976)].   Although it is "a routine and normally legitimate part" of the business of the Federal Government to classify on the basis of alien status, id., at 85, 96 S.Ct., at 1894, and to "take into account the character of the relationship between the alien and this country," id., at 80, 96 S.Ct., at 1891, only rarely are such matters relevant to legislation by a State. See Id., at 84-85, 96 S.Ct., at 1893-1894; Nyquist v. Mauclet, 432 U.S. 1, 7, n. 8, 97 S.Ct. 2120, 2124, n. 8, 53 L.Ed.2d 63 (1977).

Plyler v. Doe, 457 U.S. 202, 225 (1982).

Bearing in mind the interests of the local government versus the federal government in the areas of immigration, we proceed to our analysis of whether the federal government has pervasively regulated this field.[44]

---

[44]Both Hazleton's mayor and city council president acknowledged during the trial that the federal government has the power to address the immigration problem but they also expressed the opinion that the federal government is not adequately addressing the issue.  (N.T. 3/14/07 at 197-98; N.T. 3/13/07 at 180-81, 195-96).  A federal program exists that creates a law enforcement partnership between the Department of Homeland Security, Bureau of Immigration and Customs Enforcement and local law enforcement agencies.  (P-83, HAZ 00167).  The program allows local law enforcement officers to work in conjunction with U.S. Immigration and Customs Enforcement Officers and assist the federal government with processing the deportation of criminal aliens.  (Id.,  N.T. 3/20/07 at 32).   It provides for the federal government to enter into "agreements with state and local enforcement agencies, permitting designated officers to perform immigration law enforcement functions, pursuant to a Memorandum of Understanding (MOU), provided that the local law enforcement officers

## bb. Pervasiveness of regulations

The second factor we consider is the pervasiveness of the federal regulations.  Schneidewind, 485 U.S. at 300.  Congress has occupied the field of employment of unauthorized aliens with IRCA.  The Supreme Court has noted that IRCA is "a **comprehensive scheme** prohibiting the employment of illegal aliens in the United States."  Hoffman Plastic Compounds, Inc. v. National Labor Relations Board, 535 U.S. 1275, 1282 (2002) (emphasis added).   The Supreme Court has explained IRCA as follows:

> As we have previously noted, IRCA "forcefully" made combating the employment of illegal aliens central to "[t]he policy of immigration law." INS v. National Center for Immigrants' Rights, Inc., 502 U.S. 183, 194, and n.8, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). It did so by establishing an extensive "employment verification system," § 1324a(a)(1), designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are

---

receive appropriate training and function under the supervision of sworn U.S. Immigration and Customs Enforcement (ICE) Officers."  (P-183 at HAZ 00167).   Hazleton's police chief did not inquire into this program until after the instant ordinances were passed. (P-83, at HAZ 00168).  The police department has since applied for the program but has not yet followed through on the application as police chief believes the benefits would not outweigh the costs. (N.T. 3/21/07 at 35-36).   The police chief sees very little benefit because the ICE has already been "very responsive" to their requests regarding criminal aliens.  (Id. at 36).

> not lawfully authorized to work in the United States,
> § 1324a(h)(3). This verification system is critical to
> the IRCA regime. To enforce it, IRCA mandates
> that employers verify the identity and eligibility of all
> new hires by examining specified documents before
> they begin work. § 1324a(b). If an alien applicant is
> unable to present the required documentation, the
> unauthorized alien cannot be hired. § 1324a(a)(1).

Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 147-48
(2002)(footnote omitted).

IRCA occupies the field to the exclusion of State or local laws regarding employers hiring, employing, recruiting or referring for a fee for employment unauthorized aliens.  Congress has indicated that one of the central features of federal immigration policy is controlling the employment of unauthorized workers. Id.  IRCA provides for the prohibition of employing unauthorized workers and explains the manner in which an employer may be found liable for violating the statute and also how the employer can seek review of adverse decisions.  See generally, 8 U.S.C. § 1324a(e).  It provides for various penalties.  8 U.S.C. § 1324a(e)(5) (providing for civil fines); 8 U.S.C. § 1324a(f)(providing a criminal penalty); 8 U.S.C. § 1324c (providing penalties for document fraud).  IRCA also contains a section that prohibits unfair immigration-related employment practices.  8 U.S.C. § 1324b.

Thus, IRCA is a comprehensive scheme.  It leaves no room for state

regulation. As explained more fully below, where we discuss conflict pre-emption, any additions added by local governments would be either in conflict with the law or a duplication of its terms–the very definition of field pre-emption.

Accordingly, we conclude that the Ordinance as it applies to employers is field pre-empted. Immigration is a national issue. The United States Congress has provided complete and thorough regulations with regard to the employment of unauthorized aliens including anti-immigration discrimination provisions. Allowing States or local governments to legislate with regard to the employment of unauthorized aliens would interfere with Congressional objectives.

The case that defendant primarily relies upon as controlling precedent is DeCanas v. Bica, 424 U.S. 351 (1976). DeCanas addressed a California statute that provided "(n)o employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." Id. at 352 quoting California Labor Code Ann. § 2805(a). A trial court in California found that federal law pre-empted the California statute. Id. at 353. The California Court of Appeal found the statute to be an attempt to

regulate the conditions for admission of foreign nationals.  Id.   Congress

has exclusive authority over immigration and naturalization, thus, the

statute was preempted according to the California court.  Id.   The

Supreme Court of California denied review, and the United States

Supreme Court granted certiorari.  Id. at 354.

The Supreme Court disagreed with the California courts.  It

concluded that the "[p]ower to regulate immigration is unquestionably

exclusively a federal power."  Id. at 354.  The Court explained, however,

that just because a statute touches upon immigration, does not make it an

impermissible regulation of immigration.  Not "every state enactment which

in any way deals with aliens is a regulation of immigration and thus per se

pre-empted."  Id. at 355.  A "regulation of immigration. . . is essentially a

determination of who should or should not be admitted into the country,

and the conditions under which a legal entrant may remain."  Id. [45]

The Court proceeded to discuss field pre-emption.  With regard to

field pre-emption, the Court reviewed the Immigration and Naturalization

---

[45]Plaintiffs argue that the instant ordinances are impermissible
regulations of immigration.  Based upon this definition of "regulation of
immigration" however, we find that the laws are not unconstitutional on that
ground.  They do not regulate who can or cannot be admitted to the
country or the conditions under which a legal entrant may remain.

Act ("INA") and found its central concern is "with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." Id. at 359.   The Court noted that although the statute provided a comprehensive scheme for the regulation of immigration and naturalization "without more" it could not conclude that the employment of illegal aliens was within the "central aim" of the law. Id.   The Court only found a peripheral concern with the employment of illegal entrants in the INA. Id. at 360.  This peripheral concern was evidenced in a proviso to one of the statute's sections that indicated employment of an illegal entrant was not harboring. Id.   Thus, field pre-emption with regard to the employment of illegal aliens was inapplicable. [46]

Since, DeCanas, however, Congress has passed IRCA.   Instead of employment being only addressed in a proviso to one section of the INA, a complete statutory scheme has now been enacted that addresses the employment of unauthorized workers.  Therefore, defendant's reliance on

---

[46]  The Court then reviewed conflict pre-emption.  It concluded that the record was not sufficiently complete to provide a conflict-preemption review and remanded the case to the California court for this determination.  DeCanas, 424 U.S. at 363.

DeCanas is misplaced.[47]

As set forth in detail above, Congress has in fact enacted a comprehensive legislative scheme with regard to the employment of unauthorized aliens and occupies the field to the exclusion of state law. See Adullah v. American Airlines, Inc., 181 F.3d 363, 367 (3d Cir. 1999) (finding implied field pre-emption with regard to air safety standards as the Federal Aviation Act and other federal regulations establish complete and thorough safety standards for interstate and international air

---

[47]Defendant also relies on Incalza v. Fendi North America, Inc., 479 F.3d 1005 (9th Cir. 2007) to support its position that pre-emption is applicable.   This case does not support the defendant's position.   Incalza holds that it is not a conflict with IRCA for an employer to place an employee on unpaid leave while that employee's work authorization problems are remedied.   Id. 1010-11.

   The court only examined conflict pre-emption and did not discuss field pre-emption.  Defendant reasons that: "If Plaintiff's sweeping field preemption theory were correct, the Incalza Court would have had to strike down the state law at issue, as it would have constituted impermissible state regulation in a field occupied by Congress."   (Doc. 219, Def.'s Br. at 83-84).  We disagree.  The court simply did not decide the field pre-emption issue.  In fact, it noted that the parties did not argue the issue of field pre-emption, and conflict pre-emption was the only type of pre-emption at issue.  Id. at 1010, n.2.   Defendant asserts that Incalza is "yet another example of a recent court holding recognizing that a state or local law designed to discourage illegal immigration is not preempted."  Id.  at 84.  Defendant's interpretation of Incalza is incorrect.   The ruling can more accurately be seen as providing more rights to aliens in that it holds that immediate termination is not required under IRCA when an alien is found to be unauthorized.  Instead, an employee with a work authorization problem may be placed on unpaid leave until that issue is resolved.

transportation).[48]

## ii. Conflict pre-emption

The final form of pre-emption is conflict pre-emption.[49] Conflict pre-emption exists where either (1) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

_____

[48]Defendant asserts that state courts have found IRCA does not pre-empt state laws.   In support of this position defendant cites Safeharbor Employer Servs. I, Inc. v. Cinto Velazquez, 860 So. 2d 984, 986 (Fl. Ct. App. 2003).   Defendant's reliance on Safeharbor is unconvincing.   In that case, the District Court of Appeal of Florida held that the Florida Workers' Compensation Act allows benefits to illegal aliens, and IRCA does not pre-empt the award of such benefits.   Id. at 986.   Safeharbor does not address the issue of whether a state or municipality is pre-empted from enacting legislation addressing the issue of employment of unauthorized workers. Workers' compensation laws such as those addressed in Safeharbor deal with compensating workers injured on the job, not the hiring and employment of those aliens.   See also,Madeira v. Affordable Housing Foundation, Inc., 469 F.3d 219 (2d Cir. 2006) (finding that federal law did not pre-empt New York law that allowed injured undocumented workers to recover compensatory damages for lost earnings); Correa v. Waymouth Farms, Inc., 664 N.W.2d 324, 329 (Minn. 2003) (explaining that IRCA does not pre-empt state workers' compensation laws as it is not aimed at impairing existing state labor protections).   Once again, however, defendant has cited a case that provides rights to illegal aliens, which is inconsistent with its overall theme that such individuals have no rights.

[49]The Supreme Court has explained that field pre-emption and conflict pre-emption are not "rigidly distinct."   "Indeed, field pre-emption may be understood as a species of conflict pre-emption: a state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation."   English v. General Elec. Co., 496 U.S. 72, 79 n.5 (1990).

111

Congress" or (2) it is "impossible for a ... party to comply with both state and federal law." Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 899 (2000).

IIRA and IRCA have similar purposes in that both address the employment of unauthorized aliens.  For example, IRCA makes it unlawful "to hire, or to recruit or refer for a fee for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3)) with respect to such employment" or to hire for employment an individual without first complying with the act's verification requirements.    8 U.S.C. § 1324a(a)(1).

Likewise, IIRA provides: "It is unlawful for any business entity to recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City [of Hazleton]."   (IIRA § 4.A.)

Although the federal and local laws have a similar goal, the means to reach that goal are different.   Under federal law, to establish that they are not  hiring unauthorized workers, employers can utilize the I-9 Employment Eligibility Verification Form.  8 C.F.R.  § 274a.2(a); Getahun v. Office of Chief Administrative Hearing Officer, 124 F.3d 591, 596 (3d Cir. 1997).  In

addition to completing this form prospective employees must present documents to establish both their identity and their employment eligibility.[50] The employer must examine these documents to determine if they reasonably appear on their face to be genuine.  8 U.S.C.  § 1324a(b)(1)(A)(ii).

Under the Hazleton Ordinance, an employer must collect from the employee "identification papers" and provide them to the Hazleton Code Enforcement Office.[51]  The Code Enforcement Office then verifies with the federal government whether the employee is an unauthorized worker. (IIRA § 4.B.(3)).   The primary conflict in this area is that under federal law, the employer has the responsibility to review the documents, and in the Hazleton Ordinance, the employer is required to present the documents to the Code Enforcement Office, which contacts the federal government to determine the status of the worker.  The Hazleton Ordinance, therefore,

---

[50]Such documents include, *inter alia*:  1) a United States passport; 2) alien registration receipt card; 3) an unexpired foreign passport; and 4) an unexpired employment authorization document. 8 C.F.R.  § 274a.2(b)(v)(A). See also 8 U.S.C.  § 1324a(b)(1)(c). Additionally, the potential employees may establish their identities with, *inter alia*, 1) a driver's license; 2) a photographic school identification card; 3) a voter's registration card; and  4) a U.S.  military card or draft record.  8 C.F.R.  § 274a.2(b)(v)(B). See also 8 U.S.C.  § 1324a(b)(1)(D).

[51]IIRA does not specify which "identity documents" are required.

supplements the requirements of federal law.

IIRA also conflicts with federal law in that under federal law, employers need not verify the immigrant status of certain categories of workers.  For example, casual domestic workers and independent contractors are not covered by the federal requirements.  8 C.F.R.  § 2741a.1.   IIRA contains no such exclusions.

IRCA prohibits employers from *knowingly* hiring or *knowingly* continuing to employ aliens who are unauthorized to work in America.  See 8 U.S.C.  § 1324a(a)(1)(A).   Initially plaintiffs pointed out that IIRA does not require the element of knowledge.  (IIRA  §  4.A.).  A last minute amendment during the trial of this matter added the element of knowledge to section 4.A.  Nonetheless, IIRA still provides for strict liability, without the element of knowledge, with regard to the civil cause of action that it creates.   See IIRA § 4.E.   The federal IRCA statute does not create such a cause of action.

IIRA also conflicts with IRCA in its treatment of the Basic Pilot Program.  "The Basic Pilot Program is a voluntary, experimental program created by Congress to permit employers to electronically verify workers' employment eligibility with the U.S. Dep. Of Homeland Security and the

Social Security Administration."  Note following 8 U.S.C. § 1324a.  Under

federal law, participation in the Basic Pilot Program is not mandatory.

Under IIRA, participation in the Basic Pilot Program is at times mandatory.

See IIRA § 4.C. (providing that all Hazleton city agencies must participate

in the Basic Pilot Program);  § 4.D.  (requiring that all businesses that seek

a City contract or grant must participate in the Basic Pilot Program).

Another conflict exists in the time frames utilized by each enactment.

Under IRCA, an employee can contest a nonconfirmance (that is an initial

finding that he is unauthorized to work)  by the Basic Pilot Program within

eight (8) days.  62 C.F.R. 48309(IV)(B)(2)(a).   The Social Security

Administration and federal immigration officials have ten (10) federal work

days to respond.  (Id.)  The employer may not terminate the employee or

take other adverse action against him based upon his employment

eligibility status during this time period.  (Id.).   Under IIRA, no appeal right

is provided to the employee, and in fact, the employer must terminate the

employee within three (3) business days.  (IIRA  § 4.B.3).  Thus, in direct

conflict with IRCA, Hazleton seeks to force an employer to terminate an

employee where under federal law the employer is prohibited from

terminating that employee.  Additionally, under the Hazleton Ordinance, the

only appeal right appears to be held by the employer who may toll the three (3) day termination period. (IIRA § 7.C.(2)).  Without providing any appeal rights to the employee, IIRA is in conflict with the federal law.

Thus, this case is  analogous to Rogers v. Larson, 563 F.2d 617 (3d Cir. 1977).  Rogers dealt with a Virgin Islands law relating to the admission and employment of nonimmigrant aliens.  The law called for the termination of a nonimmigrant's employment if a qualified resident worker was available for the position.  Id. at 619.  Although federal law also addressed the employment of nonimmigrant aliens, the federal law provided more protection for the nonimmigrant aliens than the Virgin Islands law did.  Nonimmigrant aliens challenged the law as federally preempted.   The court noted that both the federal laws and the Virgin Island law had the same purposes of "assuring an adequate labor force . . . and to protect the jobs of citizens[.]" Id.  626.  However, in order to serve both these goals, "any statutory scheme . . . must inevitably strike a balance between the two goals."  Id.  In that case, as the Virgin Islands and the United States had struck the balance between the goals differently, the Virgin Islands' law amounted to "an obstacle to the accomplishment and execution of the full purposes and objectives of the" federal law.  Id.

116

Likewise in the instant case, although it appears that the goals of the two laws may be similar, a different balance between the rights of businesses and workers and the goal of preventing illegal employment is struck and IIRA ultimately ignores one of IRCA's main objectives.  A bit of a background on immigration enforcement is helpful to understand this issue.

Under federal law there are two types of immigration enforcement: border enforcement, which is keeping unauthorized persons from entering the country; and interior enforcement, which is distinguishing between legal and undocumented immigrants already in the country and removing the latter.  (N.T. 3/15/07 at 14).   In interior enforcement, officials must strike a balance between finding and removing undocumented immigrants without accidently removing immigrants and legal citizens, all without imposing too much of a burden on employers and workers. (Id. at 15).  Too stringent of an enforcement system will result in the wrongful removal of United States citizens and legal immigrants.  (Id.) United States foreign relations is affected by the manner in which the balance is struck.  Excessive enforcement jeopardizes our alliances and cooperation with regard to matters such as immigration enforcement, drug interdiction and counter-

terrorism investigations.  (Id. at 16-17).  Accordingly, the United States political system places the responsibility for striking this balance with the United States Congress and the executive branch.   (Id. at 15).  In discussing the ordinances in the instant case, city council and the mayor did not consider the implications of the ordinances on foreign policy.  (N.T. 3/14/07 at 87-89).  Their only concern, as might be expected, was for Hazleton.  (Id.)

Thus, IRCA and IIRA share a similar purpose:   to prevent the employment of persons not authorized to work in the United State while not overburdening the employer in determining whether an employee or perspective employee is an authorized worker.  The two laws, however, strike a different balance between these interests.  The laws, therefore, conflict.

IRCA also seeks to prevent discrimination against legally admitted immigrants.   The law makes it an unfair immigration-related employment practice to discriminate against a person with respect to hiring, recruitment or referral for a fee because of a person's national origin or because of an individual's citizenship status. 8 U.S.C.  § 1324b.  IIRA has no anti-discriminatory provisions, and this omission represents another conflict.

This case is also analogous to Hines v. Davidowitz, 312 U.S. 52 (1941).  In Hines, the Commonwealth of Pennsylvania enacted an Alien Registration Act, which required aliens 18 years of age or older to register once a year, provide certain information, pay a registration fee and receive an alien identification card that they had to carry at all times.  Id. at 56. The law further required aliens to present the identification card whenever demanded by a police officer or agent of the Department of Labor and Industry, and present the card before obtaining a driver's license or buying an automobile.  Id.  Violators of the act were subject to possible fines and imprisonment.  Id. at 60.   The federal government also had in effect an alien registration statute.  This law required a single registration of aliens fourteen (14) years of age and older, certain information and fingerprinting. Id. at 60.  It also provided for the secrecy of the federal files, and it did not require the aliens to carry a registration card or require them to exhibit it to the police or others.  Id. 60-61.  Violators of the act were subject to possible fines and imprisonment.  Id. at 61.

The Pennsylvania law was challenged as precluded by the federal alien registration scheme.  The Supreme Court held:   "[W]here the federal government, in the exercise of its superior authority in this field, has

enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement the federal law, or enforce additional auxiliary regulations." Id. at 66.  In finding that the law was unconstitutional, the Court noted: "And it is . . . of importance that this legislation deals with the rights, liberties and personal freedoms of human beings[.]" Id. at 68.

In support of its position that its Alien Registration Act was constitutional, Pennsylvania cited numerous cases where state legislation was upheld although it applied to aliens only. Id. 69 n.23.   The Court noted, however, that in these cases Congress had not passed legislation on the subject of the various acts. Id.

In Hines as well as the instant case, however, Congress passed legislation aimed at the very issue addressed by the State or local law. Specifically, in this case, the federal government in exercising its superior authority in the field of immigration has enacted a complete scheme of regulation on the subject on the employment of unauthorized aliens. Hazleton cannot conflict, interfere, curtail or complement this law.  As set forth above, Hazleton's Ordinance does conflict, interfere with and

120

complement IRCA.  It is therefore conflict pre-empted.

Defendant seems to argue that the law is constitutional because it is aimed at illegal aliens who have no right to be in the United States. Defendant's position fails to acknowledge that the law will affect more than illegal aliens.  It will affect every employer, every employee who is challenged as an illegal alien and every prospective employee especially those who look or act as if they are foreign.   As noted above, the Ordinance, unlike its superior federal counterpart, contains no anti-discrimination provisions.

The United States Supreme Court has noted:   "Opposition to laws permitting invasion of the personal liberties of law-abiding individuals, or singling out aliens as particularly dangerous and undesirable groups, is deep-seated in this country.  Hostility to such legislation in America stems back to our colonial history[.]"  Id. at 70.  The Court further noted: "As early as 1641, in the Massachusetts 'Body of Liberties' ,we find the statement that "Every person within this Jurisdiction, whether Inhabitant or forreiner, shall enjoy the same justice and law that is generall for the plantation ***.'" Id. at 71 n.27.

In conclusion, the employment provisions of IIRA differ from and

121

conflict with IRCA.   It is thus in violation of the Supremacy Clause of the United States Constitution.

## 2.  Tenancy provisions

The Hazleton ordinances contain two sets of provisions affecting tenancy in the city.  The first is a "harboring" provision of the IIRA that prohibits the housing of certain aliens.  (IIRA §§ 5 and 7.B.)  The second is the Tenant Registration Ordinance, (hereinafter "RO"), which requires all occupants of rental units to obtain an occupancy permit.[52]   In order to receive such a permit, an applicant must provide "proof of legal citizenship and/or residency."  (RO  § 7.b.1.g).  We will discuss the provisions of these two laws separately and then analyze the pre-emption arguments.

### a.  Housing illegal aliens

Plaintiffs assert that the "harboring" portion of IIRA is conflict pre-empted because it is directly at odds with the federal immigration system.

---

[52]The official title of the ordinance is:   "ORDINANCE 2006-13, ESTABLISHING A REGISTRATION PROGRAM FOR RESIDENTIAL RENTAL PROPERTIES; REQUIRING ALL OWNERS OF RESIDENTIAL RENTAL PROPERTIES TO DESIGNATE AN AGENT FOR SERVICE OF PROCESS; AND PRESCRIBING DUTIES OF OWNERS, AGENTS AND OCCUPANTS; DIRECTING THE DESIGNATION OF AGENTS; ESTABLISHING FEES FOR THE COSTS ASSOCIATED WITH THE REGISTRATION OF RENTAL PROPERTY; AND PRESCRIBING PENALTIES FOR VIOLATIONS." (EX. A, DOC. 82-2).

It prohibits landlords from "harboring" "illegal aliens."   (IIRA § 5.A.)

"Harboring" is defined as letting, leasing or renting a dwelling unit to an

illegal alien or permitting the occupancy of a dwelling unit by an "illegal

alien" knowingly or in reckless disregard of the fact that the alien has come

to, entered or remains in the United States in violation of the law.  (Id.).

Generally, IIRA provides a complaint procedure where a Hazleton

official, business entity or resident can file a written complaint that a

landlord is harboring an "illegal alien."  (IIRA  § 5.B.(1)).  The Code

Enforcement Office next obtains "identity data" from the owner regarding

the tenant.  (IIRA  § 5.B.(3)).  The Code Enforcement Office then consults

with the federal government to determine the tenant's immigration status.

If the verification reveals that the owner is in violation of the harboring

provisions, he must correct the violation or face fines and suspension of his

rental license.  (IIRA  § 5.B.(4) & § 5.B.(8)). [53]

### b.  Tenant Registration Ordinance

The second housing provision at issue, RO, requires, *inter alia*, that

each person who seeks to occupy a rental dwelling obtain an "occupancy

---

[53]The provisions of the harboring regulations are addressed more
particularly below with respect to the due process issues.

permit" from Hazleton.[54]   In order to obtain a permit, a potential tenant must supply to the Code Enforcement Office "proper identification showing proof of legal citizenship and/or residency."  (RO § 7.b.1.g)).  A landlord is prohibited from allowing occupancy of a rental unit unless all the occupants have obtained an occupancy permit.  (RO § 7.b.).

If a landlord allows a tenant who does not have an occupancy permit to occupy a rental unit he faces a $1,000.00 fine "for each Occupant that does not have an occupancy permit and $100 per Occupant per day for each day that the Owner or Agent continues to allow each such Occupant to occupy the Rental Unit without an occupancy permit after Owner or Agent is given notice of such violation[.]"  (RO § 10.b.).

If a tenant has an occupancy permit, but he allows other occupants to reside at the premises who do not have permits, he is in violation of the ordinance and faces the same $1,000.00/$100 per occupant per day fine.[55]

_____

[54]The permit costs ten dollars, but the fee is waived for those over age 65.  (RO § 7.b.).

[55]The city passed Ordinance 2006-35 subsequent to passing this ordinance.   Ordinance 2006-35 has the same title as this "Tenant Registration" ordinance, but, it does not contain the occupancy permit requirements.  Ordinance 2006-35 evidently did not repeal this ordinance, however, and was meant only to fill the gap with regard to registering residential rental properties while the "Tenant Registration" is challenged.

(RO § 10.b.).

Plaintiffs argue that the housing provisions of IIRA and RO are conflict pre-empted.   As set forth above, a local ordinance is conflict pre-empted where either (1) the local ordinance "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or (2) it is not possible to comply with both the federal and state law. Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 899 (2000).

Plaintiffs assert that the IIRA and RO are in direct conflict with federal law because they are based upon the assumption that: 1) the federal government seeks the removal of all aliens who lack legal status and 2) "a conclusive determination by the federal government that an individual may not remain in the United States can somehow be obtained outside of a formal removal hearing."  (Doc. 106, Pl. Br. at 11).  After a careful review, we agree.

Initially, we note that it is completely within the discretion of the federal officials to remove persons from the country who are removable.[56] Indeed, the federal government permits several categories of persons who

_____

[56]In fact at trial, Stephen Yale-Loehr, an expert in immigration law, testified that the federal government frequently exercises its discretion not to try to remove persons from the country even though they may lack lawful immigration status.  (N.T. 3/19/2007 at 114, 127).

125

may not be technically lawfully present in the United States to work and

presumably live here.  For example, the following can receive permission

from the federal government to work in the United States: 1) aliens who

have completed an application for asylum or withholding of removal; 2)

aliens who have filed an application for adjustment of status to lawful

permanent resident; 3) aliens who have filed an application for suspension

of deportation; 4) aliens paroled into the United States temporarily for

emergency reasons or reasons deemed strictly in the public interest; 5)

aliens who are granted deferred action "an act of administrative

convenience to the government which gives some cases lower priority[.]"

8 C.F.R. § 274a.12(c) ¶¶ 8-11, 14.   Additionally, aliens who have a final

order of deportation against them but are released on an order of

supervision may obtain permission to work.  Id. ¶ 18; see also 8 C.F.R.  §

274a.12(a) ¶¶ 11 - 13; 18 - 20, 22, 24) (listing more categories of aliens

who may be violating immigration laws but may nonetheless obtain

permission to work in the United States by the federal government).  In

addition, aliens who have final orders of removal against them may be

ordered released from detention by the courts if there is no likelihood of

their removal in the foreseeable future.  See Zadvydas v. Davis, 533 U.S.

678 (2001).  Although these aliens are permitted to work and implicitly to remain in the United States, they would be denied housing in Hazleton under the IIRA and RO.  The ordinances thus conflict with federal law.

Furthermore, changing status from authorized to unauthorized is complex.   For example, some individuals can affirmatively apply for regularization of status.  In other instances, regularization of status is only available after an individual has been placed in removal proceedings by the federal government (even if the operative facts justifying relief predate the commencement of the removal hearing).  (N.T. 3/19/07 at 118-121).  It may take months or years for an applicant to adjust status, obtain relief or otherwise regularize status.  (N.T. 3/19.97 at 128-129).  Submitting an application does not change an individual's immigration status, even if the application is bona fide and will ultimately be approved.   (N.T. 3/19/07 at 116-117).  A person who is proceeding through the procedure to adjust his immigration status but who currently lacks immigration status frequently will not have any documents to indicate whether he has a valid claim to remain in the country.[57]  (N.T. 3/19/07 at 121).

---

[57]For example, during the trial testimony indicated that during the 1990s Congress enacted an adjustment of immigration status referred to as "245(I)."  This statute allowed certain persons in the United States illegally to pay a $1,000.00 penalty and then their status would be adjusted

The ordinances also conflict with federal law in that they assume that the federal government seeks the removal of all undocumented aliens.   As the Supreme Court has noted:   "An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen." See, e.g., 8 U.S.C. §§ 1252, 1253(h), 1254 (1976 ed. and Supp.IV)." Plyler, 457 U.S. at 226.  The United States government, however, determines whether to remove an alien only through formal procedures set forth in the Immigration and Nationality Act, 8 U.S.C.  § § 1101 et seq. and related regulations.  Furthermore, the federal process provides procedural safeguards that include administrative appeal and judicial review.  See 8 U.S.C.  § 1229a; 8 C.F.R. 240, 1240.

Even if an alien is deemed removable after removal proceedings, they may nonetheless be allowed to stay in the United States.  For example, relief from removal may be obtained by spouses and other

---

and they would receive a green card.   Hundreds of thousands of individuals applied for relief under this enactment before it expired on April 30, 2001, but they have not yet all received their green cards.   Technically, these people are removable from the country although once their applications are processed they will have a green card.  N.T. 3/19/07 116-117.  Immigration officials use their discretion not to remove these individuals with green card applications pending.  N.T. 3/19/07 at 117. These individuals would not be allowed to live in Hazleton under its ordinances.

relatives of United States citizens, 8 U.S.C. § 1154; 8 U.S.C. § 1229b;

victims of domestic violence, 8 U.S.C. § 1229b(b)(2); and those seeking

protection from persecution or torture under the Convention Against

Torture, 8 U.S.C. § 1231(b)(3); 8 C.F.R. § § 208.16-18.

Additionally, under 8 U.S.C. 1229b, the United States Attorney

General

> may cancel removal in the case of an alien who is
> inadmissible or deportable from the United States if
> the alien - - -
> (1) has been an alien lawfully admitted for
> permanent residence for not less than 5 years,
> (2) has resided in the United States continuously for
> 7 years after having been admitted in any status,
> and
> (3) has not been convicted of any aggravated
> felony.

8 U.S.C. § 1229b.

Hence, the federal immigration rules and the decision whether an

alien should be removed are very complex.  More than resorting to the

Basic Pilot Program or the Systematic Alien Verification for Entitlements

("SAVE")[58] is necessary to determine if federal government seeks the

---

[58]SAVE "is an existing federal eligibility system used to verify status
for various federal-state cooperative programs such as the Aid to Families
with Dependent Children ("AFDC"), Food Stamps, Medicaid and
Unemployment Compensation programs under which eligibility is
dependent on lawful immigration status. See 42 U.S.C. § 1320b-7(b)(1)
and 45 C.F.R. § 233.50 (AFDC); 42 U.S.C. §§ 1320b-7(b)(2) and

removal of an individual from the United States.

As Supreme Court Justice Blackmun noted: "[T]he structure of the immigration statuses makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported." Plyler, 457 U.S. at 236 (Blackmun, J., concurring).   Additionally, Supreme Court Justice Lewis F. Powell stated: "Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country."   Plyler, 457 at 241 n.6 (Powell, J., concurring).

Hazleton's ordinances burden aliens more than federal law by prohibiting them from residing in the city although they may be permitted to remain in the United States.   The ordinances are thus in conflict with federal law and pre-empted.

RO is additionally in conflict with federal law because it calls upon the employees of the Hazleton Code Enforcement Office to examine the

---

1396b(v)(1) (Medicaid); 7 U.S.C. § 2015(f) and 42 U.S.C. § 1320b-7(b)(4) (Food Stamps)." League of United Latin American Citizens v. Wilson, 908 F. Supp. 755, 770 (C.D.Cal. 1995).   Defendant's brief indicates that the United States Bureau of Citizenship and Immigration Services at the Department of Homeland Security confirmed with defendant's counsel that it intended to use SAVE when responding to verification requests regarding Hazleton tenants.  (Doc. 87, Def. Br. At 28-29).

paperwork of those seeking permits and determine if they are properly in the country.   This procedure is in direct conflict with federal law. Immigration status can only be determined by an immigration judge.  8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.").   Further, the proceeding before the immigration judge is the "**sole and exclusive procedure** for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States."  8 U.S.C.  § 1229a(a)(3) (emphasis added).

Thus, for all the reasons set forth above, the housing provisions of the IIRA and the Tenant Registration Ordinance are preempted by federal law and are unconstitutional.

## B. Procedural Due Process

Plaintiffs' second cause of action asserts that the ordinances at issue violate the procedural protections of the Due Process Clause found in the Fourteenth Amendment of the United States Constitution.   (Compl. ¶¶ 132 - 145).  The Due Process Clause prohibits a deprivation of "life, liberty or property" without due process of the law.

Plaintiffs assert that the ordinances at issue impinge on both their

131

property and liberty interests and provide only illusory process.  Defendant

argues that the plaintiffs have no legitimate interest at stake, and

regardless, the ordinances provide sufficient process.  After a careful

review, we agree with the plaintiffs.  We will address first the interests that

are at stake and then examine the process provided by the ordinances.

Once again we will address the employment provisions and housing

provisions of the ordinances separately.

### 1.  Employment Provisions

#### a.  Protected interest

In order to determine whether the protections of the due process

clause apply, we must first determine whether the interests involved are

encompassed in the Fourteenth Amendment's protection of liberty or

property.  Baraka v. McGreevey, 481 F.3d 187, 205 (3d Cir. 2007).

"'Liberty' and 'property' are broad and majestic terms.   They are among

the '(g)reat (constitutional) concepts . . . purposely left to gather meaning

from experience . . . (T)hey relate to the whole domain of social and

economic fact, and the statesmen who founded this Nation knew too well

that only a stagnant society remains unchanged.'"  National Mutual Ins. Co.

v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949) (Frankfurter J.,

dissenting) quoted in The Board of Regents of State Colleges v. Roth, 408

U.S. 564, 571 (1972).   The analysis of the interests asserted in the instant

case is not overly complex; the appellate courts have already discussed

interests similar to those asserted by the plaintiffs.

The employer plaintiffs, including the members of the  Hazleton

Hispanic Business Association, possess Fourteenth Amendment property

and liberty interests in running their businesses. "[A] business is an

established property right entitled to protection under the Fourteenth

Amendment."  College Savings Bank v. Florida Prepaid Postsecondary

Educ. Expense Bd., 131 F.3d 353, 361 (3d Cir. 1997).   Additionally, the

individual plaintiffs have an interest in their employment.  The United

States Supreme Court has explained that "the significance of the private

interest in retaining employment cannot be gainsaid.  We have frequently

recognized the severity of depriving a person of the means of livelihood."

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985).   The

Court further noted: "While a fired worker may find employment elsewhere,

doing so will take some time and is likely to be burdened by the

questionable circumstances under which he left his previous job."  Id.

In a case dealing with an Arizona state statute that discriminated

133

against aliens, the Court further noted: "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure."  Truax v. Raich, 239 U.S. 33, 41 (1915).  These rights are both 'liberty' and 'property' rights.  Green v. McElroy, 360 U.S. 474, 492 (1959) cited in Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994).      Defendant argues that employers have no right to enter into employee contracts with unauthorized workers; therefore, no protected interests are at stake.   Defendant's argument is unconvincing.   The argument presupposes that the Ordinance will affect only unauthorized workers.  Actually, however, the IIRA affects all who are challenged under the law and all employers who have employees challenged.

Regardless, the Due Process Clause of the Fourteenth Amendment applies to all "'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  Kamara v. Attorney General of U.S., 420 F.3d 202, 216 (3d Cir. 2005) (quoting Zadvydas v. Davis, 533 U.S. 678, 693 (2001)); see also  Plyler v. Doe, 457 U.S. 202, 210 (1982)("Whatever his status under the immigration laws, an

alien is surely a 'person' in any ordinary sense of that term.  Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").

As significant constitutional due process rights are at issue, the question then becomes whether the Ordinance provides sufficient procedural safeguards to protect these important interests.  In other words, we now must determine whether the Ordinance provides process sufficient to satisfy the Fourteenth Amendment.

### b.  Process due

"The fundamental requirements of due process are notice and a meaningful opportunity to be heard, but the concept is flexible, calling for procedural protection as dictated by the particular circumstances." Harris v. City of Philadelphia, 47 F.3d 1333, 1338 (3d Cir. 1994) (internal quotation marks and citation omitted).  "'[D]ue process' is a flexible concept . . . the processes required by the Clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur. " Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305,

320 (1985).

Accordingly, we must examine the process available under the ordinances to determine whether adequate notice and hearing are provided.   With regard to the employment provisions of the Ordinance, enforcement commences with the filing of  a complaint alleging that a business entity employs unlawful worker(s) with the Hazleton Code Enforcement Office. (IIRA  § 4.B.(1)).   A complaint can be filed by "any official, business entity, or City resident."  Id.  Next, the city determines if the complaint is valid.   The Ordinance does not indicate how the validity of a complaint is determined, it merely states that a complaint alleging a violation based upon national origin, ethnicity, or race is invalid.[59]  Once a

_____

[59]Robert Dougherty, Hazleton's Director of Planning and Public Works oversees the Code Enforcement Office, which includes the Rental Registration Office.   (N.T. 3/16/07 at 39-40).  As such, Dougherty is designated to oversee the implementation and enforcement of IIRA.  (Id. at 48-49).   Dougherty indicated that not all complaints will be deemed valid. Id. at 72.  To be valid, the complaint must be in writing, have an address for the violation and the type of violation.  It would have to be signed by the complainant and dated.  Id.  at 99.     An investigatory process would be utilized to determine if the complaint was valid.  Id.  at 72, 99.  Examples of an investigation include driving by the property and calling the complainant to obtain additional information.  Id. at 99.  He also testified that they would attempt to notify the tenant and employee that a complaint had been lodged.   Id. at 110.  Nothing in the Ordinance requires such notice or explains the investigation that the Dougherty intends to implement.  As we are dealing with a facial challenge to the Ordinance and not an "as applied" challenge, we do not have to take into consideration the testimony of the

complaint is deemed valid, the city obtains "identity information" within three days from the business entity and verifies with the federal government the immigration status of the challenged employee under 8 U.S.C. § 1373(c).  (IIRA  § 4.B.(3)).  The term "identity information" is not defined in the Ordinance.

If the employer fails to provide the identity information within three (3) days, the Code Office must suspend the employer's business permit. (IIRA  § 4.B.3).   This suspension is mandatory and it is not dependent upon a finding that an "unlawful worker" has been hired.

If the employer fails to provide the identity information, and the challenge to the worker is that he is an unauthorized alien as defined in 8 U.S.C.  § 1324a(h)(3), the Code Office must "submit the identity data required by the federal government to verify, pursuant to United States Code Title 8, section 1373, the immigration status of such person(s)[.]" 4.B.3.  The Ordinance does not provide a procedure for such verification besides reference to 8 U.S.C. § 1373, which does not establish a verification mechanism.  It merely requires the Immigration and

---

manner in which the Code Enforcement Office intends to enforce the ordinances.

137

Naturalization Service to respond to inquiries from federal, state and local government seeking the citizenship or immigration status of individuals.

Once the verification is completed, the Code Office provides the results to the employer.  (IIRA § 4.B.3).  If the employer is in violation of IIRA, it must correct the violation within three (3) business days.  (IIRA § 4.B.4).   Such correction includes either a)  termination (or attempted termination) of the worker's employment; b) acquiring from the worker additional information and requesting a secondary or additional verification from the federal government of the worker's authorization. (IIRA  § 7.C). If the employee challenges his termination in a Pennsylvania court, the three (3) day period is tolled.  (IIRA § 7.C.(3)).

If the employer fails to correct the violation within the required time frame, the Code Office must suspend the entity's business permit.  (IIRA  § 4.B.(4)).   If, however, the business had previously used the federal government's "Basic Pilot Program" to verify the worker's status, the Code Office will not suspend the business's permit.  (IIRA § 4.B.(5)).

If a business license is suspended, it can be restored in one business day after a sworn affidavit is provided stating that the violation ended.  (IIRA § 4.B.(6)).  The affidavit must provide the name, address and

other "adequate identifying information" of the unlawful worker.  (IIRA §

4.B.(6)(a)).  If the appropriate authorities verify that the business entity

employed two or more workers who are unlawful due to being

"unauthorized aliens" as defined in 8 U.S.C.  § 1324a, the business entity

also must provide documentation that it has enrolled and will participate in

the Basic Pilot Program. (IIRA § 4.B.(6)(b)).  Where a business entity

violates the Ordinance a second time or subsequent times, its business

permit is suspended for twenty days by the Code Office.  (IIRA § 4.B.(7)).

 The sole procedural protection provided to employees or employers under

the Ordinance is to file an action "in the Magisterial District Court for the

City of Hazleton, subject to the right of appeal to the Luzerne County Court

of Common Pleas."  (IIRA § 7.(F)).

       Now that we have discussed the procedures available under IIRA, we

must determine if they provide notice and an opportunity to be heard.  We

find that they do not.

       As set forth above, notice is the cornerstone of due process.  IIRA

fails to require that anyone provide notice to an employee when a

complaint is filed or at any time during the proceedings.  In fact, when a

complaint is filed, the employer could merely fire the employee and avoid

the hassle of determining the employees immigration status.  Nothing in IIRA  provides protection to the employee from such action.   Thus, it violates the fundamental principle of due process and is unconstitutional.

Additionally, when a complaint is filed, the Code Enforcement Office requires the employer to provide "identity information."[60]  IIRA does not specify the nature of this information.  Therefore, the employers are left not knowing what documents they need for the "hearing."  The employer can request a second or additional verification, however, no such right is provided to the affected employee.  Such notice, therefore, is inadequate.

The final level of "hearing" that both the employer and employee may use according to IIRA is resort to the Pennsylvania court system.  The Pennsylvania courts, however, do not have the authority to determine an alien's immigration status.   Federal law makes no provision for a state court to make a decision regarding immigration status.  Such status can only be determined by an immigration judge.  8 U.S.C.  § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.").  Furthermore, the proceeding

---

[60]Under federal law, when identity information is required, the law sets forth specifically what type of documentation is necessary.  See, e.g., 8 U.S.C.  § 1324a(b)(1) (setting forth the documents that an employer must examine to verify that an individual is not an authorized alien).

before the immigration judge is the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States."  8 U.S.C. § 1229a(a)(3).[61]

Thus, IIRA attempts to provide procedural protection to those affected by it by resorting to courts that do not have jurisdiction over determinations of immigration status.  To refer those affected by IIRA to a court that cannot hear their claim is a violation of due process.

For the above reasons, we find that IIRA violates the due process rights of both the employers and employees and is thus unconstitutional.

### 2.  Landlord/tenant provisions

#### a.  Protected right

The other group of issues involve landlords and tenants.   These individuals, like the employers and employees, possess interests protected

_____

[61]We note that for federal proceedings to determine the status of an alien, significantly more rights are provided to the alien.  For example, an alien has the right to counsel, the right to a reasonable opportunity to examine the evidence against him, the right to present his own evidence, and the right to cross examine witnesses. 8 U.S.C. § 1229a(b)(4).  These protections are considerably different from those provided by the ordinances, which do not even require that an alien be notified when a complaint is filed.

141

by the Due Process Clause.   According to the Supreme Court of the

United States: "It cannot be disputed that tenants have a property interest

in their apartments for the term of their lease."   Lindsey v. Normet, 405

U.S. 56, 72 (1972)(explaining that a "lease or rental agreement gives [a

tenant] the right to peaceful and undisturbed possession of the

property.").[62]   As owners of the property, the landlords also have an

interest in it as well as in an interest in the rights to income on the property.

Id. at 72.

### b.  Process due

As the landlords and tenants both have Fourteenth Amendment

property interests, we must examine the process provided by IIRA to

determine if sufficient process is provided.

Like the employment provisions, enforcement of IIRA commences

upon the filing of  a complaint with the Hazleton Code Enforcement Office

that a landlord is harboring illegal aliens. (IIRA  § 5.B.1).   A complaint can

be filed by "any official, business entity, or resident of the City."  Id.  If the

---

[62]As Justice William O. Douglas noted: "Modern man's place of
retreat for quiet and solace is the home.  Whether rented or owned, it is his
sanctuary.  Being uprooted and put into the street is a traumatic
experience."  Lindsey v. Normet, 405 U.S. 56, 82 (1972) (Douglas,
dissenting in part).

complaint is considered valid–the Ordinance does not indicate how the

validity of a complaint is determined, it merely states that a complaint

alleges a violation based upon national original, ethnicity, or race is

invalid–the city obtains identity information from the landlord and verifies

with the federal government under 8 U.S.C. sec 1373(c), the immigration

status of the person at issue.[63]  The Code Enforcement Office then informs

the landlord of the immigration status of the tenant.  (IIRA § 5.B.(3)).  If the

tenant is an illegal alien, the landlord then has five (5) days to "correct" the

violation or his rental license is suspended.  (IIRA § 5.B.(4)).  Corrections

can be made as follows:  1)  eviction of the tenant; 2) the landlord may

collect additional information from the alien and request a second or

additional verification under 8 U.S.C. sec 1373(c); or 3) the landlord may

commence action against the tenant for recovery or possession of the

property.  (IIRA § 7.D.).

_____

[63]Section 1373 provides:
(c) Obligation to respond to inquiries
The Immigration and Naturalization Service shall respond to an inquiry by a
Federal, State, or local government agency, seeking to verify or ascertain
the citizenship or immigration status of any individual within the jurisdiction
of the agency for any purpose authorized by law, by providing the
requested verification or status information.

If unsatisfied with the results of the process provided, either the tenant or landlord may bring an action in the Magisterial District Court for the City of Hazleton, with a right to appeal to the Luzerne County Pennsylvania Court of Common Pleas.  (IIRA § 7.F.).

Now that we have discussed the procedures available under the Ordinance, we must determine if they provide notice and an opportunity to be heard.  For the same reasons discussed above with regard to the employment provisions, we find that procedures provided in the Ordinance are not sufficient to satisfy the requirements of due process.

First and foremost, the Ordinance does not provide any notice whatsoever to a tenant who is the subject of a challenge.  An ordinance which could cause people to lose their residences but provides them no notice before eviction certainly does not meet the requirements of due process.[64]  Thus, the determination can be made without the challenged individual's participation at all.

Additionally, the statute that the defendant relies upon for the proposition that the federal government must reply to their inquiry with

---

[64]The IIRA is silent as to the process the city engages in to obtain "identity data" after a complaint has been filed.  Evidently, the Code Enforcement Office obtains the information from the owner of the property and has no dealings at all with the challenged tenant.  (IIRA § 5.B.3).

144

regard to immigration status, 8 U.S.C. § 1373, does not state the nature of the "identity data" that is needed to verify the tenant's immigration status. Therefore, the owners are left not knowing what documents they need for the "hearing."  To provide for a hearing for which an interested party cannot adequately prepare is a violation of due process.

The owner/landlord can request a second or additional verification, however, no such right is provided to the affected tenant.  (IIRA § 7.D.(2).

The final level of "hearing" that both the tenant and owner/landlord may use is resort to the Pennsylvania court system–this is actually the first level of review provided to the tenant.  However, as set forth more fully above, the Pennsylvania courts do not have the authority to determine an alien's immigration status.  Such status can only be determined by an immigration judge.   Once again, the IIRA seeks to provide a remedy in a court that lacks jurisdiction.   This procedure does not comport with the requirements of due process.

Because the IIRA does not provide notice to challenged employees or tenants, does not inform the employers and owners/landlords of the types of identity information needed, and provides for judicial review in a court system that lacks jurisdiction, it violates the due process rights of

employers, employees, tenants and owners/landlords.  It is therefore

unconstitutional.

## C. Equal Protection

Plaintiffs' third cause of action claims that IIRA violates the Equal

Protection Clause of the Fourteenth Amendment by allowing the City to

consider race, ethnicity or national origin in determining whether a

complaint under the Ordinance is "valid."  (Compl. ¶¶ 146-155).  Even

though defendant amended IIRA to remove language that plaintiffs argued

gave explicit sanction to racial classification, plaintiffs continue to insist that

IIRA violates their right to equal protection of the laws.  Defendant argues

that IIRA implicates neither a fundamental right or a suspect class, and

therefore must be judged by the most deferential form of scrutiny.  Under

this form of scrutiny, defendant contends, IIRA does not violate plaintiffs'

right to equal protection.

The Fourteenth Amendment to the United States Constitution

declares that a State may not "deny to any person within its jurisdiction the

equal protection of the laws." U.S. CONST. amend. XIV § 1.  When a

plaintiff challenges a policy established by the government, the key

question becomes the level of scrutiny to apply to that policy.  For policies

that implicate a fundamental right or use "[s]uspect classifications, such as those based on race, national origin, or alienage" the "'most exacting scrutiny'" applies.  United States v. Williams, 124 F.3d 411, 422 (3d Cir. 1997) (quoting Clark v. Jeter, 486 U.S. 456, 461 (1988)); see also Loving v. Virginia, 388 U.S. 1, 12 (1967) (invalidating a state anti-miscegenation law on equal protection grounds in part because "the freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").  The United States Supreme Court has called this type of examination "'strict scrutiny.'" Gratz v. Bollinger, 539 U.S. 306, 326 (2003) (quoting Adarand Contractors, Inc. v. Peña, 515 U.S. 200, 227 (1995)).  "This means that such classifications are constitutional only if they are narrowly tailored to further compelling governmental interests."  Id. Courts use this level of scrutiny "to 'smoke out' illegitimate uses of race [or other suspect classifications] by assuring that [the government] is pursuing a goal important enough to warrant use of a highly suspect tool.'" Id. (quoting Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989)).  If, however, no suspect class or fundamental right and no classification based on sex is involved, "the statute must be sustained if it bears a rational relationship to a legitimate state interest."

Kranson v. Valley Crest Nursing Home, 755 F.2d 46, 53 (3d Cir. 1985).[65]

In their complaint and pre-trial briefing, plaintiffs argued that the City's scheme for enforcing IIRA, where the City responded to complaints from the public about improper hiring or housing of immigrants, violated equal protection rights. This system required the City's Code Enforcement Office to seek identity information from landlords and employers whenever a City resident, official or business entity submitted a "valid" complaint. Ordinance 2006-18 at §§ 4.B.1, 4.B.3. IIRA also declared that "[a] complaint which alleges a violation solely or primarily on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced." Id. at § 4.B.2. Plaintiffs contended that this language allowed the City to consider race, ethnicity or national origin in enforcing IIRA, and that the policy therefore implicated a suspect classification. They argued that the City had articulated no compelling state interest for the policy, and that the court must therefore find that IIRA violates Equal Protection.

As set forth above, the City has amended IIRA since the plaintiffs filed their second amended complaint.  As presently amended, the

_____

[65]Defendant refers to this level of scrutiny as "minimal scrutiny." We prefer the term "rational basis" as it derives from the court cases that established the test, better describes the legal standard and does less to imply the outcome of the inquiry.

Ordinance holds invalid "[a] complaint which alleges a violation on the basis of national origin, ethnicity, or race."  In informing the court of this amendment, Hazleton's trial counsel argued that the City had made this change "in an effort to simplify this issue and remove the equal protection challenge" from the case.  (N.T. 3/12/07 at 52).[66]  We have already determined that we should evaluate the latest version of the statute, and will do so here.  See supra, section IC.

Plaintiffs argue that the latest version of IIRA violates equal protection, even though the City removed language that required enforcement on the basis of race, ethnicity or national origin.   They have apparently shifted their emphasis from a focus on the language of the policy itself to an inquiry into the defendant's intent in amending IIRA.  This approach requires a slightly different analysis.  The equal protection "clause prohibits states from intentionally discriminating between individuals on the basis of race." Antonelli v. New Jersey, 419 F.3d 267,

---

[66]Hazleton's counsel declared that the City Council would meet on "Thursday, March 15th, to take out the three words that the Plaintiffs object to and have objected to continuously for page after page in all of their briefs.  Those are the words solely or primarily found in Section 4B2 and 5B2 of the ordinance . . . We are doing this to try to remove the issue, to try to accommodate the Plaintiffs."  (N.T. 3/12/07 at 52).

274 (3d Cir. 2005)).  "To prove intentional discrimination by a facially

neutral policy, a plaintiff must show that the relevant decisionmaker (e.g., a

state legislature) adopted the policy at issue 'because of,' not merely 'in

spite of,' its adverse effects upon an identifiable group."  <u>Pryor v. National

Collegiate Athletic Ass'n</u>, 288 F.3d 548, 562 (3d Cir. 2002) (quoting

<u>Personnel Administrator of Massachusetts v. Feeney</u>, 442 U.S. 256, 279

(1979).  Further, "[a] mere awareness of the consequences of an otherwise

neutral policy will not suffice."  <u>Id.</u>  "Even if a neutral law has a

disproportionately adverse effect upon a racial minority, it is

unconstitutional under the Equal Protection Clause only if that impact can

be traced to a discriminatory purpose."  <u>Pers. Administrator</u>, 442 U.S. at

272.  A party can demonstrate this "intentional discrimination" by, in

relevant part, demonstrating that "a facially neutral law or policy that is

applied evenhandedly is motivated by discriminatory intent and has a

racially discriminatory impact."  <u>Antonelli v. New Jersey</u>, 419 F.3d 267, 274

(3d Cir. 2005).

Plaintiffs point to the testimony of immigration expert Marc

Rosenblum, Ph.D., to argue that IIRA will "exacerbate the phenomenon of

'defensive hiring,'" the practice by which employers choose not to hire

150

individuals who "'might be illegal.'" (N.T. 3/15/07 at 48).  A similar problem, he found, would exist for landlords in the same situation.  (Id. at 52).  Dr. Rosenblum also argued that employers and landlords, facing steep fines and only limited process to protect their rights, would probably choose to end a relationship with anyone accused of illegal status, whether that accusation was warranted or not.  (Id. at 59-60).  Plaintiffs contend that these actions would more likely affect Latinos than members of other groups, since employers and landlords would utilize an "'informational shortcut'" and operate on the assumption that illegal aliens are most likely Latinos.  (Id. at 61).  The City was aware of this testimony about the likely discriminatory effect of IIRA when it passed the amended version of it, plaintiff points out, yet did nothing to address the discrimination that would likely result.  This failure to act in the face of knowledge of likely discrimination, plaintiffs argue, should lead the court to conclude that plaintiffs intended to discriminate with their revised IIRA.

Plaintiffs cannot demonstrate discriminatory intent in passing the amended IIRA.  They point to the testimony of Hazleton's mayor and the actions of its council as evidence of a discriminatory intent.  At trial, plaintiffs' attorney asked Louis Barletta, the mayor of Hazleton, whether he

would "reconsider" the ordinances if evidence appeared that they would have a "discriminatory effect." (N.T. 3/15/07 at 263). The mayor responded that he did "not believe that it will have a discriminatory effect," but would in fact "have the opposite" impact. (Id.). When asked if he would repeal the ordinances if evidence indicated that they would have a discriminatory effect, the mayor responded that "I believe if the ordinances are legal, I believe we have the right to enforce them. As long as they're legal, that is my concern." (Id.). When asked if he would enforce the ordinances if they were declared legal but had a discriminatory effect, the mayor declared that "if they were legal, and I believe they had a discriminatory effect, I would not present it. If they are legal, and I believe they do not have a discriminatory effect, I would pass the ordinance." (Id.). An opinion that the ordinances were legal from a court, despite a finding by experts that they were likely discriminatory, would not cause the mayor to change his resolve to enforce the ordinances, since "[e]ven experts have their own biases and opinions." (Id. at 264). Defendant also apparently passed the amendments more quickly than is usually the case for such legislation, foregoing second and third readings of the statute.

We do not find that the mayor's testimony or his knowledge of Dr.

Rosenblum's testimony about the potential impact of the ordinances

demonstrates a discriminatory intent on the part of the mayor sufficient to

find IIRA, even with its changed language, violates equal protection.

"Discriminatory intent 'implies that the decision-maker . . . selected or

reaffirmed a particular course of action at least in part 'because of,' not

merely 'in spite of,' its adverse effects upon an identifiable group.'"

Antonelli, at 419 F.3d at 274 (quoting Personnel Adm'r, 442 U.S. at 279).

At worst, Mayor Barletta testified to an intention to enforce IIRA when a

court declared it legal, and he perhaps admitted that he had been aware

that the ordinances potentially had a discriminatory effect.  He did not

testify that his desire was to discriminate or that he urged the City to

amend the ordinances out of a desire to obscure its illegal intent.  No

evidence indicates that Mayor Barletta approved of the ordinances

because of their potential discriminatory impact.  Similarly, the mere fact

that the defendant, in the face of litigation, amended IIRA outside of the

usual procedure followed by the City Council does not constitute evidence

of a discriminatory intent.[67]  Instead, the Council appeared to have acted

_____

[67]Plaintiffs point to Arlington Heights v. Metro. Hous. Dev. Corp., 429
U.S. 252 (1979) to argue that a departure from a city's normal procedures
could be evidence of a discriminatory intent.  The court in Arlington Heights
did find that "[d]epartures from the normal procedural sequence also might

on the advice of counsel to eliminate provisions in the original ordinance that could lead to a declaration of unconstitutionality.  Plaintiffs offer no evidence that this change was designed to mask a discriminatory motive. Plaintiffs therefore have not presented evidence that the ordinances, despite their facially neutral form, were motivated by a discriminatory purpose.  No equal protection violation exists on those grounds.

As another ground for an equal protection challenge, plaintiffs have argued that IIRA improperly allows the City to consider race, ethnicity or national origin in enforcing it.  As currently written, the ordinances do not implicate a fundamental right or use a suspect classification.  IIRA's enforcement provisions are now facially neutral, since they declare that no complaint that uses race, ethnicity or national origin will be enforced.  The plaintiffs also do not contend that they implicate a fundamental right, such

---

afford evidence that improper purposes are playing a role."  Id. at 267.  In providing examples of how changes to normal procedures or policies could be evidence of discrimination, the Court cited cases where cities or municipal bodies changed policies to prevent development that threatened to promote integration.  See id. at n.16 and n.17.  The court did not define what would constitute an "improper departure from a normal procedural sequence."  Id. at 267.  In distinction from the cases cited by the court (and the Arlington Heights case itself), however, the City Council in Hazleton did not depart from procedure by refusing to provide permits normally granted to applicants.  Instead, the council rushed through an amendment to the Ordinance in an attempt to save that Ordinance from being found in violation of the United States Constitution.

as marriage.  We need not examine the policy using strict scrutiny.

Accordingly, our equal protection analysis must only explore whether IIRA

has "a rational relationship to a legitimate state interest." <u>Kranson</u>, 755

F.2d at 53.  We agree with the defendant that the ordinances meet this

standard.  As its interest in passing this legislation, the City claims that it

was motivated by a desire to protect public safety by limiting the crimes

committed by illegal immigrants in the city and to safeguard community

resources expended on policing, education and health care.[68]  The City

presented evidence that some crimes were committed by illegal aliens.[69]

Assuming that the City has the right to regulate the presence of illegal

_____

[68]Testimony at trial indicated that funding for hospitals and schools in Hazleton did not come from the budget of the City of Hazleton.  This evidence indicates that Hazleton has overstated the direct cost to the city of the presence of undocumented aliens in town.  Nevertheless, we find that many costs for both the City and City residents can be associated with the increased population, particularly when those residents are undocumented workers who present special problems of communication and government-resident interaction.

[69]Certain testimony at trial concerned violated crimes committed by illegal aliens in Hazleton.  The City cited these crimes as the reason for passing its ordinances.  The plaintiffs disputed the connection between illegal immigration and crime in Hazleton, arguing that the crime rate had actually decreased during the years when increasing numbers of immigrants moved to the City.  Our disposition of this matter focuses on legal issues that do not require us to resolve this dispute.  For our analysis on the issue of equal protection, it is sufficient for us to find that the City identified serious crimes committed by illegal aliens as a problem.

aliens in the city, the City program that provides penalties for those who employ or provide housing for undocumented persons in the City is rationally related to the aim of limiting the social and public safety problems caused by the presence of people without legal authorization in the City. We therefore find that Ordinance 2006-18, as amended, does not on its face violate the plaintiffs' right to the equal protection of the laws.

## D. Privacy Rights

Plaintiffs' eighth cause of action claims IIRA and RO violate their right to privacy as protected in the United States and Pennsylvania Constitutions.  (Compl. ¶¶ 200-212).

The City's Tenant Registration Ordinance mandates the collection of certain information from those who seek authorization to dwell in rental properties.  The Ordinance requires "all Occupants" of rental properties to "obtain an occupancy permit."  Ordinance 2006-13 at § 7.b.  An applicant for such a permit must supply several pieces of information: "a) Name of Occupant; b) Mailing address of Occupant; c) Street address of Rental Unit for which Occupant is applying, if different from mailing address; d) Name of Landlord; e) Date of lease commencement; f) Proof of age if claiming exemption from the permit fee; g) Proper identification showing proof of

legal citizenship and/or residency." Id. at § 7.b.1(a-g).

IIRA does not define what constitutes "proper identification showing proof of legal citizenship and/or residency." Id. at § 7.b.1.g.  RO promises to keep the information "collected by the City . . . confidential."  Ordinance 2006-13 § 12.  That information "shall not be disseminated or released to any individual, group or organization for any purpose except as provided herein or required by law."  Id.  That "[i]nformation may be released only to authorized individuals when required during the course of an official City, state or federal investigation or inquiry."  Id.

IIRA also requires that the City collect information about the identity of various persons.  Under section 4 of IIRA, which deals with "Business Permits, Contracts, or Grants," the Hazleton Code Enforcement Office is required, upon receipt of a "valid complaint," to "request identity information from the business entity regarding any persons alleged to be unlawful workers."  Ordinance 2006-18 at § 4.B.3.  If the unlawful worker cited in the valid complaint is alleged to be an "unauthorized alien, as defined in United States Code Title 8, subsection 1324(a)(h)(3),"[70] the Code enforcement

---

[70]That section of the United States Code defines an "unauthorized alien as "an alien [who is] not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General."

office is required to "submit identity data required by the federal

government to verify, pursuant to United States Code Title 8, section 1373,

the immigration status of such person(s)[.]"[71]  The "harboring" provision of

_____

[71]Title 8 section 1373 of the United States Code reads:
"(a) In general.  Notwithstanding any other provision of Federal, State or
local law, a Federal, State or local government entity or official may not
prohibit, or in any way restrict, any government entity or official from
sending to, or receiving from, the Immigration and Naturalization Service
information regarding the citizenship or immigration status, lawful or
unlawful, of any individual.
(b) Additional authority of government entities.  Notwithstanding any other
provision of Federal, State or local law, no person or agency may prohibit,
or in any way restrict, a Federal, State, or local government entity from
doing any of the following with respect to information regarding the
immigration status, lawful or unlawful, of any individual:
        (1) Sending such information to, or requesting or receiving such
        information from, the Immigration and Naturalization Service.
        (2) Maintaining such information.
        (3) Exchanging such information with any other Federal, State, or
        local  government entity.
(c) Obligation to respond to inquiries.  The Immigration and Naturalization
Service shall respond to an inquiry by a Federal, State, or local
government agency, seeking to verify or ascertain the citizenship or
immigration status of any individual within the jurisdiction of the agency for
any purpose authorized by law, by providing the requested verification or
status information."  We presume that the Ordinance, in declaring that the
Code Enforcement Office will "submit identity data required by the federal
government to verify" a workers' status, intends to establish that the Office
will provide whatever information the government requests.  The Ordinance
does not, however, explain what information might be required.  We note
that 8 U.S.C. § 1324a(b)(1)(C)(i-ii) describes the "(d)ocuments evidencing
employment authorization" as "(i) social security account number card
(other than such a card which specifies on the face that the issuance of the
card does not authorize employment in the United States); or (ii) other
documentation evidencing authorization of employment in the United

IIRA requires owners to provide the Code Enforcement Office with "identity data needed to obtain a federal verification of immigration status" within three days of receiving written notice of a complaint to avoid penalties. Ordinance 2006-18 § 5.A.3.  A separate provision of the Ordinance specifies that the Code Enforcement Office will "submit identity data required by the federal government to verify immigration status," but that the Office will "forward identity data provided by the owner to the federal government."  Id. at § 5.B.3.

Courts have recognized two areas of privacy rights: "'one is in the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.'" United States of America v. Westinghouse Electric Corp., 638 F.2d 570, 577 (3d Cir. 1980).  This case falls into the first of those categories.  "There is no absolute protection against disclosure" of such confidential information.  Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia, 812 F.2d 105, 110 (3d Cir. 1987).  When a court evaluates "right to privacy claims, we . . . balance a possible and responsible government interest in disclosure against the individual's privacy interests."

States which the Attorney General finds, by regulation, to be acceptable for purposes of this section."  8 U.S.C. §1324a(b)(1)(C)(i-ii).

Sterling v. Borough of Minersville, 232 F.3d 190, 195 (3d Cir. 2000).

Courts have concluded that "in performing the necessary balancing inquiry

. . . 'the more intimate or personal the information, the more justified is the

expectation that it will not be subject to public scrutiny.'" Id. (quoting

Fraternal Order of Police, 812 F.2d at 118).  Further, in considering

whether private information should be disclosed, a court weighs seven

factors: "(1) the type of record requested; (2) the information it does or

might contain; (3) the potential for harm in any subsequent nonconsensual

disclosure; (4) the injury from disclosure to the relationship in which the

record was generated; (5) the adequacy of safeguards to prevent

unauthorized disclosure; (6) the degree of need for access; and (7)

whether there is an express statutory mandate, articulated public policy, or

other recognizable interest favoring access."  Doe v. Southeastern

Pennsylvania Transportation Authority, 72 F.3d 1133, 1140 (3d Cir. 1995)

(citing United States v. Westinghouse Electric Corp., 638 F.2d 570, 578

(3d Cir. 1980)).

    For reasons that will become apparent, we will address only the

question of whether the ordinances implicate private information.

**The Records Requested**

Hazleton's ordinances do not explain with precision which documents are required to complete a valid tenant registration, answer a valid complaint about an illegal worker, or meet the requirements of IIRA's harboring provisions.  The ordinances require only that an applicant under RO provide "proper identification showing proof of legal citizenship and/or residency."  Ordinance 2006-18 at §7.b.1.g.  In its brief, defendant contends that the information required by the Ordinance would "[include]: name, address, telephone number, date of birth and proof of citizenship (passport, birth certificate or naturalization document), or in the case of aliens, documentation of status (documentation of lawful permanent residency or 'green card,' nonimmigrant visa, or other relevant document issued by the federal government)."[72]

IIRA is even less clear on what records will be required of businesses and landlords attempting to refute the charges contained in a valid complaint.  Business owners charged with employing an unlawful worker

---

[72]We note that none of these documents are mentioned in the ordinances.  Since we must judge the ordinances on their face, and not how defendant claims the ordinances will be implemented, we cannot accept defendant's version of the meaning of "proper identification showing proof of legal citizenship and/or residency."  We are also unsure what constitutes other "relevant document[s] issued by the federal government" to establish a legal right to reside in the United States.

161

are required to "submit identity data required by the federal government to verify, pursuant to United States Code Title 8, section 1373, the immigration status of such person(s)[.]" Ordinance 2006-18 § 4.B.3. Landlords charged with "harboring" illegal aliens must supply the City with "identity data needed to obtain a federal verification of immigration status." Id. at § 5.A.3.

We are left to conclude that the ordinances are too vague for us to determine on their face exactly what documents renters, employers and landlords must submit in order to comply.  Testimony at trial did not clarify this matter.  The ordinances do not require the presentation of any specific documents, and even the sections of the immigration statute that the ordinances cite do not provide a list of documents the government would use to answer the City's request for a verification of status.  See 8 U.S.C. § 1373(c).  Without a clearer statement of the documents required from those seeking rental permits or fighting off complaints under IIRA, we cannot determine the discrete types of documents at issue in this case.

We find that we lack adequate information to balance the plaintiffs' privacy interest in the data requested with the City's need for that information.  Neither party has presented sufficient evidence of what type

of information will be required from plaintiffs, and plaintiffs have not adduced case law that would allow us to conclude that immigration information is on its face private data.  We will therefore dismiss the plaintiffs' privacy rights complaint.

## III.  FEDERAL STATUTORY CAUSES OF ACTION

In addition to federal constitutional claims, plaintiffs' complaint raises issues with regard to the federal Fair Housing Act and 42 U.S.C. § 1981. We now turn our attention to these issues.

## A. Fair Housing Act

The plaintiff's fourth cause of action asserts that the ordinances violate the federal Fair Housing Act (hereinafter "FHA"), 42 U.S.C. §§ 3601 *et seq.*  (Second Am. Compl. ¶ ¶ 157-164.)  The FHA prohibits discrimination in residential real estate-related transactions on the basis of "race . . . or national origin." 42 U.S.C.  § 3604(a).  Plaintiffs assert that the Defendant's ordinances discriminate based upon race and national origin in violation of the FHA.   (Second Am. Compl. ¶ 163).

Plaintiffs challenge the harboring provisions of the IIRA under the FHA.  At the time that plaintiffs filed the Second Amended Complaint, these provisions provided: "A complaint which alleges a violation **solely or**

163

**primarily** on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced."  (IIRA § 5.B.2) (emphasis added). Plaintiffs' position is that the wording of the Ordinance allows national origin and race to be relied upon, in part, for a complaint, therefore, the Ordinance violates the FHA.

Plaintiffs also challenge Hazleton's Tenant Registration Ordinance under the FHA.   The Tenant Registration Ordinance  requires tenants to show proof of lawful immigration in order to obtain an occupancy permit. (Ordinance 2006-13).  This ordinance, however, does not contain a prohibition against discrimination by housing providers.  Plaintiffs assert that  because the ordinance fails to prohibit discrimination, minority housing seekers will suffer an adverse disparate impact in obtaining housing.  In other words, plaintiffs assert that the Tenant Registration Ordinance will be discriminatory in its effect.

We find that plaintiffs' challenge to these ordinances based upon the FHA is without merit.  The defendant amended the IIRA in March 2007, and the Ordinance now reads: "A complaint which alleges a violation on the basis of national origin, ethnicity or race shall be deemed invalid and shall not be enforced."  (Def. Ex. 251, Ord. 2007-7).  As the defendant

removed the offending language from the Ordinance, plaintiffs now argue that, like the Tenant Registration Ordinance, the IIRA will be discriminatory in effect.

Plaintiffs cite the testimony of Dr. Rosenblum that the ordinances are likely to increase discrimination in housing, particularly against those of Latino descent.  (See, e.g.,Vol. 4/21:5-12; 47:17- 48:20).    We are unconvinced by plaintiffs' argument.

Plaintiffs present a facial challenge to the ordinances, not an "as-applied" challenge.[73]  Therefore, we must determine whether the statutes, as written, could not be read to conform to the law.  See United States v. Salerno, 481 U.S. 739, 745 (1987) (holding that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); Belitskus v. Pizzingrilli, 343 F.3d 632, 648 n.10 (3d Cir. 2003) (holding that "[i]n order to successfully prosecute such a challenge, plaintiffs would have to establish that no set of circumstances exist under which mandatory filing fees are valid.").  In any case, because the statutes have not yet gone into effect,

---

[73]Plaintiffs could not bring an "as-applied" challenge as the ordinances have not yet been applied.

we cannot know whether they would have the discriminatory effect that plaintiffs claim.  We therefore cannot find a Fair Housing Act violation based on Professor Rosenbaum's testimony on the predicted effects of the ordinances.

## B. Section 1981

The Fifth Cause of Action found in plaintiffs' complaint asserts a violation of 42 U.S.C. § 1981 (hereinafter "section 1981").   (Compl. ¶ 165 - 172).  Section 1981 provides that "all persons" shall, *inter alia*, have the same right to make and enforce contracts and have the full and equal benefit of all laws to the same extent enjoyed by "white citizens."[74]

---

[74]Section 1981 provides:
**(a) Statement of equal rights**
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
**(b) "Make and enforce contracts" defined**
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
**(c) Protection against impairment**
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Plaintiffs' position is that section 1981 prohibits discrimination based upon alienage and race and that the Ordinance violates this prohibition. More particularly, the plaintiffs claim that defendant violates § 1981 by making it impossible for unauthorized aliens to enter into lease agreements due to the Tenant Registration Ordinance and the housing portions of the IIRA.   Defendant asserts that illegal aliens are not persons under section 1981 and therefore, they are not afforded its protections.  We disagree with the defendant.

Generally, an alien is a "person" as that term is used under section 1981.  Takahashi v.Fish and Game Comm'n, 334 U.S. 410, 419 (1948), see also  Graham v. Richardson, 403 U.S. 365, 377 (1971) ("The protection of this statute has been held to extend to aliens as well as to citizens.").   The Supreme Court, however, has not yet addressed whether the protections of section 1981 extend to undocumented aliens, i.e. whether an undocumented alien is a "person" under section 1981.  The Court has, in the context of the Fourteenth Amendment, held that "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.  Aliens, even aliens whose presence in this country is unlawful, have long been recognized as

'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." Plyler, 457 U.S. at 210.   This reasoning applies equally to a section 1981 analysis as to the Fourteenth Amendment analysis, especially because the language used in section 1981 is based in part on the language of the Fourteenth Amendment.  Takahashi, 334 U.S. at 420. Accordingly, we find that aliens, regardless of their status under the immigration laws, are persons under section 1981.

Defendant contends that section 1981 is not commensurate with the Fourteenth Amendment.  We agree, but that does not alter our analysis. Plaintiffs do not argue that section 1981 is commensurate with the Fourteenth Amendment, but rather that the definition of "person" found in section 1981 should be construed to include undocumented workers just as the same term has been construed under the Fourteenth Amendment. Therefore, the cases that defendant cites to establish that gender discrimination, religious discrimination, national origin discrimination and age discrimination are not covered by section 1981 are not persuasive.

Further, defendant argues that to find that undocumented aliens have rights under section 1981 would be inconsistent with Congress's intent of prohibiting employment of such persons as evidenced by the passage of

168

IRCA.  This argument is unconvincing.

When Congress passes two laws which conflict, the more recent law can be viewed as a implied repeal of the earlier act in order to bring it in line with the newer law.  <u>Posadas v. Nat'l City Bank of New York</u>, 296 U.S. 497, 503 (1936) (explaining that when two statutes "are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one.") <u>quoted in</u> <u>Tineo v. Ashcroft</u>, 350 F.3d 382, 391 (3d Cir. 2003).  Thus, as the more recent of the laws, IRCA can be viewed as an implied repeal of the earlier statute to the extent of any conflict.  The conflict that we are presented with is that section 1981 provides that undocumented aliens have the same right to contract as "white citizens."  IRCA provides that unauthorized aliens do not have the right to enter into employment contracts.[75]  IRCA works as a repeal of section 1981 to the extent that section 1981 would allow unauthorized workers to enter into employment contracts.   Otherwise, the unauthorized workers have the

---

[75]IRCA involves the employment of unauthorized workers. It does not mention other types of contracts including contracts to provide housing. Further, as discussed above with regard to pre-emption, the federal government allows certain aliens to work in the United States and implicitly to live here.  To forbid these individuals from entering into housing contracts would be inconsistent with their being allowed to remain in the country.

same right to contract as other citizens.

Accordingly, section 1981 forbids the defendant from prohibiting undocumented aliens from entering into leases.  Thus, the Tenant Registration Ordinance and the housing provisions of the IIRA, which forbid such contracts, are in violation of section 1981.

## IV.  STATE LAW CAUSES OF ACTION

The final causes of action we need to address are plaintiffs' state law claims.  Plaintiffs assert that the ordinances violate the Pennsylvania Home Rule Charter Law and the Pennsylvania Landlord and Tenant Act.  In addition, plaintiffs assert that in enacting the ordinances defendant exceeded its legitimate police powers.  We will address these issues *in seriatim.*

## A.  Pennsylvania Municipality Law

Plaintiffs' sixth cause of action argues that the employment provisions of IIRA violate Pennsylvania municipality law.  (Compl. ¶¶ 174-186).  The City limits the conditions under which an employer may discharge an employee and provides discharged employees with a cause of action.  Plaintiffs contend that Hazleton has added conditions to the

terms of employment in the city in violation of the Third-Class City Code.[76]

Since Pennsylvania is an at-will employment state, Hazleton may not add

conditions to employment through an anti-illegal immigration ordinance.

Defendant argues that plaintiffs have not demonstrated that IIRA violates

any particular provision of Pennsylvania law or the Pennsylvania

Constitution, and that nothing in IIRA is contrary to such law.  In addition,

defendant argues that Pennsylvania law does not prohibit IIRA's

restrictions on employment based on immigration status.  Such restricts,

defendant contends, already exist in provisions of federal law that prohibit

businesses from knowingly employing workers without proper

documentation.  In addition, "at will" employment does not preclude a

worker from filing suit for wrongful discharge, and defendant merely

provides a private cause of action for workers seeking to vindicate such

rights.

Hazleton is a City of Third Class with an Optional Plan B form of

_____

[76]In their briefs, the parties disagree over whether Hazleton is a Home-Rule Charter City or a municipality organized under some other plan.  (See Doc. 87 at 76, Doc. 82 at ¶ 174; Doc. 106 at 64-65; Doc. 150 at 83).  The arguments they provide are premised on the powers enjoyed by these different types of cities.  Because the testimony makes clear that Hazleton is a city of the Third Class with an Optional Plan B (strong mayor-council) form of government, we will base our analysis on the powers accorded such cities in Pennsylvania law.

government.  (N.T. 3/15/07 at 204).  The powers a city has in Pennsylvania are limited, and are defined largely by the plan of government that locality adopts.  Under Pennsylvania law, "[m]unicipalities are not sovereigns; they have no original or fundamental power of legislation; they have the right and power to enact only those ordinances which are authorized by an act of the legislature."  Genkinger v. City of New Castle, 84 A.2d 303, 304 (Pa. 1951); see also Cleaver v. Board of Adjustment of Tredyffrin Twp., 200 A.2d 408, 412 (Pa. 1964); Devlin v. City of Philadelphia, 862 A.2d 1234, 1242 (Pa. 2004); Deebow v. Borough of Leetsdale, 729 A.2d 1113,1118 (Pa. 1999) (holding that "[m]unicipal corporations have no inherent powers and may do only those things which the Legislature has expressly or by necessary implication placed within their power to do.").  "'Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied.'"  Kline v. City of Harrisburg, 68 A.2d 182, 185 (Pa. 1949) (quoting DILLON ON MUNICIPAL CORPORATIONS, § 89).

Pennsylvania law defines the basic powers of a City of the Third Class in 53 PENN. STAT. § 37402.  Under that section, a Third-Class city may "(1) sue and be sued; (2) purchase land and hold real and personal

172

property for the use of the city"; "(3) lease, sell and convey any real or personal property owned by the city," make orders that serve the interests of the city in doing so; (4) form contracts in order to carry out city affairs; "(5) have and issue a corporate seal"; (6) display the Pennsylvania flag on public buildings; and (7) appropriate and use money appropriated to the city by other sources.  53 PENN. STAT. 37402(1-7).

In addition, the Third Class City Code enumerates sixty-eight specific powers enjoyed by such municipalities.  These powers include the power to pay debts and expenses, arrange for garbage collection and removal, dispose of dangerous dogs, inspect and regulate fireplaces, number buildings, prohibit nuisances, regulate signs and prevent riots.  53 PENN. STAT. § 37403(1),(6),(9),(10)(19),(16),(17),(25).  A third-class city also has the power "to make and adopt all such ordinances, by-laws, rules and regulations, not inconsistent with or restrained by the Constitution and laws of this Commonwealth, as may be expedient or necessary for the proper management, care and control of the city and its finances, and the maintenance of the peace, good government, safety and welfare of the city, and its trade, commerce and manufactures."  53 PENN. STAT. § 37403(60).  A city may pass legislation "necessary in and to the exercise of

the powers and authority of local self-government in all municipal affairs."
Id.  A city can establish fines for violations of ordinances, but may not
enact ordinances that "[contravene] or [violate] any of the provisions of the
Constitution of the United States or the Commonwealth, or of any act of the
Assembly heretofore or that may be hereafter passed and in force in said
city."  Id.

In general, Hazleton has the power to issue licenses for businesses
to operate within the City.  See Girard Trust Co. v. Philadelphia, 9 A.2d
883, 884 (Pa. 1939) (holding that "[t]he authority to inspect and license
elevators is based upon the exercise of police power, the residual source
of which is in the Commonwealth and inheres in its subdivisions upon their
creation.").  Thus, "municipalities in the exercise of the police power may
regulate certain occupations by imposing restrictions which are in addition
to, and not in conflict with, statutory regulations."  Western Pennsylvania
Restaurant Ass'n v. Pittsburgh, 77 A.2d 616, 620 (Pa. 1951).  In a general
sense, then, Hazleton has the power to license businesses under any
terms that are not in conflict with state law.  Since no state statute
regulates the employment of illegal aliens, Hazleton's restrictions on the
employment of such workers do not violate state law.

174

The private right of action supplied by the city to workers who lose their jobs to illegal aliens, however, alters the terms of employment established under state law and exceeds Hazleton's power as a municipality by contradicting the terms of state law.  Pennsylvania is an at-will employment state, meaning that an employee can "be discharged at any time unless her discharge was wrongful in that it violated a clearly recognized public policy."  McCartney v. Meadow View Manor, Inc., 508 A.2d 1254 (Pa. Super. Ct. 1986).  Thus, "[a]bsent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason."  Geary v. United States Steel Corp., 319 A.2d 174, 176 (Pa. 1974); see also Knox v. Bd. of Directors of Susquenita School Dist., 888 A.2d 640, 647 (Pa. 2005) (holding that "Pennsylvania has long subscribed to the at-will employment doctrine.  Exceptions to that doctrine have generally been limited to instances where a statute or contract limits the power of an employer unilaterally to terminate the employment relationship.").

IIRA disrupts this well-settled principle of state law.  An employer in any other Pennsylvania city is not liable to civil suit from that employee if

the employer happens to employ an "unlawful worker."[77]   At-will

employment means that an employer can terminate a workers' employment

at any time unless the termination violates a clearly defined statutory right

or public policy.[78]   Here, in the absence of the Ordinance, an employer

_____

[77]We note that this cause of action appears to impose strict liability on the employer, as it defines as an "unfair business practice" "the discharge of any employee who is not an unlawful worker by a business entity in the City" and provides the "discharged worker" with a private right of action against the employer for this unfair practice.  IIRA § 4.E(1-2). Presumably, an employee who brought that cause of action would not have to prove any *mens rea* on the employer's part, but need only show that the employer had employed an unauthorized worker to prevail in that private claim.  Such a private cause of action would thus appear to serve as a positive enforcement mechanism, requiring an employer to take positive steps to insure that no "unlawful workers" remained on the payroll to avoid an expensive lawsuit.

[78]An employer who is sued after terminating an employee on the basis of "race, color family status, religious creed, ancestry, handicap or disability, age, sex, national origin, the use of a guide or support animal because of blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals" cannot resort to the defense that Pennsylvania is an "at-will" employment state because such an employee has a clear legal right to dispute such firing.  43 PENN. STAT. § 953; see also, Cisco v. United Parcel Services, Inc., 476 A.2d 1340, 1343 (Pa. Super. Ct. 1984) (holding that "'[t]he sources of public policy [which may limit the employer's right of discharge] include legislation; administrative rules, regulation, or decision; and judicial decision.  In certain instances, a professional code of ethics may contain an expression of public policy . . . Absent legislation, the judiciary must define the cause of action in case-by case determinations.'") (quoting Pierce v. Ortho Pharmaceutical Corp., 417 A.2d 505, 512 (N.J. 1980)).  We note here that this statute gives no cause of action to a worker discriminated against because of legal immigration status.

would not face civil liability under Pennsylvania law for terminating a

worker's employment while employing another worker defined by the

Hazleton Ordinance as "unlawful."  Whatever liability an employer might

face under federal law for employing such a worker, neither state nor

federal law gives discharged employees the right to sue based on an

employer's unlawful employment of another.[79]   Defendant's

---

[79]Marc Rosenblum, an expert witness for the plaintiffs, testified that no "comparable provision" like the private right of action in Section 4.E exists under federal law.  (N.T. 3/15/07 at 60).  On cross-examination, defendant challenged this claim, arguing that "the 1996 [Illegal Immigration Reform and Immigration Responsibility] act amended Title 18, Section 1961 of the U.S. Code and created a private right of action for employees who have suffered economic injury by employers because of employers who hire unauthorized aliens[.]" (Id. at 138).  That statute, counsel pointed out, allowed injured employees to recover treble damages against employers who violate the act.  (Id. at 139).  Defense counsel cited to three cases which he claimed underscored the similarity between Hazleton's private right of action and provisions of federal law authorizing workers to sue their employers for firing them while continuing to employ undocumented workers, Williams v. Mokawk Industries, Inc., 411 F.3d 1252 (11th Cir. 2005), Mendoza v. Zirkle Fruit Co., 301 F.3d 1163 (9th Cir. 2002) and Trollinger v. Tyson Foods, Inc., 370 F.3d 602 (6th Cir. 2004). We find this claim unpersuasive; those cases do not hold what defendant claims they do.  The statute to which defendant cites, 18 U.S.C. § 1961, is part of the Racketeer Influenced and Corrupt Organizations Act (RICO), a section of the United States Code that addresses organized crime.  One provision of that act indeed offers a private right of action, providing that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. § 1962] may sue therefor in any appropriate court and shall recover threefold the damages he sustains and the cost of the suit."  18 U.S.C. § 1964(c).  To prevail on a claim under the statute, a plaintiff must prove "(1) conduct (2) of an enterprise (3) through a

argument that the ability of a discharged worker to bring a cause of action

for wrongful termination in Pennsylvania courts, "whether or not" the cause

is "meritorious" is unavailing; defendant's Ordinance would make

meritorious a cause of action that would previously have been dismissed

as lacking a legal basis.  Accordingly, the private right of action contained

---

pattern (4) of racketeering activity."  Sedima v. Imrex Co., 473 U.S. 479, 496 (1985).  Further, "a plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury."  Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 1994 (2006).  In Williams, the court found that a plaintiff could state a civil RICO claim against an employer who had violated section 274 of the Immigration and Nationality Act, "related to bringing in and harboring certain aliens."  Williams, 411 F.3d at 1257.  Plaintiff had alleged that defendant engaged in a scheme to hire hundreds of illegal immigrant workers, and that this conduct could constitute part of a racketeering claim.  Id.  We find that defendant reads this case–and other cases that find that plaintiffs can state a RICO claim (in part) by alleging that defendant violated federal immigration law–too broadly.  A plaintiff cannot, as defendant insists, state a claim for damages against an employer merely because that employer hired an unauthorized worker.  Instead, to state a RICO claim a plaintiff must also allege that the employer's illegal conduct was part of an enterprise engaged in a pattern of illegal activity and that the employer's conduct was the proximate cause of plaintiff's injury.  Under the Hazleton Ordinance, by contrast, a plaintiff must only demonstrate that the employer knowingly kept a single unauthorized worker on staff after terminating the plaintiff.  Indeed, the only real similarities between the Hazleton Ordinance and the RICO statute are the availability of treble damages to plaintiffs and the fact that employment of an unauthorized worker could be part of the basis for a lawsuit.  To adopt defendant's reasoning that Hazleton's private cause of action "matches" that available under RICO, we would have to ignore all of the elements of a civil RICO claim except the fact that damages are trebled. We decline to do so.  No private cause of action mirroring that in the Hazleton Ordinance exists in federal law.

178

in IIRA is "inconsistent with or restrained by the Constitution and laws of this Commonwealth," and is invalid.[80] 53 PENN. STAT. § 37403(60).

While the Pennsylvania legislature could add a private right of action to Pennsylvania law that did not violate the federal constitution or disrupt a federal statutory scheme,[81] the distribution of powers between the

---

[80]The City, in its post-trial memorandum, again points to the RICO statute to argue that the private cause of action created by IIRA is not a "'novel'" provision, but is instead one grounded in rights expressly established by federal law.  (Doc. 219 at 87).  Defendant points to the cases cited in the previous footnote and declares that "[p]laintiffs would do well to familiarize themselves with these federal statutes.  The IIRA Ordinance Section 4.E is based upon them." (Id.).  Plaintiffs' post-trial memorandum makes clear that they have familiarized themselves with the private cause of action contained in the RICO statute.  Indeed, unlike the defendant, plaintiffs have recognized the elements required to maintain a private cause of action under the RICO statute.  Defendant fails to recognize that causes of action are not similar simply because both offer the possibility of treble damages for certain violations of immigration laws.

[81]We reject the defendant's contention that IIRA does not disrupt the employer-employee relationship in Pennsylvania because employers are required to examine employee's identification documents by federal law, and because federal law prohibits the knowing employment of an illegal alien.  Citing 8 U.S.C. § 1324.  This argument seems contrary to  the principles of preemption discussed *supra* at part IIA.  If federal law prohibits employment of undocumented workers and provides an enforcement mechanism for doing so, Hazleton's efforts to add new document checks and private rights of action to enforce those provisions of federal law appear to interfere with a scheme already established by federal legislation.  We decline to adopt the argument that a city may avoid restrictions on its action under state law by claiming a right to enforce federal law, especially when that federal law contains no provisions for such enforcement.

179

Commonwealth and subdivisions of the Commonwealth does not permit a municipality to burden the Commonwealth's courts with new causes of action.  Hazleton could argue that the city's power to enforce ordinances permitted the use of this private right of action, but such private causes of action are unnecessary to the city's regulatory scheme.[82]  The city has its own system for enforcing this portion of IIRA and its own penalties for those who employ unlawful workers.  An employer is not found in violation of IIRA by a court decision that grants an "aggrieved worker" compensation for lost wages, but instead after an investigation by the Code Enforcement Office.  We conclude that this private right of action contained in IIRA is simply an attempt to add to the rights workers have in the city, and such action is prohibited by the Third Class City Code and the effort of

---

[82]Indeed, the City's scheme as presently constructed appears inconsistent: an employer is liable to fines from the City only when that employer "knowingly" employs an illegal alien.  Ordinance 2007-6.  The employer may avoid liability by participating in the Basic Pilot program.  Ordinance 2006-18 § 4.B.5.  Under the private right of action, however, the City makes an employer liable to any discharged worker who shows continued employment of an unauthorized worker.  Id. at § 4.E.  That liability applies regardless of whether the employer knew of the violation or not.  Id. at § 4.E.1 (establishing that "[t]he discharge of any employee who is not an unlawful worker by a business entity in the City is an unfair business practice if, on the date of the discharge, the business entity was not participating in the Basic Pilot program and the business entity was not employing an unlawful worker.").  In other words, an employer can comply with IIRA and still be liable to ex-employees under IIRA.

180

Pennsylvania to operate as an at-will employee state.

Accordingly, we find that the provisions of Section 4.E of IIRA that provides a private right of action to discharged worker are *ultra vires* and may not be enforced.  Since provisions of IIRA are severable, our decision on this matter affects only Section 4.E of the IIRA.  See Ordinance 2006-18 at § 6.B (establishing that "[I]f any part of [sic] provision of this Chapter is in conflict or inconsistent with applicable provisions of federal or state statutes, or is otherwise held to be invalid or unenforceable by any court of competent jurisdiction, such part of [sic] provision shall be suspended and superseded by such applicable laws or regulations, and the remainder of this Chapter shall not be affected thereby.").

## B.  Landlord and Tenant Act

Count VI of plaintiffs' second amended complaint asserts a cause of action under Pennsylvania's Landlord and Tenant Act of 1951, 68 PENN. STAT. § 250.101 *et seq*. (hereinafter L/T Act).  Plaintiff argues that the L/T Act is meant to be the sole source of rights, remedies and procedures governing the landlord/tenant relationship in Pennsylvania and municipalities may not alter or supplement the law.  The Hazleton ordinances, according to the plaintiffs, add requirements to landlords and

181

tenants and thus violates the L/T Act.  Defendant contends that the ordinances do not violate the L/T Act.  We agree with the defendant.

Generally, the L/T Act governs the relationship between landlords and tenants including rights and duties for both, and it also provides procedures for eviction.  See, generally, 68 PENN. STAT. §§ 250.101 *et seq.* In addition, the L/T Act provides: "All other acts and parts of acts, general, local and special, inconsistent with or supplied by this act, are hereby repealed.  It is intended that this act shall furnish a complete and exclusive system in itself."  68 PENN. STAT. § 250.602.  Plaintiffs assert that this clause and the remainder of the L/T Act pre-empts the ordinances.

The Pennsylvania Supreme Court, however, has held that the L/T Act sets forth the procedures for eviction and does not address the substantive issue of when a landlord has a right to evict.  Warren v. City of Philadelphia, 115 A.2d 218, 221 (Pa. 1955).  Warren holds that Pennsylvania did not pass the L/T Act pursuant to its police powers; therefore, local municipalities may enact local laws affecting landlord/tenant law pursuant to their police powers as long as those laws do not conflict with the L/T Act. Id. at 221.

Plaintiffs assert that the ordinances do conflict with the L/T Act. After

182

a careful review, we disagree.   Plaintiffs argue that the time frame provided by IIRA conflicts with the L/T Act because it requires that a landlord correct a violation within five (5) days of notice of the violation from Hazleton.  (IIRA § 5.B.(3)).   Under the L/T Act, according to the plaintiffs' calculations - which we accept as true for the purposes of this analysis - a tenant cannot be evicted for a minimum of twenty-three (23) days.  We find no conflict here.   In order to correct a violation under IIRA, the landlord merely has to provide a notice to quit or commence an action for the recovery of possession of the property.  (IIRA § 7.D.).  In other words, the landlord must begin the eviction process within five days, it does not have to be completed within those five days. Thus, the laws do not conflict.

Plaintiff also argues that the Tenant Registration Ordinance conflicts with the L/T Act because it requires a landlord to take reasonable steps to "remove or register" unregistered occupants of apartments within ten (10) days of learning of the unauthorized occupancy.  (RO § 9.b.).  Once again, this section does not conflict with the L/T Act.  It does not require an eviction within ten days, it merely requires that reasonable steps be taken within that period.  Reasonable steps would be steps in compliance with the L/T Act.

183

Next, plaintiffs argue that the Tenant Registration Ordinance violates the L/T Act because it requires additional occupants of a rental unit to obtain the written permission of the landlord and obtain an occupancy permit.  (RO § 10.b.)   Plaintiffs argue that this requirement is in conflict with the L/T Act's because under the L/T Act tenants have a right to invite social guests, family, or visitors for a reasonable period of time.

We agree that the L/T Act permits such visitors.   See 68 PENN. STAT. § 250.504-A.  The Tenant Registration Ordinance, however, does not forbid visitors or guests.  The occupancy permit requirements apply to one who is an "occupant."  "Occupant" is defined in the Ordinance as "a person age 18 or older who resides at a Premises."  (RO § 1.m.).  Thus, it is inapplicable to social guests and visitors and not in conflict with the L/T Act.   For the above reasons, we find that the harboring provisions of IIRA and RO do not violate the L/T Act.

## C. Police powers

Plaintiffs' ninth cause of action is that defendant's ordinances exceed its legitimate police powers.  (Compl. ¶¶ 214-237).  Defendant contends that the passage of the ordinances was a legitimate exercise of its police powers.

184

Generally, a municipality possesses "police powers" that can be used to enact legislation to promote public health, safety and general welfare. Balent v. City of Wilkes-Barre, 669 A.2d 309, 314 (Pa. 1995).

> [T]he police power delegated by the state is not infinite and unlimited. The action taken thereunder must be reasonable, it must relate to the object which it purports to carry out, and it must not invade the fundamental liberties of the citizens. Warren v. Philadelphia, 382 Pa. 380, 115 A.2d 218 (1955); Otto Milk Company v. Rose, 375 Pa. 18, 99 A.2d 467 (1953). It must also be remembered that even legitimate legislative goals cannot be pursued by means which stifle fundamental personal liberty when the goals can be otherwise more reasonably achieved. See Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

Commonwealth v. Sterlace, 354 A.2d 27 (Pa. Commw. Ct. 1976)(finding that  a municipality's ordinance dealing with the distribution of advertising material unconstitutionally burdened the First Amendment).

As we have found that the defendant's ordinances violate the plaintiffs' fundamental rights under the United States Constitution we need not determine whether they are otherwise a valid exercise of its police powers.[83]  In other words, enacting an unconstitutional ordinance is in itself

---

[83]We note that generally, it is "within the mainstream of . . . police power regulation" to prohibit the knowing employment of aliens who are not entitled to permanent residence. DeCanas, 424 U.S. at 356.  Additionally, the Pennsylvania Supreme Court has held that rent and eviction controls are valid exercises of the police power."  Warren v. City of Philadelphia,

a violation of the defendant's police powers.  <u>See</u> <u>id.</u>

Accordingly, we find that plaintiff has prevailed on its ninth cause of action in that the defendant violated its police powers with these ordinances.

**Conclusion**

Federal law prohibits Hazleton from enforcing any of the provisions of its ordinances.  Thus, we will issue a permanent injunction enjoining their enforcement.   With respect to each particular count we conclude as follows:

We find for the plaintiffs on Count I of the complaint.  Federal law pre-empts IIRA and RO.  The ordinances disrupt a well-established federal scheme for regulating the presence and employment of immigrants in the United States.  They violate the Supremacy Clause of the United States Constitution and are unconstitutional.

We find for the plaintiffs on Count II of the complaint as well.  The

---

115 A.2d 218, 220 (Pa. 1955).

Plaintiffs' argument is very fact-based.  They assert that testimony at the trial established that the ordinances do not serve the health safety and welfare of the 'citizens of Hazleton.   We need not address these factual issues to determine that the enactment of the ordinances was in fact an improper exercise of the police powers.

186

Hazleton ordinances violate the procedural due process protections of the Fourteenth Amendment to the United States Constitution.  They penalize landlords, tenants, employers and employees without providing them the procedural protections required by federal law, including notice and an opportunity to be heard.  Our analysis applies to illegal aliens as well as to legal residents and citizens.  The United States Constitution provides due process protections to *all* persons.

We will dismiss Counts III and IV of the complaint regarding Equal Protection and the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.,* respectively.  Neither IIRA nor RO facially discriminate on the basis of race, ethnicity or national origin.

On Count V, which alleges a violation of plaintiffs' right to contract under 42 U.S.C. § 1981, we find for the plaintiffs.  Just as with the Fourteenth Amendment analysis, illegal aliens are "persons" under that statute, and the City may not burden their right to contract more than that of other persons.

Plaintiffs prevail in part on Count VI, which challenges the power of the City under Pennsylvania law to enact the employment-related provisions of IIRA.   The defendant acted *ultra vires* in enacting the portion

of IIRA which creates a private cause of action for a dismissed employee. The City, however, has the power to license businesses in ways that do not violate Pennsylvania law.  Thus, we will dismiss the remaining portion of the count.

We will dismiss Count VII, which challenges the power of the City to enact the housing provisions of the ordinances under the Pennsylvania Landlord Tenant Act, 68 PENN. STAT. §§ 250.101 *et seq.*  The ordinances provide renters the procedural protections the statute requires.

We find that we lack sufficient evidence to make a determination on Count VIII of the complaint, which contends that the Hazleton ordinances violate plaintiffs' privacy rights.  As written, the ordinances are too vague for us to analyze what information will be required from workers and tenants.  We therefore cannot determine whether the ordinances violate plaintiffs' privacy rights.

Plaintiffs prevail on Count IX, which contends that defendant exceeded its police powers.  Defendant exceeded its police powers by enacting unconstitutional ordinances.

Whatever frustrations officials of the City of Hazleton may feel about the current state of federal immigration enforcement, the nature of the

political system in the United States prohibits the City from enacting ordinances that disrupt a carefully drawn federal statutory scheme.  Even if federal law did not conflict with Hazleton's measures, the City could not enact an ordinance that violates rights the Constitution guarantees to every person in the United States, whether legal resident or not.  The genius of our Constitution is that it provides rights even to those who evoke the least sympathy from the general public.  In that way, all in this nation can be confident of equal justice under its laws.  Hazleton, in its zeal to control the presence of a group deemed undesirable, violated the rights of such people, as well as others within the community.  Since the United States Constitution protects even the disfavored, the ordinances cannot be enforced.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PEDRO LOZANO,** | : | **No. 3:06cv1586** |
| **HUMBERTO HERNANDEZ,** | : | |
| **ROSA LECHUGA,** | : | **(Judge Munley)** |
| **JOSE LUIS LECHUGA,** | : | |
| **JOHN DOE 1,** | : | |
| **JOHN DOE 3,** | : | |
| **JOHN DOE 7,** | : | |
| **JANE DOE 5,** | : | |
| **CASA DOMINICA OF HAZLETON, INC.,** | : | |
| **HAZLETON HISPANIC BUSINESS ASSOCIATION, and** | : | |
| **PENNSYLVANIA STATEWIDE LATINO COALITION,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF HAZLETON,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>VERDICT</u>

**AND NOW**, to wit, this 26th day of July 2007, we hereby **DECLARE**

that Hazleton Ordinance Nos. 2006-18, 2006-40 and 2007-6 (hereinafter

"IIRA") and Hazleton Ordinance No. 2006-13, (hereinafter "RO"), are

unconstitutional.  We **PERMANENTLY ENJOIN** the defendant from

enforcing IIRA and RO.

All the plaintiffs have standing to pursue this action except Rosa

Lechuga and Jose Luis Lechuga.  The Lechugas lack standing because this lawsuit would not remedy the injury they have suffered.[84]

Due to the unique nature of the issues in this lawsuit, the intense public interest in the outcome and the public antipathy expressed towards participants in the case, the unnamed plaintiffs are allowed to proceed anonymously.

We have addressed the ordinances as amended through March 2007.  The ordinances in their amended versions do not eliminate the grounds for plaintiffs' constitutional challenges.

With regard to each count of the complaint, our verdict is as follows:

Count I, the Supremacy Clause, we find **FOR PLAINTIFFS**. Federal law pre-empts IIRA and RO.

Count II, Due Process, we find **FOR PLAINTIFFS**.  IIRA and RO violate the procedural due process protections of the Fourteenth Amendment to the United States Constitution.

Counts III and IV, Equal Protection and the Fair Housing Act, 42 U.S.C. § § 3601, *et seq.,* respectively, are **DISMISSED**.  Neither IIRA nor

---

[84]Plaintiff Humberto Hernandez is dismissed as plaintiffs have presented no evidence regarding him.

RO facially discriminate on the basis of race, ethnicity or national origin.

Count V, 42 U.S.C. § 1981, we find **FOR PLAINTIFFS**.  Illegal aliens are "persons" under 42 U.S.C. § 1981. IIRA and RO impermissibly burden their right to contract.

Count VI, Home Rule Charter Law, we find partially **FOR PLAINTIFFS**, and we **DISMISS** partially.  We find **FOR PLAINTIFFS** with regard to the portion of IIRA which creates a private cause of action for a dismissed employee. With regard to the other portions of IIRA and RO, defendant did not act beyond its municipal powers, and we **DISMISS** that portion of the count.

Count VII, Pennsylvania Landlord and Tenant Act, 68 PENN. STAT. §§ 250.101 *et seq* is **DISMISSED**.  Neither IIRA nor RO violate the procedural protections required under the Landlord and Tenant Act.

Count VIII, privacy rights, is **DISMISSED**.  We lack sufficient evidence to make a determination with regard to plaintiffs' privacy rights.

Count IX, police powers, we find **FOR PLAINTIFFS**.  Enacting unconstitutional laws is beyond the defendant's police powers.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

## APPENDIX

HISTORY OF IMMIGRATION REGULATION IN AMERICA

The history of federal regulation of immigration is one of a transformation from a largely open system to one where federal rules govern nearly every aspect of the immigrant experience, from the conditions under which new residents may enter to the terms under which they may labor.  Prior to the end of the nineteenth century, immigration restriction was minimal: the government "counted the number of immigrants for statistical purposes, and it decreed certain minimum living conditions aboard ship."  JOHN HIGHAM, STRANGERS IN THE LAND:  PATTERNS OF AMERICAN NATIVISM, 1860-1925, 43 (1983); see also SUCHENG CHAN, *European and Asian Immigration into the United States in Comparative Perspective, 1820s to 1920s*, in IMMIGRATION RECONSIDERED: HISTORY, SOCIOLOGY AND POLITICS, 62 (Virginia Yans-McLaughlin, ed.,1990) (finding that "[e]xcept for the sedition laws passed in the early years of the republic, the United States had no immigration laws until 1875, when prostitutes and convicts were excluded.").[85]  In 1882, Congress denied entry to "convicts,

---

[85]Although this does not signify that all groups immigrating to America before the late nineteenth century were welcomed.  From the

193

lunatics, idiots, and persons likely to become a public charge." Id.  This law added to the basic restrictions first instituted by the federal government in 1875, when Congress excluded from entry "persons convicted of 'crimes involving moral turpitude' and prostitutes."  MAE M. NGAI, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA, 59 (2004).

Though these federal laws restricted who could enter the United States, they did not place any numerical quotas or absolute restrictions on any class of persons.  Reflecting a society dominated by the proposition that racial identity determined one's capacity to participate in society, however, late nineteenth-century immigration law enacted much more robust restrictions on immigration from countries identified by contemporary ideology as populated by "inferior" races.[86]  Years of

_____

earliest colonial settlements in the 1600s, more-established residents often reacted negatively to immigrants perceived as different or in some way threatening.

[86]Congress often aimed such legislation at Asians.  Examples include:  the 1882 Chinese Exclusion Act; the "Gentlemen's Agreement of 1907," which prevented the immigration of Japanese men; and the 1924 Immigration Act's exclusion of  "aliens ineligible for citizenship," which included "peoples of all the nations of East and South Asia."  Ngai at 37.  An 1877 Congressional Report on the proposed Chinese Exclusion Act demonstrates the racial attitudes that drove these policies: the report contended that "'[t]here is not sufficient brain capacity in the Chinese race to furnish motive power for self-government.  Upon the point of morals, there is no Aryan or European race which is not far superior to the

agitation led to new restrictions on who could enter the United States in the

years during and after the First World War.[87]   In 1917, Congress restricted

---

Chinese."  Kitty Calavita, *The Paradoxes of Race, Class, Identity, and "Passing": Enforcing the Chinese Exclusion Acts, 1882-1910*, 25 LAW & SOC. INQUIRY 1, 4.

[87]This opposition to immigration came from a wide variety of groups and perspectives.  Labor unions, fearful that immigrants drove down wages, frequently agitated for restrictions on entry, though their positions were equivocal; many union leaders–like Samuel Gompers of the American Federation of Labor–were immigrants or deeply connected to the immigrant experience.  Higham at 70-72.  The Ku Klux Klan, originally organized in the South after the Civil War to intimidate black voters, reappeared in northern areas in 1915 to take part in the debate about immigration, arguing for restrictions.  See Higham, 286-99.  This version of the Klan, unlike "the first Klan, which admitted white men of every type and background . . . accepted only native-born Protestant whites and combined an anti-Negro with an increasingly anti-foreign outlook."  Id. at 288.  Other groups argued that immigrants were responsible for crime and disorder in America's rapidly growing cities, and that social order and control required restrictions on who could enter the country.  See, e.g. Higham at 90 (finding that "[a]nti-foreign sentiment filtered through a specific ethnic stereotype when Italians were involved; for in American eyes they bore the mark of Cain.  They suggested the stiletto, the Mafia, the deed of impassioned violence.").  Finally, some contended that immigrants, particularly those who were from southern and eastern Europe and were Catholic or Jewish, were diluting American culture by undermining its traditional bases.  See Higham at 95-96 (establishing that "[h]ardly had the new [southern and eastern European] immigration begun to attract attention when race-conscious intellectuals discovered its hereditary taint.  In 1890 the Brahmin president of the American Economic Association alerted his fellow scholars to the new tide of 'races . . . of the very lowest stage of degradation.'  About the same time [U.S. Senator] Henry Cabot Lodge noticed the shift away from northwestern Europe and began to bristle at its racial consequences.").   See also Ngai, IMPOSSIBLE SUBJECTS at 93 (finding that "[t]he Johnson-Reed Immigration Act of 1924 was

immigration by political radicals[88] and imposed a literacy test on those

seeking entry.[89]  Higham at 202.  The 1921 Immigration Act tightened

restrictions on immigration, establishing "the first sharp and absolute

numerical restrictions on European immigration" in United States history

and implementing "a nationality quota system based on the pre-existing

composition of the American population."  Id. at 311.  These attempts at

restricting immigration culminated in the Immigration Act of 1924, which

capped yearly entries into the United States at 150,000, with quotas

assigned to each country based on two percent of the foreign-born

individuals of each nationality in the United States in 1890.  RONALD

TAKAKI, STRANGERS FROM A DIFFERENT SHORE: A HISTORY OF ASIAN

---

motivated primarily by political concerns over the country's ethnic and racial composition, but economic factors were still relevant.").

[88]The law "exclude[d] from the United States not only individual advocates of violent revolution but also those who advocated sabotage or belonged to revolutionary organizations; [and] second, [determined] to deport any alien who at any time after entry was found preaching such doctrines."  Higham at 202.

[89]The literacy test prevented entry for "adult immigrants unable to read a simple passage in some language," with only two exceptions: "[a]n admissible alien might bring in members of his immediate family despite their illiteracy, and in the interest of Russian Jews the same exemption applied to all aliens who could prove they were fleeing from religious persecution . . . refugees from political prosecution received no such exemption."  Higham at 203.

AMERICANS, 209 (2d ed., 1998).  The Act also excluded "aliens ineligible for citizenship" from entry, adding Japanese people to the list of those who were excluded from immigrating altogether.[90]  The Act did not, however, restrict immigration from Mexico or other countries in the Western Hemisphere, though it did establish regulations for entry.[91]  Ngai, IMPOSSIBLE SUBJECTS at 50.

Historian Mae Ngai has noted that passage of the 1924 act meant

---

[90]Previous laws had excluded Chinese and Asian Indian immigrants from entering the United States; the 1924 Act simply solidified these efforts to restrict Asian immigration.  Takaki at 209.  Because the Philippines became a United States possession after the 1898 war with Spain, however, the act did not restrict Filipino migration to Hawaii or the United States mainland.  Filipino migration therefore increased dramatically after 1924 as more jobs became available.  Ngai at 103.  In 1930, 56,000 Filipinos, most of them men, lived on the west coast.  Id.  That number represented a tenfold increase from 1920.  Id.  Their presence sometimes led to violence from locals.  In 1927, a Washington apple grower brought eleven Filipino workers he hired to a local jail for protection after he learned that white people had threatened to "'deport'" them.  Id. at 105.  At the same time, more than 500 Filipinos left the Yakima Valley region "after white residents threatened to attack them."  Id.

[91]According to historian Mae Ngai, "while practicing exclusion toward Asia and restriction toward Europe, Congress imposed no practical restrictions on immigration from the countries of the Western Hemisphere."  Ngai continues to say that many nativistic Americans, however, supported exclusion or restriction of Mexican immigrants, who were considered part of an "unstable 'mongrel race.'"  Mae Ngai, *The Lost Immigration Debate: Border Control Didn't Always Dictate Policy*, 3, BOSTON REVIEW (September/October 2006).  Retrieved July 23, 2007 from http:/bostonreview.net/BR31.5/ngai.html.

"that numerical restriction created a new class of persons within the national body–illegal aliens–whose inclusion in the nation was at once a social reality and a legal impossibility."  Ngai, IMPOSSIBLE SUBJECTS at 57. Much of federal immigration law in subsequent decades would be aimed at identifying and controlling these illegal residents, provisions not previously present in American law.[92]  Before the changes brought by the immigration regulation of the 1910s and 1920s, the process of entering the United States as an immigrant was fairly simple, if invasive: an immigrant need only present herself at the border for inspection.[93]  Once immigrants

---

[92]We note that the descendants of non-Asian immigrants who entered this country before the restrictions of the 1920s who condemn present-day illegal immigrants by pointing out that "when my relatives came to this country, they followed the law" ignore one very crucial fact: virtually no law existed to prevent anyone from entering the country prior to that period.  No federal crime for unauthorized entry existed until 1929. See Ngai, IMPOSSIBLE SUBJECTS at 60.

[93]Historian Mae Ngai notes that Mexican immigrants were still subject to immigration requirements in the 1924 law, which included presentation of a passport or visa; payment of a head tax; and inspection at entry. Ngai, *Lost Immigration Debate* at 4.  Ngai describes this process as it occurred for Mexicans seeking to enter the United States in a later period: "[inspection at the Mexican border involved a degrading procedure of bathing, delousing, medical-line inspection, and interrogation.  The baths were new and unique to Mexican immigrants, requiring them to be inspected while naked, have their hair shorn, and have their clothing and baggage fumigated.  Line inspection, modeled after the practice formerly used at Ellis Island, required immigrants to walk in single file past a medical officer."  Ngai, IMPOSSIBLE SUBJECTS at 68.

cleared this initial hurdle (represented to many by Ellis Island), they were

free to enter the country, and did not need to carry any documents or do

anything to prove particular status.[94]  The passage of quotas and other

restrictions on immigration, however, meant that the status of many aliens

in the United States had become far from clear.[95]  Much of the subsequent

history of American immigration law is the history of an attempt to

determine the status of aliens living in the United States.[96]  Only in 1929

---

[94]One notable exception would be Chinese immigrants who had fraudulently obtained reentry certificates or become "paper sons."

[95]Mae Ngai points out that after the 1924 Act, "many Mexicans entered the United States through a variety of means that were not illegal but comprised irregular, unstable categories of lawful admission, making it more difficult to distinguish between those who were lawfully in the country and those who were not."  Ngai, IMPOSSIBLE SUBJECTS at 70.

[96]This situation was reflected by the changing role that deportation played in federal policy.  An 1875 federal law that excluded convicts and prostitutes from entry failed to "provide for their deportation except as an immediate part of the exclusion process."  Daniel Kanstroom, *United States Immigration Policy at the Millenium: Deportation, Social Control, and Punishment: Some Thoughts About Why Hard Laws Make Bad Cases*, 113 HARV. L. REV. 1889, 1909 (2000).  Only in 1891 did Congress pass legislation providing for the deportation of aliens who became public charges within a year of their arrival, provided that the condition that caused the alien's hardship existed prior to arrival in the country.  Ngai, IMPOSSIBLE SUBJECTS at 59.  The steamship companies that had carried such an immigrant to the country was liable for the cost of the immigrant's return.  Id.  Congress otherwise established no means or funding for deportation.

did the United States first provide penalties for unlawful entry, making the

first such entry a misdemeanor punishable by up to a year in jail or a

$1,000 fine and the second offense a felony, punishable by two years

imprisonment or a $2,000 fine.  Ngai, IMPOSSIBLE SUBJECTS at 60.

Congress made occasional changes to this immigration system over

the next forty years,[97] but the use of quotas and the principal of national

exclusion remained central to the federal scheme.  The most fundamental

---

[97]Examples of such changes include: the establishment of contract labor programs involving West Indian agricultural laborers in the Southeast, Puerto Rican agricultural workers in the Northeast (who were U.S. citizens) and the well-known *Bracero* Program, by which 4.6 million Mexican workers traveled to the United States to work in agriculture between 1942 and 1964 (Ngai, IMPOSSIBLE SUBJECTS at 138-39); the end of Chinese exclusion in 1943 (Id. at 204); the Chinese Confession Program that began in 1956 and allowed Chinese persons who confessed that they "had entered the country by fraudulent means" the opportunity to adjust their status (under law current at the time seven years of continuous United States residency or ninety days service the armed forces could lead to permanent residency) (Id. at 218); the 1948 Displaced Persons Act, which "provided for the admission of 202,000 European refugees over two years" (Id. at 236); the 1952 McCarran-Walter Act, which "brought many fragments of the nation's immigration and naturalization laws under a single code," capped immigrants at 155,000 per year under the quota system, maintained the national origins basis for national quotas, imposed quotas on former British colonies in the Caribbean and lifted restrictions on Japanese and Korean immigration (Id. at 238); and the asylum extended by the United States government to Vietnamese "boat people" in the 1970s.  Aristide R. Zolberg, *Reforming the Back Door: The Immigration Reform and Control Act of 1986 in Historical Perspective*, 322, *in* IMMIGRATION RECONSIDERED (YANS-MCLAUGHLIN, ed.).

change in federal regulation of immigration came with the passage of the

Immigration Act of 1965.  This act abolished the national-origins quotas

established in the 1924 act and allowed an annual admission of 170,000

Immigrants from the Eastern Hemisphere and 120,000 from the Western.

Takaki, at 419.  The restrictions on immigration for the Western

Hemisphere represented a radical change in restrictions on immigration

from that part of the world.[98]  Ngai, IMPOSSIBLE SUBJECTS at 258.  The law

still provided for national quotas, but distributed them equally, not on the

basis of previous immigration in particular years.  Takaki at 419.  The law

also exempted from the quota spouses, minor children and parents of

United States citizens.  Id.  Immigrants would be admitted according to

certain preference categories for adult family members, professionals,

workers for unfilled positions and refugees.  Id.   These changes led to an

even more active role for the federal government in investigating and

determining the status of immigrants, since "strict positive certification was

---

[98]Ngai notes that a change in the law in 1976 that assigned a 20,000 annual-immigrant quota to all countries in the western hemisphere "recast Mexican migration as 'illegal.'  When one considers that in the early 1960s annual 'legal' Mexican migration comprised 200,000 braceros and 35,000 regular admissions for permanent residency, the transfer of migration to 'illegal' form should have surprised no one."  Ngai, IMPOSSIBLE SUBJECTS at 261.

required to ensure that they would not compete with Americans." Aristide R. Zolberg, *Reforming the Back Door: The Immigration Reform and Control Act of 1986 in Historical Perspective*, 320, in IMMIGRATION RECONSIDERED (YANS-MCLAUGHLIN, ed.). Still, the 1965 Act represented a major change in the focus of immigration policy from a race-based policy to one that: "clearly institutionalized family reunion as the leading principle governing general immigration." Id.[99]

Congress extended its reach over the lives of aliens in the United States with the 1986 Immigration Reform and Control Act ("IRCA"). The Act established sanctions for employers who hired illegal aliens, providing a civil penalty of $250 to $2,000 for each worker hired and criminal

---

[99]Congress has established other means by which potential immigrants can enter the country outside of the established immigration-regulation measures. The most prominent of these is asylum, "which offers permanent protection for aliens who fear future persecution, or who have suffered past persecution, in their home country." Patricia A. Seith, *Note: Escaping Domestic Violence: Asylum as a Means of Protection for Battered Women*, 97 COLUM. L. REV. 1804, 1816 (1997). A person seeking asylum must file an application with Immigration and Customs Enforcement after arrival in the United States. Id. An officer reads the application and interviews the applicant. Id. If the applicant does not convince this officer to grant him asylum, he is generally referred to an immigration judge for removal. Id. at 1816-17. An applicant who faces an unfavorable decision can appeal to the Board of Immigration Appeals, and eventually to the federal courts. Id. at 1817. That process might take years. Id.

penalties for a "pattern and practice" of illegal hiring, including a fine of up

to $3,000 and six month prison sentences.  Zolberg at 334.  Such

employers also had to verify the immigration status of all job applicants.  Id.

at 335.  The Act also provided a means for illegal aliens to obtain amnesty

by "apply[ing] for legal status within an eighteenth-month period starting six

months after the bill became law."  Id. at 334.[100]

During the 1990s Congress implemented procedures to limit the

rights of aliens to court review of administrative determinations of their

status.  The Anti-terrorism and Effective Death Penalty Act ("AEDPA") of

1996 "eliminated judicial review of deportation and exclusion orders for

noncitizens convicted of 'aggravated felonies.'" Lenni B. Benson, *Back to*

*the Future: Congress Attacks the Right to Judicial Review of Immigration*

*Proceedings*, 29 CONN. L. REV. 1411, 1412.  The act also removed a long-

established waiver of deportability for long-term lawful United States

---

[100]Gloria Sandrino-Glasser describes the provisions of IRCA as: "(1) legalization of undocumented immigrants residing in the U.S. continuously since 1982; (2) sanctions for employers who hire undocumented aliens; (3) reimbursement of governments for added costs of legalization; (4) screening of welfare applicants for migration status; and (5) special programs to bring in agricultural laborers." Gloria Sandrino-Glasser, *Los Confundidos: De-Conflating Latinos/as' Race and Ethnicity*, 19 CHICANO-LATINO L. REV. 69 at n.38.

residents.  Id. at 1412.  That same year, Congress placed new restrictions on immigration and review of agency removal decisions in the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRAIRA").  Id. That legislation increased resources for enforcement of the immigration laws, made more aliens eligible for deportation or exclusion, limited agency discretion to change immigrants' status and increased the penalties for violating immigration laws.  Peter J. Spiro, *Learning to Live with Immigration Federalism*, 29 CONN. L. REV. 1627, 1633 (1997).  That act also limited review of deportation orders in certain circumstances, particularly those who had been convicted of certain crimes or based their petition on certain "disfavored claims."[101]  Id. at 1645.

---

[101]The most important provisions of this act in relation to review of immigration status included "new, and more restrictive, procedures for the granting of discretionary waivers of removal on hardship grounds . . . new grounds of excludability (now called 'inadmissibility') and deportability, some of them designed to visit more lasting disabilities on former illegal aliens . . .substantially revised the procedures and criteria for granting asylum to refugees . . . made deep inroads on the availability of judicial review, both in individual cases and in class litigation . . . imposed massive reliance on detention of aliens who may be subject to removal . . . established new procedures for the 'expedited removal' of certain categories of arriving aliens . . . revised . . . benefits restrictions and affidavit of support procedures, and expanded the exclusion ground for aliens deemed likely to become a public charge." Gerald L. Neuman, *Symposium: Admissions and Denials: A Dialogic Introduction to the Immigration Law Symposium*, 29 CONN. L. REV. 1395, 1396-97 (1997).

The history of federal regulation of immigration, then, is one of the creation of an intricate and complex bureaucracy that restricted who could immigrate to the United States and under what terms.  Those immigration regulations have also come to define the conditions under which aliens can find employment in the country.  The creation of this complex federal bureaucracy not only altered the role of the federal government in relation to immigration; it also transformed the status of immigrants in American society.  A foreign-born person in the United States in 1870 had a presumptively legal status; no careful legal inquiry was required to determine whether that person had a right to reside in the country.  By 1990, however, determining whether a foreign-born person enjoyed a legal right to remain in the United States demanded a detailed legal examination that involved numerous federal statutes, several adjudicatory bodies, and a

―――――――――――

The IIRAIRA also permitted states to develop "pilot programs under which undocumented aliens are denied driver's licenses" and allowed the Attorney General of the United States "to deputize state and local authorities to enforce federal immigration law."  Spiro at 1645.  The Personal Responsibility Act, passed at around the same time as this other legislation, permitted "the states to extend certain benefits to aliens at their option.  With respect to federally funded Medicare and what is colloquially known as 'welfare' (now called 'temporary assistance to needy families'), states may make independent determinations on the eligibility of legal resident aliens." Id. at 1637.

number of appeals and exceptions.  More than one hundred years of federal regulation have made the federal supremacy over immigration an intricate affair.